## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

THE WESTERN AND SOUTHERN LIFE
INSURANCE COMPANY
400 Broadway, MS32
Cincinnati, OH 45202

and

WESTERN-SOUTHERN LIFE ASSURANCE
COMPANY
400 Broadway, MS32
Cincinnati, OH 45202

and

COLUMBUS LIFE INSURANCE COMPANY
400 Broadway, MS32
Cincinnati, OH 45202

and

INTEGRITY LIFE INSURANCE COMPANY
400 Broadway, MS32
Cincinnati, OH 45202

and

NATIONAL INTEGRITY LIFE INSURANCE
COMPANY
400 Broadway, MS32
Cincinnati, OH 45202

and

FORT WASHINGTON INVESTMENT
ADVISORS, INC. on behalf of FORT
WASHINGTON ACTIVE FIXED INCOME LLC
400 Broadway, MS32
Cincinnati, OH 45202

      Plaintiffs,

    v.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. A 1 1 0 4 8 1 7

Judge _____

14

**COMPLAINT**

**JURY TRIAL DEMANDED**



D93558091 IN1

FILED
2011 JUN 22 P 3: 53

JPMORGAN CHASE BANK, N.A.                    :
270 Park Ave.                                :
New York, NY  10017-2014                     :
                                             :
                                             :
       SERVE ALSO:                           :
       Anthony J. Horan, Secretary           :
       Registered Agent                      :
       270 Park Avenue, 35th Floor           :
       New York, NY  10017-2014              :

and                                          :
                                             :
J.P. MORGAN MORTGAGE ACQUISITION             :
CORPORATION                                  :
270 Park Ave.                                :
New York, NY  10017-2014                     :
                                             :
                                             :
       SERVE ALSO:                           :
       The Corporation Trust Company         :
       Registered Agent                      :
       Corporation Trust Center              :
       1209 Orange Street                    :
       Wilmington, DE  19801                 :
                                             :
and                                          :
                                             :
J.P. MORGAN SECURITIES LLC                   :
270 Park Ave.                                :
New York, NY  10017-2014                     :
                                             :
                                             :
       SERVE ALSO:                           :
       The Corporation Trust Company         :
       Registered Agent                      :
       Corporation Trust Center              :
       1209 Orange Street                    :
       Wilmington, DE  19801                 :
                                             :
and                                          :

ii

J.P. MORGAN ACCEPTANCE CORPORATION I
270 Park Avenue
New York, NY 10017

    SERVE ALSO:
    The Corporation Trust Company
    Registered Agent
    Corporation Trust Center
    1209 Orange Street
    Wilmington, DE 19801

and

WASHINGTON MUTUAL MORTGAGE
SECURITIES CORP.
1201 3rd Ave.
Seattle, WA 98101-3029

    SERVE ALSO:
    The Corporation Trust Company
    Registered Agent
    Corporation Trust Center
    1209 Orange Street
    Wilmington, DE 19801

and

WAMU CAPITAL CORPORATION
1201 3rd Ave.
Seattle, WA 98101-3029

    SERVE ALSO:
    CT Corporation System
    Registered Agent
    1801 West Bay Dr., NW
    Ste. 206
    Olympia, WA 98502

and

iii

C  WAMU ASSET ACCEPTANCE CORPORATION
1201 3rd Ave.
Seattle, WA 98101-3029                              :
                                                    :
     C  <u>SERVE ALSO:</u>                          :
        The Corporation Trust Company               :
        Registered Agent                            :
        Corporation Trust Center                    :
        1209 Orange Street                          :
        Wilmington, DE 19801                        :
                                                    :
                    Defendants.                     :



## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| NATURE OF ACTION | | 1 |
| PARTIES | | 5 |
| I. | Plaintiffs | 5 |
| II. | JPMorgan Defendants | 6 |
| III. | WaMu Defendants | 8 |
| JURISDICTION AND VENUE | | 10 |
| SUBSTANTIVE ALLEGATIONS | | 11 |
| I. | The Market for Residential Mortgage-Backed Securities | 11 |
| | A. The Securitization Process | 13 |
| II. | Western & Southern's Purchases of Defendants' Certificates | 15 |
| III. | Defendants Abandoned Their Disclosed Underwriting Standards to Facilitate The Sale of Low-Quality Loans to Investors | 21 |
| | A. Defendants' Representations That the Securitized Loans Were Underwritten According to Prudent Underwriting Standards and Practices | 21 |
| | 1. JPMorgan Defendants' Representations | 22 |
| | a. JPMALT 2005-S1 | 22 |
| | b. JPMMT 2005-S3 | 29 |
| | c. JPMAC 2006-WF1 | 35 |
| | d. JPMAC 2007-CH1 | 37 |
| | 2. WaMu Defendants' Representations | 39 |
| | a. WMALT 2005-7 | 39 |

b. WMALT 2005-9 ................................................................40

c. WMALT 2006-4 ................................................................42

d. WMALT 2006-5 ................................................................43

e. WMALT 2006-4 ................................................................45

f. WMALT 2007-OA3 ...........................................................47

IV. Defendants Abandoned Underwriting Standards to Generate a Large Volume of Loans for Securitization and Sale to Investors ..................................................48

A. Widespread Defaults Confirm Defendants Abandoned The Disclosed Underwriting Standards .....................................................................50

B. Defendants' Own Documents and Testimony Confirm They Abandoned Their Underwriting Standards ......................................56

1. JPMorgan Securitizations ...........................................................56

a. Wells Fargo Originated Loans ...........................................58

2. WaMu Securitizations ................................................................60

V. Misrepresentations Concerning Transfer of Title to the Issuing Trusts ....................................................................................67

VI. Scienter Allegations Applicable to Common Law Fraud Claims .........................71

VII. Western & Southern's Detrimental Reliance and Damages ..................................73

VIII. Liability of the Sponsors, Depositors, and Underwriters as Sellers of Securities to Western & Southern ............................................................................74

IX. Liability of the JPMorgan Sponsor and Depositor as Control Persons ................76

A. JPM Mortgage Acquisition .........................................................76

B. JPMAC ........................................................................................76

FIRST CAUSE OF ACTION (Violation of ORC § 1707.41) ............................................77

SECOND CAUSE OF ACTION (Violation of ORC § 1707.44(B)(4)) .......................................78

THIRD CAUSE OF ACTION (Violation of ORC § 1707.44(J)) ...........................................78

FOURTH CAUSE OF ACTION (Violation of ORC § 1707.44(G)) ..............................................79

FIFTH CAUSE OF ACTION (Rescission pursuant to ORC § 1707.43) ....................................80

SIXTH CAUSE OF ACTION (Negligent Misrepresentation) ...................................................80

SEVENTH CAUSE OF ACTION (Common-Law Fraud) ..........................................................82

EIGHTH CAUSE OF ACTION (Violation of Section 11 of the 1933 Act) ...............................83

NINTH CAUSE OF ACTION (Violation of Section 12(a)(2) of the 1933 Act).........................85

TENTH CAUSE OF ACTION (Violation of Section 15 of the 1933 Act) .................................87

PRAYER FOR RELIEF ...........................................................................................................88

JURY TRIAL DEMANDED ......................................................................................................89

The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company and Fort Washington Investment Advisors, Inc. (collectively, "Western & Southern"), by and through their attorneys, bring this action against JPMorgan Chase Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation; J.P. Morgan Securities LLC; J.P. Morgan Acceptance Corporation I (collectively, the "JPMorgan Defendants"); WaMu Asset Acceptance Corporation; WaMu Capital Corporation; and Washington Mutual Mortgage Securities Corporation (collectively, the "WaMu Defendants" and together with the JPMorgan Defendants, "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities (the "Certificates") to Western & Southern. The Certificates were sold pursuant to public filings and offering materials that contained untrue statements and omissions of material facts, in violation of Sections 1707.41 and 1707.44 of the Ohio Revised Code and, with respect to certain Certificates, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"). Western & Southern further states claims for common-law fraud and/or negligent misrepresentation against certain Defendants.

2.      The Certificates were created and sold pursuant to four securitizations structured by the JPMorgan Defendants, and six securitizations structured by the WaMu Defendants.

3.      The JPMorgan Defendants significantly increased their origination and securitization of mortgage loans – particularly non-prime loans – starting in 2003. Between 2004 and 2005, their securitization of residential mortgage loans grew more than fivefold, from approximately $4.5 billion to $24 billion.

4.    The WaMu Defendants similarly began to increase their origination and securitization of riskier loans around 2003. From 2003 to 2004, the WaMu Defendants increased their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion. By the end of 2006, this figure had almost tripled again to $29 billion.

5.    In marketing the Certificates to Western & Southern, Defendants represented that the loans backing the securities were underwritten in accordance with prudent underwriting standards designed to ensure that borrowers could repay the loans. These representations were material to Western & Southern's decision to purchase the Certificates. Defendants were the exclusive source of information regarding the loans backing the Certificates. Unlike Defendants, Western & Southern did not have access to loan files. Western & Southern therefore depended on Defendants to verify that the information presented to it and other investors was true and accurate.

6.    In reality, however, the loans backing the Certificates deviated substantially from what the Defendants represented to Western & Southern. To generate substantial volumes of loans to sell to investors, Defendants abandoned or disregarded disclosed underwriting guidelines, often originating or acquiring loans issued to borrowers regardless of the borrowers' ability to repay. The loans were issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification.

7.    The JPMorgan Defendants systematically abandoned underwriting standards in their quest to generate and securitize more mortgage loans. James Dimon, the Chief Executive Officer of JPMorgan Chase & Co., the direct or indirect parent company of the JP Morgan Defendants, admitted that "the underwriting standards of our mortgage business should have

2

been higher." He further added that the JPMorgan Defendants had originated and securitized "bad products" that were pushed on borrowers by "unscrupulous mortgage salesmen and mortgage brokers." These admissions are confirmed by an internal Chase Home Finance, LLC memorandum from the relevant time period that outlined "cheats and tricks" for brokers to gain approval for risky loan products.

8.     The WaMu Defendants likewise discarded internal risk guidelines in order to increase their production and securitization of mortgage loans. In its report on the financial crisis dated April 13, 2011, the Senate Permanent Subcommittee on Investigations ("PSI") devoted over 100 pages to a case study of the WaMu Defendants' misconduct in the issuance of mortgage-backed securities ("MBS"). The PSI described its case study as "how one bank's strategy for growth and profit led to the origination and securitization of hundreds of billions of dollars in poor quality mortgages that undermined the U.S. financial system."

9.     The facts reported by the PSI may be summarized as follows: the WaMu Defendants "engaged in shoddy lending practices that contributed to a mortgage time bomb." Motivated by the goal of becoming a "dominant sub-prime lender" and earning increased fees in connection with its securitizations, the WaMu Defendants delved into ever-riskier loan products while ignoring its underwriting and due diligence procedures. And the WaMu Defendants off-loaded much of the risk to investors like Western & Southern.

10.     The WaMu Defendants consistently sacrificed loan quality in its pursuit of increased market share. In a WaMu internal newsletter dated October 31, 2005 – but made public only recently – risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan. Melissa Martinez,

3

WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes. A former Senior Mortgage Underwriter, who worked at WaMu from 2003 until 2007, explained that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?"

11.  An internal WaMu review discovered that "an extensive level of loan fraud exist[ed] . . . virtually all of it stemming from employees in those areas circumventing bank policy surrounding loan verification and review." When later asked about these types of incidents during a Congressional hearing, a former WaMu executive in charge of securitizations admitted: "I understood there was fraud." Indeed, recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, Washington Mutual Bank ("WaMu Bank") started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans. WaMu made a conscious decision to off-load these loans through securitizations and sales to investors.

12.  Defendants' systemic disregard for their underwriting guidelines contrasts starkly with Defendants' representations in the relevant offering materials that the loans backing the securities were underwritten in accordance with prudent underwriting standards designed to ensure that borrowers could repay the loans.

13.  All of the Certificates purchased by Western & Southern were triple-A rated, or the equivalent, at the time of Western & Southern's investment. Now they do not even qualify as investment grade. They are "junk." In a majority of the 10 securitizations in which Western & Southern purchased Certificates, over 40% of the loans backing the securities have now

4

defaulted, have been foreclosed upon, or are delinquent. Indeed, the defaults, foreclosures, and delinquencies have reached more than 48% in some securitizations. Under the Ohio Securities Act, Western & Southern is entitled to rescind its purchase of these securities and/or recover appropriate damages. Similar relief is also available under the 1933 Act and/or common law fraud and negligent misrepresentation.

## PARTIES

### I.    Plaintiffs

14.    Plaintiff Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life insurance and annuity products.

15.    Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life insurance and annuity products.

16.    Plaintiff Columbus Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life, accident and health insurance and annuity products.

17.    Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life, accident and health insurance and annuity products.

18.    Plaintiff National Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of New York, with its principal place of business in Goshen, New York. It sells life, accident and health insurance and annuity products.

National Integrity Life Insurance Company is a wholly-owned subsidiary of Integrity Life Insurance Company.

19.    Fort Washington Investment Advisors, Inc. is a registered investment advisor formed under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio. Fort Washington Investment Advisors brings this action on behalf of Fort Washington Active Fixed Income LLC, a Delaware limited liability company with its principal place of business in Cincinnati, Ohio.

