## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THE WESTERN AND SOUTHERN LIFE
INSURANCE COMPANY, et al.,

        Plaintiffs,

      v.

JPMORGAN CHASE BANK, N.A., et al.,

        Defendants.

Case No. 1:11-cv-00495

Judge Susan J. Dlott

**AMENDED COMPLAINT**

**(WITH JURY DEMAND
ENDORSED HEREON)**

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................................ 1

PARTIES ........................................................................................................... 6

I.      Plaintiffs ................................................................................................. 6

II.     JPMorgan Defendants ............................................................................ 7

III.    WaMu Defendants .................................................................................. 9

JURISDICTION AND VENUE ....................................................................... 11

SUBSTANTIVE ALLEGATIONS ................................................................. 12

I.      THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES ........... 12

II.     THE SECURITIZATION PROCESS ................................................................. 14

III.    WESTERN & SOUTHERN'S PURCHASES OF DEFENDANTS' CERTIFICATES .. 18

IV.     DEFENDANTS ABANDONED THEIR DISCLOSED UNDERWRITING
        STANDARDS TO FACILITATE THE SALE OF LOW-QUALITY LOANS TO
        INVESTORS ................................................................................................ 27

        A.      Defendants Touted Their Underwriting Standards ............................... 27

                1.      The JPMorgan Defendants' Representations ........................... 28

                        a.      JPMALT 2005-S1 ........................................... 28

                        b.      JPMMT 2005-S3 ............................................. 35

                        c.      JPMAC 2006-WF1 ......................................... 41

                        d.      JPMAC 2007-CH1 ......................................... 43

                2.      The WaMu Defendants' Representations ................................. 44

        B.      Widespread Defaults and Downgrades Confirm Defendants Abandoned Their
                Disclosed Underwriting Standards ..................................................... 48

C.    Defendants Routinely "Waived In" Loans They Knew Did Not Comply With Their Stated Underwriting Standards ........................................................ 54

D.    Other Evidence Demonstrating that Defendants Abandoned their Disclosed Underwriting Standards .......................................................................... 57

      1.    Defendants' Shoddy Lending Practices .................................... 57

            a.    The JPMorgan Defendants ............................................ 57

            b.    The WaMu Defendants ................................................. 59

      2.    Defendants Acquired Loans From Originators Who Employed Shoddy Origination Practices ................................................................ 66

            a.    Wells Fargo ................................................................. 67

            b.    Countrywide ................................................................. 68

            c.    AHMC ......................................................................... 72

            d.    Greenpoint ................................................................... 74

            e.    RFC ............................................................................. 75

            f.    MortgageIT .................................................................. 76

V.    MISREPRESENTATIONS CONCERNING TRANSFER OF MORTGAGES AND NOTES TO THE ISSUING TRUSTS ........................................................................ 77

      A.    Defendants' Representations ................................................................. 79

      B.    Contrary to Defendants' Representations, They Did Not Properly Assign Large Numbers of Mortgages and Notes and Failed to Deliver Mortgage Loan Files to the Trusts ........................................................................................ 81

      C.    Defendants' Statements or Omissions Regarding MERS Were Also Misleading .......................................................................................... 87

VI.   DEFENDANTS MANIPULATED THE RATINGS PROCESS ..................................... 88

VII.  DEFENDANTS IMPROPERLY MANIPULATED THE APPRAISAL PROCESS ...... 91

VIII. SCIENTER ALLEGATIONS APPLICABLE TO COMMON LAW FRAUD CLAIMS 93

IX.   WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES ......... 94

X.      LIABILITY OF THE SPONSORS, DEPOSITORS, AND UNDERWRITERS AS
        SELLERS OR SALE PARTICIPANTS ................................................................. 97

XI.     LIABILITY OF THE JPMORGAN SPONSOR AND DEPOSITOR AS CONTROL
        PERSONS ........................................................................................................... 98

        A.      JPM Mortgage Acquisition .................................................................. 98

        B.      JPMAC ................................................................................................. 99

FIRST CAUSE OF ACTION (Violation of ORC § 1707.41) ........................................ 99

SECOND CAUSE OF ACTION (Violation of ORC § 1707.44(B)(4)) .................................. 100

THIRD CAUSE OF ACTION (Violation of ORC § 1707.44(J)) ............................................ 100

FOURTH CAUSE OF ACTION (Violation of ORC § 1707.44(G)) ........................................ 101

FIFTH CAUSE OF ACTION (Rescission pursuant to ORC § 1707.43) ................................. 101

SIXTH CAUSE OF ACTION (Negligent Misrepresentation) .................................................. 102

SEVENTH CAUSE OF ACTION (Common-Law Fraud) ......................................................... 103

EIGHTH CAUSE OF ACTION (Violation of Section 11 of the 1933 Act) ............................. 104

NINTH CAUSE OF ACTION (Violation of Section 12(a)(2) of the 1933 Act) ....................... 106

TENTH CAUSE OF ACTION (Violation of Section 15 of the 1933 Act) ............................... 108

PRAYER FOR RELIEF ......................................................................................................... 109

JURY TRIAL DEMANDED .................................................................................................. 110

The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company and Fort Washington Investment Advisors, Inc. (collectively, "Western & Southern"), by and through their attorneys, bring this action against JPMorgan Chase Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation; J.P. Morgan Securities LLC; J.P. Morgan Acceptance Corporation I (collectively, the "JPMorgan Defendants"); WaMu Asset Acceptance Corporation; WaMu Capital Corporation; and Washington Mutual Mortgage Securities Corporation (collectively, the "WaMu Defendants" and together with the JPMorgan Defendants, "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities (the "Certificates") to Western & Southern. The Certificates were sold pursuant to public filings and offering materials that contained untrue statements and omissions of material facts, in violation of Sections 1707.41, 1707.43 and 1707.44 of the Ohio Revised Code and, with respect to certain Certificates, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"). Western & Southern further states claims for common-law fraud and/or negligent misrepresentation against certain Defendants.

2.      To take advantage of the exploding market for residential mortgage-backed securities, the JPMorgan Defendants significantly increased their origination and securitization of mortgage loans starting in 2003. Between 2004 and 2005, their securitization of residential mortgage loans grew more than fivefold, from approximately $4.5 billion to $24 billion. The JPMorgan Defendants were responsible for originating or purchasing large blocks of mortgage

loans, repackaging those loans into securities, and selling the newly-created securities to investors like Western & Southern.

3.     The WaMu Defendants similarly began to increase their origination and securitization of riskier loans around 2003. From 2003 to 2004, the WaMu Defendants increased their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion. By the end of 2006, this figure had almost tripled again to $29 billion. In order to maximize their profit, the WaMu Defendants also controlled virtually every aspect of the process of securitizing the loans underlying the Certificates.

4.     In marketing the Certificates to Western & Southern, the Defendants represented that the loans backing the securities were underwritten in accordance with prudent underwriting standards that ensured a borrower could repay the loan. The Defendants further represented that the mortgage loans underlying each securitization had been validly assigned to the Trusts so that the Trusts would have the ability to foreclose upon a particular property in the event of a borrower's default.

5.     In reality, however, the loans backing the Certificates deviated substantially from what was represented to Western & Southern. To generate an ever-growing volume of loans to sell to investors, the Defendants abandoned their disclosed underwriting guidelines, often originating or purchasing loans issued to borrowers regardless of their ability to repay. The loans were often issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and other departures from the disclosed underwriting criteria that had no proper justification.

6.     The JPMorgan Defendants' systemic departure from their underwriting guidelines was a focus of a report issued in January 2011 by the Congressional Financial Crisis Inquiry

Commission ("FCIC Report").  The FCIC Report demonstrated that although the JPMorgan

Defendants were notified that 13% of the mortgage loans underlying JPMorgan's securitizations

during the relevant period did not comply with JPMorgan's stated underwriting guidelines, but

the JPMorgan Defendants included such loans in their offerings anyway.  James Dimon, the

Chief Executive Officer of JPMorgan Chase & Co., the direct or indirect parent company of the

JP Morgan Defendants, confirmed that the JPMorgan Defendants failed to adhere to

underwriting standards they touted as prudent in the Offering Materials.  Mr. Dimon admitted

that "the underwriting standards of our mortgage business should have been higher."  He further

added that the JPMorgan Defendants had originated and securitized "bad products" that were

pushed on borrowers by "unscrupulous mortgage salesmen and mortgage brokers."

   7.  The WaMu Defendants likewise discarded internal risk guidelines in order to

increase their production and securitization of mortgage loans.  In its report on the financial crisis

dated April 13, 2011, the Senate Permanent Subcommittee on Investigations ("PSI") devoted

over 100 pages to a case study of the WaMu Defendants' misconduct in the issuance of

mortgage-backed securities.  The PSI described its case study as "how one bank's strategy for

growth and profit led to the origination and securitization of hundreds of billions of dollars in

poor quality mortgages that undermined the U.S. financial system."

   8.  The facts reported by the PSI may be summarized as follows:  the WaMu

Defendants "engaged in shoddy lending practices that contributed to a mortgage time bomb."

Motivated by the goal of becoming a "dominant sub-prime lender" and earning increased fees in

connection with its securitizations, the WaMu Defendants delved into ever-riskier loan products

while ignoring their underwriting and due diligence procedures.  And the WaMu Defendants

offloaded much of the risk to investors like Western & Southern.

9.      The WaMu Defendants consistently sacrificed loan quality in their pursuit of increased market share.  In a WaMu internal newsletter dated October 31, 2005 – but made public only recently – risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.  Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.  A former Senior Mortgage Underwriter, who worked at WaMu from 2003 until 2007, explained that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?"

10.      An internal WaMu review discovered that "an extensive level of loan fraud exist[ed] . . . virtually all of it stemming from employees in those areas circumventing bank policy surrounding loan verification and review."  When later asked about these types of incidents during a Congressional hearing, a former WaMu executive in charge of securitizations admitted: "I understood there was fraud."  Indeed, recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, Washington Mutual Bank ("WaMu Bank") started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans.  WaMu Bank made a conscious decision to offload these loans through securitizations and sales to investors.

11.      Defendants' systemic disregard for their underwriting guidelines contrasts starkly with Defendants' representations in the relevant offering materials that the loans backing the

4

securities were underwritten in accordance with prudent underwriting standards designed to ensure that borrowers could repay the loans.

12.     It has also recently come to light that despite representations to the contrary in the Offering Materials, Defendants did not properly assign many of the mortgage notes or properly transfer the mortgage files underlying each securitization.  As a result, the affected mortgage loans cannot be foreclosed upon if a borrower defaults.  Defendants have engaged in wide-spread foreclosure misconduct, filing false documentation with courts nationwide in an attempt to cover up their failure to assign mortgage loans and documentation in accordance with their disclosures in the Offering Materials.

13.     For example, until very recently, Defendants have submitted documents in foreclosure proceedings purportedly signed by a woman who has been dead for over 15 years. Defendants have also used, and reportedly continue to use, an army of other (presumably living) "robo-signers" who file thousands of false documents, or outright forgeries, daily in an attempt to cover up the fact that Defendants did not properly assign title or transfer files in connection with their securitizations.  Former head of the FDIC Shelia Bair recently described the foreclosure misconduct of Defendants and others as "pervasive."  Other officials describe it as an "epidemic" and an "affront to state courts."

14.     Defendants' representations concerning, among other matters, adherence to meaningful underwriting standards and proper assignment practices were material to Western & Southern's decision to purchase Certificates because the Defendants were the exclusive source of information regarding the loans backing the securities.  Unlike Defendants, Western & Southern did not have access to loan files.  Western & Southern therefore depended on the Defendants to

perform the necessary due diligence to verify that the information presented to it and other investors was true and accurate.

15.     <u>All</u> of the Certificates purchased by Western & Southern were triple-A rated, or the equivalent, at the time of Western & Southern's investment.  Now they do not even qualify as investment grade.  They are "junk."  In a majority of the 10 securitizations in which Western & Southern purchased Certificates, over 30% of the loans backing the securities have now defaulted, have been foreclosed upon, or are delinquent.  Indeed, the defaults, foreclosures, and delinquencies have reached more than 45% in three securitizations.  Under the Ohio Securities Act, Western & Southern is entitled to rescind its purchase of these securities and/or recover appropriate damages.  Similar relief is also available under the 1933 Act and/or common law fraud and negligent misrepresentation.

## PARTIES

**I.     Plaintiffs**

16.     Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

17.      Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

18.     Plaintiff Columbus Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance and annuity products.

19.     Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance and annuity products.

20.     Plaintiff National Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of New York, with its principal place of business in Goshen, New York.  It sells life, accident and health insurance and annuity products. National Integrity Life Insurance Company is a wholly-owned subsidiary of Integrity Life Insurance Company.

21.     Fort Washington Investment Advisors, Inc. is a registered investment advisor formed under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio.  Fort Washington Investment Advisors brings this action on behalf of Fort Washington Active Fixed Income LLC, a Delaware limited liability company with its principal place of business in Cincinnati, Ohio.

## II.     JPMorgan Defendants

22.     *JPMorgan Seller/Sponsor Defendant*.   Defendant J.P. Morgan Mortgage Acquisition Corp.  ("JPM Mortgage Acquisition") is a Delaware corporation with its principal place of business in New York, New York.  JPM Mortgage Acquisition is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A.  JPM Mortgage Acquisition served as the Sponsor and Seller with regard to each of the four JPMorgan securitizations at issue.

23.     *JPMorgan Underwriter Defendant*.   Defendant J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place of business in New York, New York. J.P. Morgan Securities LLC is the successor-in-interest to J.P. Morgan Securities Inc., which converted to a limited liability company on or about September 1, 2010.  J.P. Morgan Securities

Inc. and its successor-in-interest, J.P. Morgan Securities LLC, are referred to herein as "J.P. Morgan Securities."  J.P. Morgan Securities engaged in investment banking activities in the United States and was the primary nonbank subsidiary of JPMorgan Chase & Co.  ("JPMorgan Chase").  J.P. Morgan Securities acted as the Underwriter for each of the four JPMorgan securitizations at issue.  As such, J.P. Morgan Securities participated in the drafting and dissemination of the prospectus supplements pursuant to which all of the JPMorgan Certificates were sold to Western & Southern.

24.    *JPMorgan Depositor Defendant.*    Defendant J.P. Morgan Acceptance Corporation I ("JPMAC") is a Delaware corporation with its principal place of business in New York, New York.  JPMAC is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC.  JPMAC was the Depositor for each of the four JPMorgan securitizations at issue.

25.    *JPMorgan Originator Defendant.*    Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase, and a Delaware corporation.  Its main office is located in New York, New York.  JPMC Bank is a commercial bank that is subject to examination and regulation by the Officer of the Comptroller of Currency ("OCC").  JPMC Bank originated and/or acquired loans securitized in three of the four JPMorgan securitizations at issue in this case.  JPMC Bank is also a defendant in this action as the successor-in-interest to Washington Bank.

26.    *Relevant JPMorgan Non-Parties.*    The Certificates for each of the JPMorgan securitizations were issued by trusts established by JPMAC.  The four issuing trusts were: J.P. Morgan Alternative Loan Trust 2005-S1 ("JPMALT 2005-S1"), J.P. Morgan Trust 2005-S3 ("JPMMT 2005-S3"), J.P. Morgan Acquisition Trust 2006-WF1 ("JPMAC 2006-WF1"), and J.P.

8

Morgan Acquisition Trust 2007-CH1 ("JPMAC 2007-CH1") (collectively, the "JPMorgan Trusts").

27.     Chase Home Finance, LLC ("CHF"), a Delaware limited liability company, is a wholly owned, indirect subsidiary of JPMC Bank.  CHF originated certain JPMC Bank mortgage loans and subsequently provided these loans to JPM Mortgage Acquisition, on behalf of JPMC Bank, for the following 3 JPMorgan trusts:  JPMALT 2005-S1, JPMAC 2006-WF1, and JPMAC 2007-CH1.

28.     At all relevant times, the JPMorgan Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

**III.    WaMu Defendants**

29.     _WaMu Sponsor Defendant_.  At all relevant times, WaMu Bank was a federal savings association that provided financial services to consumer and commercial clients.  WaMu Bank served as the Co-Sponsor for one of the six WaMu securitizations at issue in this action.  On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement with the FDIC, under which JPMC Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its ownership of WaMu Capital Corporation, WaMu Asset Acceptance Corporation, and Washington Mutual Mortgage Securities Corporation.  Therefore, this action is brought against JPMC Bank as the successor-in-interest to WaMu Bank.  WaMu Bank is not a defendant in this action.