## II.    JPMorgan Defendants

20.    *JPMorgan Seller/Sponsor Defendant*.   Defendant J.P. Morgan Mortgage Acquisition Corp. ("JPM Mortgage Acquisition") is a Delaware corporation with its principal place of business in New York, New York. JPM Mortgage Acquisition is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A. JPM Mortgage Acquisition served as the Sponsor and Seller with regard to each of the four JPMorgan securitizations at issue.

21.    *JPMorgan Underwriter Defendant.*   Defendant J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place in New York, New York. J.P. Morgan Securities LLC is the successor-in-interest to J.P. Morgan Securities Inc., which converted to a limited liability company on or about September 1, 2010. J.P. Morgan Securities Inc. and its successor-in-interest, J.P. Morgan Securities LLC, are referred to herein as "J.P. Morgan Securities." J.P. Morgan Securities engaged in investment banking activities in the United States and was the primary nonbank subsidiary of JPMorgan Chase & Co. ("JPMorgan Chase"). J.P. Morgan Securities acted as the Underwriter for each of the four JPMorgan securitizations at issue. As such, J.P. Morgan Securities participated in the drafting and

6

dissemination of the prospectus supplements pursuant to which all of the JPMorgan Certificates were sold to Western & Southern.

22.     *JPMorgan Depositor Defendant.*   Defendant J.P. Morgan Acceptance Corporation I ("JPMAC") is a Delaware corporation with its principal place of business in New York, New York.  JPMAC is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC.  JPMAC was the Depositor for each of the four JPMorgan securitizations at issue.

23.     *JPMorgan Originator Defendant.*   Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase, and a Delaware corporation.  Its main office is located in New York, New York.  JPMC Bank is a commercial bank that is chartered, and its business is subject to examination and regulation by the Officer of the Comptroller of Currency ("OCC").  It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").  JPMC Bank originated and/or acquired loans securitized in three of the four JPMorgan securitizations at issue in this case.  JPMC Bank is also a defendant in this action as the successor-in-interest to Washington Mutual Bank.

24.     *Relevant JPMorgan Non-Parties.*   The Certificates for each of the JPMorgan securitizations were issued by trusts established by JPMAC.  The four issuing trusts were: J.P. Morgan Alternative Loan Trust 2005-S1 ("JPMALT 2005-S1"), J.P. Morgan Trust 2005-S3 ("JPMMT 2005-S3"), J.P. Morgan Acquisition Trust 2006-WF1 ("JPMAC 2006-WF1"), and J.P. Morgan Acquisition Trust 2007-CH1 ("JPMAC 2007-CH1") (collectively, the "JPMorgan Trusts").

25.     JPMorgan Chase is a Delaware corporation subject to examination and regulation by the OCC. It is the direct or indirect parent of all the JPMorgan corporate defendants in this action.

26.     Chase Home Finance, LLC ("CHF"), a Delaware limited liability company, is a wholly owned, indirect subsidiary of JPMC Bank. CHF originated certain JPMC Bank mortgage loans and subsequently provided these loans to JPM Mortgage Acquisition, on behalf of JPMC Bank, for the following 3 JPMorgan trusts: JPMALT 2005-S1, JPMAC 2006-WF1, and JPMAC 2007-CH1.

27.     At all relevant times, the JPMorgan Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

**III.     WaMu Defendants**

28.     *WaMu Sponsor Defendant*. At all relevant times, WaMu Bank was a federal savings association that provided financial services to consumer and commercial clients. WaMu Bank served as the Co-Sponsor for one of the six WaMu securitizations at issue in this action. On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement with the FDIC, under which JPMC Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its ownership of WaMu Capital Corporation, WaMu Asset Acceptance Corporation, and Washington Mutual Mortgage Securities Corporation. Therefore, this action is brought against JPMC Bank as the successor-in-interest to WaMu Bank. WaMu Bank is not a defendant in this action.

29.  *WaMu Sponsor Defendant*. Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") is a Delaware corporation with its principal place of business in Brooklyn, New York. WMMSC was, at all relevant times, a wholly-owned, special-purpose subsidiary of WaMu Bank. WMMSC served as the Sponsor with respect to the six WaMu securitizations at issue in this action, and the Depositor with respect to two of the WaMu securitizations at issue in this action. WMMSC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

30.  *WaMu Underwriter Defendant.* Defendant WaMu Capital Corporation ("WCC") is a Washington corporation with its principal place of business in Seattle, Washington. WCC was, at all relevant times, a registered broker-dealer and a wholly-owned subsidiary of WaMu Bank, and served as the sole or co-Underwriter for all five WaMu securitizations at issue in this action. In this capacity, WCC was intimately involved in structuring, pricing, and selling the WaMu Certificates at issue. WCC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

31.  *WaMu Depositor Defendants.* Defendant WaMu Asset Acceptance Corporation ("WMAAC") is a Delaware corporation with its principal place of business in Seattle, Washington. WMAAC was, at all relevant times, a wholly-owned subsidiary of WaMu Bank. WMAAC served as depositor and filed registration statements and accompanying prospectuses with respect to four of the six WaMu securitizations at issue. WMAAC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

32.     *Relevant Non-Parties.*   The Certificates for each of the six WaMu securitizations were issued by trusts established by the WaMu Depositors.  The six issuing trusts were: Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-7 ("WMALT 2005-7"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-9 ("WMALT 2005-9"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-4 ("WMALT 2006-4"), Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 ("WMALT 2006-5"), Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-9 ("WMALT 2006-9"), and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA3 ("WMALT 2007-OA3").

33.     The term "WaMu" refers to the Washington Mutual group of companies before September 25, 2008, including the WaMu Defendants.

34.     At all relevant times, the WaMu Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of the corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over Western & Southern's claims which are brought under the Ohio Securities Act, common law fraud, negligent misrepresentation and the 1933 Act.

36.     This Court has personal jurisdiction over the Defendants by virtue of their securities sales to Western & Southern in Ohio.

37.     Venue is proper pursuant to Ohio Civ. R. 3(B) because, among other reasons, Hamilton County is the principal place of business of most of the plaintiffs.

## SUBSTANTIVE ALLEGATIONS

38.     The JPMorgan Defendants structured four securitizations at issue in this action and the WaMu Defendants structured six securitizations at issue in this action.

## I.     THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

39.     In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans. Under the traditional model, they either held the mortgage loans they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac").

40.     Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan. As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

41.     Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale. By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory guidelines. These loans are known in the industry as "conforming" loans, and are historically the most conservative loans with the lowest rates of delinquency and default. Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming" loans.

42.     In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as

11

residential mortgage-backed securities, to investors. Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors would receive timely payments of principal and interest. Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

43.     In the early 2000's, the demand for securities backed by mortgage loans increased. Private financial institutions stepped in to meet the demand by originating an ever-growing number of non-conforming loans, such as loans based on reduced documentation, loans issued to subprime borrowers, and adjustable loans where the interest rate increases after a period of time. These loans were then securitized for sale to private investors. By 2001, $240 billion in residential mortgage-backed securities were issued through private securitizations. By 2006, that amount had increased by almost five times – to $1.033 trillion.

44.     The JPMorgan Defendants took advantage of this exploding demand for mortgage-backed securities by originating and securitizing large volumes of residential mortgage loans. Beginning in 2003, the JPMorgan Defendants significantly increased their origination and securitization of mortgage loans – particularly non-prime loans. The JPMorgan Defendants originated approximately $7.2 billion in non-prime mortgage loans in 2003, $8.5 billion in 2004, and $8.7 billion in 2005. In addition, JPMAC increased its securitization of residential mortgage loans more than fivefold between 2004 and 2005, from approximately $4.5 billion to $24 billion.

45.     The WaMu Defendants also took advantage of the exploding market for residential mortgage-backed securities by dramatically increasing their origination and securitization of riskier loans around 2003. From 2003 to 2004, the WaMu Defendants increased

12

their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion. By the end of 2006, this figure had almost tripled again to $29 billion.

## A.     THE SECURITIZATION PROCESS

46.     To create residential mortgage-backed securities, such as the Certificates purchased by Western & Southern, a process known as "mortgage securitization" is used. Mortgage loans are acquired from mortgage originators and pooled together, with securities constituting interests in the cash flow from the mortgage pools then sold to investors. The securities are also referred to as mortgage pass-through securities because the cash flow from the pool of mortgages is passed through to the securities holders when payments are made by the underlying mortgage borrowers.

47.     Each securitization involves several entities that perform distinct tasks. The first step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition by the Depositor of an inventory of mortgage loans from a Sponsor or Seller, which either originates the loans or acquires the loans from other mortgage originators in exchange for cash.

48.     To create securities backed by the mortgage loans, the Depositor then forms one or more mortgage pools with the inventory of loans and creates tranches of interests in the mortgage pools with various levels of seniority. Interests in these tranches are then issued by the Depositor (who serves as the Issuer) through a trust in the form of bonds, or certificates.

49.     Each tranche has a different level of purported risk and reward, and, often, a different credit rating. The most senior tranches often receive the highest investment grade rating (triple-A). Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns. The most senior tranches of securities will be entitled to payment in full before the junior tranches. Conversely, losses on the underlying loans in the

13

asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that. This hierarchy in the division of cash flows is referred to as the "flow of funds" or "waterfall."

50.    The Depositor works with one or more of the nationally recognized credit-rating agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired by the Depositor (and Underwriter). Once the asset pool is securitized, the certificates are issued to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as Western & Southern.

51.    Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans. Detailed information about the credit quality of the loans is contained in the loan files developed and maintained by the mortgage originators when making the loans.

52.    For residential mortgage loans, such as the loans that backed the Certificates purchased by Western & Southern, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, and an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios, and occupancy status. The loan file should also include notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of compensating factors that justified any departure from those standards.

14

53.     Western & Southern and other investors do not have access to the loan files. Instead, the Sponsor, Depositor, and Underwriter are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors. This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

## II.     WESTERN & SOUTHERN'S PURCHASES OF DEFENDANTS' CERTIFICATES

54.     Western & Southern made the following purchases of Certificates from the following Defendants, representing a total investment of over $650 million:

| Asset | Face Value | Seller Defendants |
|---|---|---|
| JPMALT 2005-S1 1A1 | 2,200,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMALT 2005-S1 1A1 | 2,200,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 4,300,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 2,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |

15

| Asset | Face Value | Seller Defendants |
|---|---|---|
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 2,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 2,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 3,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |

16

| Asset | Face Value | Seller Defendants |
|---|---|---|
| JPMAC 2006-WF1 A5 | 6,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 2,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 2,025,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2006-WF1 A5 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2007-CH1 AF4 | 3,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2007-CH1 AF4 | 3,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMAC 2007-CH1 AF4 | 1,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |

| Asset | Face Value | Seller Defendants |
|---|---|---|
| JPMAC 2007-CH1 AF4 | 3,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMMT 2005-S3 | 2,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| JPMMT 2005-S3 | 13,000,000.00 | JPM Mortgage Acquisition<br><br>JPMAC<br><br>J.P. Morgan Securities |
| WMALT 2005-7 2CB1 | 1,424,200.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 5,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 1,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 2,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 2,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 2,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-7 2CB1 | 1,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 847,207.71 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 1,059,009.63 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 1,000,000.00 | WMMSC<br><br>WCC |

18

| Asset | Face Value | Seller Defendants |
|---|---|---|
| WMALT 2005-9 2A4 | 500,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 1,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 1,250,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 5,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 6,150,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 7,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 7,500,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 5,000,000.00 | WMMSC<br><br>WCC |
| WMALT 2005-9 2A4 | 1,650,000.00 | WMMSC<br><br>WCC |
| WMALT 2006-4 3A2A | 7,500,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2006-4 3A2A | 1,100,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2006-4 3A2A | 7,500,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |

| Asset | Face Value | Seller Defendants |
|---|---|---|
| WMALT 2006-4 3A6 | 2,200,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-4 3A6 | 7,800,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 1A10 | 2,000,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 1A10 | 1,500,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 1A10 | 6,000,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 1A10 | 2,000,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 1A10 | 1,500,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 3A6 | 3,000,000.00 | WMMSC WCC WMAAC |
| WMALT 2006-5 3A6 | 5,500,000.00 | WMMSC WCC WMAAC |

| Asset | Face Value | Seller Defendants |
|---|---|---|
| WMALT 2006-5 3A6 | 1,500,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2006-9 A3 | 3,000,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2006-9 A3 | 22,000,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2006-9 A3 | 5,000,000.00 | WMMSC<br><br>WCC<br><br>WMAAC |
| WMALT 2007-OA3 5A | 7,235,244.30 | WMMSC<br><br>WaMu Bank<br><br>WCC<br><br>WMAAC |
| WMALT 2007-OA3 5A | 904,405.54 | WMMSC<br><br>WaMu Bank<br><br>WCC<br><br>WMAAC |

## III. DEFENDANTS ABANDONED THEIR DISCLOSED UNDERWRITING STANDARDS TO FACILITATE THE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A. Defendants' Representations That the Securitized Loans Were Underwritten According to Prudent Underwriting Standards and Practices

55. The fundamental basis upon which residential mortgage-backed securities are

valued is the ability of the borrowers to repay the principal and interest on the underlying loans

and the adequacy of the collateral for those loans. If the borrowers cannot pay, and the collateral is insufficient, the securities experience losses. For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the offering materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

56.     As Sponsors of the securitizations at issue, JPMAC, WMMSC and WaMu Bank (now JPMC Bank) either originated loans or purchased loans from third-party originators. Each loan was purportedly underwritten according to a set of underwriting guidelines, which are specific criteria that the mortgage loans must meet. In general, the underwriting guidelines stipulated what documentation was required to be included in the mortgage loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds, and payment histories, among other things) and criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-to-value ratios.