30.     *WaMu Sponsor Defendant*.  Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") is a Delaware corporation with its principal place of business in Brooklyn, New York.  WMMSC was, at all relevant times, a wholly-owned, special-purpose subsidiary of WaMu Bank.  WMMSC served as the Sponsor with respect to the six WaMu securitizations at issue in this action, and the Depositor with respect to two of the WaMu securitizations at issue in this action.  WMMSC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

31.     *WaMu Underwriter Defendant*.  Defendant WaMu Capital Corporation (''WCC'') is a Washington corporation with its principal place of business in Seattle, Washington.  WCC was, at all relevant times, a registered broker-dealer and a wholly-owned subsidiary of WaMu Bank, and served as the sole or co-Underwriter for all six WaMu securitizations at issue in this action.  In this capacity, WCC was intimately involved in structuring, pricing, and selling the WaMu Certificates at issue.  WCC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

32.     *WaMu Depositor Defendants*.  Defendant WaMu Asset Acceptance Corporation ("WMAAC") is a Delaware corporation with its principal place of business in Seattle, Washington.  WMAAC was, at all relevant times, a wholly-owned subsidiary of WaMu Bank.  WMAAC served as depositor and filed registration statements and accompanying prospectuses with respect to four of the six WaMu securitizations at issue.  WMAAC is not currently directly affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

33.     _Relevant Non-Parties._   The Certificates for each of the six WaMu securitizations were issued by trusts established by the WaMu Depositors.  The six issuing trusts were: Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-7 Trust ("WMALT 2005-7"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-9 Trust ("WMALT 2005-9"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-4 Trust ("WMALT 2006-4"), Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 Trust ("WMALT 2006-5"), Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-9 Trust ("WMALT 2006-9"), and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA3 Trust ("WMALT 2007-OA3") (the "WaMu Trusts").  The WaMu Trusts and the JPMorgan Trusts are referred to collectively as the "Trusts."

34.     The term "WaMu" refers to the Washington Mutual group of companies before September 25, 2008, including the WaMu Defendants.

35.     At all relevant times, the WaMu Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of the corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

**JURISDICTION AND VENUE**

36.     This action was originally filed in the Hamilton County Court of Common Pleas which has jurisdiction over Western & Southern's claims which are brought under the Ohio Securities Act, common law fraud, negligent misrepresentation and the 1933 Act.  Defendants

removed this action to this Court and have agreed to the filing of this amended complaint without prejudice to any arguments Plaintiffs may have in favor of remand of this action.

37.     This Court has personal jurisdiction over the Defendants by virtue of their securities sales to Western & Southern in Ohio.

38.     Venue is proper pursuant because this case was filed in the Hamilton County Court of Common Pleas, which is located in the boundaries of the United States District Court for the Southern District of Ohio, Western Division.

## SUBSTANTIVE ALLEGATIONS

## I.     THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

39.     In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans.  Under the traditional model, they either held the mortgage loans they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac").

40.     Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan.  As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

41.     Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale.  By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory

guidelines.  These loans are known in the industry as "conforming" loans, and are historically the most conservative loans with the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming" loans.

42.     In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as residential mortgage-backed securities, to investors.  Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors would receive timely payments of principal and interest.  Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

43.     In the early 2000's, the demand for securities backed by mortgage loans increased.  Private financial institutions stepped in to meet the demand by originating an ever-growing number of non-conforming loans, such as loans based on reduced documentation, loans issued to subprime borrowers, and adjustable loans where the interest rate increases after a period of time.  These loans were then securitized for sale to private investors.  By 2001, $240 billion in residential mortgage-backed securities were issued through private securitizations.  By 2006, that amount had increased by almost five times – to $1.033 trillion.

44.     The JPMorgan Defendants took advantage of this exploding demand for mortgage-backed securities by originating and securitizing large volumes of residential mortgage loans.  Beginning in 2003, the JPMorgan Defendants significantly increased their origination and securitization of mortgage loans – particularly non-prime loans.  The JPMorgan Defendants originated approximately $7.2 billion in non-prime mortgage loans in 2003, $8.5 billion in 2004,

13

and $8.7 billion in 2005.  In addition, JPMAC increased its securitization of residential mortgage loans more than fivefold between 2004 and 2005, from approximately $4.5 billion to $24 billion.

45.     The WaMu Defendants also took advantage of the exploding market for residential mortgage-backed securities by dramatically increasing their origination and securitization of riskier loans around 2003.  From 2003 to 2004, the WaMu Defendants increased their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion.  By the end of 2006, this figure had almost tripled again to $29 billion.

## II.     THE SECURITIZATION PROCESS

46.     To create residential mortgage-backed securities, such as the Certificates purchased by Western & Southern, a process known as "mortgage securitization" is used. Mortgage loans are acquired from mortgage originators and pooled together, with securities constituting interests in the cash flow from the mortgage pools then sold to investors.  The securities are also referred to as mortgage pass-through securities because the cash flow from the pool of mortgages is passed through to the securities holders when payments are made by the underlying mortgage borrowers.

47.     Each securitization involves several entities that perform distinct tasks.  The first step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition by the Depositor of an inventory of mortgage loans from a Sponsor or Seller, which either originates the loans or acquires the loans from other mortgage originators in exchange for cash.

48.     To create securities backed by the mortgage loans, the Depositor then forms one or more mortgage pools with the inventory of loans and creates tranches of interests in the mortgage pools with various levels of seniority.  Interests in these tranches are then issued by the Depositor (who serves as the Issuer) through a trust in the form of bonds, or certificates.

49.     Each tranche has a different level of purported risk and reward, and, often, a different credit rating.  The most senior tranches often receive the highest investment grade rating (triple-A).  Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns.  The most senior tranches of securities will be entitled to payment in full before the junior tranches.  Conversely, losses on the underlying loans in the asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that.  This hierarchy in the division of cash flows is referred to as the "flow of funds" or "waterfall."

50.     The Depositor works with one or more of the nationally recognized credit-rating agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired by the Depositor (and Underwriter).  Once the asset pool is securitized, the certificates are issued to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as Western & Southern.

51.     Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans.  Detailed information about the credit quality of the loans is contained in the loan files developed and maintained by the mortgage originators when making the loans.

52.     For residential mortgage loans, such as the loans that backed the Certificates purchased by Western & Southern, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, and an appraisal of the property that will secure the loan and provide the basis for

other measures of credit quality, such as loan-to-value ratios, and occupancy status. The loan file should also include notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of compensating factors that justified any departure from those standards.

53.     Western & Southern and other investors do not have access to the loan files. Instead, the Sponsor, Depositor, and Underwriter are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors. This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

54.     The securitization process incentivized the Defendants to abandon or disregard underwriting standards so that they could originate and purchase huge volumes of low-quality loans to securitize.

55.     As the private residential mortgage-backed securities market expanded, the traditional "originate to hold" model morphed into the "originate to distribute" model. Under the "originate to distribute" model, mortgage companies, such as the Defendants, no longer held the mortgage loans to maturity. Rather, they offloaded the risk of loss to the investors who purchased an interest in the securitized pool of loans.

56.     The new distribution model was highly profitable for the Defendants and other mortgage companies. By securitizing and selling mortgage loans to investors through underwriters, mortgage companies received immediate payment for the loans, shifted the loans off their books, and were able to issue more loans. The securitization process enabled the

mortgage companies to earn most of their income from transaction and loan-servicing fees.

Because the mortgage companies did not have to bear the risk of loss, they had an unchecked

incentive to originate more and more loans to feed into the securitization machine.

57.    The Attorney General for the Commonwealth of Massachusetts explained this

unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks which
> held the loans in their own portfolios, knew their borrowers, and earned profit by
> writing good loans and collecting interest over many years.  Those banks had to
> live with their "bad paper" and thus had a strong incentive to avoid making bad
> loans.  In recent years, however, the mortgage market has been driven and funded
> by the sale and securitization of the vast majority of loans.  Lenders now
> frequently make mortgage loans with the intention to promptly sell the loan and
> mortgage to one or more entities. . . .  The lenders' incentives thus changed from
> writing good loans to writing a huge volume of loans to re-sell, extracting their
> profit at the front end, with considerably less regard to the ultimate performance
> of the loans.

58.    Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the

incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on the
> terms of the sale, much or all of the risks are passed on to the loan purchaser.
> Thus, originators who sell loans may have less incentive to undertake careful
> underwriting than if they kept the loans.  Moreover, for some originators, fees tied
> to loan volume made loan sales a higher priority than loan quality.  This
> misalignment of incentives, together with strong investor demand for securities
> with high yields, contributed to the weakening of underwriting standards.

59.    To take advantage of the exploding market for residential mortgage-backed

securities, the JPMorgan Defendants and the WaMu Defendants abandoned or disregarded

underwriting guidelines and failed to conduct adequate due diligence so that they could originate

and purchase as many loans as possible for securitization.  Indeed, even when perfunctory due

diligence revealed non-compliant loans, the Defendants "waived" the loans into the

securitizations anyway.

60. Unbeknownst to Western & Southern, the JPMorgan Defendants and the WaMu Defendants originated or purchased loans that had been issued to borrowers regardless of their ability to pay. The loans were often issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and/or exceptions to underwriting criteria that had no proper justification.

## III. WESTERN & SOUTHERN'S PURCHASES OF DEFENDANTS' CERTIFICATES

61. Western & Southern made the following purchases of Certificates from the following Defendants, representing a total investment of over $202 million:

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|-------|-----------|-------------|------------|-------------------|
| JPMALT 2005-S1 1A1 | Columbus Life Insurance Company | 12/26/2006 | 2,200,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMALT 2005-S1 1A1 | Western-Southern Life Assurance Company | 12/26/2006 | 2,200,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 4,300,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | National Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 6,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | National Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A6 | Western and Southern Life Insurance Company | 8/31/2006 | 2,025,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Integrity Life Insurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Western-Southern Life Assurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Western-Southern Life Assurance Company | 3/13/2007 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | National Integrity Life Insurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| | | | | J.P. Morgan Securities (Underwriter) |
| JPMMT 2005-S3 | Columbus Life Insurance Company | 10/10/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMMT 2005-S3 | Western and Southern Life Insurance Company | 10/10/2006 | 13,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| WMALT 2005-7 2CB1 | Integrity Life Insurance Company | 10/05/2005 | 1,424,200.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western-Southern Life Assurance Company | 10/05/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | National Integrity Life Insurance Company | 10/05/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | National Integrity Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|-------|-----------|-------------|------------|-------------------|
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 09/26/2007 | 847,207.71 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 09/26/2007 | 1,059,009.63 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 10/31/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 10/31/2005 | 500,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western and Southern Life Insurance Company | 10/31/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Integrity Life Insurance Company | 10/31/2005 | 1,250,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Integrity Life Insurance Company | 10/31/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western-Southern Life Assurance Company | 10/31/2005 | 6,150,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western-Southern Life Assurance Company | 10/31/2005 | 7,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | National Integrity Life Insurance Company | 10/31/2005 | 7,500,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | National Integrity Life Insurance Company | 10/31/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western and Southern Life Insurance Company | 10/31/2005 | 1,650,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2006-4 3A2A | Integrity Life Insurance Company | 04/28/2006 | 7,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2006-4 3A2A | Western-Southern Life Assurance Company | 04/28/2006 | 1,100,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A2A | National Integrity Life Insurance Company | 04/28/2006 | 7,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A6 | Columbus Life Insurance Company | 04/28/2006 | 2,200,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A6 | Western-Southern Life Assurance Company | 04/28/2006 | 7,800,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Integrity Life Insurance Company | 06/30/2006 | 2,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Integrity Life Insurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Western-Southern Life Assurance Company | 06/30/2006 | 6,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Western-Southern Life Assurance Company | 06/30/2006 | 2,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | National Integrity Life Insurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2006-5 3A6 | Integrity Life Insurance Company | 06/30/2006 | 3,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 3A6 | Western-Southern Life Assurance Company | 06/30/2006 | 5,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 3A6 | Western-Southern Life Assurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-9 A3 | Columbus Life Insurance Company | 10/31/2006 | 3,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-9 A3 | Western-Southern Life Assurance Company | 10/31/2006 | 22,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-9 A3 | National Integrity Life Insurance Company | 10/31/2006 | 5,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2007-OA3 5A | Fort Washington Investment Advisors, Inc. | 10/11/2007 | 7,235,244.30 | WMMSC (co-Sponsor)<br><br>WaMu Bank (co-Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

26

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2007-OA3 5A | Western-Southern Life Assurance Company | 10/11/2007 | 904,405.54 | WMMSC (co-Sponsor) WaMu Bank (co-Sponsor) WCC (Underwriter) WMAAC (Depositor) |

## IV. DEFENDANTS ABANDONED THEIR DISCLOSED UNDERWRITING STANDARDS TO FACILITATE THE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A. Defendants Touted Their Underwriting Standards

62. The fundamental basis upon which residential mortgage-backed securities are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans. If the borrowers cannot pay, and the collateral is insufficient, the securities experience losses. For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the offering materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

63. Defendants represented in the Offering Materials that the loans underlying each securitization were underwritten in accordance with meaningful underwriting standards designed to ensure a borrower's ability to pay and the sufficiency of the collateral underlying each mortgage loan. These representations were false. As set forth below in Sections IV(B)-(D), the mortgage loans underlying Western & Southern's Certificates did not comply with the underwriting standards the Offering Materials described because those standards were systemically ignored. In originating or acquiring the loans, the Defendants ignored borrowers'

actual repayment ability and the value and adequacy of mortgaged property that was used as collateral. Systematic, bulk exceptions to underwriting standards were granted without proper compensating factors. And Defendants failed to inform investors that they were systematically abusing the "exceptions" process in order to further circumvent their purported underwriting standards.

### 1. The JPMorgan Defendants' Representations

#### a. JPMALT 2005-S1

64. For the JPMALT 2005-S1 offering, 2.80% of the mortgage loans in pool 1, 71.24% of the mortgage loans in pool 2, and 100.00% of the mortgage loans in pool 3 were originated or acquired by JPMC Bank, approximately 26.12% of the mortgage loans in pool 1, and 10.68% of the mortgage loans in pool 2 were originated or acquired by PHH Mortgage Corporation ("PHH"). Approximately 33.35% of the mortgage loans in pool 1 and 2.28% of the mortgage loans in pool 2 were originated or acquired by GreenPoint Mortgage Funding, Inc. ("GreenPoint"), and approximately 37.73% of the mortgage loans in pool 1 and 15.79% of the mortgage loans in pool 2 were originated or acquired by SunTrust Mortgage, Inc. ("SunTrust").

65. The Prospectus Supplement for this offering made representations that the mortgage originators for the loans had followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

66. The Prospectus Supplement represented that, generally, regardless of originator, the underwriting process was utilized to "evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral." (JPMALT 2005-S1 Prospectus Supplement, dated November 23, 2005, at S-33.)

28

       67.    The Prospectus Supplement represented standard underwriting procedures as

follows:

> In general, a prospective borrower applying for a loan is required to fill out a
> detailed application designed to provide to the underwriting officer pertinent
> credit information.  As part of the description of the borrower's financial
> condition, the borrower generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an authorization to
> apply for a credit report which summarizes the borrower's credit history with
> local merchants and lenders and any record of bankruptcy.  In most cases, an
> employment verification is obtained from an independent source (typically the
> borrower's employer), which verification reports, among other things, the length
> of employment with that organization, the current salary, and whether it is
> expected that the borrower will continue such employment in the future.

(*Id.*)

       68.    The Prospectus Supplement also represented the eligibility and underwriting

requirements for loans made under an alternative documentation program:

> A lender may also originate mortgage loans pursuant to alternative sets of
> underwriting criteria under reduced or limited documentation programs. . . .
> Loans underwritten under these programs are generally limited to borrowers who
> have demonstrated an established ability and willingness to repay the mortgage
> loans in a timely fashion.  Permitted maximum loan-to-value ratios under these
> programs are generally more restrictive than those under the lender's standard
> underwriting criteria.

(*Id.*)

       69.    Finally, the Prospectus Supplement represented that, under standard underwriting

procedures, exceptions were allowed only in specific circumstances:

> From time to time, exceptions to a lender's underwriting policies may be made.
> Such exceptions may be made on a loan-by-loan basis at the discretion of the
> lender's underwriter.  Exceptions may be made after careful consideration of
> certain mitigating factors such as borrower liquidity, employment and residential
> stability and local economic conditions.

(*Id.*)

70.     The Prospectus Supplement for the JPMALT 2005-S1 offering also made specific representations about the underwriting standards applied by each originator.

71.     As to JPMC Bank, the Prospectus Supplement represented that the mortgage loans were originated and underwritten in accordance with "underwriting policies customarily employed by CHF. . . .  CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."  (*Id.* at S-34.)

72.     The Prospectus Supplement represented:

> CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records.  The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants.  In addition, CHF verifies employment, income and assets.  Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party.

(*Id.*)

73.     The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the borrower's ability to repay.  Specifically, the Prospectus Supplement stated that "a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses."  (JPMALT 2005-S1 Prospectus Supplement at S-34.)

74.     The Prospectus Supplement further represented that JPMC Bank applied conservative underwriting guidelines even to loans originated under CHF's Reduced

Documentation Program, Streamlined Refinance Program, "No Doc" program, and Stated

Income Stated Asset Program. The Prospectus Supplement provided as follows:

> In order to qualify for the [Reduced Documentation Program], the borrower must
> satisfy a 20% down-payment requirement from the borrower's own assets. These
> assets are verified through bank statements and may be supplemented by third-
> party verification. A residential mortgage credit report, or "in file" report, is
> obtained and reviewed to determine the borrower's repayment history. The
> maximum loan-to-value ratio of any mortgage loan originated under this
> program is approximately 80% (65% for "cash out" refinancings). . . . In order to
> qualify for [the Streamlined Refinance Program], the borrower must have
> demonstrated overall creditworthiness as defined in the program guides. In
> addition, a documented servicing record with respect to such borrower of at least
> 24 months must be available. If there are multiple lenders during such 24 month
> period, CHF must have been the servicer for at least the most recent 12 months. . .
> . The underwriting for ["No Doc"] loans is based primarily or entirely on a
> stronger credit profile (evidenced by a higher minimum FICO credit risk score), a
> lower maximum product limit and additional due diligence performed on the
> collateral. . . . The underwriting for [the Stated Income Stated Asset Program] is
> based primarily or entirely on stronger credit profile and lower loan-to-value ratio
> requirements.