57.     Defendants represented to investors, including Western & Southern, that the securitized loans were underwritten according to customary and typical underwriting standards, applied consistently to ensure the quality of the securitized loans. As detailed below, for each securitization, Defendants made specific representations about the originators' underwriting standards or the underwriting standards that Defendants insisted the originators follow.

### 1.     JPMorgan Defendants' Representations

#### a.     JPMALT 2005-S1

58.     For the JPMALT 2005-S1 offering, 2.80% of the mortgage loans in pool 1, 71.24% of the mortgage loans in pool 2, and 100.00% of the mortgage loans in pool 3 were originated or acquired by JPMC Bank, approximately 26.12% of the mortgage loans in pool 1,

and 10.68% of the mortgage loans in pool 2 were originated or acquired by PHH Mortgage

Corporation ("PHH"). Approximately 33.35% of the mortgage loans in pool 1 and 2.28% of the

mortgage loans in pool 2 were originated or acquired by GreenPoint Mortgage Funding, Inc.

("GreenPoint"), and approximately 37.73% of the mortgage loans in pool 1 and 15.79% of the

mortgage loans in pool 2 were originated or acquired by SunTrust Mortgage, Inc. ("SunTrust").

59.     The Prospectus Supplement for this offering made representations that the

mortgage originators for the loans had followed specific underwriting guidelines to ensure the

quality of the loans being originated, as described below.

60.     The Prospectus Supplement represented that, generally, regardless of originator,

the underwriting process was utilized to "evaluate a borrower's credit standing and repayment

ability, and the value and adequacy of the related Mortgaged Property as collateral." (JPMALT

2005-S1 Prospectus Supplement at S-33.)

61.     The Prospectus Supplement represented standard underwriting procedures as

follows:

> In general, a prospective borrower applying for a loan is required to fill out a
> detailed application designed to provide to the underwriting officer pertinent
> credit information. As part of the description of the borrower's financial
> condition, the borrower generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an authorization to
> apply for a credit report which summarizes the borrower's credit history with
> local merchants and lenders and any record of bankruptcy. In most cases, an
> employment verification is obtained from an independent source (typically the
> borrower's employer), which verification reports, among other things, the length
> of employment with that organization, the current salary, and whether it is
> expected that the borrower will continue such employment in the future.

(*Id.*)

62.     The Prospectus Supplement also represented the eligibility and underwriting

requirements for loans made under an alternative documentation program:

> A lender may also originate mortgage loans pursuant to alternative sets of
> underwriting criteria under reduced or limited documentation programs. . . .
> Loans underwritten under these programs are generally limited to borrowers who
> have demonstrated an established ability and willingness to repay the mortgage
> loans in a timely fashion. Permitted maximum loan-to-value ratios under these
> programs are generally more restrictive than those under the lender's standard
> underwriting criteria.

(*Id.*)

63.    Finally, the Prospectus Supplement represented that, under standard underwriting

procedures, exceptions were allowed only in specific circumstances:

> From time to time, exceptions to a lender's underwriting policies may be made.
> Such exceptions may be made on a loan-by-loan basis at the discretion of the
> lender's underwriter. Exceptions may be made after careful consideration of
> certain mitigating factors such as borrower liquidity, employment and residential
> stability and local economic conditions.

(*Id.*)

64.    The Prospectus Supplement for the JPMALT 2005-S1 offering also made specific

representations about the underwriting standards applied by each originator.

65.    As to JPMC Bank, the Prospectus Supplement represented that the mortgage

loans were originated and underwritten in accordance with "underwriting policies customarily

employed by CHF. . . . CHF's underwriting standards are designed to evaluate a borrower's

credit standing and repayment ability as well as the value and adequacy of the mortgaged

property as collateral." (*Id.* at S-34.)

66.    The Prospectus Supplement represented:

> CHF obtains a three-file merged credit report for each borrower, which
> summarizes each repository's credit score, credit history and depth, and any
> derogatory public records. The middle of three credit scores is used if there is a
> single applicant and the lower of both middle credit scores is used if there are
> joint applicants. In addition, CHF verifies employment, income and assets. Self-
> employed prospective borrowers are generally required to submit their federal
> income tax returns for the last two years and in certain cases a separate statement
> of income and expenses independently verified by a third party.

24

(*Id.*)

67.     The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the borrower's ability to repay. Specifically, the Prospectus Supplement stated that "a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses." (JPMALT 2005-S1 Prospectus Supplement at S-34.)

68.     The Prospectus Supplement further represented that JPMC Bank applied conservative underwriting guidelines even to loans originated under CHF's Reduced Documentation Program, Streamlined Refinance Program, "No Doc" program, and Stated Income Stated Asset Program. The Prospectus Supplement provided as follows:

> In order to qualify for the [Reduced Documentation Program], the borrower must satisfy a 20% down-payment requirement from the borrower's own assets. These assets are verified through bank statements and may be supplemented by third-party verification. A residential mortgage credit report, or "in file" report, is obtained and reviewed to determine the borrower's repayment history. The maximum loan-to-value ratio of any mortgage loan originated under this program is approximately 80% (65% for "cash out" refinancings). . . . In order to qualify for [the Streamlined Refinance Program], the borrower must have demonstrated overall creditworthiness as defined in the program guides. In addition, a documented servicing record with respect to such borrower of at least 24 months must be available. If there are multiple lenders during such 24 month period, CHF must have been the servicer for at least the most recent 12 months. . . . The underwriting for ["No Doc"] loans is based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral. . . . The underwriting for [the Stated Income Stated Asset Program] is based primarily or entirely on stronger credit profile and lower loan-to-value ratio requirements.

(*Id.* at S-34-35).

25

69.     Finally, the Prospectus Supplement represented that exceptions to the underwriting guidelines would be allowed only in specific circumstances, and that those loans had sufficient compensating factors:

> From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and underwriting personnel of the Chase Originators who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

(*Id.* at S-35.)

70.     As to originator PHH, the Prospectus Supplement represented that:

> PHH's underwriting standards . . . are intended to result in the origination of investment-quality mortgage loans that are salable in the secondary mortgage market. They are applied in originating or purchasing loans for its own account, and in originating loans for, or purchasing loans from, other lenders under various "private-label" programs . . . PHH's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made.

(*Id.* at S-35-36.)

71.     To that end, the Prospectus Supplement represented that PHH calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

> PHH generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. From time to time, PHH makes loans where these ratios are exceeded. In those instances, PHH's underwriters typically look at compensating factors such as the liquidity of the mortgagor and the stability of the real estate market where the property is located.

(*Id.* at S-38.)

72.     The Prospectus Supplement further represented that PHH required all borrowers to:

provide information concerning his or her assets, liabilities, income and expenses
. . . along with an authorization to obtain any necessary third party verifications,
including a credit report summarizing the applicant's credit history . . . PHH
reviews the applicant's credit history and outstanding debts, as reported on the
credit report. . . . PHH verifies the applicant's liquid assets to ensure that the
applicant has adequate liquid assets to apply toward any required down payment,
closing costs, prepaid interest, and a specified amount of cash reserves after the
closing of the related mortgage. . . . PHH also evaluates the applicant's income to
determine its stability, probability of continuation, and adequacy to service the
proposed PHH debt payment.

(*Id.* at S-36.)

73.     The Prospectus Supplement also represented that PHH applied conservative

underwriting guidelines even to loans originated under alternative documentation programs:

Loans underwritten under the Reduced Documentation Program, Stated Income,
Stated Asset Program, Stated Income Full Asset Program and No Income Stated
Asset Program are generally limited to borrowers who have demonstrated an
established ability and willingness to repay the mortgage loans in a timely
fashion. Permitted maximum loan-to-value ratios under the Reduced
Documentation Program, Stated Income, Stated Asset Program, Stated Income
Full Asset Program and No Income Stated Asset Program are generally more
restrictive than those under the standard underwriting criteria of PHH.

(JPMALT 2005-S1 Prospectus Supplement at S-38.)

74.     Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

From time to time, exceptions to PHH's underwriting policies may be made.
Such exceptions are made on a loan-by-loan basis only at the discretion of PHH's
underwriters and may be made only after careful consideration of certain
compensating factors such as borrower capacity, liquidity, employment and
residential stability.

(*Id.* at S-39.)

75.     As to originator GreenPoint, the Prospectus Supplement represented that:

Generally, the GreenPoint underwriting guidelines are applied to evaluate the
prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral. Based on these and other factors, GreenPoint will determine the level of documentation to be provided by the prospective borrower. Exceptions to the GreenPoint underwriting guidelines are permitted where compensating factors are present.

(*Id.* at S-41.)

76.     The Prospectus Supplement represented that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay. To that end, the Prospectus Supplement represented that GreenPoint calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income.

(*Id.*)

77.     Finally, the Prospectus Supplement represented that reduced documentation programs were available only to borrowers with favorable credit histories and LTV ratios:

> Mortgage loans underwritten under this type of [limited documentation] program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion . . . Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation or alternative documentation requirements . . . Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

(*Id.* at S-41.)

78.     As to originator SunTrust, the Prospectus Supplement represented that SunTrust's underwriting guidelines were intended "to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing

28

and cash reserves for fully documented loans, and to evaluate the acceptability and marketability of the property to be used as collateral." (*Id.* at S-40.)

79.     In addition, the Prospectus Supplement represented:

> SunTrust requires that the borrower's sources of income have the probability of continuance, are stable sources and are sufficient to support repayment of the mortgage loan requested when disclosure and verification is required. . . . A borrower is required to complete an application designed to provide pertinent information about the borrower, the property to be financed and the type of loan desired. As part of the description of the borrower's financial condition, SunTrust may require a description of assets and income. Liabilities and expenses are included on the application and SunTrust obtains a credit report, which summarizes the borrower's credit history with merchants and lenders and any public records. In general, employment verification is obtained providing current and historical income information unless the specific program does not require disclosure or verification of employment.

(JPMALT 2005-S1 Prospectus Supplement at 40.)

80.     Finally, the Prospectus Supplement indicated that SunTrust utilized reduced documentation and verification programs only "when specific underwriting criteria are met" and that exceptions would only be allowed "if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used." (*Id.*)

### b.     JPMMT 2005-S3

81.     For the JPMMT 2005-S3 offering, 47.49% of the mortgage loans in pool 1, and 2.89% of the mortgage loans in pool 2 were originated or acquired by JPMC Bank or CHF, approximately 34.17% of the mortgage loans in pool 1 and .39% of the mortgage loans in pool 2 were originated or acquired by GreenPoint. Approximately 78.1% of the mortgage loans in pool 2 were originated or acquired by Countrywide Home Loans, Inc. ("Countrywide) and approximately 10.4% of the mortgage loans in pool 2 were originated or acquired by PHH. No other originator originated or acquired more than 10% of the mortgage loans in any mortgage group.

82.     The Prospectus Supplement for this offering made representations that the mortgage originators for the loans had followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

83.     The Prospectus Supplement represented that, generally, regardless of originator, the underwriting process was utilized to "evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (JPMMT 2005-S3 Prospectus Supplement at S-30.)

84.     The Prospectus Supplement represented standard underwriting procedures as follows:

> In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future.

(*Id.* at S-30-31.)

85.     The Prospectus Supplement also represented the eligibility and underwriting requirements for loans made under an alternative documentation program:

> A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. . . . Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

(*Id.* at S-31.)

30

86.     Finally, the Prospectus Supplement represented that, under standard underwriting procedures, exceptions were allowed only in specific circumstances:

> From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

(*Id.* at S-31.)

87.     The Prospectus Supplement for the JPMMT 2005-S3 offering also made specific representations about the underwriting standards applied by each originator.

88.     As to JPMC Bank, the Prospectus Supplement represented that the mortgage loans were originated and underwritten in accordance with "underwriting policies customarily employed by CHF. . . . CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." (*Id.* at S-31-32.)

89.     The Prospectus Supplement represented:

> CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records. The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants. In addition, CHF verifies employment, income and assets. Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party.

(*Id.* at S-32.)

90.     The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the borrower's ability to repay. Specifically, the Prospectus Supplement stated that "a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed

31

loan and other expenses related to the residence (such as property taxes and insurance) as well as
to meet other financial obligations and monthly living expenses." (JPMMT 2005-S1 Prospectus
Supplement at S-32.)

91.     The Prospectus Supplement further represented that JPMC Bank applied
conservative underwriting guidelines even to loans originated under CHF's Reduced
Documentation Program, Streamlined Refinance Program, "No Doc" program, and Stated
Income Stated Asset Program. The Prospectus Supplement provided as follows:

> In order to qualify for the [Reduced Documentation Program], the borrower must
> satisfy a 20% down-payment requirement from the borrower's own assets. These
> assets are verified through bank statements and may be supplemented by third-
> party verification. A residential mortgage credit report, or "in file" report, is
> obtained and reviewed to determine the borrower's repayment history. The
> maximum loan-to-value ratio of any mortgage loan originated under this
> program is approximately 80% (65% for "cash out" refinancings). . . . In order to
> qualify for [the Streamlined Refinance Program], the borrower must have
> demonstrated overall creditworthiness as defined in the program guides. In
> addition, a documented servicing record with respect to such borrower of at least
> 24 months must be available. If there are multiple lenders during such 24 month
> period, CHF must have been the servicer for at least the most recent 12 months. . .
> . The underwriting for ["No Doc"] loans is based primarily or entirely on a
> stronger credit profile (evidenced by a higher minimum FICO credit risk score), a
> lower maximum product limit and additional due diligence performed on the
> collateral. . . . The underwriting for [the Stated Income Stated Asset Program] is
> based primarily or entirely on stronger credit profile and lower loan-to-value ratio
> requirements.