(*Id.* at S-34-35).

75.     Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions and/or variances to CHF's underwriting policies
> may be made. Such exceptions and/or variances may be made only if specifically
> approved on a loan-by-loan basis by certain credit and underwriting personnel of
> the Chase Originators who have the authority to make such exceptions and/or
> variances. Exceptions and/or variances may be made only after careful
> consideration of certain mitigating factors such as borrower capacity, liquidity,
> employment and residential stability and local economic conditions.

(*Id.* at S-35.)

76.     As to originator PHH, the Prospectus Supplement represented that:

PHH's underwriting standards . . . are intended to result in the origination of
investment-quality mortgage loans that are salable in the secondary mortgage
market. They are applied in originating or purchasing loans for its own account,

and in originating loans for, or purchasing loans from, other lenders under various "private-label" programs . . . PHH's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made.

(*Id.* at S-35-36.)

77. To that end, the Prospectus Supplement represented that PHH calculated

borrowers' debt-to-income ("DTI") ratios to ensure that they could make their monthly

payments:

> PHH generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. From time to time, PHH makes loans where these ratios are exceeded. In those instances, PHH's underwriters typically look at compensating factors such as the liquidity of the mortgagor and the stability of the real estate market where the property is located.

(*Id.* at S-38.)

78. The Prospectus Supplement further represented that PHH required all borrowers

to:

> provide information concerning his or her assets, liabilities, income and expenses . . . along with an authorization to obtain any necessary third party verifications, including a credit report summarizing the applicant's credit history . . . PHH reviews the applicant's credit history and outstanding debts, as reported on the credit report. . . . PHH verifies the applicant's liquid assets to ensure that the applicant has adequate liquid assets to apply toward any required down payment, closing costs, prepaid interest, and a specified amount of cash reserves after the closing of the related mortgage. . . . PHH also evaluates the applicant's income to determine its stability, probability of continuation, and adequacy to service the proposed PHH debt payment.

(*Id.* at S-36.)

79. The Prospectus Supplement also represented that PHH applied conservative

underwriting guidelines even to loans originated under alternative documentation programs:

> Loans underwritten under the Reduced Documentation Program, Stated Income, Stated Asset Program, Stated Income Full Asset Program and No Income Stated Asset Program are generally limited to borrowers who have demonstrated an

established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios under the Reduced· Documentation Program, Stated Income, Stated Asset Program, Stated Income Full Asset Program and No Income Stated Asset Program are generally more restrictive than those under the standard underwriting criteria of PHH.

(JPMALT 2005-S1 Prospectus Supplement at S-38.)

80.     Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions to PHH's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, employment and residential stability.

(*Id.* at S-39.)

81.     As to originator GreenPoint, the Prospectus Supplement represented that:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Based on these and other factors, GreenPoint will determine the level of documentation to be provided by the prospective borrower. Exceptions to the GreenPoint underwriting guidelines are permitted where compensating factors are present.

(*Id.* at S-41.)

82.     The Prospectus Supplement represented that underwriting standards were

consistently applied to confirm the value of the collateral and the borrower's ability to repay. To

that end, the Prospectus Supplement represented that GreenPoint calculated borrowers' DTI

ratios to ensure that they could make their monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income.

33

(*Id.*)

83.     Finally, the Prospectus Supplement represented that reduced documentation

programs were available only to borrowers with favorable credit histories and loan-to-value

("LTV") ratios:

> Mortgage loans underwritten under this type of [limited documentation] program
> are generally limited to borrowers with credit histories that demonstrate an
> established ability to repay indebtedness in a timely fashion . . . .  Permitted
> maximum loan-to-value ratios (including secondary financing) under limited
> documentation programs are generally more restrictive than mortgage loans
> originated with full documentation or alternative documentation requirements
> . . . .  Mortgage loans underwritten under no documentation programs are
> generally limited to borrowers with favorable credit histories and who satisfy
> other standards for limited documentation programs.

(*Id.* at S-41.)

84.     As to originator SunTrust, the Prospectus Supplement represented that SunTrust's

underwriting guidelines were intended "to evaluate the borrower's capacity to repay the loan, to

evaluate the credit history of the borrower, to verify the availability of funds required for closing

and cash reserves for fully documented loans, and to evaluate the acceptability and marketability

of the property to be used as collateral."  (*Id.* at S-40.)

85.     In addition, the Prospectus Supplement represented:

> SunTrust requires that the borrower's sources of income have the probability of
> continuance, are stable sources and are sufficient to support repayment of the
> mortgage loan requested when disclosure and verification is required. . . .  A
> borrower is required to complete an application designed to provide pertinent
> information about the borrower, the property to be financed and the type of loan
> desired.  As part of the description of the borrower's financial condition, SunTrust
> may require a description of assets and income.  Liabilities and expenses are
> included on the application and SunTrust obtains a credit report, which
> summarizes the borrower's credit history with merchants and lenders and any
> public records.  In general, employment verification is obtained providing current
> and historical income information unless the specific program does not require
> disclosure or verification of employment.

(JPMALT 2005-S1 Prospectus Supplement at 40.)

86.     Finally, the Prospectus Supplement indicated that SunTrust utilized reduced documentation and verification programs only "when specific underwriting criteria are met" and that exceptions would only be allowed "if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used." (*Id.*)

### b.     JPMMT 2005-S3

87.     For the JPMMT 2005-S3 offering, 47.49% of the mortgage loans in pool 1, and 2.89% of the mortgage loans in pool 2 were originated or acquired by JPMC Bank or CHF, approximately 34.17% of the mortgage loans in pool 1 and .39% of the mortgage loans in pool 2 were originated or acquired by GreenPoint.  Approximately 78.1% of the mortgage loans in pool 2 were originated or acquired by Countrywide Home Loans, Inc. ("Countrywide) and approximately 10.4% of the mortgage loans in pool 2 were originated or acquired by PHH.  No other originator originated or acquired more than 10% of the mortgage loans in any mortgage group.

88.     The Prospectus Supplement for this offering made representations that the mortgage originators for the loans had followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

89.     The Prospectus Supplement represented that, generally, regardless of originator, the underwriting process was utilized to "evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral."  (JPMMT 2005-S3 Prospectus Supplement, dated December 27, 2005, at S-30.)

90.     The Prospectus Supplement represented standard underwriting procedures as follows:

In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future.

(*Id.* at S-30-31.)

91.     The Prospectus Supplement also represented the eligibility and underwriting

requirements for loans made under an alternative documentation program:

A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. . . . Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

(*Id.* at S-31.)

92.     Finally, the Prospectus Supplement represented that, under standard underwriting

procedures, exceptions were allowed only in specific circumstances:

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

(*Id.* at S-31.)

93.     The Prospectus Supplement for the JPMMT 2005-S3 offering also made specific

representations about the underwriting standards applied by each originator.

94.     As to JPMC Bank, the Prospectus Supplement represented that the mortgage loans were originated and underwritten in accordance with "underwriting policies customarily employed by CHF. . . .  CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."  (*Id.* at S-31-32.)

95.     The Prospectus Supplement represented:

> CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records.  The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants.  In addition, CHF verifies employment, income and assets.  Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party.

(*Id.* at S-32.)

96.     The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the borrower's ability to repay.  Specifically, the Prospectus Supplement stated that "a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses." (JPMMT 2005-S3 Prospectus Supplement at S-32.)

97.     The Prospectus Supplement further represented that JPMC Bank applied conservative underwriting guidelines even to loans originated under CHF's Reduced Documentation Program, Streamlined Refinance Program, "No Doc" program, and Stated Income Stated Asset Program.  The Prospectus Supplement provided as follows:

> In order to qualify for the [Reduced Documentation Program], the borrower must satisfy a 20% down-payment requirement from the borrower's own assets.  These

37

assets are verified through bank statements and may be supplemented by third-party verification. A residential mortgage credit report, or "in file" report, is obtained and reviewed to determine the borrower's repayment history. The maximum loan-to-value ratio of any mortgage loan originated under this program is approximately 80% (65% for "cash out" refinancings). . . . In order to qualify for [the Streamlined Refinance Program], the borrower must have demonstrated overall creditworthiness as defined in the program guides. In addition, a documented servicing record with respect to such borrower of at least 24 months must be available. If there are multiple lenders during such 24 month period, CHF must have been the servicer for at least the most recent 12 months. . . . The underwriting for ["No Doc"] loans is based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral. . . . The underwriting for [the Stated Income Stated Asset Program] is based primarily or entirely on stronger credit profile and lower loan-to-value ratio requirements.

(*Id.* at S-31-32.)

98. Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and underwriting personnel of the Chase Originators who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

(*Id.* at S-33.)

99. As to originator GreenPoint, the Prospectus Supplement represented that:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Based on these and other factors, GreenPoint will determine the level of documentation to be provided by the prospective borrower. Exceptions to the GreenPoint underwriting guidelines are permitted where compensating factors are present.

(*Id.* at S-38.)

38

100.    The Prospectus Supplement represented that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay. To that end, the Prospectus Supplement represented that GreenPoint calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income.

(*Id.*)

101.    Finally, the Prospectus Supplement represented that reduced documentation programs were available only to borrowers with favorable credit histories and LTV ratios:

> Mortgage loans underwritten under this type of [limited documentation] program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion . . . . Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation or alternative documentation requirements . . . . Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

(*Id.* at S-38.)

102.    As to originator Countrywide, the Prospectus Supplement represented that:

> [a]ll of the mortgage loans in the trust fund originated or acquired by Countrywide Home Loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. . . . . Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total

monthly debt to the monthly gross income (the "debt-to-income" ratios) are
within acceptable limits.

(JPMMT 2005-S3 Prospectus Supplement at S-34-35.)

103.    The Prospectus Supplement described Countrywide's "Full Documentation"

program as follows:

In general under the Full Documentation Loan Program (the "Full Documentation
Program"), each prospective borrower is required to complete an application
which includes information with respect to the applicant's assets, liabilities,
income, credit history, employment history and other personal information. Self-
employed individuals are generally required to submit their two most recent
federal income tax returns.  Under the Full Documentation Program, the
underwriter verifies the information contained in the application relating to
employment, income, assets or mortgages.

(*Id.* S-34.)

104.    Where documents were not subject to the Full Documentation Program, the

Prospectus Supplement represented that compliance with specific underwriting safeguards was

required.  The Prospectus Supplement provided:

Under the Reduced Documentation Program, some underwriting documentation
concerning income, employment and asset verification is waived.  Countrywide
Home Loans obtains from a prospective borrower either a verification of deposit
or bank statements for the two-month period immediately before the date of the
mortgage loan application or verbal verification of employment.  Since
information relating to a prospective borrower's income and employment is not
verified, the borrower's debt-to-income ratios are calculated based on the
information provided by the borrower in the mortgage loan application.  The
maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

The CLUES Plus Documentation Program permits the verification of employment
by alternative means, if necessary, including verbal verification of employment or
reviewing paycheck stubs covering the pay period immediately prior to the date of
the mortgage loan application. To verify the borrower's assets and the sufficiency
of the borrower's funds for closing, Countrywide Home Loans obtains deposit or
bank account statements from each prospective borrower for the month
immediately prior to the date of the mortgage loan application.  Under the CLUES
Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and
property values may be based on appraisals comprising only interior and exterior

40

inspections. Cash-out refinances and investor properties are not permitted under
the CLUES Plus Documentation Program.

(*Id.* at S-36.)

105.    Finally, the Prospectus Supplement represents that exceptions to Countrywide's

underwriting guidelines were permissible only "if compensating factors are demonstrated by a

prospective borrower." (*Id.* S-34.)

### c.    JPMAC 2006-WF1

106.    For the JPMAC 2006-WF1 offering, all of the mortgage loans were originated by

Wells Fargo Bank, N.A. ("Wells Fargo"). The Prospectus Supplement for this offering

represented that Wells Fargo followed specific underwriting guidelines to ensure the quality of

the loans being originated, as described below.

107.    The Prospectus Supplement represented that Well Fargo's underwriting standards

were designed to "evaluate the applicant's credit standing and ability to repay the loan, as well as

the value and adequacy of the mortgaged property as collateral."   (JPMAC 2006-WF1

Prospectus Supplement, dated August 29, 2006, at S-22.)

> The underwriting standards that guide the determination represent a balancing of
> several factors that may affect the ultimate recovery of the loan amount,
> including, among others, the amount of the loan, the ratio of the loan amount to
> the property value (i.e., the lower of the appraised value of the mortgaged
> property and the purchase price), the borrower's means of support and the
> borrower's credit history.

(*Id.*)

108.    The Prospectus Supplement represented standard underwriting procedures as

follows:

> A prospective borrower applying for a mortgage loan is required to complete a
> detailed application.  The loan application elicits pertinent information about the
> applicant, with particular emphasis on the applicant's financial health (assets,
> liabilities, income and expenses), the property being financed and the type of loan

desired. . . .  With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders.  Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant. . . .  In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level.  Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

(*Id.* at S-23.)

109.    The Prospectus Supplement further represented that Wells Fargo's "Alt-A"

programs were subject to restrictions designed to ensure that loans were placed with more credit-

worthy borrowers with less favorable credit profiles.  According to the Prospectus Supplement:

Loan applicants with less favorable credit profiles generally are restricted to consideration for loans with higher interest rates, lower maximum loan amounts and lower loan-to-value ratios than applicants with more favorable credit profiles. Except for loans originated under the "No Ratio" program, the maximum total debt to gross income ratio for each credit level is generally 50%.

(*Id.* at S-27.)

110.    Wells Fargo's guidelines also stated:

On a case-by-case basis, Wells Fargo Bank may make the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors.  Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to-income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses.

(*Id.* at S-22).

111.    Finally, the Prospectus Supplement represented that exceptions to Wells Fargo's

underwriting standards would only be granted "after careful consideration of certain mitigating

factors such as borrower liquidity, employment and residential stability and local economic conditions."  (*Id.* at S-23.)

### d.    JPMAC 2007-CH1

112.    For the JPMAC 2007-CH1 offering, all of the mortgage loans were originated by CHF.  The Prospectus Supplement for this offering represented that CHF followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

113.    The Prospectus Supplement represented that "[t]he mortgage loans were originated and underwritten in accordance with either the Chase Home Mortgage Call Center Underwriting Guidelines described below (the "CHM Call Center Underwriting Guidelines") or the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines described below (the "CHM Wholesale/Retail Underwriting Guidelines")."  (JPMAC 2007-CH1 Prospectus Supplement, dated March 7, 2007, at S-89.)

114.    In the Prospectus Supplement, JPMC Bank further represented that "[t]here are three major steps in the underwriting process: (1) identify the eligibility and appropriate credit grade of the mortgagor, (2) evaluate the eligibility and lendable equity of the mortgaged property, and (3) ensure that the mortgage loan terms meet those acceptable for the applicable credit grade."  (*Id.*)

115.    The Prospectus Supplement went on to represent that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay. Specifically, under the CHM Call Center Underwriting Guidelines, "the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan," as well as the "credit standing and repayment ability of the prospective borrower" were considered in the loan approval process.  (*Id.*)

116.    The Prospectus Supplement further represented that JPMC Bank applied

conservative underwriting guidelines even to loans originated under its stated income program:

> The CHM Stated Income Program is a no income verification program available
> for credit grades A1/A+ through B2.  The CHM Call Center Underwriting
> Guidelines utilize various credit grade categories to grade the likelihood that the
> mortgagor will satisfy the repayment conditions of the mortgage loan.  These
> credit grade categories establish the maximum permitted loan-to-value ratio, debt-
> to-income ratio and loan amount, given the borrower's credit history considered
> in a manner generally consistent with non-prime mortgage industry practice, the
> occupancy status of the mortgaged property, the type of mortgaged property and
> documentation type.

(*Id.* at S-90.)

117.    Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> On a case by case basis, CHM Call Center underwriters may determine that,
> based upon compensating factors, a prospective borrower not strictly qualifying
> under the underwriting risk category guidelines described below warrants an
> underwriting exception.  Compensating factors may include, but are not limited
> to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable
> employment and time in the same residence.

(*Id.* at S-94.)