(*Id.* at S-31-32.)

92.     Finally, the Prospectus Supplement represented that exceptions to the
underwriting guidelines would be allowed only in specific circumstances, and that those loans
had sufficient compensating factors:

> From time to time, exceptions and/or variances to CHF's underwriting policies
> may be made. Such exceptions and/or variances may be made only if specifically
> approved on a loan-by-loan basis by certain credit and underwriting personnel of
> the Chase Originators who have the authority to make such exceptions and/or
> variances. Exceptions and/or variances may be made only after careful

32

consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

(*Id.* at S-33.)

93.     As to originator GreenPoint, the Prospectus Supplement represented that:

Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Based on these and other factors, GreenPoint will determine the level of documentation to be provided by the prospective borrower. Exceptions to the GreenPoint underwriting guidelines are permitted where compensating factors are present.

(*Id.* at S-38.)

94.     The Prospectus Supplement represented that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay. To that end, the Prospectus Supplement represented that GreenPoint calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income.

(*Id.*)

95.     Finally, the Prospectus Supplement represented that reduced documentation programs were available only to borrowers with favorable credit histories and LTV ratios:

Mortgage loans underwritten under this type of [limited documentation] program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion . . . Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation or alternative documentation requirements ... Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

33

(*Id.* at S-38.)

96.    As to originator Countrywide, the Prospectus Supplement represented that:

> [a]ll of the mortgage loans in the trust fund originated or acquired by
> Countrywide Home Loans will have been originated or acquired by Countrywide
> Home Loans in accordance with its credit, appraisal and underwriting standards. .
> . . . Countrywide Home Loans' underwriting standards are applied by or on
> behalf of Countrywide Home Loans to evaluate the prospective borrower's credit
> standing and repayment ability and the value and adequacy of the mortgaged
> property as collateral. Under those standards, a prospective borrower must
> generally demonstrate that the ratio of the borrower's monthly housing expenses
> (including principal and interest on the proposed mortgage loan and, as
> applicable, the related monthly portion of property taxes, hazard insurance and
> mortgage insurance) to the borrower's monthly gross income and the ratio of total
> monthly debt to the monthly gross income (the "debt-to-income" ratios) are
> within acceptable limits.

(JPMMT 2005-S1 Prospectus Supplement at S-34-35.)

97.    The Prospectus Supplement described Countrywide's "Full Documentation"

program as follows:

> In general under the Full Documentation Loan Program (the "Full Documentation
> Program"), each prospective borrower is required to complete an application
> which includes information with respect to the applicant's assets, liabilities,
> income, credit history, employment history and other personal information. Self-
> employed individuals are generally required to submit their two most recent
> federal income tax returns. Under the Full Documentation Program, the
> underwriter verifies the information contained in the application relating to
> employment, income, assets or mortgages.

(*Id.* S-34.)

98.    Where documents were not subject to the Full Documentation Program, the

Prospectus Supplement represented that compliance with specific underwriting safeguards was

required. The Prospectus Supplement provided:

> Under the Reduced Documentation Program, some underwriting documentation
> concerning income, employment and asset verification is waived. Countrywide
> Home Loans obtains from a prospective borrower either a verification of deposit
> or bank statements for the two-month period immediately before the date of the
> mortgage loan application or verbal verification of employment. Since

34

> information relating to a prospective borrower's income and employment is not
> verified, the borrower's debt-to-income ratios are calculated based on the
> information provided by the borrower in the mortgage loan application. The
> maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.
>
> The CLUES Plus Documentation Program permits the verification of employment
> by alternative means, if necessary, including verbal verification of employment or
> reviewing paycheck stubs covering the pay period immediately prior to the date of
> the mortgage loan application. To verify the borrower's assets and the sufficiency
> of the borrower's funds for closing, Countrywide Home Loans obtains deposit or
> bank account statements from each prospective borrower for the month
> immediately prior to the date of the mortgage loan application. Under the CLUES
> Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and
> property values may be based on appraisals comprising only interior and exterior
> inspections. Cash-out refinances and investor properties are not permitted under
> the CLUES Plus Documentation Program.

(*Id.* at S-36.)

99.    Finally, the Prospectus Supplement represents that exceptions to Countrywide's

underwriting guidelines were permissible only "if compensating factors are demonstrated by a

prospective borrower." (*Id.* S-34.)

### c.    JPMAC 2006-WF1

100.    For the JPMAC 2006-WF1 offering, all of the mortgage loans were originated by

Wells Fargo Bank, N.A. ("Wells Fargo"). The Prospectus Supplement for this offering

represented that Wells Fargo followed specific underwriting guidelines to ensure the quality of

the loans being originated, as described below.

101.    The Prospectus Supplement represented that Well Fargo's underwriting standards

were designed to "evaluate the applicant's credit standing and ability to repay the loan, as well as

the value and adequacy of the mortgaged property as collateral." (JPMAC 2006-WF1

Prospectus Supplement at S-22.)

> The underwriting standards that guide the determination represent a balancing of
> several factors that may affect the ultimate recovery of the loan amount,
> including, among others, the amount of the loan, the ratio of the loan amount to

the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history.

(*Id.*)

102.    The Prospectus Supplement represented standard underwriting procedures as

follows:

A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. . . . With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders. Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant. . . . In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

(*Id.* at S-23.)

103.    The Prospectus Supplement further represented that Wells Fargo's "Alt-A"

programs were subject to restrictions designed to ensure that loans were placed with more credit-

worthy borrowers with less favorable credit profiles. According to the Prospectus Supplement:

Loan applicants with less favorable credit profiles generally are restricted to consideration for loans with higher interest rates, lower maximum loan amounts and lower loan-to-value ratios than applicants with more favorable credit profiles. Except for loans originated under the "No Ratio" program, the maximum total debt to gross income ratio for each credit level is generally 50%.

(*Id.* at S-27.)

104.    Wells Fargo's guidelines also stated:

36

On a case-by-case basis, Wells Fargo Bank may make the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors. Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses.

(*Id.* at S-22).

105.    Finally, the Prospectus Supplement represented that exceptions to Wells Fargo's underwriting standards would only be granted "after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions." (*Id.* at S-23.)

### d.    JPMAC 2007-CH1

106.    For the JPMAC 2007-CH1 offering, all of the mortgage loans were originated by CHF. The Prospectus Supplement for this offering represented that CHF followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

107.    The Prospectus Supplement represented that "[t]he mortgage loans were originated and underwritten in accordance with either the Chase Home Mortgage Call Center Underwriting Guidelines described below (the "CHM Call Center Underwriting Guidelines") or the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines described below (the "CHM Wholesale/Retail Underwriting Guidelines")." (JPMAC 2007-CH1 Prospectus Supplement at S-89.)

108.    In the Prospectus Supplement, JPMC Bank further represented that "[t]here are three major steps in the underwriting process: (1) identify the eligibility and appropriate credit grade of the mortgagor, (2) evaluate the eligibility and lendable equity of the mortgaged

property, and (3) ensure that the mortgage loan terms meet those acceptable for the applicable credit grade." (*Id.*)

109.    The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay. Specifically, under the CHM Call Center Underwriting Guidelines, "the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan," as well as the "credit standing and repayment ability of the prospective borrower" were considered in the loan approval process. (*Id.*)

110.    The Prospectus Supplement further represented that JPMC Bank applied conservative underwriting guidelines even to loans originated under its stated income program:

> The CHM Stated Income Program is a no income verification program available for credit grades A1/A+ through B2. The CHM Call Center Underwriting Guidelines utilize various credit grade categories to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These credit grade categories establish the maximum permitted loan-to-value ratio, debt-to-income ratio and loan amount, given the borrower's credit history considered in a manner generally consistent with non-prime mortgage industry practice, the occupancy status of the mortgaged property, the type of mortgaged property and documentation type.

(*Id.* at S-90.)

111.    Finally, the Prospectus Supplement represented that exceptions to the underwriting guidelines would be allowed only in specific circumstances, and that those loans had sufficient compensating factors:

> On a case by case basis, CHM Call Center underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence.

(*Id.* at S-94.)

38

### 2.  WaMu Defendants' Representations

#### a.  WMALT 2005-7

112.  For the WMALT 2005-7 offering, the mortgage loans were purchased or acquired by WMMSC directly or indirectly from affiliated or unaffiliated third parties who either originated the applicable mortgage loans or purchased the mortgage loans through correspondent or broker lending.  All of the mortgage loans in the WMALT 2005-7 offering were purportedly originated in accordance with WMMSC's underwriting guidelines.  All of the mortgage loans in the WMALT 2005-7 offering were purportedly originated in accordance with WMMSC's underwriting guidelines.

113.  The Prospectus for the WMALT 2005-7 offering made specific representations about WMMSC's underwriting standards and represented that those standards were designed to ensure the quality of the loans being originated, as described below

114.  The Prospectus Supplement represented that WMMSC's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans: "All of the credit, appraisal, and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the adequacy of the Mortgaged Property as collateral."  (WMALT 2005-7 Prospectus Supplement at 18.)

115.  The Prospectus Supplement represented standard underwriting procedures as follows:

> In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items.  Each prospective Mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history.  With respect to establishing the prospective Mortgagor's ability to make timely payments, the Company will require evidence regarding the Mortgagor's

39

employment and income, and of the amount of deposits made to financial institutions where the Mortgagor maintains demand or savings accounts.

(*Id.*)

116. The Prospectus also stated that the originators applied conservative underwriting guidelines even to loans originated under their low documentation programs:

> For a mortgage loan originated under a Limited Documentation Origination Program to qualify for purchase by the Company, the prospective mortgagor must have a good credit history and be financially capable of making a larger cash down payment, in a purchase, or be willing to finance less of the appraised value, in a refinancing, than would otherwise be required by the Company. Currently, the Company's underwriting standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase.

(*Id.*)

117. The Prospectus Supplement also stated that: "The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac. In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing." (*Id.*)

### b. WMALT 2005-9

118. For the WMALT 2005-9 offering, the mortgage loans were purchased or acquired by WMMSC directly or indirectly from affiliated or unaffiliated third parties who either originated the applicable mortgage loans or purchased the mortgage loans through correspondent or broker lending. All of the mortgage loans in the WMALT 2005-9 offering were purportedly originated in accordance with WMMSC's underwriting guidelines. All of the mortgage loans in the WMALT 2005-9 offering were purportedly originated in accordance with WMMSC's underwriting guidelines.

40

119.    The Prospectus Supplement for the WMALT 2005-9 offering made specific representations about WMMSC's underwriting standards and represented that those standards were designed to ensure the quality of the loans being originated, as described below.

120.    The Prospectus Supplement represented WMMSC's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans: "All of the credit, appraisal, and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the adequacy of the Mortgaged Property as collateral." (WMALT 2005-9 Prospectus Supplement at 17-18.)

121.    The Prospectus Supplement represented standard underwriting procedures as follows:

> In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective Mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history. With respect to establishing the prospective Mortgagor's ability to make timely payments, the Company will require evidence regarding the Mortgagor's employment and income, and of the amount of deposits made to financial institutions where the Mortgagor maintains demand or savings accounts.

(*Id.* at 18.)

122.    The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their low documentation programs:

> For a mortgage loan originated under a Limited Documentation Origination Program to qualify for purchase by the Company, the prospective mortgagor must have a good credit history and be financially capable of making a larger cash down payment, in a purchase, or be willing to finance less of the appraised value, in a refinancing, than would otherwise be required by the Company. Currently, the Company's underwriting standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase.

(*Id.*)

41

### c. WMALT 2006-4

123.    For the WMALT 2006-4 offering, WMMSC purchased or acquired 13.9% of the mortgage loans backing the securities from Secured Bankers Mortgage Corporation, and approximately 12% from Residential Funding Corporation with respect to the group 1 and group 2 loans, and approximately 22.5% from GreenPoint Mortgage Funding, Inc. with respect to group 3. All of the mortgage loans owned by the Trust were purportedly originated in accordance with WMMSC's or WaMu Bank's underwriting guidelines.

124.    The Prospectus Supplement for the WMALT 2006-4 offering made specific representations about WMMSC's and WaMu Bank's underwriting standards.

125.    The Prospectus Supplement represented that WMMSC's and WaMu Bank's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(WMALT 2006-4 Prospectus Supplement at S-30.)

126.    The Prospectus Supplement further provided that, under WMMSC's and WaMu Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments: "in evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the

42

borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id.* at S-31.

127.    The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their limited documentation programs:

> Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. . . . In all cases, the borrower's employment is verified with the employer by telephone.

(*Id.* at S-32).

128.    Finally, the Prospectus Supplement represented that the originators allowed exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(*Id.* at S-32).