### 2.    The WaMu Defendants' Representations

118.    The WaMu Defendants originated or purchased all of the mortgage loans

underlying the WaMu securitizations at issue in this action.  To the extent that the WaMu

Defendants disclosed the identity of originators of more than ten percent of any particular loan

group underlying a securitizations, that information is summarized in the chart below:

| WMALT 2006-4 | Loan Groups 1 and 2:<br>Secured Bankers Mortgage Corporation originated approximately 13.9%<br>Residential Funding Corporation ("RFC") originated approximately 12.0%<br><br>Loan Group 3: |
| --- | --- |

| | GreenPoint originated approximately 22.5% |
|---|---|
| **WMALT 2006-5** | Loan Groups 1, 2 and 4: <br> American Mortgage Network, Inc. originated approximately 2.40% <br> GreenPoint originated approximately 22.12% <br> First Magnus Financial Corporation originated approximately 12.94% <br> American Home Mortgage Corp. ("AHMC") originated approximately 11.29% <br><br> Loan Group 3: <br> American Home Mortgage Corp. originated approximately 23.03% <br> GreenPoint originated approximately 22.10% |
| **WMALT 2006-9** | M&T Mortgage Corporation originated approximately 45.2% <br> First Magnus Financial Corporation originated approximately 14.3% |
| **WMALT 2007-OA3** | Loan Groups 1 and 2: <br> MortgageIT, Inc. ("MortgageIT") originated approximately 38.8% |

119. The Offering Materials represented that all of the underlying loans were underwritten in accordance with WaMu Bank's or WMMSC's underwriting standards, regardless of the originator of the loan. These underwriting standards were purportedly designed to ensure the soundness of the borrowers and the underlying loans. For example, the WMALT 2006-5 Offering Materials promised investors that these "underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." WMALT 2006-5 Prospectus Supplement dated June 27, 2006 at S-38. The same or similar representations appeared in the Offering Materials associated with each of the other WaMu securitizations involved in this action. *See* Exhibit A.

120. The Offering Materials promised investors that the Originators for the loans had collected a variety of financial information about a borrower to ensure that the borrower could repay the loan. For example, the WMALT 2006-5 Prospectus Supplement provided:

> Prospective borrowers are required to complete a standard loan application in which they may provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and

> credit history. Each borrower also provides an authorization to access a credit
> report that summarizes the borrower's credit history.

WMALT 2006-5 Prospectus Supplement at S-38. The same or similar representations

appeared in the Offering Materials associated with each of the other WaMu

securitizations involved in this action. *See* Exhibit A.

121. The Offering Materials also promised investors that only borrowers who

demonstrated the ability to repay loans had received them. For example, the WMALT 2006-5

Prospectus Supplement provided: "in evaluating a prospective borrower's ability to repay a

mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments,

real property taxes and other monthly housing expenses to the borrower's gross income (referred

to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total

monthly debt (including certain non-housing expenses) to the borrower's gross income (referred

to as the "debt-to-income ratio" or "back end ratio")." (WMALT 2006-5 Prospectus Supplement

at S-39.) The same or similar representations appeared in the Offering Materials associated with

each of the other WaMu securitizations involved in this action. *See* Exhibit A.

122. The Offering Materials reassured investors that the WaMu Defendants applied

conservative underwriting guidelines even to loans originated under their limited documentation

programs. For example, the WMALT 2006-5 Prospectus Supplement provided:

> Each mortgage loan has been underwritten under one of the following
> documentation programs. Under a full/alternative documentation program, the
> income as stated in the prospective borrower's loan application is verified through
> receipt of the borrower's most recent pay stub and receipt of the borrower's most
> recent W-2 form (or forms) reflecting a minimum of 12 months of income or, in
> the case of self-employed borrowers or borrowers who derive a substantial
> portion of their income from commissions, receipt of two years of personal (and,
> if applicable, business) tax returns. For self-employed borrowers, profit and loss
> statements may also be required. Under a full/alternative documentation program,
> the borrower's stated assets are verified through receipt of the borrower's two
> most recent bank or brokerage statements. . . .

46

Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. Generally, under a reduced documentation program, either (i) a borrower's employment and assets are verified, but no verification of a borrower's income is undertaken, or (ii) a borrower's employment and income are verified, but no verification of a borrower's assets is undertaken. Mortgage loans underwritten under a reduced documentation program may also include mortgage loans with less than one year of borrower income verification. In addition, rate/term and cash-out refinance mortgage loans underwritten under a reduced documentation program for which verification of a borrower's employment is required, may or may not require verification of a borrower's assets. . . . In all cases, the borrower's employment is verified with the employer by telephone.

Generally, a no ratio program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no ratio program relies on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and the borrower's assets. The borrower's income is not required to be obtained or verified. The borrower's stated assets may be verified through receipt of the borrower's recent bank or brokerage statements or directly with the financial institution. In all cases, the borrower's employment is verified with the employer by telephone.

Generally, a no documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no documentation program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. Generally, no verification of the borrower's employment, income or assets is undertaken. In some cases, the borrower's employment may be verified by telephone with the employer if the borrower's employment has been disclosed.

(WMALT 2006-5 Prospectus Supplement at S-39-40.) The same or similar representations appeared in the Offering Materials associated with each of the other WaMu securitizations involved in this action. *See* Exhibit A.

123. The Offering Materials represented that the originators allowed exceptions to their underwriting standards only when there were sufficient compensating factors. For example, the WMALT 2006-5 Prospectus Supplement provided:

Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(WMALT 2006-5 Prospectus Supplement at S-40.) The same or similar representations appeared in the Offering Materials associated with each of the other WaMu securitizations involved in this action. *See* Exhibit A.

124. Finally, the Offering Materials represented that the WaMu Defendants conducted extensive due diligence to ensure that loans that were not underwritten in accordance with the disclosed underwriting guidelines were not included in the pool of loans underlying the securitization. For example, the WMALT 2006-5 Prospectus Supplement provided:

The sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers. Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase. Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers. For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis.

(WMALT 2006-5 Prospectus Supplement at S-41.) The same or similar representations appeared in the Offering Materials associated with each of the other WaMu securitizations involved in this action. *See* Exhibit A.

*[Remainder of page intentionally left blank.]*

**B.      Widespread Defaults and Downgrades Confirm Defendants Abandoned
         Their Disclosed Underwriting Standards**

125. Even though the Certificates purchased by Western & Southern were supposed to be long-term, stable investments, just a few years after their issuance, a high percentage of the

mortgage loans backing the offerings have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificate holders, including Western & Southern. The following table contains the most recent performance data available for the loan pools:

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| JPMALT 2005-S1 | 12 | 4,151 | 5.10 |
| | 24 | 3,581 | 8.18 |
| | 36 | 3,242 | 14.02 |
| | 48 | 2,931 | 24.97 |
| | 60 | 2,593 | 29.08 |
| JPMAC 2006-WF1 | 12 | 3,642 | 16.10 |
| | 24 | 3,144 | 34.31 |
| | 36 | 2,706 | 49.64 |
| | 48 | 2,281 | 48.70 |
| | 60 | NA | NA |
| JPMAC 2007-CH1 | 12 | 6,720 | 4.74 |
| | 24 | 5,965 | 13.97 |
| | 36 | 5,303 | 24.11 |
| | 48 | 4,830 | 27.44 |
| | 60 | NA | NA |
| JPMMT 2005-S3 | 12 | 1,851 | 1.81 |
| | 24 | 1,707 | 2.58 |
| | 36 | 1,610 | 5.70 |
| | 48 | | 13.55 |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| | | 1,369 | |
| | 60 | 1,136 | 16.64 |
| WMALT 2005-7 | 12 | 2,074 | 1.57 |
| | 24 | 1,830 | 3.83 |
| | 36 | 1,674 | 7.77 |
| | 48 | 1,526 | 15.38 |
| | 60 | 1,377 | 18.97 |
| WMALT 2005-9 | 12 | 1,819 | 1.77 |
| | 24 | 1,617 | 5.55 |
| | 36 | 1,536 | 9.22 |
| | 48 | 1,424 | 19.39 |
| | 60 | 1,278 | 22.58 |
| WMALT 2006-4 | 12 | 1,393 | 12.03 |
| | 24 | 1,221 | 23.94 |
| | 36 | 1,092 | 40.31 |
| | 48 | 923 | 47.98 |
| | 60 | 799 | 44.65 |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| WMALT 2006-5 1A10 | 12 | 2,692 | 5.47 |
| | 24 | 2,421 | 12.42 |
| | 36 | 2,197 | 28.43 |
| | 48 | 1,919 | 33.08 |
| | 60 | NA | NA |
| WMALT 2006-5 3A6 | 12 | 2,291 | 13.06 |
| | 24 | 2,011 | 29.74 |
| | 36 | 1,737 | 45.32 |
| | 48 | 1,481 | 45.61 |
| | 60 | NA | NA |
| WMALT 2006-9 | 12 | 782 | 12.24 |
| | 24 | 679 | 23.19 |
| | 36 | 574 | 33.04 |
| | 48 | 478 | 39.17 |
| | 60 | NA | NA |
| WMALT 2007-OA3 | 12 | 2,668 | 13.63 |
| | 24 | 2,463 | 40.21 |
| | 36 | 2,137 | 52.86 |
| | 48 | 1,855 | 56.13 |
| | 60 | NA | NA |

126.    Defaults are usually caused by a large and unexpected disruption to a borrower's income.  In a properly underwritten pool of loans, one would not expect to see such a large spike of defaults occurring shortly after origination, because it is unlikely that many borrowers would all incur a sudden and unexpected change to their repayment ability so soon after purchasing a home.  Indeed, economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files.  This makes sense – when borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.

127.    Not only have the loans backing Western & Southern's Certificates experienced extraordinary rates of default, the Certificates' ratings have significantly deteriorated.  All of Western & Southern's Certificates initially received the highest possible ratings - Standard & Poor's ("S&P") AAA rating, or its equivalent from the other rating agencies.  According to its website, "[a]n obligation rated 'AAA' has the highest rating assigned by Standard &Poor's.  The obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk."  This is the same rating typically given to bonds backed by the full faith and credit of the U.S. government, such as treasury bills.  Historically, an AAA-rated security had an expected loss rate of less than 0.05%.

128.    Because of the high delinquency and default rates on the underlying loans, virtually all of Western & Southern's Certificates have been downgraded to "junk-bond" ratings, as can be seen in the following table:

| Certificate Offering and Class | Original Moody's Rating | Current Moody's Rating | Original Fitch Rating | Current Fitch Rating | Original S&P Rating | Current S&P Rating |
|---|---|---|---|---|---|---|
| JPMALT 2005-S1 1A1 | -- | -- | AAA | C | AAA | CCC |
| JPMAC 2006-WF1 A5 | Aaa | Ca | -- | -- | AAA | CCC |
| JPMAC 2006-WF1 A6 | Aaa | Caa2 | -- | -- | AAA | CCC |
| JPMAC 2007-CH1 AF4 | Aaa | Caa2 | AAA | CC | AAA | BBB* |
| JPMMT 2005-S3 1A3 | -- | -- | AAA | CC | AAA | CCC |
| WMALT 2005-7 2CB1 | Aaa | Caa1 | -- | -- | AAA | CCC |
| WMALT 2005-9 2A4 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-4 3A2A | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-4 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-5 1A10 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-5 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-9 A3 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2007-OA3 5A | Aaa | Caa3 | -- | -- | AAA | CC |

129.    The poor performance of the loan pools and the rapidly dropping credit ratings of the Certificates have caused a massive decline in the market values of the Certificates. According to the most recent data, Western & Southern's Certificates have lost 28% of their market value.

130.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools.  Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of

defaults, foreclosures, and delinquencies.  The dismal performance of the mortgage loans underlying Western & Southern's Certificates is itself strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics Defendants claimed.  The defaults and related drop in market value thus are due to Defendants' wrongdoing, and not because of a general change in economic conditions.

> **C.  Defendants Routinely "Waived In" Loans They Knew Did Not Comply With Their Stated Underwriting Standards**

131.    In its January 2011 report, the FCIC exposed the Defendants' practice of routinely "waiving in" mortgage loans that they knew or should have known did not comply with their stated underwriting guidelines.

132.    Defendants sometimes relied on outside firms to conduct the reviews of mortgage loans underlying a securitization in an effort to ensure that they were paying as little as possible for the underlying mortgage loans (translating into increased profits for the Defendants).  One of the largest such firms was Clayton Holdings.  As the FCIC concluded in its January 2011 report: "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept."

133.    For each loan pool they were hired to review, Clayton checked for: (1) adherence to seller-credit underwriting guidelines and client-risk tolerances; (2) compliance with federal, state and local regulatory laws; and (3) the integrity of electronic loan data provided by the seller to the prospective buyer.  This review was commonly referred to as a "credit and compliance review."  Contract underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to verify loan information, identified discrepancies in key data points, and graded loans based on seller guidelines and client tolerances.  This included answering such

questions as whether the "loans meet the underwriting guidelines," "comply with federal and state laws, notably predatory-lending laws and truth-in-lending requirements," and "were the reported property values accurate."   It also "critically" analyzed whether, to the extent a loan was deficient, there were any "compensating factors."

134.    Clayton generated regular reports for the Defendants and the loan seller that summarized Clayton's review findings, including summaries of the loan files that were outside the relevant underwriting standards.  Once Clayton identified such problems, the seller had the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why a loan complied with the underwriting standards.  If additional information was provided, Clayton re-graded the loan.  Once this process was complete, Clayton provided the underwriters and sponsors with final reports.

135.    Clayton gave loans one of three grades – Grade 3 loans "failed to meet guidelines and were not approved," while Grade 1 loans "met guidelines."  Tellingly, only 54% of the nearly one-million loans reviewed by Clayton Holdings "met guidelines," a number that its former president admitted indicated "there [was] a quality control issue in the factory" for mortgage-backed securities.

136.    Internal Clayton documents show that, contrary to the Defendants' representations, a startlingly high percentage of loans reviewed by Clayton for Defendants were defective, but were nonetheless included by the Defendants in loan pools sold to Western & Southern and other investors.  ***Clayton's data showed 26% (or 6,325) of the 23,668 loans that it reviewed for the JPMorgan Defendants failed to conform with their disclosed underwriting standards.  Similarly, 26% (or 9,408) of the 35,008 loans that Clayton reviewed for the WaMu Defendants failed to conform to Defendants' stated underwriting standards.***

137.    With such a high failure rate, the Defendants should have rejected their pools outright, and seriously investigated whether the relevant originators could be considered a trusted source of loans in the future.  At a minimum, the Defendants could have and should have increased the sample size given that Clayton Holdings did not review every loan in a pool.

138.    The Defendants did neither.  They not only continued to work with problematic originators, they failed to conduct any investigation and instead simply ignored the red flags raised by Clayton's results.  Of the 26% of loans in the JPMorgan and WaMu pools identified by Clayton as non-compliant, the JPMorgan Defendants "waived in" 51% (or 13% of the total JPMorgan pool), including the toxic loans in securitization pools for purchase by investors such as Western & Southern.  WaMu similarly waived in approximately one third of non-compliant loans (or 7% of the total WaMu pool).

139.    Accordingly, data from Defendants' own agent shows that 13% of the loans in JPMorgan's collateral pools, and 7% of the loans in the WaMu collateral pools, had seriously failed the applicable guidelines and were not subject to any compensating factors.  It thus cannot be credibly disputed that the Defendants regularly securitized large numbers of defective, toxic loans – contrary to representations to investors like Western & Southern.

140.    The hidden "waiver" of rejected loans that were not subject to any compensating factors was an omission that rendered the Defendants' disclosures regarding their underwriting and due diligence processes materially misleading.  As the FCIC report concluded:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 loans were waived in.
> . . . .
> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans.  **Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this**

information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

**D.     Other Evidence Demonstrating that Defendants Abandoned their Disclosed Underwriting Standards**

**1.     Defendants' Shoddy Lending Practices**

**a.     The JPMorgan Defendants**

141.     61% of the mortgage loans backing the JPMorgan Certificates that Western & Southern purchased were originated by CHF, the home mortgage division of Defendant JPMC Bank, far more than any other originator.

142.     CHF's departure from underwriting standards has been confirmed by James Dimon, CEO of JPMorgan Chase. Mr. Dimon testified under oath to the FCIC on January 13, 2010 that "the underwriting standards of our mortgage business should have been higher. We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

143.     CHF also relied heavily on third parties to originate loans. Mr. Dimon testified that these broker-loans performed markedly worse: "We've also closed down most-almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," and admitted that "there were some unscrupulous mortgage salesmen and mortgage brokers."

144.     The problems with CHF's origination business admitted to by Mr. Dimon have been corroborated and expanded upon in many different investigations of JPMorgan entities and legal actions that have been brought against them as a result. On information and belief, witnesses will testify in this action that, during the relevant period:

- CHF underwriters faced intense pressure to close loans at any cost, primarily because their salaries were dependent upon the quantity of loans they originated. This pressure for volume resulted in underwriting errors.

- CHF management would often override the decisions of underwriters to reject a loan, falsifying income information, removing harmful background documentation, and seeking altered appraisal values, in order to push the application through.

- CHF management would also work with underwriters, instructing them on how to find a way to successfully close a loan, such as calculating an LTV ratio or an income level that was needed for a particular loan to close.

- CHF underwriters would use lax income verification techniques, were discouraged from verifying income information, and were encouraged to make exceptions for the "reasonableness" of the income stated on applications.

- CHF underwriters were often not provided with all of the relevant borrower information, and certain data, such as credit scores and income, were susceptible to manipulation, especially with low documentation loans.