### d.    WMALT 2006-5

129.    For the WMALT 2006-5 offering, WMMSC purchased or acquired 22.4% of the mortgage loans backing the securities from American Mortgage Network, Inc., approximately 22.12% from GreenPoint Mortgage Funding, Inc., and approximately 12.94% from First Magnus Financial Corporation, with respect to the group 1, group 2, and group 4 loans. With respect to Group 3, WMMSC purchased or acquired 23.03% of the mortgage loans backing the securities from American Mortgage Network, Inc. and approximately 22.1% from GreenPoint Mortgage

43

Funding, Inc. All of the mortgage loans owned by the Trust were purportedly originated in accordance with WMMSC's or WaMu Bank's underwriting guidelines.

130.    The Prospectus Supplement for the WMALT 2006-5 offering made specific representations about WMMSC's and WaMu Bank's underwriting standards.

131.    The Prospectus Supplement represented that WMMSC's and WaMu Bank's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(WMALT 2006-5 Prospectus Supplement at S-38.)

132.    The Prospectus Supplement further provided that, under WMMSC's and WaMu Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments: "in evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id.* at S-39.

133.    The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their limited documentation programs:

> Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets . . . . In all cases, the borrower's employment is verified with the employer by telephone.

44

(*Id.* at S-40.)

134.   Finally, the Prospectus Supplement represented that the originators allowed

exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(*Id.*)

### e.   WMALT 2006-4

135.   For the WMALT 2006-4 offering, WMMSC purchased or acquired approximately

42.5% of the mortgage loans backing the securities from M&T Mortgage Corporation, and

approximately 14.3% from First Magnus Financial Corporation.  All of the mortgage loans

owned by the Trust were purportedly originated in accordance with WMMSC's or WaMu

Bank's underwriting guidelines.

136.   The Prospectus Supplement for the WMALT 2006-9 offering made specific

representations about WMMSC's and WaMu Bank's underwriting standards.

137.   The Prospectus Supplement represented that WMMSC's and WaMu Bank's

standards were consistently applied to confirm a borrower's ability to repay and to produce

performing loans:

> The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(WMALT 2006-9 Prospectus Supplement at S-26.)

45

138.   The Prospectus Supplement further provided that, under WMMSC's and WaMu Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments: "in evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id.* at S-27.

139.   The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their limited documentation programs:

> Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores.  A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets . . . . In all cases, the borrower's employment is verified with the employer by telephone or by other independent means.

(*Id.* at S-28.)

140.   Finally, the Prospectus Supplement represented that the originators allowed exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present.  In those cases, the basis for the exception is documented.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(*Id.*)

46

### f. WMALT 2007-OA3

141. For the WaMu 2007-OA3 offering, WMMSC or WaMu Bank purchased the mortgage loans from various originators, and in particular, approximately 39.8% from MortgageIT, Inc. with respect to loan group 1 and loan group 2. All of the mortgage loans in the WaMu 2007-OA3 offering were purportedly originated in accordance with WMMSC or WaMu Bank's underwriting guidelines.

142. The Prospectus Supplement for the WMALT 2007-OA3 offering made specific representations about WMMSC's and WaMu Bank's underwriting standards.

143. The Prospectus Supplement represented that WaMu Bank's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Washington Mutual Mortgage Securities Corp.'s underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(WaMu 2007-OA3 Prospectus Supplement dated March 22, 2007, at S-63.)

144. The Prospectus Supplement further provided that, under WaMu Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments: "in evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing to- income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id.* at S-64.

47

145.    The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their low documentation programs:

> Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets . . . In all cases, the borrower's employment is verified with the employer by telephone or by other independent means.

(*Id.* at S-65.)

146.    Finally, the Prospectus Supplement represented that the originators allowed exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(*Id.* at S-66.)

## IV.    Defendants Abandoned Underwriting Standards to Generate a Large Volume of Loans for Securitization and Sale to Investors

147.    The securitization process incentivized the JPMorgan Defendants and the WaMu Defendants to abandon or disregard underwriting standards so that they could originate and purchase huge volumes of low-quality loans to securitize.

148.    As the private residential mortgage-backed securities market expanded, the traditional "originate to hold" model morphed into the "originate to distribute" model. Under the "originate to distribute" model, mortgage companies, such as the JPMorgan Defendants and the WaMu Defendants, no longer held the mortgage loans to maturity. Rather, they off-loaded the risk of loss to the investors who purchased an interest in the securitized pool of loans.

149.    The new distribution model was highly profitable for the JPMorgan Defendants and the WaMu Defendants and other mortgage companies. By securitizing and selling mortgage loans to investors through underwriters, mortgage companies received immediate payment for the loans, shifted the loans off their books, and were able to issue more loans. The securitization process enabled the mortgage companies to earn most of their income from transaction and loan-servicing fees. Because the mortgage companies did not have to bear the risk of loss, they had an unchecked incentive to originate more and more loans to feed into the securitization machine.

150.    The Attorney General for the Commonwealth of Massachusetts explained this unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks which held the loans in their own portfolios, knew their borrowers, and earned profit by writing good loans and collecting interest over many years. Those banks had to live with their "bad paper" and thus had a strong incentive to avoid making bad loans. In recent years, however, the mortgage market has been driven and funded by the sale and securitization of the vast majority of loans. Lenders now frequently make mortgage loans with the intention to promptly sell the loan and mortgage to one or more entities. . . . The lenders' incentives thus changed from writing good loans to writing a huge volume of loans to re-sell, extracting their profit at the front end, with considerably less regard to the ultimate performance of the loans.

151.    Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on the terms of the sale, much or all of the risks are passed on to the loan purchaser. Thus, originators who sell loans may have less incentive to undertake careful underwriting than if they kept the loans. Moreover, for some originators, fees tied to loan volume made loan sales a higher priority than loan quality. This misalignment of incentives, together with strong investor demand for securities with high yields, contributed to the weakening of underwriting standards.

152.    To take advantage of the exploding market for residential mortgage-backed securities, the JPMorgan Defendants and the WaMu Defendants abandoned or disregarded

49

underwriting guidelines and failed to conduct adequate due diligence so that they could originate and purchase as many loans as possible for securitization. Indeed, even when perfunctory due diligence revealed non-compliant loans, the Defendants "waived" the loans into the securitizations anyway.

153. Unbeknownst to Western & Southern, the JPMorgan Defendants and the WaMu Defendants originated or purchased loans that had been issued to borrowers regardless of their ability to pay. The loans were often issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification.

**A.      Widespread Defaults Confirm Defendants Abandoned The Disclosed Underwriting Standards**

154. Even though the Certificates purchased by Western & Southern were supposed to be long-term, stable investments, just a few years after their issuance, a high percentage of the mortgage loans backing the offerings have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificate holders, including Western & Southern. The following table contains the most recent performance data available for the loan pools:

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| JPMALT 2005-S1 1A1 | 12 | 4,151 | 5.10 |
| | 24 | 3,581 | 8.18 |
| | 36 | 3,242 | 14.02 |
| | 48 | 2,931 | 24.97 |
| | 60 | 2,593 | 29.08 |

50

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| JPMAC 2006-WF1 A5 | 12 | 3,642 | 16.10 |
| | 24 | 3,144 | 34.31 |
| | 36 | 2,706 | 49.64 |
| | 48 | 2,281 | 48.70 |
| | 60 | NA | NA |
| JPMAC 2006-WF1 A6 | 12 | 3,642 | 16.10 |
| | 24 | 3,144 | 34.31 |
| | 36 | 2,706 | 49.64 |
| | 48 | 2,281 | 48.70 |
| | 60 | NA | NA |
| JPMAC 2007-CH1 AF4 | 12 | 6,720 | 4.74 |
| | 24 | 5,965 | 13.97 |
| | 36 | 5,303 | 24.11 |
| | 48 | 4,830 | 27.44 |
| | 60 | NA | NA |
| JPMMT 2005-S3 1A3 | 12 | 1,851 | 1.81 |
| | 24 | 1,707 | 2.58 |
| | 36 | 1,610 | 5.70 |
| | 48 | 1,369 | 13.55 |
| | 60 | 1,136 | 16.64 |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| WMALT 2005-7 2CB1 | 12 | 2,074 | 1.57 |
| | 24 | 1,830 | 3.83 |
| | 36 | 1,674 | 7.77 |
| | 48 | 1,526 | 15.38 |
| | 60 | 1,377 | 18.97 |
| WMALT 2005-9 2A4 | 12 | 1,819 | 1.77 |
| | 24 | 1,617 | 5.55 |
| | 36 | 1,536 | 9.22 |
| | 48 | 1,424 | 19.39 |
| | 60 | 1,278 | 22.58 |
| WMALT 2006-4 3A2A | 12 | 1,393 | 12.03 |
| | 24 | 1,221 | 23.94 |
| | 36 | 1,092 | 40.31 |
| | 48 | 923 | 47.98 |
| | 60 | 799 | 44.65 |
| WMALT 2006-4 3A6 | 12 | 1,393 | 12.03 |
| | 24 | 1,221 | 23.94 |
| | 36 | 1,092 | 40.31 |
| | 48 | 923 | 47.98 |
| | 60 | 799 | 44.65 |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| WMALT 2006-5 1A10 | 12 | 2,692 | 5.47 |
| | 24 | 2,421 | 12.42 |
| | 36 | 2,197 | 28.43 |
| | 48 | 1,919 | 33.08 |
| | 60 | NA | NA |
| WMALT 2006-5 3A6 | 12 | 2,291 | 13.06 |
| | 24 | 2,011 | 29.74 |
| | 36 | 1,737 | 45.32 |
| | 48 | 1,481 | 45.61 |
| | 60 | NA | NA |
| WMALT 2006-9 A3 | 12 | 782 | 12.24 |
| | 24 | 679 | 23.19 |
| | 36 | 574 | 33.04 |
| | 48 | 478 | 39.17 |
| | 60 | NA | NA |
| WMALT 2007-OA3 | 12 | 2,668 | 13.63 |
| | 24 | 2,463 | 40.21 |
| | 36 | 2,137 | 52.86 |
| | 48 | 1,855 | 56.13 |
| | 60 | NA | NA |

155.    Defaults are usually caused by a large and unexpected disruption to a borrower's income.  In a properly underwritten pool of loans, one would not expect to see such a large spike of defaults occurring shortly after origination, because it is unlikely that many borrowers would all incur a sudden and unexpected change to their repayment ability so soon after purchasing a home.  Indeed, economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files.  This makes sense – when borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.

156.    Not only have the loans backing Western & Southern's Certificates experienced extraordinary rates of default, the Certificates' ratings have significantly deteriorated.  All of Western & Southern's Certificates initially received the highest possible ratings - Standard & Poor's ("S&P") AAA rating, or its equivalent from the other rating agencies.  According to its website, "[a]n obligation rated 'AAA' has the highest rating assigned by Standard &Poor's.  The obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk."  This is the same rating typically given to bonds backed by the full faith and credit of the U.S. government, such as treasury bills.  Historically, an AAA-rated security had an expected loss rate of less than 0.05%.

157.    Because of the high delinquency and default rates on the underlying loans, virtually all of Western & Southern's Certificates have been downgraded to "junk-bond" ratings, as can be seen in the following table:

54

| Certificate Offering and Class | Original Moody's Rating | Current Moody's Rating | Original Fitch Rating | Current Fitch Rating | Original S&P Rating | Current S&P Rating |
|---|---|---|---|---|---|---|
| JPMALT 2005-S1 1A1 | -- | -- | AAA | C | AAA | CCC |
| JPMAC 2006-WF1 A5 | Aaa | Ca | -- | -- | AAA | CCC |
| JPMAC 2006-WF1 A6 | Aaa | Caa2 | -- | -- | AAA | CCC |
| JPMAC 2007-CH1 AF4 | Aaa | Caa2 | AAA | CC | AAA | BBB* |
| JPMMT 2005-S3 1A3 | -- | -- | AAA | CC | AAA | CCC |
| WMALT 2005-7 2CB1 | Aaa | Caa1 | -- | -- | AAA | CCC |
| WMALT 2005-9 2A4 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-4 3A2A | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-4 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-5 1A10 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-5 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-9 A3 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2007-OA3 5A | Aaa | Caa3 | -- | -- | AAA | CC |

158.    The poor performance of the loan pools and the rapidly dropping credit ratings of the Certificates have caused a massive decline in the market values of the Certificates. According to the most recent data, the Certificates should be worth approximately $202.3 million, but their market value is substantially lower – approximately $145.3 million. That is a decline in value of more than 28% in the aggregate.

159.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools. Loan pools that were properly underwritten and contained loans with the represented characteristics would have

experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies. The dismal performance of the mortgage loans underlying Western & Southern's Certificates is itself strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics Defendants claimed. The defaults and related drop in market value thus are due to Defendants' wrongdoing, and not because of a general change in economic conditions.

**B.      Defendants' Own Documents and Testimony Confirm They Abandoned Their Underwriting Standards**

       **1.      JPMorgan Securitizations**

    160.      61% of the mortgage loans backing the JPMorgan Certificates that Western & Southern purchased were originated by CHF, the home mortgage division of Defendant JPMC Bank, far more than any other originator.