145.     An internal CHF memorandum outlining "cheats and tricks" to gain approval for risky mortgage loans from the "Zippy system" – a CHF automated loan underwriting system – further demonstrates CHF's abandonment of underwriting guidelines. This memorandum advised CHF personnel to inflate the borrowers' income or otherwise falsify loan applications. The memorandum exhorted brokers to "Never Fear!!" If Zippy rejects a "stated income/stated asset" loan application, "Zippy can be adjusted (just ever so slightly)." The memorandum encouraged brokers to game the Zippy system because "[i]t's super easy! Give it a try!" The document instructed brokers not to break down income by base, overtime, commissions, or bonuses, but to lump it all into base income. The memorandum also recommended that "[i]f your borrower is getting a gift, add it to the bank account along with the rest of the assets. Be sure to remove any mention of gift funds[.]" As an additional technique to attain approval for these risky loans, the author counseled "resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets."

### b.      The WaMu Defendants

146.      In 2005, with the market for conventional, fixed-rate loans drying up, WaMu formalized a strategy to move away from low risk to high risk home loans.  As James G. Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate PSI, WaMu Bank's focus had shifted by mid-2005 "to becoming more of a higher risk, sub-prime lender . . . .  This effort was characterized by statements advocating that the company become either via acquisition or internal growth a dominant sub-prime lender."  Documents recently released by the PSI show that, in April 2006, the President of WaMu's Home Loans Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin Products."  The presentation showed that the least profitable loans were government-backed and fixed loans; the most profitable were Option ARM, Home Equity, and Subprime Loans.  Subprime loans, at 150 basis points, were eight times more profitable than fixed loans at 19 basis points.

147.      In its push to generate more risky loan products, WaMu Bank pressed its sales agents to pump out loans while disregarding underwriting guidelines.  WaMu Bank gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives.  "It was the Wild West," said Steven M.  Knobel, founder of an appraisal company, Mitchell, Maxwell & Jackson, which did business with WaMu until 2007.  "If you were alive, they would give you a loan.  Actually, I think if you were dead, they would still give you a loan."  Indeed, Mr. Vanasek testified that "[b]ecause of the compensation systems rewarding volume vs. quality and the independent structure of the loan originators, I am confident that at times borrowers were

coached to fill out applications with overstated incomes or net worth adjusted to meet the minimum underwriting policy requirements."

148.     WaMu's own recently released internal documents confirm these accounts.  In 2003, WaMu held focus groups with borrowers, loan officers, and mortgage brokers to determine how to sell its Option ARM product.  An Option ARM loan is typically a 30-year ARM that initially offers the borrower four monthly payment options: a specified minimum payment (which was typically lower than the interest payment and therefore caused the loan to grow, referred to as negative amortization), an interest-only payment, a 15-year fully amortizing payment, and a 30-year fully amortizing payment.  A 2003 report summarizing the focus group research stated: "Few participants fully understood the Option ARM. . . .  Participants generally chose an Option ARM because it was recommended to them by their Loan Consultant. . . .  Only a couple of people had any idea how the interest rate on their loan was determined."  It said that while borrowers "generally thought that negative amortization was a moderately or very bad concept," this perception could be turned around by mentioning "that price appreciation would likely overcome any negative amortization."  The report concluded: "[T]he best selling point for the Option ARM loan was [borrowers] being shown how much lower their monthly payment would be . . . versus a fixed-rate loan."  Significantly, the majority of the WaMu securitizations at issue here securitized Option ARM loans.

149.     Fay Chapman, WaMu's former Chief Legal Officer, candidly admitted to the *Seattle Times,* that "[m]ortgage brokers put people into the product [Option ARM] who shouldn't have been."  Another former WaMu employee, Renee Larsen, related that borrowers did not know they were getting cheated because the Option ARM loan was so difficult to understand.

Yet sales of these high-risk loans soared. In 2003, WaMu originated $32.3 billion of Option ARM loans. By 2005, that number had doubled to $64.1 billion.

150. WaMu designed its employee compensation structure to favor these types of high-risk loans. In a document entitled "2007 Product Strategy," WaMu noted that it must "maintain a compensation structure that supports the high margin product strategy." A compensation grid from 2007 shows the company paid the highest commissions on pay-option adjustable rate mortgages ("Option ARMs"), subprime loans and home-equity loans: A $300,000 Option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount. The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes. Likewise, a WaMu "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Options ARM, Non-prime referrals and Home Equity Loans . . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

151. The reason WaMu could originate so many high-risk loans was because its underwriting guidelines became so loose as to render them effectively meaningless. In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan. Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

152. On September 28, 2007, WaMu's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending. The

recently-released report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR." It additionally concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

153. In early 2008, Radian Guaranty Inc., one of WaMu Bank's loan insurers, issued a similar report to WaMu Bank with the results of its review conducted from August 13, 2007 to September 28, 2007. The objectives of the review were, *inter alia,* to determine WaMu Bank's "compliance with Radian's underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's underwriting decisions." Radian gave WaMu Bank an overall rating of "Unacceptable." Of 133 loans reviewed, it found 11 loans or 8% had "insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines." Of the 10 delinquent loans it reviewed, it found that half had "questionable property values, occupancy and possible strawbuyers [sic]." Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger, WaMu's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases causes our origination data to be suspect particularly with respect to DTI [Debt To Income]."

154. Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file." She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out," she said. Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents." When Ms. Chapman asked

how they could possibly foreclose it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it.'"

155. According to Tom Golon, a former senior home loan consultant for WaMu in Seattle, Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down." The WaMu staff was subjected to "total blanketing – e-mails, memos, meetings set up so people understood that this was what the company wanted them to do."

156. Various witnesses with direct experience in WaMu's underwriting operations will also testify that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule. For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

157. WaMu's appetite for volume also led it to ignore the rampant fraud that infected its origination business. Perhaps the most compelling evidence involves two top loan producers at two different WaMu offices, called Montebello and Downey, in Southern California. Each of those loan officers made hundreds of millions of dollars in home loans each year and consistently won recognition for their efforts. In 2005, an internal WaMu review found that loans from those two offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])." The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review." The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these

particular willful behaviors on the part of the employees named."  But virtually none of the proposed recommendations were implemented.

158.    Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans.  WaMu thus made a decision to offload these loans through securitization and sale to investors.

159.    In a recently published October 17, 2006 presentation to WaMu Bank's Board of Directors, David Schneider, the former President of WaMu Home Loans, described one of WaMu Bank's "'Mitigating Procedures" as "[p]eriodic non performing asset sales to manage credit risk."

160.    It has also been freshly discovered that, on February 14, 2007, David Beck, at the time an Executive Vice President at Defendant WCC, sent an e-mail to Mr.  Schneider and Cheryl Feltgen, Chief Credit Officer for Home Loans, observing that "[t]he performance of newly minted option arm loans is causing us problems . . .  We should address selling 1Q as soon as we can before we loose [sic] the oppty."

161.    In response, Ms.  Feltgen advised that:

California, Option ARMs, large loan size ($1 to $2.5 million) have been the fastest increasing delinquency rates in the SFR [Single Family Residential] portfolio. . . .  Our California concentration is getting close to 50% and many submarkets within California actually have declining house prices according to the most recent OFHEO data from third quarter of 2006.  There is a meltdown in the subprime market which is creating a "flight to quality." . . . There is still strong interest around the world in US residential mortgages.  Gain on sale margins for Option ARMs arc attractive.  This seems to me to be a great time to sell as many Option ARMs as we possibly can.  [CEO] Kerry Killinger was certainly encouraging us to think seriously about it at the MER last week.

162.    Ms.  Feltgen then forwarded these e-mails to additional WaMu executives, noting: "We are contemplating selling a larger portion of our Option ARMs than we have in the recent

64

past.  Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the market seems not yet to be discounting a lot for those factors."  As noted above, the majority of the WaMu securitizations that are the subject of this action securitized the very types of deteriorating loans that Ms. Feltgen and other senior WaMu executives identified – Option ARM loans originated from 2005 through 2007 with high concentrations in California.

163.    In response to Ms.  Feltgen's e-mail, on February 20, 2007, Robert Shaw, Senior Credit Officer at WaMu, circulated an analysis of the delinquency rates in WaMu's investment portfolio.  Mr.  Shaw explained that the results "show that seven combined factors contain $8.3 billion HFI [Hold for Investment] Option ARM balances which experienced above-average increases in the 60+ delinquency rate during the last 12 months (a 821% increase, or 10 times faster than the average increase of 70%)."  Accordingly, Mr.  Shaw "recommend[ed] that we select loans with some or all of these characteristics to develop a HFS [Hold for Sale] pool."

164.    Not only did WaMu Defendants decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans.  An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . .  confirmed to contain suspicious activity from being sold to an investor."  In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors.  The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud.  There is evidence that this control weakness has existed for some time."

165.     In only one of the astonishing exchanges during the PSI's recent hearings, David

Beck, the WCC executive in charge of securitizations, flatly admitted that its securitizations were

tainted by fraud and underwriting deficiencies.

> Senator Levin: Purchasers of these securities were relying on you to provide
> truthful information.  You knew about it.  (Referring to fraudulent loans in
> securities).  Wasn't that your job?
> David Beck: I understood there was fraud. …
> Senator Coburn: Were you aware ever that the loans underlying the securities
> were having problems?
> Mr.  Beck: I knew we had underwriting problems.

166.     Needless to say, none of this was disclosed to investors, such as Western &

Southern.  The WaMu Defendants did not disclose that WaMu Bank was pushing high risk loans

onto borrowers who could not afford them.  Nor did they disclose that WaMu Bank had

effectively lowered its underwriting standards to such an extent as to render them meaningless,

or that they were granting exceptions without regard to loan quality.  Likewise, the WaMu

Defendants did not disclose that they were selling underperforming assets in order to shift "credit

risk" off their books.  It goes without saying that had Western & Southern known these facts, it

never would have acquired the WaMu Certificates.

### 2.     Defendants Acquired Loans From Originators Who Employed Shoddy Origination Practices

167.     Although Defendants originated many of the loans underlying their

securitizations, they also acquired loans from third party originators that systemically abandoned

any semblance of underwriting standards.  As set forth in Section IV(C), Defendants were aware

of the deficiencies in these loans as a result of their agent's review of a sample of the underlying

loans.  But Defendants continued to work with these originators and offload toxic mortgages on

investors such as Western & Southern.  Defendants alliance with these originators is additional

evidence that Defendants abandoned their disclosed underwriting standards.

### a. Wells Fargo

168.    Wells Fargo originated or acquired all of the loans underlying JPMAC 2006-WF1 or approximately 19% of the loans backing the JPMorgan Certificates that Western & Southern purchased.  That the loans originated by Wells Fargo in connection with JPMAC 2006-WF1 failed to adhere to any semblance of sound underwriting practices is established by the astonishing default rates that have emerged with respect to this offering.  ***Approximately 50%*** of the loans originated by Wells Fargo in connection with JPMAC 2006 WF1 are now in default or foreclosure.  Moreover, while the Certificates that Western & Southern purchased in connection with the JPMAC 2006 WF1 offering were ***initially rated AAA by Standard & Poors, they now are rated CCC***.  The existence of astonishing default rates and downgrades plainly establishes that Wells Fargo did not adhere to the underwriting guidelines touted in the JPMAC 2006-WF1 Prospectus Supplement.

169.    Plaintiffs in *In re Wells Fargo Mortgage Backed Certificates Litigation*, 09-cv-01376 (SI) (N.D. Cal.) challenged statements concerning Wells Fargo's underwriting guidelines virtually identical to those that appeared in the JPMAC 2006-WF1 Prospectus Supplement.  The court declined to dismiss such claims holding that Wells Fargo "failed to disclose that variance from the stated standards was essentially [Wells Fargo's] norm."  712 F. Supp. 2d 958, 971 (N.D. Cal. 2010).

170.    The problems with Wells Fargo's origination business have been corroborated and expanded upon in many different investigations of JPMorgan entities and legal actions that have been brought against them as a result.  On information and belief, Wells Fargo "placed 'intense pressure' on its loan officers to close loans, including by coaching borrowers to provide qualifying  income information, accepting implausible or falsified income information, and

lowering its standards near the end of the calendar year." *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d at 971.  Wells Fargo management would often override the decisions of underwriters to reject a loan, falsifying income information, removing harmful background documentation, and seeking altered appraisal values, in order to push the application through.  Wells Fargo management would also work with underwriters, instructing them on how to find a way to successfully close a loan, such as calculating an LTV ratio or an income level that was needed for a particular loan to close.  And the lapses in underwriting at Wells Fargo "infected the entire underwriting process, including with respect to prime loans." *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d at 971.

### b.      Countrywide

171.     As set forth in Section IV(A)(1), Countrywide originated loans underlying JPMMT 2005-S3.

172.     Countrywide systematically ignored its disclosed underwriting standards.  In pursuit of market share, unbeknownst to Western & Southern and to the investing public, Countrywide internally adopted a "matching" strategy that would approve any mortgage product feature offered by a competitor.  By mixing and matching the worst features of mortgage products from different competitors, Countrywide's composite product offering pushed the "frontier" of already aggressive industry underwriting practice.

173.     This "matching" strategy could only be implemented through the substantial and material abandonment of Countrywide's claimed credit-risk-reducing underwriting procedures.  To get around these "theoretical" requirements, Countrywide set up a system whereby any loan would be approved by way of underwriting "exceptions," and coached borrowers on how to apply for loan products that required little or no income or asset verification.  Internal documents

show that these so-called "exceptions" constituted upwards of a third of all loans and were based purely on the desire to increase loan volume (and therefore Countrywide's profits) and not on "compensating factors" as represented in the Offering Materials. This systemic abandonment of Countrywide's stated underwriting guidelines infected all of the loans it securitized.

174. For example, on August 2, 2005, Countrywide's then CFO, David Sambol, discussed Countrywide's CEO's strategy of "cherry picking" loans such that Countrywide would retain less risky mortgages while the most toxic loans were offloaded on investors including Western & Southern. Sambol wrote to Countryide's CEO, Angelo Mozilo: "we need to analyze the securitization implications on what remains if the bank is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans." Mozilo responded that it was better for Countrywide if it funneled the more toxic loans to investors through the securitization process. According to Mozilo:

> there is a price we will pay no matter what we do. *The difference being that by placing less attractive loans in the secondary market we know exactly the economic price we will pay when the sales settle.* By placing, even at 50%, *into the Bank we have no idea what economic and reputational losses we will suffer not to say anything about restrictions placed upon us by regulators*.

(Emphasis added). In other words, Countrywide's CEO intentionally placed toxic loans with investors to shield Countrywide from exposure. This highly material information was never disclosed to investors.

175. Mozilo's zest to offload riskier loans was driven by his observation that the loans Countrywide was offering did not satisfy Countrywide's own underwriting guidelines. For example, in an April 13, 2006 email, Mozilo wrote to a Countrywide officer that he was concerned that certain subprime loans had been originated ***"with serious disregard for process***

*[and] compliance with guidelines***,"** resulting in the delivery of loans **"with deficient**

**documentation":**

> *I have personally observed a serious lack of compliance within our origination system*
> *as it relates to documentation and generally a deterioration in the quality of loans*
> *originated versus the pricing of those loan[s].*  . . .

> *Obviously as CEO I cannot continue the sanctioning of the origination of this product*
> *until such time I can get concrete assurances that we are not facing a continuous*
> *catastrophe.*

(Emphasis added).

176.    Mozilo was further driven by his belief that Countrywide's riskier loans faced

imminent default.  In a June 1, 2006 email regarding Option ARMs, Mozilo warned Sambol and

other executives that borrowers "are going to experience a payment shock which is going to be

difficult if not impossible for them to manage."  Mozilo warned that "[w]e know or can reliably

predict what's going to happen in the next couple of years."  Mozilo acknowledged internally

(but never disclosed to investors) that the majority of Option ARMs were originated using stated

income, and that evidence suggested that borrowers were misstating their incomes.

177.    The decision by Countrywide to deviate from underwriting guidelines was not

accidental.  Countrywide's Chief Risk Officer John McMurray testified that his credit risk

department **"would reject proposals for new products but the people in sales nevertheless used**

**the exceptions procedure to achieve the same result."**  He was "surprised, angry, and

disappointed," for instance, when he found out Countrywide had advertising fliers promoting

loans that had low FICO requirements, only required a stated (non-documented) income, and

provided 100% financing even though the credit risk department had previously rejected those

fliers.

178.    McMurray also testified that he had conversations with others in Countrywide, including Sambol, about the fact that Countrywide was underwriting loans that were prohibited by its underwriting guidelines.  Indeed, in a May 22, 2005 email, McMurray complained to Sambol that *"exceptions are generally done at terms more aggressive than our guidelines. . . .* Given the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."  (Emphasis added).

179.    Sambol embraced Countrywide's abandonment of its underwriting guidelines stating in a February 13, 2005 that "we should be willing to price *virtually any loan that we reasonably believe we can sell/securitize* without losing money, even if other lenders can't or won't do the deal."  (Emphasis added).