    161.      CHF's departure from underwriting standards has been confirmed by James Dimon, CEO of JPMorgan Chase. Mr. Dimon testified under oath to the FCIC on January 13, 2010 that "the underwriting standards of our mortgage business should have been higher. We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

    162.      CHF also relied heavily on third parties to originate loans. Mr. Dimon testified that these broker-loans performed markedly worse: "We've also closed down most-almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," and admitted that "there were some unscrupulous mortgage salesmen and mortgage brokers."

    163.      According to an article in *Bloomberg* on February 17, 2010, Mr. Dimon believed, at least from late 2006, that JPMorgan's mortgage backed securities were a bad investment, and

attempted to rid JPMorgan of such risk. The article noted that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William King, then its head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

164. In addition, on June 21, 2011, the United States Securities and Exchange Commission announced that Defendant J.P. Morgan Securities had agreed to pay $153.6 million to settle SEC charges relating to J.P. Morgan Securities' efforts to unload complex mortgage securities on its clients at a time when it knew full well that these securities were not credit worthy investments. As part of the settlement, the JPMorgan Securities was forced to "improve the way it reviews and approves mortgage securities transactions," including MBS.

165. The problems with CHF's origination business admitted to by Mr. Dimon have been corroborated and expanded upon in many different investigations of JPMorgan entities and legal actions that have been brought against them as a result. On information and belief, witnesses will testify in this action that, during the relevant period:

- CHF underwriters faced intense pressure to close loans at any cost, primarily because their salaries were dependent upon the quantity of loans they originated. This pressure for volume resulted in underwriting errors.

- CHF management would often override the decisions of underwriters to reject a loan, falsifying income information, removing harmful background documentation, and seeking altered appraisal values, in order to push the application through.

- CHF management would also work with underwriters, instructing them on how to find a way to successfully close a loan, such as calculating an LTV ratio or an income level that was needed for a particular loan to close.

- CHF underwriters would use lax income verification techniques, were discouraged from verifying income information, and were encouraged to make exceptions for the "reasonableness" of the income stated on applications.

- CHF underwriters were often not provided with all of the relevant borrower information, and certain data, such as credit scores and income, were susceptible to manipulation, especially with low documentation loans.

166. An internal CHF memorandum outlining "cheats and tricks" to gain approval for risky mortgage loans from the "Zippy system" – a CHF automated loan underwriting system – further demonstrates CHF's abandonment of underwriting guidelines. This memorandum advised CHF personnel to inflate the borrowers' income or otherwise falsify loan applications. The memorandum exhorted brokers to "Never Fear!!" If Zippy rejects a "stated income/stated asset" loan application, "Zippy can be adjusted (just ever so slightly)." The memorandum encouraged brokers to game the Zippy system because "[i]t's super easy! Give it a try!" The document instructed brokers not to break down income by base, overtime, commissions, or bonuses, but to lump it all into base income. The memorandum also recommended that "[i]f your borrower is getting a gift, add it to the bank account along with the rest of the assets. Be sure to remove any mention of gift funds[.]" As an additional technique to attain approval for these risky loans, the author counseled "resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets."

### a. Wells Fargo Originated Loans

167. Wells Fargo originated or acquired all of the loans underlying JPMAC 2006 WF1 or approximately 19% of the loans backing the JPMorgan Certificates that Western & Southern purchased. That the loans originated by Wells Fargo in connection with JPMAC 2006 WF1 failed to adhere to an semblance of sound underwriting practices is established by the astonishing default rates that have emerged with respect to this offering. *Approximately 50%* of the loans originated by Wells Fargo in connection with JPMAC 2006 WF1 are now in default or foreclosure. Moreover, while the Certificates that Western & Southern purchased in connection with the JPMAC 2006 WF1 offering were *initially rated triple AAA by Standard & Poors, they now are rated CCC.* The existence of astonishing default rates and downgrades plainly

58

establishes that Wells Fargo did not adhere to the underwriting guidelines touted in the JPMAC 2006 WF1 Prospectus Supplement.

168.    Plaintiffs in *In re Wells Fargo Mortg. Backed Certificates Litig.*, 09-cv-01376 (SI) (N.D. Cal.) have challenged statements concerning Wells Fargo's underwriting guidelines virtually identical to those that appeared in the JPMAC 2006 WF1 Prospectus Supplement. The court has already declined to dismiss such claims holding that Wells Fargo "failed to disclose that variance from the stated standards was essentially [Wells Fargo's] norm." 712 F. Supp. 2d 958, 971 (N.D. Cal. 2010).

169.    The problems with Wells Fargo origination business have been corroborated and expanded upon in many different investigations of JPMorgan entities and legal actions that have been brought against them as a result. On information and belief, witnesses will testify in this action that, during the relevant period:

- Wells Fargo "placed 'intense pressure' on its loan officers to close loans, including by coaching borrowers to provide qualifying income information, accepting implausible or falsified income information, and lowering its standards near the end of the calendar year." *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d at 971.

- Wells Fargo management would often override the decisions of underwriters to reject a loan, falsifying income information, removing harmful background documentation, and seeking altered appraisal values, in order to push the application through.

- Wells Fargo management would also work with underwriters, instructing them on how to find a way to successfully close a loan, such as calculating an LTV ratio or an income level that was needed for a particular loan to close.

- Wells Fargo underwriters would use lax income verification techniques, were discouraged from verifying income information, and were encouraged to make exceptions for the "reasonableness" of the income stated on applications.

- Wells Fargo underwriters were often not provided with all of the relevant borrower information, and certain data, such as credit scores and income, were susceptible to manipulation, especially with low documentation loans.

- The lapses in underwriting at Wells Fargo "infected the entire underwriting process, including with respect to prime loans." *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d at 971.

### 2. WaMu Securitizations

170.     In 2005, with the market for conventional, fixed-rate loans drying up, WaMu

formalized a strategy to move away from low risk to high risk home loans.  As James G.

Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate

PSI, WaMu Bank's focus had shifted by mid-2005 "to becoming more of a higher risk, sub-

prime lender . . . . This effort was characterized by statements advocating that the company

become either via acquisition or internal growth a dominant sub-prime lender."  Documents

recently released by the PSI show that, in April 2006, the President of WaMu's Home Loans

Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin

Products." The presentation showed that the least profitable loans were government-backed and

fixed loans; the most profitable were Option ARM, Home Equity, and Subprime Loans.

Subprime loans, at 150 basis points, were eight times more profitable than fixed loans at 19 basis

points.

171.     In its push to generate more risky loan products, WaMu Bank pressed its sales

agents to pump out loans while disregarding underwriting guidelines.  WaMu Bank gave

mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees,

bolstering profits and ultimately the compensation of the bank's executives.  "It was the Wild

West," said Steven M.  Knobel, founder of an appraisal company, Mitchell, Maxwell & Jackson,

which did business with WaMu until 2007.  "If you were alive, they would give you a loan.

Actually, I think if you were dead, they would still give you a loan." Indeed, Mr. Vanasek

testified that "[b]ecause of the compensation systems rewarding volume vs. quality and the

independent structure of the loan originators, I am confident that at times borrowers were coached to fill out applications with overstated incomes or net worth adjusted to meet the minimum underwriting policy requirements."

172.     WaMu's own recently released internal documents confirm these accounts.  In 2003, WaMu held focus groups with borrowers, loan officers, and mortgage brokers to determine how to sell its Option ARM product.  An Option ARM loan is typically a 30-year ARM that initially offers the borrower four monthly payment options: a specified minimum payment (which was typically lower than the interest payment and therefore caused the loan to grow, referred to as negative amortization), an interest-only payment, a 15-year fully amortizing payment, and a 30-year fully amortizing payment.  A 2003 report summarizing the focus group research stated: "Few participants fully understood the Option ARM. . . .  Participants generally chose an Option ARM because it was recommended to them by their Loan Consultant. . . .  Only a couple of people had any idea how the interest rate on their loan was determined."  It said that while borrowers "generally thought that negative amortization was a moderately or very bad concept," this perception could be turned around by mentioning "that price appreciation would likely overcome any negative amortization."  The report concluded: "[T]he best selling point for the Option ARM loan was [borrowers] being shown how much lower their monthly payment would be . . . versus a fixed-rate loan."  Significantly, the majority of the WaMu securitizations at issue here securitized Option ARM loans.

173.     Fay Chapman, WaMu's former Chief Legal Officer, candidly admitted to the *Seattle Times,* that "[m]ortgage brokers put people into the product [Option ARM] who shouldn't have been."  Another former WaMu employee, Renee Larsen, related that borrowers did not know they were getting cheated because the Option ARM loan was so difficult to understand.

Yet sales of these high-risk loans soared. In 2003, WaMu originated $32.3 billion of Option ARM loans. By 2005, that number had doubled to $64.1 billion.

174.    WaMu designed its employee compensation structure to favor these types of high-risk loans. In a document entitled "2007 Product Strategy," WaMu noted that it must "maintain a compensation structure that supports the high margin product strategy." A compensation grid from 2007 shows the company paid the highest commissions on Option ARMs, subprime loans and home-equity loans: A $300,000 Option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount. The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes. Likewise, a WaMu "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Options ARM, Non-prime referrals and Home Equity Loans . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

175.    The reason WaMu could originate so many high-risk loans was because its underwriting guidelines became so loose as to render them effectively meaningless. In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan. Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

176.    On September 28, 2007, WaMu's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending. The recently-released report determined that "[c]redit weakness and underwriting deficiencies is a

repeat finding with CCR." It additionally concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

177.    In early 2008, Radian Guaranty Inc., one of WaMu Bank's loan insurers, issued a similar report to WaMu Bank with the results of its review conducted from August 13, 2007 to September 28, 2007. The objectives of the review were, *inter alia,* to determine WaMu Bank's "compliance with Radian's underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's underwriting decisions." Radian gave WaMu Bank an overall rating of "Unacceptable." Of 133 loans reviewed, it found 11 loans or 8% had "insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines." Of the 10 delinquent loans it reviewed, it found that half had "questionable property values, occupancy and possible strawbuyers [sic]." Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger, WaMu's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases causes our origination data to be suspect particularly with respect to DTI [Debt To Income]."

178.    Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file." She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out," she said. Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents." When Ms. Chapman asked

how they could possibly foreclose it, "they said there was a letter in the file from OJ. Simpson saying 'the judgment is no good, because I didn't do it.'"

179.    According to Tom Golon, a former senior home loan consultant for WaMu in Seattle, Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down." The WaMu staff was subjected to "total blanketing – e-mails, memos, meetings set up so people understood that this was what the company wanted them to do."

180.    Various witnesses with direct experience in WaMu's underwriting operations will also testify that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule. For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

181.    WaMu's appetite for volume also led it to ignore the rampant fraud that infected its origination business. Perhaps the most compelling evidence involves two top loan producers at two different WaMu offices, called Montebello and Downey, in Southern California. Each of those loan officers made hundreds of millions of dollars in home loans each year and consistently won recognition for their efforts. In 2005, an internal WaMu review found that loans from those two offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])." The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review." The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these

64

particular willful behaviors on the part of the employees named." But virtually none of the proposed recommendations were implemented.

182.    Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans. WaMu thus made a decision to off-load these loans through securitization and sale to investors.

183.    In a recently published October 17, 2006 presentation to WaMu Bank's Board of Directors, David Schneider, the former President of WaMu Home Loans, described one of WaMu Bank's "'Mitigating Procedures" as "[p]eriodic non performing asset sales to manage credit risk."

184.    It has also been freshly discovered that, on February 14, 2007, David Beck, at the time an Executive Vice President at Defendant WCC, sent an e-mail to Mr. Schneider and Cheryl Feltgen, Chief Credit Officer for Home Loans, observing that "[t]he performance of newly minted option arm loans is causing us problems . . . We should address selling 1Q as soon as we can before we loose [sic] the oppty."

185.    In response, Ms. Feltgen advised that:

California, Option ARMs, large loan size ($1 to $2.5 million) have been the fastest increasing delinquency rates in the SFR [Single Family Residential] portfolio. . . . Our California concentration is getting close to 50% and many submarkets within California actually have declining house prices according to the most recent OFHEO data from third quarter of 2006. There is a meltdown in the subprime market which is creating a "flight to quality." . . . There is still strong interest around the world in US residential mortgages. Gain on sale margins for Option ARMs arc attractive. This seems to me to be a great time to sell as many Option ARMs as we possibly can. [CEO] Kerry Killinger was certainly encouraging us to think seriously about it at the MER last week.

186.    Ms. Feltgen then forwarded these e-mails to additional WaMu executives, noting: "We are contemplating selling a larger portion of our Option ARMs than we have in the recent

65

past. Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the market seems not yet to be discounting a lot for those factors." As noted above, the majority of the WaMu securitizations that are the subject of this action securitized the very types of deteriorating loans that Ms Feltgen and other senior WaMu executives identified – Option ARM loans originated from 2005 through 2007 with high concentrations in California.

187.    In response to Ms. Feltgen's e-mail, on February 20, 2007, Robert Shaw, Senior Credit Officer at WaMu, circulated an analysis of the delinquency rates in WaMu's investment portfolio. Mr. Shaw explained that the results "show that seven combined factors contain $8.3 billion HFI [Hold for Investment] Option ARM balances which experienced above-average increases in the 60+ delinquency rate during the last 12 months (a 821% increase, or 10 times faster than the average increase of 70%)." Accordingly, Mr. Shaw "recommend[ed] that we select loans with some or all of these characteristics to develop a HFS [Hold for Sale] pool."