180.    Countrywide's business units heeded the call, placing "virtually any loan" that Countrywide thought it could offload on investors like Western & Southern who were assured by Countrywide's public disclosures that Countrywide followed its own underwriting guidelines. Internal reviews conducted by Countrywide in 2006 concluded that one third of all Countrywide loans violated Countrywide's underwriting guidelines.  Frank Aguilera, a Managing Director responsible for risk management, reported the "particularly alarming" results that 23% *of the subprime loans at the time were generated as exceptions,* even taking into account "all guidelines, published and not published, approved and not yet approved."  The exception rate for "80/20" products (which are particularly risky because they provide 100% financing) was even higher.  Aguilera wrote at the time that *"The results speak towards our inability to adequately impose and monitor controls on production operations."* (Emphasis added).  Another internal review conducted around the same time concluded that "approximately *40% of the Bank's*

*reduced documentation loans . . . could potentially have income overstated by more than*

*10% and a significant percent of those loans would have income overstated by 50% or more.*"

181.    While Countrywide was fully aware of its failure to adhere to its underwriting

guidelines it continued to place "virtually any loan" that it thought it could dump on investors

such as Western & Southern.  In a February 11, 2007 email to Sambol, McMurray reiterated his

concerns about Countrywide's strategy of matching any type of loan product offered by its

competitors, which he said could expose the Company to the riskiest offerings in the market: "*I*

*doubt this approach would play well with regulators, investors, rating agencies[,] etc.  To*

*some, this approach might seem like we've simply ceded our risk standards . . .  to whoever*

*has the most liberal guidelines.*"  (Emphasis added).

182.    During a March 12, 2007 meeting of Countrywide's credit risk committee, the

Risk Management department reported that *12% of Countrywide loans that were reviewed*

*internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-*

*value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already-wide*

*underwriting guidelines*.

183.    In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted:

"Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of

the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have

qualified at the fully indexed rate."  Countrywide also admitted that "*almost 25% of the*

*borrowers would not have qualified for any other [Countrywide] product*."

c.    AHMC

184.    As set forth in Section IV(A)(2), AHMC originated mortgage loans underlying

WMALT 2006-5.

185.     It is now apparent that AHMC regularly disregarded its underwriting standards to grow market share.  AHMC's senior management imposed intense pressure on its underwriters to approve mortgage loans, and AHMC's incentive commission structure was designed to encourage a high volume of closed loans, rather than scrutiny of loan quality and underwriting. Underwriters were required to approve a certain minimum number of loans – five per day and 100 per month – in order to qualify for incentive compensation.  Loan "Validators" and "Closers" were similarly paid by volume, with a minimum of closed loans (18 and 80, respectively) required in order to qualify for bonuses.

186.     An October 2005 AHMC "Credit Update" outlined the company's conscious decision to promote increasingly lax underwriting standards.  Under the heading "Guideline Interpretation," the presentation set forth 30 pages of revised credit factors that made clear that AHMC's underwriting guidelines were to be relaxed substantially or rendered essentially meaningless in order to allow the company to make loans to high-risk borrowers.  Specifically, on each page, AHMC set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What We Observed in [Our] Prior History" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new interpretations included:

- not requiring verification of income sources on stated income loans;
- reducing the required documentation for self-employed borrowers; and
- broadening the acceptable use of second and third loans to cover the full property value.

187.     That same document also set forth AHMC's "Quality Control Philosophy" regarding its lending practices.  As that document made clear, underwriters and loan officers were to adhere to a philosophy that "Very few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

73

188.     In addition, according to a complaint filed by the SEC on April 28, 2009, senior executives of AHMC made false and misleading disclosures designed to conceal AHMC's financial condition from investors and violated various anti-fraud provisions of the federal securities laws. *Securities and Exchange Commission v. Michael Strauss, Stephen Hozie and Robert Bernstein*, No. 09-CV-4150 (RB), April 28, 2009 (S.D.N.Y.).

189.     Significantly, the SEC complaint alleges that AHMC issued public statements misleadingly omitting the fact that AHMC originated a large portion of mortgage loans without verifying the borrower's income.

190.     Ultimately, AHMC's loan origination and underwriting practices were so suspect that in a 2010 report, the Officer of the Comptroller of the Currency, United States Department of Treasury, identified AHMC as the 10th worst subprime lender in the entire nation.

### d.     Greenpoint

191.     As set forth in Section IV(A), Greenpoint originated mortgage loans underlying both JPMorgan and WaMu securitizations that are subject to this action.

192.     Greenpoint's loans were underwritten by over 18,000 brokers – a large enough number that Greenpoint could not exercise any degree of realistic control.  Typically, new Greenpoint-approved brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

193.     Greenpoint did not verify the income of borrowers as represented in the Offering Materials but had a reputation in the industry for cutting corners on underwriting.  As a result of Greenpoint's poor underwriting practices, Greenpoint's parent, Capital One, subsequently took an $860 million charge for its loan portfolio.

e.     **RFC**

194.     As set forth in Section IV(A)(2), RFC originated mortgage loans underlying WMALT 2006-4.

195.     MBIA Insurance Corporation ("MBIA") had access to some of the complete loan files for certain securitizations involving RFC originated securitizations.  In the course of its review of the loan files, MBIA found evidence that RFC systemically departed from its underwriting guidelines.  For example, in *MBIA Insurance Co. v. Residential Funding Corp.*, No. 603552-2008 (N.Y.S. Sup. Ct.), MBIA states that it obtained mortgage loans for multiple RFC transactions and found that out of 7,913 loans examined, "at least 7,019 – more than 88% of the mortgage loans that MBIA reviewed – were not originated or acquired in material compliance with RFC's representations and warranties."

196.     In *MBIA Insurance Co. v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corp.)*, No. 600837/2010 (N.Y.S. Sup. Ct.) MBIA states:  "To date, MBIA has been able to obtain and review loan files associated with 4,104 delinquent and charged-off loans. . . . At least 89% of the 4,104 delinquent or charged off loans reviewed by MBIA were not originated in material compliance with GMAC Mortgage's Underwriting Guidelines or the contractual representations and warranties made by GMAC mortgage."

197.     MBIA's review also found that "A significant number of mortgage loans were made on the basis of 'stated incomes' that were grossly unreasonable or were approved despite DTI or [combined LTV] ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or in the Purchase Agreements or Prospectus Supplements. . . .  GMAC Mortgage used its proprietary automated electronic loan underwriting program known as Assetwise . . . .  Assetwise assisted in the underwriting of mortgage loans by automating the

process of determining whether a loan met pre-specified underwriting criteria set up by the program. . . .  Assetwise, however, failed to analyze proposed mortgage loans using criteria set forth in GMAC Mortgage's underwriting guidelines.  As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards."

198.    Similarly, in the *Residential Funding Corp.* case, MBIA's review found:  "Of the 1,847 mortgage loans [examined by MBIA] . . . only 129 mortgage loans – less than 7% of the mortgage loans reviewed – were originated or acquired in material compliance with RFC's representations and warranties . . . with respect to the underwriting of the mortgage loans contributed to the RFC transactions."

199.    MBIA also noted that:  "The Underwriting Guidelines . . . only allowed RFC to make exceptions to the Underwriting Guidelines in very specifically defined and limited circumstances . . . .  RFC's Underwriting guidelines required that a form – Form 1600 – be completed and approved for any exceptions made to the Underwriting Guidelines in connection with the underwriting of purchase of a mortgage loan. [Yet, in fact f]or a significant number of non-compliant mortgage loans, RFC did not identify any specifically defined exception that was permitted under the underwriting Guidelines.  Further for a significant number of mortgage loans, RFC failed to document the alleged exceptions on a form 1600 as required by the Underwriting Guidelines."

**f.    MortgageIT**

200.    As set forth in Section IV(A)(2), MortgageIT originated mortgage loans underlying WMALT 2007-A3.

201.    MortgageIT was recently sued by the United States for originating loans "in blatant disregard of whether borrowers could make mortgage payments." *United States of*

*America v. Deutsche Bank AG et al.*, 1:11-cv-02976-LAK (S.D.N.Y.). Of 39,000 government-insured mortgages originated by MortgageIT Inc., 12,500 went into default.

202.    Federal Home Loan Bank of Boston ("FHLB") had access to some of the complete loan files for certain securitizations involving MortgageIT-originated securitizations. In the course of its review of the loan files, FHLB found additional evidence that MortgageIT systemically departed from its underwriting guidelines. For example, in *Federal Home Loan Bank of Boston v. Ally Financial Inc. f/k/a GMAC LLC, et al.*, No. 11-1533 (Super. Ct. Mass.), FHLB found that loans were originated despite evidence that the borrower provided false employment or salary information and loans were approved despite the fact that the LTV ratios exceeded what was allowed in MortgageIT's underwriting guidelines. FHLB also found evidence that MortgageIT routinely failed to adhere to industry standard appraisal practices.

203.    Similarly, MortgageIT's insurer Assured Guaranty Corp. ("Assured") had access to the results of a third-party loan-level review of a securitization involving a pool of loans 75% of which were originated by MortgageIT. The results of the review demonstrated that the essential characteristics of the MortgageIT mortgage loans underlying Certificates sold to Western & Southern were misrepresented, and that the problems in the MortgageIT underwriting practices were systemic. According to Assured, 1532 out of a total 1774 loan files, or roughly 86% of the loan files examined, contained breaches of the applicable underwriting guidelines.

## V.    MISREPRESENTATIONS CONCERNING TRANSFER OF MORTGAGES AND NOTES TO THE ISSUING TRUSTS

204.    The Defendants falsely stated in the Offering Materials that each mortgage and each note in the securitizations would be assigned to the relevant Trust and that the loan files would be transferred such that the Trust would have the right to foreclose upon property subject to each mortgage loan.

205. A fundamental step in the mortgage securitization process is the transfer to the issuing trust for each mortgage-backed securities offering of good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the holders to be legally entitled to enforce the mortgage loans in case of default.

206. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

207. The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).

208. Generally, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

209. In order to preserve the bankruptcy-remote status of the issuing trusts in mortgage-backed securities transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the trust. Rather, the notes and security instruments are generally initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities. After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

78

210.    In addition, the PSA generally requires the transfers of the mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust qualifies as a tax-free real estate mortgage investment conduit.

211.    The applicable state trust law generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery, and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

A.    **Defendants' Representations**

212.    Defendants represented in the Offering Materials associated with each securitization that the underlying mortgage notes would be properly assigned to the Trusts and that the mortgage files would similarly be delivered to the Trusts.  For example, the JPMALT 2005-S1 Prospectus Supplement assured investors that

> [p]ursuant to a pooling and servicing agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). . . .  In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian the Mortgage File. Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records.

(JPMALT 2005-S1 Prospectus Supplement, dated November 23, 2005, at S-32.) The same representation appeared in the JPMMT 2005-S3 Prospectus Supplement, dated December 27, 2005, at S-29.

213.    The following similar representation appeared in the Prospectus Supplement for JPMAC 2006-WF1:

> Pursuant to the Pooling and Servicing Agreement, on the Closing Date the
> Depositor will sell, transfer, assign, set over and otherwise convey without
> recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the
> Mortgage Loans and its rights under the Assignment Agreement (including the
> right to enforce the Originator's purchase obligations).

(JPMAC 2006-WF1 Prospectus Supplement, dated August 29, 2006, at S-18.)  The same

representation appeared in the JPMAC 2007-CH1 Prospectus Supplement, dated March 7, 2007,

at S-137.

214.    The Prospectus for WMALT 2005-7 and WMALT 2005-9 represented:

> The Company, a Servicing Entity or a Servicer, as the case may be, will, as to
> each Mortgage Loan, deliver or cause to be delivered to the Trustee the Mortgage
> Note, an assignment (except as to any Mortgage Loan registered on the MERS
> System (as defined below). . . .  With respect to any Mortgage Loan registered on
> the mortgage electronic registration system (the 'MERS System') maintained by
> MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or any
> successor thereto ('MERS'), an assignment of Mortgage will not be delivered to
> the Trustee as described above, but instead the change in beneficial ownership to
> the Trust will be registered electronically through the MERS System in
> accordance with the rules of membership of MERS.  MERS will serve as
> mortgagee of record with respect to these Mortgage Loans solely as a nominee of
> the Trust, in an administrative capacity, and will not have any interest in these
> Mortgage Loans.

215.    The Offering Materials for WMALT 2006-4, 2006-5, 2006-9 and WMALT 2007-

OA3 represented:

> The depositor will, with respect to each mortgage asset, deliver or cause to be
> delivered to the trustee, or to the custodian, a mortgage note endorsed to the
> trustee, the trust, or in blank, the original recorded mortgage with evidence of
> recording or filing indicated on it, and an assignment (except as to any mortgage
> loan registered on the MERS® System) to the trustee, the trust, or in blank of the
> mortgage in a form for recording or filing as may be appropriate in the state
> where the mortgaged property is located.

(WMALT 2006-4 Prospectus Supplement, dated April 26, 2006, at 51, WMALT 2006-5

Prospectus Supplement, dated June 27, 2006, at 51, WMALT 2006-9 Prospectus Supplement,

dated October 26, 2006, at 51, and WMALT 2007-OA3 Prospectus Supplement, dated March 26,

2007, at 50.)

216.     These disclosures led investors to conclude that the Defendants had taken all steps necessary to ensure the Trusts could foreclose upon a mortgage loan if the borrower defaulted, an obviously material representation.  But this was not the case.  In many instances, the Defendants either lost the paperwork necessary to prove title or failed to deliver it to the Trusts as is required under state law.

**B.     Contrary to Defendants' Representations, They Did Not Properly Assign Large Numbers of Mortgages and Notes and Failed to Deliver Mortgage Loan Files to the Trusts**

217.     In their zeal to offload toxic loans to investors such as Western & Southern, Defendants did not come close to complying with the strict rules governing assignment.  Indeed, Defendants lost much of the paperwork relating to the loans underlying their securitizations or made no attempt to deliver the original mortgage notes and security instruments to the issuing trusts as required under state law.  Now, they are engaged in an attempt to cover up their failure to validly assign the mortgage notes and security instruments filing false documentation in courts nationwide and forging assignment documents in an effort to cover up their tracks.  Former head of the FDIC Shelia Bair recently described Defendants' misconduct as "pervasive" during an interview aired on the television program *60 Minutes*.

218.     Attorneys General from all fifty states are currently investigating the misdeeds of Defendants and others in the mortgage industry who have attempted to cover up the widespread failure to properly assign mortgage loans to securitization trusts by attempting to foreclose on homes without proper documentation.  Attorney General Tom Miller of Iowa, who is leading the National Association of Attorneys General ("NAAG") initiative against the improper practices in the mortgage industry, commented that the Defendants' so-called paperwork issues were an egregious "affront to state courts."  Upon information and belief, the Attorneys General have

uncovered significant evidence of wrongdoing by Defendants, cumulative of the evidence discussed herein, that will be made public when they either sue Defendants or similarly situated parties or enter into a settlement with the Attorneys General.

219.    The Federal Reserve System, the OCC and the Office of Thrift Supervision recently issued a report that confirms that the JPMorgan Defendants and the WaMu Defendants routinely did not transfer the original mortgage loan documents to the issuing trusts for MBS transactions.  In the *Interagency Review of Foreclosure Policies and Practices* released April 2011, the agencies reported that their extensive examinations of mortgage loan servicers (not the Trusts) including JPMorgan Bank (including in its capacity as successor to WaMu Bank) **"*showed that servicers possessed original notes and mortgages.*"**  The *Interagency Report* found that Wells Fargo, the Master Servicer for JPMALT 2005-S1, JPMMT 2005-S3, and JPMAC 2006-WF1 was similarly in possession of original mortgage notes in it capacity as servicer.  As a result, contrary to the JPMorgan Defendants' and WaMu Defendants' assertions to the contrary in the Offering Materials, the mortgage note or the mortgage file for each underlying loan was not transferred properly and none of the trusts have the right to foreclose on any of the affected underlying loans.

220.    In addition, the OCC issued a Consent Order dated April 13, 2011 finding that Defendants tried to cover up the fact that the issuing Trusts do not have legal title sufficient to allow them to foreclose upon the underlying mortgage loans by engaging in fraudulent or improper foreclosure practices.  The OCC found that Defendants:

> (a) filed or caused to be filed in state and federal courts affidavits executed by [their] employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records,

when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; [and]

(c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

221.    The OCC similarly issued a Consent Order dated April 13, 2011 finding that

Wells Fargo has tried to cover up the fact that the issuing Trusts do not have legal title sufficient

to allow them to foreclose upon the underlying mortgage loans by engaging in fraudulent or

improper foreclosure practices.  The OCC found that Wells Fargo:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; [and]

(c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time . . . .

222.    Defendants and Wells Fargo stipulated to the Consent Order and, thus, admitted

the OCC's findings.  The Consent Order requires Defendants and Wells Fargo to undertake a

sweeping review of their foreclosure practices.  Upon information and belief, this review will

uncover substantial additional evidence demonstrating that the Defendants' representations concerning proper assignment of mortgages and delivery of mortgage files were false.