188.    Not only did WaMu Defendants decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans. An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an investor." In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."

189.    In only one of the astonishing exchanges during the PSI's recent hearings, David Beck, the WCC executive in charge of securitizations, flatly admitted that its securitizations were tainted by fraud and underwriting deficiencies.

> Senator Levin: Purchasers of these securities were relying on you to provide truthful information. You knew about it. (Referring to fraudulent loans in securities). Wasn't that your job?
> David Beck: I understood there was fraud. ...
> Senator Coburn: Were you aware ever that the loans underlying the securities were having problems?
> Mr. Beck: I knew we had underwriting problems.

190.    Needless to say, none of this was disclosed to investors, such as Western & Southern. The WaMu Defendants did not disclose that WaMu Bank was pushing high risk loans onto borrowers who could not afford them. Nor did they disclose that WaMu Bank had effectively lowered its underwriting standards to such an extent as to render them meaningless, or that they were granting exceptions without regard to loan quality. Likewise, the WaMu Defendants did not disclose that they were selling underperforming assets in order to shift "credit risk" off their books. It goes without saying that had Western & Southern known these facts, it never would have acquired the WaMu Certificates.

## V.    MISREPRESENTATIONS CONCERNING TRANSFER OF TITLE TO THE ISSUING TRUSTS

191.    Both the JPMorgan Defendants and the WaMu Defendants falsely stated in the Offering Materials that title to each mortgage loan was transferred to the relevant trust such that the trust would acquire the right to foreclose upon property subject to each mortgage loan.

192.    A fundamental step in the mortgage securitization process is the transfer to the issuing trust for each MBS offering of good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the holders to be legally entitled to enforce the mortgage loans in case of default.

193.  The JPMALT 2005-S1 Prospectus Supplement assured investors that title would

be transferred properly, providing:

> Pursuant to a pooling and servicing agreement, on the Closing Date the Depositor
> will sell, transfer, assign, set over and otherwise convey without recourse to the
> Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its
> rights under the Assignment Agreements (including the right to enforce the
> Originators' purchase obligations). . . .  In connection with such transfer and
> assignment of the Mortgage Loans, the Depositor will deliver or cause to be
> delivered to the Trustee or its custodian the Mortgage File.  Assignments of the
> Mortgage Loans to the Trustee (or its nominee) will be recorded in the
> appropriate public office for real property records.

JPMALT 2005-S1 Prospectus Supplement at S-32. The same representation appeared in the

JPMMT 2005-S2 Prospectus Supplement at S-30.

194.  The following similar representation appeared in the Prospectus Supplement for

JPMAC 2006-WF-1:

> Pursuant to the Pooling and Servicing Agreement, on the Closing Date the
> Depositor will sell, transfer, assign, set over and otherwise convey without
> recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the
> Mortgage Loans and its rights under the Assignment Agreement (including the
> right to enforce the Originator's purchase obligations).

JPMAC 2006-WF-1 at S-18.  The same representation appeared in the JPMAC 2007-CH1

Prospectus Supplement at S-137.

195.  The Prospectus for WMALT 2005-7, WMALT 2005-9

> The Company, a Servicing Entity or a Servicer, as the case may be, will, as to
> each Mortgage Loan, deliver or cause to be delivered to the Trustee the Mortgage
> Note, an assignment (except as to any Mortgage Loan registered on the MERS
> System (as defined below). . . .  With respect to any Mortgage Loan registered on
> the mortgage electronic registration system (the 'MERS System') maintained by
> MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or any
> successor thereto ('MERS'), an assignment of Mortgage will not be delivered to
> the Trustee as described above, but instead the change in beneficial ownership to
> the Trust will be registered electronically through the MERS System in
> accordance with the rules of membership of MERS.  MERS will serve as
> mortgagee of record with respect to these Mortgage Loans solely as a nominee of

68

the Trust, in an administrative capacity, and will not have any interest in these Mortgage Loans.

196.    The Prospectus for WMALT 2006-4, 2006-5, 2006-9 represented:

The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located

See WMALT 2006-4 Prospectus at 51, WMALT 2006-5 Prospectus at 51, and WMALT 2006-9 Prospectus at 51. The same representation appeared in the Prospectus for WMALT 2007-OA3 at 50.

197.    Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

198.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).

199.    Generally, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

200.    In order to preserve the bankruptcy-remote status of the issuing trusts in MBS transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the trust. Rather, the notes and security instruments are generally

69

initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities. After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

201.    In addition, the PSA generally requires the transfers of the mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust qualifies as a tax-free real estate mortgage investment conduit.

202.    The applicable state trust law generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery, and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

203.    The Federal Reserve System, the OCC and the Office of Thrift Supervision recently issued a report that confirms that the JPMorgan Defendants and the WaMu Defendants routinely did not transfer the original mortgage loan documents to the issuing trusts for MBS transactions. In the *Interagency Review of Foreclosure Policies and Practices* released April 2011, the agencies reported that their extensive examinations of mortgage loan servicers including JPMorgan Bank (including in its capacity as successor to WaMu Bank) ***"showed that servicers possessed original notes and mortgages."*** As a result, contrary to the JPMorgan Defendants' and WaMu Defendants' assertions to the contrary in the offering materials, the mortgage note or the mortgage file for each underlying loan was not transferred properly and none of the trusts have the right to foreclose on any of the affected underlying loans.

204. The WaMu Defendants' representation that "the change in beneficial ownership to the Trust will be registered electronically through the MERS System" was also false. As a New York State appellate court recently held, parties cannot avoid state laws governing assignment and recording of mortgages through use of the MERS System. Thus, use of the MERS System was a nullity. *See Bank of N.Y. v. Silverberg*, 2011 NY Slip Op 5002 (2d Dep't June 7, 2011) (holding the assignment to MERS is a nullity where note was not physically delivered to MERS).

## VI. SCIENTER ALLEGATIONS APPLICABLE TO COMMON LAW FRAUD CLAIMS

205. The allegations below are made in support of common law fraud claims, not in support of Plaintiffs' Ohio Securities Act claims, federal 1933 Act claims, and negligent misrepresentation claims.

206. The same evidence discussed above not only shows that the representations were untrue, but that the Wamu Defendants *knew* it was falsely representing the underlying process and the risk profiles behind the Mortgage Loans. For instance:

- WaMu management consciously loosened lending guidelines in order to boost income from securitizations. In its push to generate more risky loan products, WaMu Bank pressed its sales agents to pump out loans while disregarding underwriting guidelines. WaMu Bank gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives.

- In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan. Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

- Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file." She would "take

71

the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out," she said.

- In 2005, an internal WaMu review found that loans from two of WaMu's top loan producing offices, Downey and Montebello had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])." The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review." The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named." But virtually none of the proposed recommendations were implemented.

- Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans. WaMu thus made a decision to off-load these loans through securitization and sale to investors. For example, in a recently published October 17, 2006 presentation to WaMu Bank's Board of Directors, David Schneider, the former President of WaMu Home Loans, described one of WaMu Bank's "Mitigating Procedures" as "[p]eriodic non performing asset sales to manage credit risk." Similarly, it has also been freshly discovered that, on February 14, 2007, David Beck, at the time an Executive Vice President at Defendant WCC, sent an e-mail to Mr. Schneider and Cheryl Feltgen, Chief Credit Officer for Home Loans, observing that "[t]he performance of newly minted option arm loans is causing us problems . . . We should address selling 1Q as soon as we can before we loose [sic] the oppty."

- Not only did WaMu Defendants decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans. An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an investor." In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."

- David Beck, the WCC executive in charge of securitizations, flatly admitted that the WaMu Defendants' securitizations were tainted by fraud and underwriting deficiencies, stating during Senate testimony "I understood there was fraud" and "I knew we had underwriting problems."

## VII.   WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES

207.    In making the investments, Western & Southern relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the relevant underwriting process whereby the underlying loans were generated.  Western & Southern received, reviewed, and relied upon the Offering Materials, which described in detail the Mortgage Loans underlying each offering.

208.    In purchasing the Certificates, Western & Southern justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Materials.

209.    But for the misrepresentations and omissions in the Offering Materials, Western & Southern would not have purchased or acquired the Certificates, because those representations and omissions were material to its decision to acquire the Certificates, as described above.

210.    The false and misleading statements of material facts and omissions of material facts in the Offering Materials directly caused Western & Southern damage, because the Certificates were in fact far riskier than Defendants had described them to be.  The loans underlying the Certificates experienced default and delinquency at very high rates due to Defendants' abandonment of its underwriting guidelines.

211.    Western & Southern has incurred substantial losses in market value and lost principal and interest payments, due to the poor quality of the collateral underlying the Certificates.  The income and principal payments which Western & Southern has been paid have been lower than Western & Southern expected and lower than the payments to which Western & Southern is entitled under the "waterfall" provisions of the securitizations.

73

212. The disclosure of irregularities in underwriting practices and increased risk regarding future cash flow has also led to a substantial decline in market value of the Certificates. Western & Southern purchased the Certificates not only for their income stream, but also with an expectation of possible reselling the Certificates on the secondary market. Western & Southern thus viewed market value as a critical aspect of the Certificates it purchased. Western & Southern incurred substantial losses on the Certificates due to a drastic decline in market value attributable to Defendants' misrepresentations which, when disclosed, revealed that the Mortgage Loans likely had a substantially higher risk profile than investors (including Western & Southern) were led to believe.

213. Western & Southern's losses on the Certificates have been much greater than they would have been if the loans were as Defendants described them to be.

214. The drastic and rapid loss in value of Western & Southern's Certificates was primarily and proximately caused by Defendants' issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Offering Materials. These rates of delinquency and default were much higher than expected for securitizations supported by collateral fitting Defendants' representations, and much higher than they would have been if the Mortgage Loans had been properly underwritten. The drastic increases in delinquency and default on the Mortgage Loans were not attributable to the recent decline in the American housing market, but rather due to Defendants' wrongdoing.

## VIII. LIABILITY OF THE SPONSORS, DEPOSITORS, AND UNDERWRITERS AS SELLERS OF SECURITIES TO WESTERN & SOUTHERN

215. The Defendants that qualify as sellers of securities under the Ohio Securities Act and the federal 1933 Act are the Sponsors (JPM Mortgage Acquisition, WMMSC and WaMu Bank (now JPMC Bank)), the Depositors (JPMAC, WMMSC, and WMAAC), and the

74

Underwriters (J.P. Morgan Securities and WCC). Each of these is primarily liable for

misrepresentations in the Offering Materials under ORC §§ 1707.41, 1707.44. The JPMorgan

Defendants are also liable as primary violators of Section 11 of the 1933 Act in connection with

the JPMAC 2006-WF1 and JPMMT 2007-CH1 offerings.

216. As the Sponsors and/or Sellers for the securitizations at issue, JPM Mortgage

Acquisition, WMMSC and WaMu Bank originated or acquired the mortgage loans that were

pooled together in the securitizations, and then sold, transferred, or otherwise conveyed title to

those loans to the Depositors pursuant to Pooling and Servicing Agreements. JPM Mortgage

Acquisition, WMMSC and WaMu Bank (now JPMC Bank) had responsibility for preparing the

Offering Materials that were used to solicit purchases of the Certificates and were identified on

the Prospectuses and Prospectus Supplements. JPM Mortgage Acquisition and WMMSC

profited from the sales of the Certificates.

217. As the Depositors for the securitizations at issue, JPMAC, WMMSC, and

WMAAC purchased the mortgage loans from the Sponsors pursuant to the Pooling and

Servicing Agreements. The Depositors then purportedly sold, transferred, or otherwise conveyed

the mortgage loans to the Trusts, which held the loans as collateral for the Certificates. The

Depositors shared responsibility for preparing the Offering Materials that were used to solicit

purchases of the Certificates, and were identified on the Prospectuses and Prospectus

Supplements. In addition, the Depositors were responsible for registering the offerings with the

SEC. The Depositors profited from the sales of the Certificates.

218. The Trusts issued the Certificates that were sold to investors, including Western

& Southern. The Trusts had no autonomy or assets of their own, but were mere agents of the

75

Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Sponsors and Depositors and issuing the Certificates for sale to the investors.

219.    The Sponsors, Depositors, and Trusts used the Underwriters J.P. Morgan Securities and WCC to market and sell the Certificates. The Underwriters were responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines. The Underwriters profited from the sales of the Certificates.

220.    The Sponsors, Depositors, Underwriters, and Trusts successfully solicited Western & Southern's purchase of the Certificates at issue. The Underwriters transferred title in the Certificates to Western & Southern.

## IX.    LIABILITY OF THE JPMORGAN SPONSOR AND DEPOSITOR AS CONTROL PERSONS

### A.    JPM Mortgage Acquisition

221.    JPM Mortgage Acquisition, as the Sponsor for each of the four JPMorgan securitizations at issue, had day-to-day control over the related Depositor and, through the Depositor, the JPMorgan Trusts, JPM Mortgage Acquisition acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositor and then to the JPMorgan Trusts. JPM Mortgage Acquisition also determined and approved the structure of the securitizations and the manner in which the Depositor and the JPMorgan Trusts sold the JPMorgan Certificates, and controlled the disclosures made in connection with each JPMorgan offering at issue.