223.    Defendants have engaged in widespread misconduct to cover up the fact that mortgage notes and/or security instruments were often not properly assigned and delivered to the Trusts.  Defendants utilize so-called "robo-signers" who execute tens of thousands of foreclosure affidavits a month, all necessarily false because they are allegedly based on their own personal knowledge, and many of them without proper documentation including evidence of possession of the underlying mortgage note.  These "robo-signers" sometimes attempt to execute assignments retroactive to the closing date of the relevant securitization in an attempt to circumvent state laws governing assignment.  Such purportedly retroactive assignments are invalid.

224.    Courts have concluded that the Defendants have committed outright fraud to cover up the fact that they did not bother to properly assign mortgages or maintain mortgage documentation.  For example, in *JP Morgan Chase Bank, N.A. v. Pocopanni*, Case No. 16-2008-CA-3989 (Cir. Ct. Fla. Aug. 9, 2010), the Court stated as follows:

> The Court finds by clear and convincing evidence that WAMU, Chase and [counsel for JPMC Bank] committed fraud on this Court. . . . The Court finds that WAMU and Chase made representations to this Court during the course of the instant action that are known to be false. . . . Throughout the litigation, WAMU and Chase and [their counsel] have represented to this Court that plaintiff owns and holds the note and mortgage.  Moreover, WAMU and [counsel] created a false Assignment of Mortgage dated April 11, 2008 as evidence of these assertions. . . .  The Court finds by clear and convincing evidence that these acts committed by WAMU, Chase and [counsel] amount to a "knowing deception intended to prevent the defendants from discovery essential to defending the claim" and are therefore fraud.

225.    One of the Defendants' "robo-signers" was a woman named Martha Kunkle.  Ms. Kunkle died in 1995, but the Defendants continued to use her name on "robo-signed" documents

until 2010 foreclosing upon many homes where WaMu Bank (know part of JPMC Bank) served as the servicer as was the case with each of the WaMu securitizations involved in this action.

226. Beth Ann, another JPMC Bank "robo-signer" testified that she signed *18,000* foreclosure related documents a month candidly admitting that she had absolutely no personal knowledge regarding assertions made in the documents she was signing.  It was absolute fiction.

227. One of JPMC Bank's other "robo-signers," Angela Nolan, detailed in testimony Defendants' practice of deceiving courts by fabricating an "allonge" after the fact as evidence that the original mortgage note was properly endorsed when it was not.  State laws require that indorsements be executed on the back of the original note when it is assigned.  In the rare event that a mortgage is assigned so many times that there is no longer space on the back of the note state laws allow parties to permanently attach a separate piece of paper – an allonge – to document subsequent indorsements.  Ms. Nolan testified that JPMC Bank has a regular practice of executing an allonge years after the closing of the securitization despite the fact that the there was room on the original notes for additional endorsements.  She further confirmed that the Defendants routinely represented to courts that the allonges evidence proper assignments (when they did not).

228. Another JPMorgan "robo-signer" is Barbara Hindman an employee of JPMC Bank in Jacksonville, FL.  She wears many hats.  In some foreclosure documents filed in state courts she represents that she is "Vice President of Mortgage Electronic Registration Systems, Inc."  Sometimes she is "Vice President, Bank of America, N.A."  Other times she is "Vice President, JP Morgan Chase Bank, N.A., as successor-in-interest to Washington Mutual Bank."  Ms. Hinman works with Margaret Dalton another JPMorgan "robo-signer" based in Jacksonville, Florida.

229. Upon information and belief, other JPMorgan "robo-signers" include Beth Cottrell, Whitney Cook, Christina Trowbridge and Stacy Spohn from the CHF office in Franklin County, Ohio.

230. Defendants have also retained third party vendors to "robo-sign" documents for them including Lender Processing Services Inc. ("LPS"). LPS is now the subject of a federal criminal investigation related to its foreclosure document preparation. Additionally, the Attorneys General of Michigan, California and Florida have issued subpoenas to LPS seeking various foreclosure documents prepared by LPS "robo-signers." LPS employees have testified that LPS prepared thousands of fabricated foreclosure documents on a daily basis for their clients including the Defendants. For example, in *In re: Wilson* (U.S. Bk. Ct., No. 07-11862) (E.D. Louisiana), LPS employees confirmed that employees of LPS routinely swear under oath that certain facts are true, without confirming that they are, and that no attempt is made to confirm that assertions made in foreclosure documentation are accurate. Reflecting the widespread, systemic misconduct perpetrated by the Defendants and others, the Court in the *Wilson* action involving LPS remarked, "[t]he fraud perpetrated on the Court, Debtors, and trustee would be shocking if this Court had less experience concerning the conduct of mortgage servicers."

231. As a direct result of Defendants' blatant misconduct, in September 2010 Defendants had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures publicly acknowledging that 56,000 of Defendants' filed foreclosure proceedings included potentially forged or otherwise improper documentation.

232. LPS's subsidiary DOCx was recently the subject of an investigative report that was aired on the television program *60 Minutes*. "Robo-signers" employed by DOCx were required to "robo-sign" 340 documents an hour and 4,000 per day for Wells Fargo and other

bank clients.  Wells Fargo, the servicer for three of the four JPMorgan securitizations at issue in this action, was reportedly one of DOCx's clients.

233.    One of Wells Fargo's "robo-signers" is a woman named Xee Moua who admitted that she executes hundreds of foreclosure documents every day without reading them.  *"Signer" Issue Raised for Wells Fargo*, WSJ (Oct. 15, 2010).  Ms. Moua said she reviewed up to 500 on a daily basis.

234.    After Ms. Moua disclosed Wells Fargo's widespread practice of filing false mortgage documents, Wells Fargo admitted that it had filed false foreclosure documentation in *55,000* foreclosure proceedings.

235.    Ohio Attorney General Richard Cordray commenced an investigation in the wake of Ms. Moua's admission and asked Wells Fargo to voluntarily vacate all foreclosures based on improper paperwork.

236.    Astonishingly, a July 19, 2011 Associate Press report confirms that Defendants continue to "robo-sign" documents and file false foreclosure documents in an effort to cover up their epic failure to deliver notes and security instruments and deliver loan files as promised in the Offering Materials.  Associated Press interviewed officials with intimate knowledge of mortgage recording in counties across the country.  They confirmed that Defendants and other banks were still committing foreclosure fraud and "robo-signing."  One official stated: "It is still an epidemic."  Professor L. Randall Wray of the University of Missouri-Kansas City confirmed: "The banks have completely screwed up property records."

## C.    Defendants' Statements or Omissions Regarding MERS Were Also Misleading

237.    The WaMu Defendants' representations that mortgage loans were properly recorded with the MERS system were also false.  As multiple courts, including Ohio courts, have

held, because the actual mortgage note is not transferred to MERS, the use of the MERS System

is a nullity. Accordingly, in February 2011, MERS instructed its lender members to stop

foreclosing in the name of MERS in light of the overwhelming weight of legal authority holding

that beneficial ownership of an underlying mortgage cannot be transferred to MERS.

238. The JPMorgan Defendants did not disclose that they were attempting to record

loans that they acquired from other originators with MERS rather than following traditional

procedures. However, during a conference call in October 2010, Mr. Dimon admitted that the

JPMorgan Defendants regularly use MERS in an attempt to assign mortgages acquired from

other originators in connection with their securitizations. The failure to disclose this fact was

highly material and rendered the JPMorgan Defendants' reassurances that mortgage notes had

been assigned properly false when made.

## VI.    DEFENDANTS MANIPULATED THE RATINGS PROCESS

239. Each tranche of the Western & Southern Certificates received a credit rating

indicating the rating agencies' view of its risk profile. The initial ratings given to the Certificates

were AAA, or the highest available investment rating. The ratings were material to reasonable

investors, including Western & Southern, because the ratings provided additional assurances that

investors would receive the expected interest and principal payments. The Certificates would

have been unmarketable to investors like Western & Southern and would not have been issued

but for the provision of these ratings.

240. The Offering Materials represented that the rating agencies conducted an analysis

designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools

and issued ratings accordingly. For example, the Offering Materials for JPMAC 2006-WF1

represent:

> The ratings assigned to mortgage pass-through certificates address the
> likelihood of the receipt of all payments on the mortgage loans by the related
> certificateholders under the agreements pursuant to which such certificates are
> issued.  Such ratings take into consideration the credit quality of the related
> mortgage pool, including any credit support providers, structural and legal
> aspects associated with such certificates, and the extent to which the payment
> stream on the mortgage pool is adequate to make the payments required by such
> certificates.

JPMAC 2006-WF1 Prospectus Supplement at S-66.  Each of the Prospectus Supplements

relating to the Defendants' other offerings that are part of this action provide identical or

substantially similar disclosures.  *See* Exhibit B.  Each Prospectus Supplement also provides the

ratings for each class of certificate issued, based on ratings analyses done by multiple ratings

agencies.

241.    These representations were false.  The ratings given to the Certificates by the

major credit rating agencies were based on the loan profiles supplied to the agencies by the

Defendants.  But as discussed above and below, most (if not all) of the key components of that

data were false because the Defendants failed to adhere to their disclosed underwriting standards,

failed to assign title to the underlying mortgages properly and manipulated the appraisal of the

properties underlying the mortgage pools.  As such, Defendants essentially pre-determined the

ratings by feeding inaccurate information into the ratings system.  This rendered misleading

Defendants' representations concerning the ratings and their significance because Defendants

failed to disclose that the ratings would be based entirely on unreliable information provided by

Defendants themselves.

242.    In addition, the Senate Permanent Subcommittee on Investigations ("PSI")

recently released documents from the internal files of the Defendants detailing how the

Defendants manipulated the credit rating agencies to achieve their desired rating results.  The

PSI reported that investment banks, including JPMC Bank and WaMu Bank, "were pressuring

[the ratings agencies] to ease rating standards" on mortgage-backed securities.  This included the Defendants' practice of blacklisting ratings analysts who refused to provide favorable credit ratings to the toxic mortgage portfolios they were offloading to investors such as Western & Southern.

243.     It was recently revealed that despite touting the Certificates to Western & Southern as safe and sound investments worthy of the ratings agencies' highest ratings, the Defendants actually believed otherwise.  Indeed, the JPMorgan Defendants were actively placing bets against the health of the housing market and were helping a group of hedge funds to do the same at the expense of clients of the JPMorgan Defendants.

244.     On June 21, 2011, the United States Securities and Exchange Commission announced that Defendant J.P. Morgan Securities had agreed to pay $153.6 million to settle SEC charges relating to J.P. Morgan Securities' efforts to unload complex mortgage securities on its clients at a time when it knew full well that these securities were not credit worthy investments. As part of the settlement, JPMorgan Securities was forced to "improve the way it reviews and approves mortgage securities transactions," including mortgage backed securities.

245.     Moreover, according to an article in *Bloomberg* on February 17, 2010, Mr. Dimon believed, at least from late 2006, that JPMorgan's mortgage backed securities were a bad investment, and attempted to rid JPMorgan of such risk.  The article noted that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William King, then its head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

246.     That JPMorgan was placing bets against the housing market at the same time the JPMorgan Defendants were unloading billions of mortgage-backed securities on investors is

powerful evidence that the Defendants were aware that their manipulation of the ratings process was resulting in inaccurate ratings.

## VII.    DEFENDANTS IMPROPERLY MANIPULATED THE APPRAISAL PROCESS

247.    The Offering Materials for Defendants' offerings all represent that Defendants required and relied upon independent, industry-standard appraisals to determine the adequacy of the underlying collateral.  *See* Exhibit C.  Each prospectus also contains representations concerning the LTV and combined loan-to-value ("CLTV") ratios of the mortgage loans underlying each securitization.  These representations were false.

248.    The representations regarding appraisals and LTV and CLTV ratios were materially false and misleading because:  (i) the appraisers were not independent from the respective mortgage lenders, which pressured appraisers to value the mortgaged property at a pre-determined, preconceived, inflated, and false appraisal value; (ii) the actual LTV and CLTV ratios for many of the mortgage loans underlying Western & Southern's Certificates were higher than what was reported in the Offering Materials; (iii) sales managers employed by the respective originators had and utilized the authority to override and inflate an appraiser's final professional valuation of the mortgaged property; and, as such, (iv) the appraisals failed to conform to industry standards.

249.    That the Defendants misstated LTV and CLTV statistics contained in the Offering Materials is confirmed by Congressional testimony and other statements made by those in the industry about the widespread corruption in the appraisal processes, including those used by the companies at issue here, during all times relevant to this Complaint.

250.    For instance, Richard Bitner, a former executive of a subprime lender for fifteen years, testified in April 2010 that "the appraisal process [was] highly susceptible to

manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals." Similarly, Patricia Lindsay, a former wholesale lender, testified in April 2010 that in her experience appraisers throughout the industry were "often times pressured into coming in 'at value,'" *i.e.,* at least the amount needed for the loan to be approved. The appraisers "fearing" their "future business and their livelihoods" would choose properties "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."

251. And Jim Amorin, President of the Appraisal Institute, testified in April 2009 regarding the industry-wide problem that "in many cases, appraisers are ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again . . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"

252. The FCIC's January 2011 report recounts the similar testimony of Dennis J. Black, an appraiser with twenty-four years of experience who held continuing education services across the country. "He heard complaints from appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems. Black told the FCIC, 'The story I have heard most often is the client saying he could not use the appraisal because the value was [not] what they needed.' The client would hire somebody else."

253. Moreover, as set forth in Section VI, the JPMorgan Defendants placed massive bets against the housing market, and helped hedge funds do the same (to their clients' detriment). This is powerful evidence that the JPMorgan Defendants were aware that their manipulation of the ratings process was resulting in inflated appraisals and that LTV and CLTV ratios were misrepresented in the Offering Materials.

92

## VIII.  SCIENTER ALLEGATIONS APPLICABLE TO COMMON LAW FRAUD CLAIMS

254.    The allegations below are made in support of common law fraud claims, not in support of Plaintiffs' Ohio Securities Act claims, federal 1933 Act claims, and negligent misrepresentation claims.

255.    The same evidence discussed above not only shows that the representations were untrue, but that the WaMu Defendants *knew* they were falsely representing the underlying process and the risk profiles behind the Mortgage Loans.  For instance:

- WaMu management consciously loosened lending guidelines in order to boost income from securitizations.  In its push to generate more risky loan products, WaMu Bank pressed its sales agents to pump out loans while disregarding underwriting guidelines. WaMu Bank gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives.

- In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.  Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

- Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file." She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here?  We're just going to take this stuff and throw it out," she said.

- In 2005, an internal WaMu review found that loans from two of WaMu's top loan producing offices, Downey and Montebello had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])."  The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review."  The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named."  But virtually none of the proposed recommendations were implemented.

- Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its mortgage loans, particularly among Option ARM loans. WaMu thus made a decision to offload these loans through securitization and sale to investors. For example, in a recently published October 17, 2006 presentation to WaMu Bank's Board of Directors, David Schneider, the former President of WaMu Home Loans, described one of WaMu Bank's "Mitigating Procedures" as "[p]eriodic non performing asset sales to manage credit risk." Similarly, it has also been freshly discovered that, on February 14, 2007, David Beck, at the time an Executive Vice President at Defendant WCC, sent an e-mail to Mr. Schneider and Cheryl Feltgen, Chief Credit Officer for Home Loans, observing that "[t]he performance of newly minted option arm loans is causing us problems . . . We should address selling 1Q as soon as we can before we loose [sic] the oppty."

- Not only did WaMu Defendants decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans. An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an investor." In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."

- David Beck, the WCC executive in charge of securitizations, flatly admitted that the WaMu Defendants' securitizations were tainted by fraud and underwriting deficiencies, stating during Senate testimony "I understood there was fraud" and "I knew we had underwriting problems."

- WaMu's agent, Clayton, notified the WaMu Defendants that 7% of their mortgage pools included in their securitizations did not comply with their underwriting guidelines. But the WaMu Defendants did nothing to rectify the situation. Instead they included the non-compliant loans in securitizations sold to investors such as Western & Southern without requiring evidence of sufficient compensating factors.

## IX. WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES

256. In making the investments, Western & Southern relied upon the Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of their underwriting processes, the assignment of the underlying mortgage loans, the ratings ascribed to the Certificates and the appraisal of the

underlying properties.  Western & Southern received, reviewed, and relied upon the Offering

Materials, which described in detail the mortgage loans underlying each offering.

257.    In purchasing the Certificates, Western & Southern justifiably relied on the

Defendants' false representations and omissions of material fact detailed above, including the

misstatements and omissions in the Offering Materials.  These representations materially altered

the total mix of information upon which Western & Southern made its purchasing decisions.

258.    But for the misrepresentations and omissions in the Offering Materials, Western

& Southern would not have purchased or acquired the Certificates as it ultimately did, because

those representations and omissions were material to its decision to acquire the Certificates, as

described above.

259.    The false and misleading statements of material facts and omissions of material

facts in the Offering Materials directly caused Western & Southern damage, because the

Certificates were in fact far riskier than the Defendants described them to be.  The loans

underlying the Certificates experienced default and delinquency at extraordinarily high rates due

to the abandonment of the disclosed underwriting guidelines.  And when the inevitable defaults

followed, many of the underlying loans could not be foreclosed upon because the Defendants

failed to assign the mortgages properly.  Western & Southern's losses on the Certificates have

been much greater than they would have been if the loans were as Defendants described them to

be.