### B.    JPMAC

222.    JPMAC, as the Depositor for each of the four JPMorgan securitizations at issue, had day-to-day control over the JPMorgan Trusts. JPMAC created the JPMorgan Trusts and

used them as agents to hold the pools of underlying mortgage loans and issue the JPMorgan

Certificates for sale to investors. JPMAC formed the pools of mortgage loans underlying the

JPMorgan Certificates, and determined the tranches of interests in the pools and their various

levels of seniority. JPMAC then transferred the pools to the JPMorgan Trusts, which had no

discretion or control over the mortgages in the pool. JPMAC also controlled the disclosures

made in connection with each JPMorgan offering at issue.

### FIRST CAUSE OF ACTION
#### (Violation of ORC § 1707.41)

223.    Western & Southern realleges each allegation above as if fully set forth herein.

224.    This claim is brought under Section 1707.41 of the Ohio Securities Act, ORC §

1707.41 against all Defendants. Defendants (a) offered securities for sale by a written or printed

circular, prospectus, or advertisement; (b) Western & Southern purchased these securities relying

on such written or printed circular, prospectus, or advertisement; and (c) such written or printed

circular, prospectus, or advertisement contained untrue statements of material fact and/or omitted

material facts necessary to make the statements made not misleading.

225.    Defendants had knowledge of the untrue statements of material fact and

omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants

failed to exercise reasonable diligence in ascertaining their falsity.

226.    As a result of Defendants' dissemination of materially false and misleading

information and their failure to disclose material facts, Western & Southern was misled into

believing that the Certificates were more creditworthy investments than they actually were.

227.    By virtue of the foregoing, Defendants have violated ORC § 1707.41. As a direct

and proximate result of the Section 1707.41 Defendants' wrongful conduct, Western & Southern

has suffered damages in connection with the purchase and subsequent decline in value of the Certificates.

## SECOND CAUSE OF ACTION
### (Violation of ORC § 1707.44(B)(4))

228.    Western & Southern realleges each allegation above as if fully set forth herein.

229.    This claim is brought under the Ohio Securities Act, ORC § 1707.44(B), against all Defendants. Defendants made false representations concerning material and relevant facts, in the Offering Materials for the purpose of selling securities within the State of Ohio.

230.    Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

231.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Western & Southern was misled into believing that the Certificates were more creditworthy investments than they actually were.

232.    By virtue of the foregoing, Defendants have violated ORC § 1707.44(B)(4). As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates.

## THIRD CAUSE OF ACTION
### (Violation of ORC § 1707.44(J))

233.    Western & Southern realleges each allegation above as if fully set forth herein.

234.    This claim is brought under the Ohio Securities Act, ORC § 1707.44(J), against all Defendants. Defendants knowingly made or caused to be made materially misleading false statements in the Offering Materials concerning the value of the Certificates.

78

235.     Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

236.     As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Western & Southern was misled into believing that the Certificates were more creditworthy investments than they actually were.

237.     By virtue of the foregoing, Defendants have violated ORC § 1707.44(J).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, in connection with reduced interest payments on certain Certificates and in connection with the subsequent sale of certain Certificates for a loss.

### FOURTH CAUSE OF ACTION
### (Violation of ORC § 1707.44(G))

238.     Western & Southern realleges each allegation above as if fully set forth herein.

239.     This claim is brought under the Ohio Securities Act, ORC § 1707.44(G), against all Defendants.  Defendants knowingly engaged in acts prohibited under the Ohio Securities Act in connection with the sale of the Certificates to Western & Southern.

240.     By virtue of the foregoing, Defendants have violated ORC § 1707.44(G).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, in connection with reduced interest payments on certain Certificates and in connection with the subsequent sale of certain Certificates for a loss.

## FIFTH CAUSE OF ACTION
### (Rescission pursuant to ORC § 1707.43)

241.    Western & Southern realleges each allegation above as if fully set forth herein including but not limited the First, Second, Third and Fourth Causes of Action herein.

242.    This claim is brought under the Ohio Securities Act, ORC § 1707.43, against all Defendants. As set forth in the First, Second, Third and Fourth Causes of Action herein, the Defendants sold the certificates in violation of the Ohio Securities Act.

243.    Western & Southern is entitled to void and rescind the sale of Certificates under OCR § 1707.43 and recover the full amount of consideration paid for the Certificates and all taxable court costs.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)

244.    Western & Southern realleges each allegation above as if fully set forth herein.

245.    This is a claim for negligent misrepresentation against JPM Mortgage Acquisition, JPMAC, WMMSC and WMAAC (the "Negligent Misrepresentation Defendants").

246.    Western & Southern made 63 separate investments in 10 Offerings of mortgage-backed securities that the Defendants securitized and sold. The Negligent Misrepresentation Defendants also originated or acquired, and underwrote, all the loans in the Offerings.

247.    Because Defendants arranged the securitizations it had unique and special knowledge about the loans in the Offerings. In particular, Defendants had unique and special knowledge and expertise regarding the quality of the underwriting of the loans underlying each securitization.

248.    Because Western & Southern could not evaluate the loan files for the mortgage loans underlying its Certificates, and because Western & Southern could not examine the

80

underwriting quality or servicing practices for the mortgage loans in the securitizations on a loan-by-loan basis, it was heavily reliant on Defendants' unique and special knowledge regarding the underlying mortgage loans when determining whether to make each investment of Certificates. Western & Southern was entirely reliant on Defendants to provide accurate information regarding the loans in engaging in that analysis.

249. Defendants were aware that Western & Southern was seeking to compile a portfolio of conservative investments and that Western & Southern relied on Defendants' unique and special expertise and experience and depended upon Defendants for accurate and truthful information.

250. Based on its expertise, superior knowledge, and relationship with Western & Southern, Defendants owed a duty to Western & Southern to provide complete, accurate, and timely information regarding the mortgage loans and the offerings. The Negligent Misrepresentation Defendants breached their duty to provide such information to Western & Southern.

251. The Negligent Misrepresentation Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Western & Southern's investment in the offerings. At the time they made these misrepresentations, the Negligent Misrepresentation Defendants knew, or at a minimum were negligent in not knowing, that these statements were false, misleading, and incorrect. Such information was known to the Negligent Misrepresentation Defendants but not known or readily known to Western & Southern, and the Negligent Misrepresentation Defendants knew that Western & Southern was acting in reliance on mistaken information.

252. Western & Southern reasonably relied on the information the Negligent Misrepresentation Defendants did provide and was damaged as a result of these misrepresentations. Had Western & Southern known the true facts regarding Defendants' underwriting practices and the quality of the loans making up the securitizations, it would not have purchased the Certificates.

253. The Negligent Misrepresentation Defendants' material misrepresentations and omissions set forth above were made without any reasonable ground for believing that the representations were true.

254. By reason of the foregoing, the Negligent Misrepresentation Defendants are liable to Western & Southern for negligent misrepresentation.

255. As a result of the foregoing, Western & Southern has suffered damages according to proof.

## SEVENTH CAUSE OF ACTION
### (Common-Law Fraud)

256. Western & Southern realleges each allegation above as if fully set forth herein.

257. This claim is brought against the WaMu Defendants.

258. The material representations set forth above were fraudulent, and the WaMu Defendants' representations fraudulently omitted material statements of fact.

259. Each of the WaMu Defendants knew their representations and omissions were false and/or misleading at the time they were made. Each of the WaMu Defendants made the misleading statements with intent to defraud Western & Southern.

260. Western & Southern justifiably relied on the WaMu Defendants' false representations and misleading omissions.

82

261.    Had Western & Southern known the true facts regarding the WaMu Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

262.    As a result of the WaMu Defendants' false and misleading statements and omissions, as alleged herein, Western & Southern has suffered damages according to proof. The WaMu Defendants are liable to Western & Southern for common-law fraud.

## EIGHTH CAUSE OF ACTION
### (Violation of Section 11 of the 1933 Act )

263.    Western & Southern realleges each allegation above as if fully set forth herein, except to the extent that Western & Southern expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

264.    This cause of action is based solely on claims of strict liability or negligence under the 1933 Act. This count is predicated upon the JPMorgan Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials associated with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

265.    This claim is brought under Section 11 of the 1933 Act, 15 U.S.C. §77k ("Section 11"), against the JPMorgan Defendants.

266.    Each of Western & Southern's purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the registration statements and prospectus supplements that were filed with the SEC in connection with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

267.    The Offering Materials for the offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. At the time it obtained

83

the Certificates, Western & Southern did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

268. The JPMorgan Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Western & Southern of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Materials.

269. The JPMorgan Defendants are strictly liable to Western & Southern for the materially untrue statements and omissions in the Offering Materials under Section 11.

270. The JPMorgan Defendants owed to Western & Southern a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. The JPMorgan Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

271. This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the complaint in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al v. J.P. Morgan Acceptance Corporation I et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of Western & Southern's claims afforded by that filing.

272. Western & Southern has sustained damages measured by the difference between the price Western & Southern paid for the certificates and (1) the value of the Certificates at the time this suit was brought, or (2) the price at which Western & Southern sold the Certificates in

84

the market prior to the time suit was brought. Western & Southern's Certificates lost substantial

market value subsequent to and due to the materially untrue statements of facts and omissions of

material facts in the Offering Materials alleged herein.

273. By reason of the conduct herein alleged, the JPMorgan Defendants violated

Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing. By virtue of

the foregoing, Western & Southern is entitled to damages from each of the JPMorgan

Defendants.

## NINTH CAUSE OF ACTION
### (Violation of Section 12(a)(2) of the 1933 Act)

274. Western & Southern realleges each allegation above as if fully set forth herein,

except to the extent that Western & Southern expressly excludes from this cause of action any

allegation that could be construed as alleging fraud or intentional or reckless conduct.

275. This cause of action is based solely on claims of strict liability or negligence

under the 1933 Act. This count is predicated upon the JPMorgan Defendants' negligence for

making untrue and materially misleading statements in the Offering Materials for the JPMAC

2006-WF1 and JPMAC 2007-CH1 offerings.

276. This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C.

§77l(a)(2) ("Section 12(a)(2)"), against the JPMorgan Defendants.

277. The JPMorgan Defendants offered and sold the Certificates to Western &

Southern by means of the defective Offering Materials, including the Prospectuses and

Prospectus Supplements, which contained materially untrue statements of facts and omitted to

state material facts necessary to make the statements, in the light of the circumstances under

which they were made, not misleading. Western & Southern purchased the Certificates directly

85

from the JPMorgan Defendants, who both transferred title to Western & Southern and who solicited Western & Southern for financial gain.

278.    The JPMorgan Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

279.    The JPMorgan Defendants owed to Western & Southern the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The JPMorgan Defendants failed to exercise such reasonable care.

280.    The JPMorgan Defendants knew, or in the exercise of reasonable care should have known, that the Offering Materials contained materially untrue statements of facts and omissions of material facts, as set forth above, at the time of the Offerings. Conversely, Western & Southern did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

281.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the complaint in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al v. J.P. Morgan Acceptance Corporation I et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of Western & Southern's claims afforded by that filing.

86

282.     Western & Southern sustained material damages in connection with its investments in the securitizations and accordingly has the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.  Western & Southern hereby tenders its Certificates and demands rescission.

## TENTH CAUSE OF ACTION
### (Violation of Section 15 of the 1933 Act)

283.     Western & Southern realleges each allegation above as if fully set forth herein.

284.     This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. §770 ("Section 15"), against JPM Mortgage Acquisition and JPMAC (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

285.     The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of depositor and/or issuing trusts associated with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

286.     The Section 15 Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Materials.  The Section 15 Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

287.     The Section 15 Defendants had power and influence over the JPMorgan Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control,

87

directly or indirectly, the decision making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Materials.

288.    The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Western & Southern.

289.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material factor and were not misleading.

290.    Western & Southern did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

291.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with – and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

## PRAYER FOR RELIEF

WHEREFORE Western & Southern prays for relief as follows:

An award of damages against Defendants in favor of Western & Southern against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.    Rescission and recovery of the consideration paid for the Certificates, with interest thereon, pursuant to Western & Southern's Ohio Securities Act claims and Section 12(a)(2);

b.      Western & Southern's monetary losses, including loss of market value and loss of

principal and interest payments;

c.      Attorneys' fees and costs;

d.      Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.


Dated: June 22, 2011

                                        Respectfully Submitted,

                                        Glenn V. Whitaker  (0018169)
                                        Eric W. Richardson  (0066530)
                                        Adam C. Sherman  (0076850)
                                        Vorys, Sater, Seymour and Pease LLP
                                        Suite 2000, Atrium Two
                                        221 East Fourth Street
                                        P.O. Box 0236
                                        Cincinnati, Ohio  45201-0236
                                        Telephone:    (513) 723-4000
                                        Facsimile:    (513) 723-4056

                                        *Attorneys for Plaintiffs The Western and
                                        Southern Life Insurance Company, Western-
                                        Southern Life Assurance Company, Columbus
                                        Life Insurance Company, Integrity Life
                                        Insurance Company, National Integrity Life
                                        Insurance Company and Fort Washington
                                        Investment Advisors, Inc.*

89

*OF COUNSEL:*

David H. Wollmuth
Vincent T. Chang
Steven S. Fitzgerald
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

### PRAECIPE TO THE CLERK

Please serve the defendants by certified U.S. Mail, return receipt requested, a summons

and this complaint at the addresses set forth above.

_____
Eric W. Richardson