260.    There are several potential ways of valuing a mortgage-backed security.  One of

the potential ways that lower value can be measured, and part of the evidence that Western &

Southern has been damaged, can be found in secondary-market pricing.  Though the market may

have temporarily "seized up" during the financial crisis, it has since partially recovered and there

was and is a functioning secondary market for mortgage-backed securities such as the Certificates here. Numerous brokers are active in, and have trading desks specifically dedicated to, the secondary market for mortgage-backed securities, including without limitation Defendants or their affiliates, Barclays, Bank of America, Citigroup, Deutsche Bank, Goldman Sachs, Royal Bank of Scotland, and Nomura.

261. According to data provided to the FCIC, between May 2007 and November 2008 Goldman Sachs alone bought and sold $17 billion worth of MBS cash securities, and $32 billion worth of credit default swaps linked to mortgage-backed securities, representing a total of 7,000 trades. These figures demonstrate the liquidity in the secondary market for mortgage-backed securities.

262. Western & Southern has incurred substantial losses in market value on the Certificates. Further, the income and principal payments that Western & Southern received have been less than Western & Southern expected under the "waterfall" provisions of the securitizations. Even in the context of the real estate crisis, the Certificates would have held most, if not all, of their value had the securities underlying the loans been as represented by the Defendants in the Offering Materials. This decreased value is evidenced collectively by, but need not be measured solely by, among other things: (a) the high rates of default and delinquency of the Mortgage Loans; (b) the Certificates' plummeting credit ratings; and (c) lower-than-expected past and current income streams from the Certificates.

263. The drastic and rapid loss in value of Western & Southern's Certificates was primarily and proximately caused by the issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Offering Materials, and due to the failure to assign mortgage loans to each Trust in a manner sufficient to

allow the Trust to foreclose upon the underlying property in the event of a default. Delinquencies and defaults were much higher than they would have been if the mortgage loans had been properly underwritten and remain higher than they should be due to the inability of each Trust to foreclose upon many defaulted properties.

## X.     LIABILITY OF THE SPONSORS, DEPOSITORS, AND UNDERWRITERS AS SELLERS OR SALE PARTICIPANTS

264.     The Defendants that qualify as sellers of securities or that otherwise participated in the sale of securities are the Sponsors (JPM Mortgage Acquisition, WMMSC and WaMu Bank (now JPMC Bank)), the Depositors (JPMAC, WMMSC, and WMAAC), and the Underwriters (J.P. Morgan Securities and WCC). Each of these is liable for misrepresentations in the Offering Materials under ORC §§ 1707.41, 1707.43 and 1707.44. The JPMorgan Defendants are also liable as primary violators of Section 11 of the 1933 Act in connection with the JPMAC 2006-WF1 and JPMMT 2007-CH1 offerings.

265.     As the Sponsors and/or Sellers for the securitizations at issue, JPM Mortgage Acquisition, WMMSC and WaMu Bank originated or acquired the mortgage loans that were pooled together in the securitizations, and then sold, transferred, or otherwise conveyed title to those loans to the Depositors pursuant to Pooling and Servicing Agreements. JPM Mortgage Acquisition, WMMSC and WaMu Bank (now JPMC Bank) had responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates and were identified on the Prospectuses and Prospectus Supplements. JPM Mortgage Acquisition and WMMSC profited from the sales of the Certificates.

266.     As the Depositors for the securitizations at issue, JPMAC, WMMSC, and WMAAC purchased the mortgage loans from the Sponsors pursuant to the Pooling and Servicing Agreements. The Depositors then purportedly sold, transferred, or otherwise conveyed

the mortgage loans to the Trusts, which held the loans as collateral for the Certificates. The Depositors shared responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements. In addition, the Depositors were responsible for registering the offerings with the SEC. The Depositors profited from the sales of the Certificates.

267. The Trusts issued the Certificates that were sold to investors, including Western & Southern. The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Sponsors and Depositors and issuing the Certificates for sale to the investors.

268. The Sponsors, Depositors, and Trusts used the Underwriters J.P. Morgan Securities and WCC to market and sell the Certificates. The Underwriters were responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines. The Underwriters profited from the sales of the Certificates.

269. The Sponsors, Depositors, Underwriters, and Trusts successfully solicited Western & Southern's purchase of the Certificates at issue.

## XI. LIABILITY OF THE JPMORGAN SPONSOR AND DEPOSITOR AS CONTROL PERSONS

### A. JPM Mortgage Acquisition

270. JPM Mortgage Acquisition, as the Sponsor for each of the four JPMorgan securitizations at issue, had day-to-day control over the related Depositor and, through the Depositor, the JPMorgan Trusts, JPM Mortgage Acquisition acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositor and then to the JPMorgan Trusts. JPM Mortgage Acquisition also determined and

approved the structure of the securitizations and the manner in which the Depositor and the JPMorgan Trusts sold the JPMorgan Certificates, and controlled the disclosures made in connection with each JPMorgan offering at issue.

      **B.**      **JPMAC**

271.    JPMAC, as the Depositor for each of the four JPMorgan securitizations at issue, had day-to-day control over the JPMorgan Trusts.  JPMAC created the JPMorgan Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the JPMorgan Certificates for sale to investors.  JPMAC formed the pools of mortgage loans underlying the JPMorgan Certificates, and determined the tranches of interests in the pools and their various levels of seniority.  JPMAC then transferred the pools to the JPMorgan Trusts, which had no discretion or control over the mortgages in the pool.  JPMAC also controlled the disclosures made in connection with each JPMorgan offering at issue.

**FIRST CAUSE OF ACTION**
**(Violation of ORC § 1707.41)**

272.    Western & Southern realleges each allegation above as if fully set forth herein.

273.    This claim is brought under the Ohio Securities Act, ORC § 1707.41 against all Defendants.  Defendants (a) offered securities for sale by a written or printed circular, prospectus, or advertisement; (b) Western & Southern purchased these securities relying on such written or printed circular, prospectus, or advertisement; and (c) such written or printed circular, prospectus, or advertisement contained untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

274.    Defendants had knowledge of the untrue statements of material fact and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

275.     As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Western & Southern was misled into believing that the Certificates were more creditworthy investments than they actually were.

276.     By virtue of the foregoing, Defendants violated ORC § 1707.41.  As a direct and proximate result of the Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates

**SECOND CAUSE OF ACTION**
**(Violation of ORC § 1707.44(B)(4))**

277.     Western & Southern realleges each allegation above as if fully set forth herein.

278.     This claim is brought under the Ohio Securities Act, ORC § 1707.44(B), against all Defendants.  Defendants made false representations concerning material and relevant facts in the Offering Materials for the purpose of selling securities within the State of Ohio.

279.     Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

280.     By virtue of the foregoing, Defendants violated ORC § 1707.44(B)(4).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates.

**THIRD CAUSE OF ACTION**
**(Violation of ORC § 1707.44(J))**

281.     Western & Southern realleges each allegation above as if fully set forth herein.

282.     This claim is brought under the Ohio Securities Act, ORC § 1707.44(J), against all Defendants.  Defendants knowingly made or caused to be made materially misleading false statements in the Offering Materials concerning the value of the Certificates.

283.    Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

284.    By virtue of the foregoing, Defendants have violated ORC § 1707.44(J).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates.

**FOURTH CAUSE OF ACTION**
**(Violation of ORC § 1707.44(G))**

285.    Western & Southern realleges each allegation above as if fully set forth herein.

286.    This claim is brought under the Ohio Securities Act, ORC § 1707.44(G), against all Defendants.  Defendants knowingly engaged in acts prohibited under the Ohio Securities Act in connection with the sale of the Certificates to Western & Southern.

287.    By virtue of the foregoing, Defendants violated ORC § 1707.44(G).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates.

**FIFTH CAUSE OF ACTION**
**(Rescission pursuant to ORC § 1707.43)**

288.    Western & Southern realleges each allegation above as if fully set forth herein including but not limited the First, Second, Third and Fourth Causes of Action herein.

289.    This claim is brought under the Ohio Securities Act, ORC § 1707.43, against all Defendants.  As set forth in the First, Second, Third and Fourth Causes of Action herein, Defendants made sales in violation of the Ohio Securities Act or participated in or aided the sellers in making such sale.

290.    Western & Southern is entitled to void and rescind the sale of Certificates under ORC § 1707.43 and recover the full amount of consideration paid for the Certificates and all taxable court costs.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)

291.    Western & Southern realleges each allegation above as if fully set forth herein.

292.    This is a claim for negligent misrepresentation against JPM Mortgage Acquisition, WMMSC, JPMC Bank, JPMAC, and WMAAC (the "Negligent Misrepresentation Defendants").

293.    Western & Southern made 63 separate investments in 10 Offerings of mortgage-backed securities that the Defendants securitized and sold.  The Negligent Misrepresentation Defendants also originated or acquired all the loans in the offerings.

294.    The Negligent Misrepresentation Defendants supplied false information for use by Western & Southern in making an investment decision.

295.    Because Western & Southern could not evaluate the loan files for the mortgage loans underlying its Certificates, and because Western & Southern could not examine the underwriting quality or servicing practices for the mortgage loans in the securitizations on a loan-by-loan basis, it was heavily reliant on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the underlying mortgage loans when determining whether to make each investment of Certificates.  Western & Southern was entirely reliant on the Negligent Misrepresentation Defendants to provide accurate information regarding the loans in engaging in that analysis.

296.    The Negligent Misrepresentation Defendants were aware that Western & Southern was seeking to compile a portfolio of conservative investments and that Western &

102

Southern relied on the Negligent Misrepresentation Defendants' unique and special expertise and experience and depended upon the Negligent Misrepresentation Defendants for accurate and truthful information.

297. Based on their expertise, superior knowledge, and relationship with Western & Southern, the Negligent Misrepresentation Defendants owed a duty to Western & Southern to provide complete, accurate, and timely information regarding the mortgage loans and the offerings. The Negligent Misrepresentation Defendants breached their duty to provide such information to Western & Southern.

298. The Negligent Misrepresentation Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Western & Southern's investments in the offerings.

299. Western & Southern reasonably relied on the information the Negligent Misrepresentation Defendants did provide and was damaged as a result of these misrepresentations. Had Western & Southern known the true facts regarding Defendants' underwriting practices and the quality of the loans making up the securitizations, it would not have purchased the Certificates.

300. By reason of the foregoing, the Negligent Misrepresentation Defendants are liable to Western & Southern for negligent misrepresentation.

301. As a result of the foregoing, Western & Southern has suffered damages according to proof.

### SEVENTH CAUSE OF ACTION
### (Common-Law Fraud)

302. Western & Southern realleges each allegation above as if fully set forth herein.

303. This claim is brought against the WaMu Defendants.

304. The material representations set forth above were fraudulent, and the WaMu Defendants' representations fraudulently omitted material statements of fact.

305. Each of the WaMu Defendants knew their representations and omissions were false and/or misleading at the time they were made. Each of the WaMu Defendants made the misleading statements with intent to defraud Western & Southern.

306. Western & Southern justifiably relied on the WaMu Defendants' false representations and misleading omissions.

307. Had Western & Southern known the true facts regarding the WaMu Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

308. As a result of the WaMu Defendants' false and misleading statements and omissions, as alleged herein, Western & Southern has suffered damages according to proof. The WaMu Defendants are liable to Western & Southern for common-law fraud.

**EIGHTH CAUSE OF ACTION**
**(Violation of Section 11 of the 1933 Act)**

309. Western & Southern realleges each allegation above as if fully set forth herein, except to the extent that Western & Southern expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

310. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act. This count is predicated upon the JPMorgan Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials associated with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

311. This claim is brought under Section 11 of the 1933 Act, 15 U.S.C. §77k ("Section 11"), against the JPMorgan Defendants.

312.    Each of Western & Southern's purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the registration statements and prospectus supplements that were filed with the SEC in connection with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

313.    The Offering Materials for the offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  At the time it obtained the Certificates, Western & Southern did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

314.    The JPMorgan Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Western & Southern of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Materials.

315.    The JPMorgan Defendants are strictly liable to Western & Southern for the materially untrue statements and omissions in the Offering Materials under Section 11.

316.    The JPMorgan Defendants owed to Western & Southern a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The JPMorgan Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

317.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the

effective date of the Offering Materials, by virtue of the timely filing of the complaint in

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al v. J.P. Morgan*

*Acceptance Corporation I et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of

Western & Southern's claims afforded by that filing.

318.    Western & Southern has sustained damages measured by the difference between

the price Western & Southern paid for the certificates and (1) the value of the Certificates at the

time this suit was brought, or (2) the price at which Western & Southern sold the Certificates in

the market prior to the time suit was brought.  Western & Southern's Certificates lost substantial

market value subsequent to and due to the materially untrue statements of facts and omissions of

material facts in the Offering Materials alleged herein.

319.    By reason of the conduct herein alleged, the JPMorgan Defendants violated

Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing.  By virtue of

the foregoing, Western & Southern is entitled to damages from each of the JPMorgan

Defendants.

### NINTH CAUSE OF ACTION
### (Violation of Section 12(a)(2) of the 1933 Act)

320.    Western & Southern realleges each allegation above as if fully set forth herein,

except to the extent that Western & Southern expressly excludes from this cause of action any

allegation that could be construed as alleging fraud or intentional or reckless conduct.

321.    This cause of action is based solely on claims of strict liability or negligence

under the 1933 Act.  This count is predicated upon the JPMorgan Defendants' negligence for

making untrue and materially misleading statements in the Offering Materials for the JPMAC

2006-WF1 and JPMAC 2007-CH1 offerings.

322.    This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C.
§77I(a)(2) ("Section 12(a)(2)"), against the JPMorgan Defendants.

323.    The JPMorgan Defendants offered and sold the Certificates to Western &
Southern by means of the defective Offering Materials, including the Prospectuses and
Prospectus Supplements, which contained materially untrue statements of facts and omitted to
state material facts necessary to make the statements, in the light of the circumstances under
which they were made, not misleading.  Western & Southern purchased the Certificates directly
from the JPMorgan Defendants, who both transferred title to Western & Southern and who
solicited Western & Southern for financial gain.

324.    The JPMorgan Defendants offered the Certificates for sale, sold them, and
distributed them by the use of means or instruments of transportation and communication in
interstate commerce.

325.    The JPMorgan Defendants owed to Western & Southern the duty to make a
reasonable and diligent investigation of the statements contained in the Offering Materials, to
ensure that such statements were true, and to ensure that there was no omission to state a material
fact required to be stated in order to make the statements contained therein not misleading.  The
JPMorgan Defendants failed to exercise such reasonable care.

326.    The JPMorgan Defendants knew, or in the exercise of reasonable care should
have known, that the Offering Materials contained materially untrue statements of facts and
omissions of material facts, as set forth above, at the time of the Offerings.  Conversely, Western
& Southern did not know, nor in the exercise of reasonable diligence could it have known, of the
untruths and omissions contained in the Offering Materials at the time it purchased the
Certificates.

327.     This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the complaint in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al v. J.P. Morgan Acceptance Corporation I et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of Western & Southern's claims afforded by that filing.

328.     Western & Southern sustained material damages in connection with its investments in the securitizations and accordingly has the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.  Western & Southern hereby tenders its Certificates and demands rescission.

### TENTH CAUSE OF ACTION
### (Violation of Section 15 of the 1933 Act)

329.     Western & Southern realleges each allegation above as if fully set forth herein.

330.     This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C.  §770 ("Section 15"), against JPM Mortgage Acquisition and JPMAC (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

331.     The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of depositor and/or issuing trusts associated with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

332.     The Section 15 Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the

Offering Materials.  The Section 15 Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

333.    The Section 15 Defendants had power and influence over the JPMorgan Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Materials.

334.    The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Western & Southern.

335.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material factor and were not misleading.

336.    Western & Southern did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

337.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with – and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

PRAYER FOR RELIEF

WHEREFORE Western & Southern prays for relief as follows:

An award of damages against Defendants in favor of Western & Southern against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

     a.     Rescission and recovery of the consideration paid for the Certificates, with interest thereon, pursuant to Western & Southern's Ohio Securities Act claims and Section 12(a)(2);

     b.     Western & Southern's monetary losses, including loss of market value and loss of principal and interest payments;

     c.     Attorneys' fees and costs;

     d.     Prejudgment interest at the maximum legal rate; and

     e.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated: August 1,  2011

Respectfully Submitted,

/s/ Glenn V. Whitaker_____

Glenn V. Whitaker  (0018169)
Eric W. Richardson  (0066530)
Adam C. Sherman  (0076850)
Vorys, Sater, Seymour and Pease LLP
Suite 2000, Atrium Two
221 East Fourth Street
Cincinnati, Ohio  45202
Telephone:    (513) 723-4000
Facsimile:     (513) 723-4056

*Attorneys for Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company and Fort Washington Investment Advisors, Inc.*

*OF COUNSEL:*

David H. Wollmuth
Vincent T. Chang
Steven S. Fitzgerald
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing Amended Complaint was served upon counsel and parties via the

Court's CM/ECF System, this 1st day of August 2011.


/s/ Glenn V. Whitaker           
Glenn V. Whitaker