## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY; WESTERN-SOUTHERN LIFE ASSURANCE COMPANY; COLUMBUS LIFE INSURANCE COMPANY; INTEGRITY LIFE INSURANCE COMPANY; NATIONAL INTEGRITY LIFE INSURANCE COMPANY; and FORT WASHINGTON INVESTMENT ADVISORS, INC. on behalf of FORT WASHINGTON ACTIVE FIXED INCOME LLC, | : : : : : : : : : : | Civil Action No. 1:11-CV-00495 <br><br> Chief Judge Susan J. Dlott <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, | : | |
| v. | : : : | |
| JPMORGAN CHASE BANK, N.A.; JPMORGAN MORTGAGE ACQUISITION CORPORATION; J.P. MORGAN SECURITIES LLC; J.P. MORGAN ACCEPTANCE CORPORATION I; WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.; WAMU CAPITAL CORPORATION; and WAMU ASSET ACCEPTANCE CORPORATION, | : : : : : : : : : | |
| Defendants. | | |
| JPMORGAN CHASE BANK, N.A., | : | |
| Third-Party Plaintiff, | : : | |
| v. | : : | |
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, | : : : | |
| Third-Party Defendant. | : | |

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...................................................................................................1

PARTIES .......................................................................................................................6

    I.    Plaintiffs .........................................................................................................6

    II.   JPM Defendants..............................................................................................7

    III.  WaMu Defendants ..........................................................................................9

JURISDICTION AND VENUE ....................................................................................11

SUBSTANTIVE ALLEGATIONS ...............................................................................11

    I.    RESIDENTIAL MORTGAGE-BACKED SECURITIES ...................................11

    II.   THE SECURITIZATION PROCESS .................................................................12

    III.  DEFENDANTS MISREPRESENTED LOAN UNDERWRITING STANDARDS ...................................................................................................15

        A.    Misrepresentations Regarding Loan Underwriting Standards in the Offering Materials ...............................................................................15

            1.    The JPM Defendants' Misrepresentations....................................15

            2.    The WaMu Defendants' Misrepresentations.................................19

        B.    Defendants Routinely "Waived In" Loans They Knew Did Not Comply With Loan Underwriting Standards..........................................22

        C.    Publicly Available Information Demonstrates that Defendants Systematically Abandoned Loan Underwriting Standards......................25

            1.    The JPM Defendants ....................................................................25

            2.    The WaMu Defendants..................................................................27

            3.    Defendants Acquired Loans From Other Originators That Abandoned Loan Underwriting Standards ...................................31

                a.    Countrywide .....................................................32

|  | b. | Wells Fargo ................................................................... 33 |

|  | c. | GreenPoint .................................................................... 34 |

|  | d. | MortgageIT ................................................................... 35 |

| | D. | The Certificates Experienced Widespread Defaults and Downgrades ...... 35 |

| IV. | DEFENDANTS MANIPULATED THE APPRAISAL PROCESS .................... 40 |

| V. | DEFENDANTS MISREPRESENTED OWNER OCCUPANCY RATES .......... 44 |

| VI. | DEFENDANTS MANIPULATED THE RATINGS PROCESS......................... 46 |

| VII. | DEFENDANTS' MISREPRESENTATIONS REGARDING TRANSFER OF TITLE, THEIR FORECLOSURE PRACTICES, AND THE MERS SYSTEM .. 48 |

| | A. | Misrepresentations Regarding Transfer of Title........................................ 49 |

| | B. | Misrepresentations Regarding MERS ....................................... 51 |

| VIII. | DEFENDANTS CONSPIRED WITH LOAN SERVICERS AND ORIGINATORS TO COVER UP THE MISSTATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS ................................................................... 53 |

| | A. | Forgery and Perjury in Foreclosure Proceedings ..................................... 53 |

| | B. | Defendants' Acts of Perjury in Ohio ....................................... 58 |

| | C. | Fraud and Tortious Interference With Trustee Obligations ..................... 61 |

| IX. | DEFENDANTS RECEIVED MORTGAGE INSURANCE KICKBACKS ........ 64 |

| X. | DEFENDANTS ENGAGED IN BANK FRAUD.................................. 67 |

| XI. | WESTERN & SOUTHERN'S PURCHASES OF DEFENDANTS' CERTIFICATES ................................................................................ 69 |

| XII. | WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES ....................................................................................... 69 |

| XIII. | LIABILITY OF THE SPONSORS, DEPOSITORS, AND UNDERWRITERS AS SELLERS OR SALE PARTICIPANTS .............................................................. 70 |

| IX. | WESTERN & SOUTHERN DID NOT KNOW AND COULD NOT HAVE KNOWN OF ITS CLAIMS PRIOR TO JUNE 2009........................................... 72 |

FIRST CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.41) ....................75

SECOND CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(B)(4)) ......76

THIRD CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(J)) ...............76

FOURTH CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(G)) ..........76

FIFTH CAUSE OF ACTION (Repayment Pursuant to Ohio Securities Act, ORC § 1707.43) ...77

SIXTH CAUSE OF ACTION (Tortious Interference With Contract) .........................................77

SEVENTH CAUSE OF ACTION (Common Law Fraud) .........................................................78

EIGHTH CAUSE OF ACTION (Common Law Conspiracy – WaMu Defendants) ...................79

NINTH CAUSE OF ACTION (Common Law Conspiracy – JPM Defendants) .........................80

TENTH CAUSE OF ACTION (Violation of Ohio Corrupt Activities Act, ORC § 2923.31 - 2923.36 – WaMu Enterprise) ..........................................................................................81

ELEVENTH CAUSE OF ACTION (Violation of Ohio Corrupt Activities Act, ORC § 2923.31 - 2923.36 – JPM Enterprise) ..........................................................................................85

TWELFTH CAUSE OF ACTION (Violation of Section 11 of the 1933 Act) ...........................87

THIRTEENTH CAUSE OF ACTION (Violation of Section 12(a)(2) of the 1933 Act) .............89

FOURTEENTH CAUSE OF ACTION (Violation of Section 15 of the 1933 Act) ....................90

PRAYER FOR RELIEF ........................................................................................................91

JURY TRIAL DEMANDED ..................................................................................................92

Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc. (collectively, "Western & Southern"), by and through their attorneys, bring this action against JPMorgan Chase Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation; J.P. Morgan Securities LLC; J.P. Morgan Acceptance Corporation I (collectively, "JPM Defendants"); WaMu Asset Acceptance Corporation; WaMu Capital Corporation; and Washington Mutual Mortgage Securities Corporation (collectively, "WaMu Defendants" and together with the JPM Defendants, "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      Defendants, certain of their affiliates, and certain other parties have engaged in a pattern of corrupt activity whereby they sought illegally to profit from the origination, securitization, and servicing of mortgage loans, and the sale of residential mortgage-backed securities ("RMBS").

2.      Western & Southern has been directly harmed by these corrupt activities as a result of its purchase of $202 million of JPM and WaMu RMBS certificates (collectively, the "Certificates").

3.      Between October 5, 2005 and October 10, 2007, Western & Southern purchased the Certificates in the following ten securitization transactions:

 (i.)  J.P. Morgan Alternative Loan Trust, Series 2005-S1 ("JPMALT 2005-S1");

 (ii.)  J.P. Morgan Mortgage Trust, Series 2005-S3 ("JPMMT 2005-S3");

 (iii.)  J.P. Morgan Acquisition Trust, Series 2006-WF1 ("JPMAC 2006-WF1");

 (iv.)  J.P. Morgan Acquisition Trust, Series 2007-CH1 ("JPMAC 2007-CH1") (with

JPMALT 2005-S1, JPMMT 2005-S3, and JPMAC 2006-WF1, the "JPM

Offerings");

   (v.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2005-7 Trust ("WMALT 2005-7");

   (vi.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2005-9 Trust ("WMALT 2005-9");

   (vii.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2006-4 Trust ("WMALT 2006-4");

 (viii.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2006-5 Trust ("WMALT 2006-5");

   (ix.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2006-9 Trust ("WMALT 2006-9"); and

   (x.)    Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2007-OA3 Trust ("WMALT 2007-OA3") (with WMALT 2005-7, WMALT

2005-9, WMALT 2006-4, WMALT 2006-5, the "WaMu Offerings").

4.    The Certificates in the JPM Offerings (the "JPM Certificates") were offered for

sale pursuant to Shelf Registration Statements dated August 25, 2005, April 24, 2006, February

26, 2007, a Prospectus and Prospectus Supplement for each of the four JPM Offerings, and

various other materials filed with the Securities and Exchange Commission ("SEC") by the JPM

Defendants, and certain data compilations and loan tapes (collectively, the "JPM Offering

Materials").

5.    The Certificates in the WaMu Offerings (the "WaMu Certificates") were offered

for sale pursuant to Shelf Registration Statements dated August 23, 2005, January 6, 2006, and

March 22, 2007, a Prospectus and Prospectus Supplement for each of the six WaMu Offerings, other related documents filed with the SEC by the WaMu Defendants, and certain data compilations and loan tapes (collectively, the "WaMu Offering Materials") (with the "JPM Offering Materials," the "Offering Materials").

6.     The Offering Materials contained untrue statements and omissions of material fact that violated Sections 1707.41, 1707.43, 1707.44, and 2923.23 of the Ohio Revised Code, and Ohio common law, and, with respect to certain Certificates, Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act").

7.     In marketing the Certificates to Western & Southern and other investors, Defendants falsely represented, among other things, that loans underlying the Certificates met standard underwriting guidelines, that homes securing underlying loans were legitimately appraised, and that specified percentages of such homes were owner-occupied.  Defendants also falsely represented that the underlying mortgage loans would be properly assigned to the trusts and that certain related documents would be endorsed and delivered, in that (i) the original promissory notes would be endorsed in blank and delivered to the trust (via either the trustee or a "custodian"); (ii) mortgage assignments would be executed in the name of the appropriate trust (with all intervening assignments properly evidenced) or registered with the Mortgage Electronic Registration Service ("MERS") (including, in states where required, a substitution of trustee for all loans, including MERS loans, prior to foreclosure), so as to allow efficient foreclosure on mortgaged properties in the event of borrower default, and (iii) the contents of the mortgage file would be delivered to the applicable trustee.  The procedures described in the preceding sentence are referred to herein as "Transfer of Title."

8.     The loans underlying the Certificates deviated significantly from what was

represented in the Offering Materials, and Defendants failed to follow the procedures for

Transfer of Title represented in the Offering Materials.

9.      To take advantage of the exploding market for RMBS, the JPM Defendants and

the WaMu Defendants significantly increased their origination and securitization of mortgage

loans.  The JPM Defendants originated approximately $7.2 billion in non-prime mortgage loans

in 2003, $8.5 billion in 2004, and $8.7 billion in 2005.  In addition, the JPM Defendants also

increased their securitization of residential mortgage loans more than fivefold between 2004 and

2005, from approximately $4.5 billion to $24 billion.  And from 2003 to 2004, the WaMu

Defendants increased their securitization of subprime loans over 100%, from $4.6 billion to

$11.8 billion.  By the end of 2006, this figure had almost tripled again to $29 billion.

10.     To supply the ever-growing volume of loans to sell to investors, the Defendants

abandoned their loan origination standards, regularly originating or purchasing loans issued to

borrowers regardless of their ability to repay or the value of the collateral.  Defendants also

failed to follow required procedures for Transfer of Title.  As a result, loans cannot be timely

foreclosed in the event of default, causing reduced collateral values, increased servicing fees and

servicer advances, and greater losses absorbed by the Certificates.  Defendants also used their

securitizations as a multi-faceted opportunity to extract profits unrelated to sale of RMBS, such

as through insurance kickbacks and fraudulent overcharges to defaulted borrowers.

11.     Defendants' misconduct has prompted several criminal and civil investigations by

government agencies and was discussed at length in the January 2011 report by the

Congressional Financial Crisis Inquiry Commission (the "2011 FCIC Report") and the April 13,

2011 report of the Senate Permanent Subcommittee on Investigations (the "2011 Subcommittee

Report").  On February 29, 2012, JPM announced that it had received a "Wells Notice" from the

SEC threatening to bring an enforcement action against J.P. Morgan Securities LLC in connection with certain RMBS offerings.

12.    The Attorneys General of all fifty states conducted an investigation of extensive misconduct by Defendants and other loan servicers in mortgage foreclosure proceedings, including participation in acts of perjury and falsification of documents designed to fraudulently conceal Defendants' failure to meet the requirements for Transfer of Title.  That investigation resulted in a settlement pursuant to which the largest loan servicers in the industry, including JPMorgan Chase Bank, N.A., will pay $26 billion for their wrongful conduct.

13.    In sum, the Certificates sold by Defendants to Western & Southern and other investors were part of a fraudulent scheme involving, among other things, the securitization and sale of RMBS through false representations as to loan origination and Transfer of Title, private mortgage insurance kickbacks, "force-placing" property and casualty insurance on defaulted borrowers, and fraudulent sales of whole loans to government sponsored entities.  In addition, Defendants, other originators of the loans underlying the Certificates and their servicer affiliates have engaged in a conspiracy to cover up Defendants' RMBS misrepresentations through submission of incomplete, false, and misleading monthly reports to investors and trustees, perjury, falsification of documents, and false representations to the SEC and the trustees for the Certificate securitizations.

14.    Defendants' misconduct has caused Western & Southern tens of millions of dollars of losses, which Western & Southern is entitled to recover under the Ohio Securities Act, the Ohio Corrupt Activities Act, Ohio common law, and the Securities Act of 1933.

## PARTIES

**I.    Plaintiffs**

15.    Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

16.    Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

17.    Plaintiff Columbus Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance and annuity products.

18.    Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It is the parent company of Plaintiff National Integrity Life Insurance Company.  It sells life, accident and health insurance and annuity products.

19.    Plaintiff National Integrity Life Insurance Company is an insurance company formed under the laws of the State of New York, with its principal underwriting and insurance operations in Goshen, New York.  It primarily sells annuity products.  National Integrity's senior management is located in Cincinnati, Ohio and its investment decisions, including the decision to purchase the Certificates, are made by employees of the company or its affiliates in Cincinnati, Ohio.

20.    Plaintiff Fort Washington Investment Advisors, Inc. is a registered investment advisor formed under the laws of the State of Ohio, with its principal place of business in

Cincinnati, Ohio.  Fort Washington Investment Advisors brings this action on behalf of Fort Washington Active Fixed Income LLC, a Delaware limited liability company with its principal place of business in Cincinnati, Ohio.

## II.    JPM Defendants

21.    *JPMorgan Seller/Sponsor Defendant*.   Defendant J.P. Morgan Mortgage Acquisition Corp. ("JPM Mortgage Acquisition") is a Delaware corporation with its principal place of business in New York, New York.  JPM Mortgage Acquisition is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A.  JPM Mortgage Acquisition was the sponsor and seller with respect to each of the four JPM Offerings at issue.

22.    *JPMorgan Underwriter Defendant*.   Defendant J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place of business in New York, New York.  J.P. Morgan Securities LLC is the successor-in-interest to J.P. Morgan Securities Inc., which converted to a limited liability company on or about September 1, 2010.  J.P. Morgan Securities Inc. and its successor-in-interest, J.P. Morgan Securities LLC, are referred to herein as "J.P. Morgan Securities."  J.P. Morgan Securities engaged in investment banking activities in the United States and was the primary nonbank subsidiary of JPMorgan Chase & Co. ("JPMorgan Chase").  J.P. Morgan Securities acted as the Underwriter for each of the four JPM Offerings at issue.  As such, J.P. Morgan Securities participated in the drafting and dissemination of the JPM Offering Materials.

23.    *JPMorgan Depositor Defendant*.   Defendant J.P. Morgan Acceptance Corporation I ("JPMAC") is a Delaware corporation with its principal place of business in New York, New York.  JPMAC is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC.  JPMAC was the depositor for each of the four JPM Offerings at issue.

24.    *JPMorgan Originator Defendant*.    Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase, and a Delaware corporation.  Its main office is located in New York, New York.  JPMC Bank is a commercial bank that is subject to examination and regulation by the Officer of the Comptroller of Currency ("OCC").  JPMC Bank originated and/or acquired loans securitized in three of the four JPM Offerings at issue in this case.  JPMC Bank is also a defendant in this action as the successor-in-interest to Washington Mutual Bank.

25.    *Relevant Non-Parties*.    The Certificates for each of the JPM Offerings were issued by trusts established by JPMAC.  The four issuing trusts were JPMALT 2005-S1, JPMMT 2005-S3, JPMAC 2006-WF1, and JPMAC 2007-CH1 (collectively, the "JPMorgan Trusts").

26.    Chase Home Finance, LLC ("CHF"), a Delaware limited liability company, is a wholly owned, indirect subsidiary of JPMC Bank.  CHF originated certain JPMC Bank mortgage loans and subsequently provided these loans to JPM Mortgage Acquisition, on behalf of JPMC Bank, for the following three JPMorgan Trusts: JPMALT 2005-S1, JPMAC 2006-WF1, and JPMAC 2007-CH1.

27.    The term "JPM" refers to the JPMorgan group of companies, including the JPM Defendants.

28.    At all relevant times, the JPM Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged against them in this Second Amended Complaint.  Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their

authority.

## III.   WaMu Defendants

29.   *WaMu Sponsor Defendant*.   At all relevant times, Washington Mutual Bank ("WaMu Bank") was a federal savings association that provided financial services to consumer and commercial clients.  WaMu Bank served as the co-sponsor for one of the six WaMu Offerings at issue in this action.  On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement with the FDIC, under which JPMC Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its ownership of WaMu Capital Corporation, WaMu Asset Acceptance Corporation, and Washington Mutual Mortgage Securities Corporation.  JPMC Bank is the successor-in-interest to WaMu Bank with respect to the claims asserted in this action.  WaMu Bank is not a defendant in this action.

30.   *WaMu Sponsor Defendant*.   Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") is a Delaware corporation with its principal place of business in Brooklyn, New York.  Prior to September 25, 2008, WMMSC was a wholly-owned, special-purpose subsidiary of WaMu Bank.  WMMSC served as the sponsor with respect to the six WaMu Offerings at issue in this action, and as the depositor with respect to two of the WaMu Offerings at issue in this action.  WMMSC is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank, and is not currently affiliated with WaMu Bank.

31.   *WaMu Underwriter Defendant*.   Defendant WaMu Capital Corporation (''WCC'') is a Washington corporation with its principal place of business in Seattle, Washington.  Prior to September 25, 2008, WCC was a registered broker-dealer and a wholly-owned subsidiary of WaMu Bank, and served as the sole or co-underwriter for all six WaMu

9

Offerings at issue in this action.  In this capacity, WCC was involved in structuring, pricing, and selling the WaMu Certificates at issue.  WCC is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank, and is not currently affiliated with WaMu Bank.

32.     *WaMu Depositor Defendant.*  Defendant WaMu Asset Acceptance Corporation ("WMAAC") is a Delaware corporation with its principal place of business in Seattle, Washington.  Prior to September 25, 2008, WMAAC was a wholly-owned subsidiary of WaMu Bank.  WMAAC served as depositor and filed Offering Materials with respect to four of the six WaMu Offerings at issue.  WMAAC is now a subsidiary of JPMC Bank, successor-in-interest to WaMu Bank, and is not currently affiliated with WaMu Bank.

33.     *Relevant Non-Parties.*  The Certificates for each of the six WaMu Offerings were issued by trusts established by the WaMu Depositors.  The six issuing trusts were WMALT 2005-7, WMALT 2005-9, WMALT 2006-4, WMALT 2006-5, WMALT 2006-9, and WMALT 2007-OA3 (the "WaMu Trusts").  The WaMu Trusts and the JPMorgan Trusts are referred to collectively as the "Trusts."

34.     The term "WaMu" refers to the Washington Mutual group of companies before September 25, 2008, including the WaMu Defendants.

35.     At all relevant times, the WaMu Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged against them in this Second Amended Complaint.  Any allegations about acts of the corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over Western & Southern's claims under the Ohio Securities Act, Ohio Corrupt Activities Act, Ohio Common law, and the 1933 and 1934 Act.

37.     This Court has personal jurisdiction over the Defendants by virtue of their securities sales to Western & Southern in Ohio and their other business activities in Ohio.

38.     Venue is proper in Hamilton County because it is the principal place of business of most of the plaintiffs.

## SUBSTANTIVE ALLEGATIONS

## I.     RESIDENTIAL MORTGAGE-BACKED SECURITIES

39.     In the 1980s and 1990s, mortgage loan originators followed a traditional model whereby they either held loans to maturity or sold them to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Under the traditional model, mortgage loans were typically conservative, first-lien loans to prime borrowers.  An originator would profit if the borrower made timely interest and principal payments, but would lose if the borrower defaulted and the property value was less than the loan balance.  As a result, originators had good reason to carefully establish the creditworthiness of each borrower and the true value of each underlying property before issuing a loan.

40.     Loans sold to Fannie Mae and Freddie Mac were also generally conservative loans to prime borrowers.  Such loans could not exceed certain maximum amounts and had to conform to specific guidelines on origination and servicing.  Mortgage loans that exceed Fannie Mae and Freddie Mac maximums or otherwise do not meet their guidelines are known as "non-conforming" loans.

41.     In the early 2000s, the demand for RMBS increased.  Private financial institutions began originating and then securitizing an ever-growing number of non-conforming loans, such as loans in excess of Fannie and Freddie maximums, loans based on reduced documentation, and loans with adjustable interest rates.  By 2001, private financial institutions had issued $240 billion in face amount of RMBS, and by 2006 that amount had increased to over $1 trillion.

42.     The traditional mortgage model was abandoned as result of this explosive growth. Every year hundreds of billons of dollars in mortgage loans were now originated to be resold at a profit through private label RMBS, with investors, not loan originators, facing losses in the event of borrower default.

## II.     THE SECURITIZATION PROCESS

43.     The process through which RMBS are created and sold is known as mortgage securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the loans.

44.     The first step in a securitization is generally the origination or acquisition of mortgage loans by a "sponsor" (or "seller"), and the sale or transfer of a large pool of such loans by the sponsor to a "depositor," typically a special-purpose affiliate of the sponsor.

45.     The depositor then conveys the pool of loans to a trustee (typically a large national bank) pursuant to a "pooling and servicing agreement" that establishes various classes, or "tranches," of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the

underwriter over the cost of acquiring the mortgage loans.  Here, Defendants acted as sponsor, depositor, and underwriter of the Certificates and profited at each stage of the securitization process.

46.     The pooling and servicing agreement also appoints a "servicer" to manage the administration of the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination and transaction covenants regarding Transfer of Title, tracking mortgage documentation, and managing and selling foreclosed properties.  The servicer is also required to deliver monthly remittance reports to holders of certificates and the trustee describing the performance of underlying loans and compliance with the pooling and servicing agreement.  The contents of those reports are specified in the pooling and servicing agreement and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. 229.1121.

47.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

48.     The sponsor and the underwriter typically hire one or more credit-rating agencies, and seek for each tranche the highest possible rating in order to facilitate the underwriter's marketing of certificates to investors.

49.     Because cash flow from underlying loans is the sole source of funds to pay

holders of a mortgage-backed security, the credit quality of the security turns on the credit

quality of, and the collateral securing, the underlying loans, which often number in the

thousands.

50.     Detailed information about loan credit quality and loan collateral is contained in

loan files, which are initially developed and maintained by mortgage originators.  For residential

mortgage loans, each loan file should contain, among other things, the loan note, the loan

application, verification of income and employment, and an appraisal of the mortgaged property.

51.     RMBS investors like Western & Southern do not have access to the loan files.

Instead, sponsors, depositors, and underwriters like Defendants are responsible for gathering,

analyzing, and verifying information about the underwriting, credit quality, collateral value, and

other characteristics of underlying mortgage loans, and then summarizing that information for

potential investors in various offering materials.  This due diligence and disclosure process is a

critical safeguard for investors, and a fundamental legal obligation of sponsors, depositors, and

underwriters.

52.     The agreements whereby sponsors purchase mortgage loans typically include

loan-level representations and warranties by the originator as to, among other things, loan

origination guidelines, borrower ability to repay, loan-to-value ratios, owner occupancy, and

completeness of loan documentation.  The agreements further provide that if any such

representation and warranty is found to be inaccurate as to any loan, then the purchaser of the

loan (typically the sponsor) may require the originator to repurchase (or "put back") the defective

loan.

53.     In turn, the pooling and servicing agreements whereby loans are deposited into

RMBS trusts typically include representations and warranties by depositors to the trustees that

are comparable to, or incorporate by reference, those of originators in their loan purchase agreements with the sponsors. Further, the pooling and servicing agreements contain certain covenants that the procedures for Transfer of Title will be accomplished at, or shortly after, the closing of the RMBS offering. Pooling and servicing agreements also provide that if any representation and warranty concerning a mortgage loan is found to be inaccurate or if any covenant regarding the Transfer of Title is breached, then the trust may require the depositor, seller, or originator to repurchase the defective loan.

54.     In addition, pooling and servicing agreements typically provide that all parties to the agreement – depositor, servicer, and trustee – must disclose to the others any breach of any of the representations and warranties or covenants regarding the Transfer of Title that materially adversely affects the interests of holders of certificates.

## III.    DEFENDANTS MISREPRESENTED LOAN UNDERWRITING STANDARDS

### A.    Misrepresentations Regarding Loan Underwriting Standards in the Offering Materials

55.     RMBS are valued principally on borrower ability to repay underlying loans and adequacy of the mortgaged property securing those loans. If borrowers cannot repay and the collateral is insufficient, then investors will incur losses.

#### 1.    The JPM Defendants' Misrepresentations

56.     The JPM Offering Materials represented that loans underlying each securitization were underwritten in accordance with meaningful underwriting standards designed to ensure that loans were only made to qualified borrowers and that mortgaged properties provided sufficient collateral for the loans they secured.

57.     For example, the JPMALT 2005-S1 Prospectus Supplement stated that, regardless of the originator of a loan, the underwriting process was utilized to "evaluate a borrower's credit

standing and repayment ability, and the value and adequacy of the related Mortgaged Property as

collateral." JPMALT 2005-S1 Prospectus Supplement, dated November 23, 2005, at S-33.

58.     The JPMALT 2005-S1 Prospectus Supplement further represented:

> In general, a prospective borrower applying for a loan is required to fill out a
> detailed application designed to provide to the underwriting officer pertinent
> credit information.  As part of the description of the borrower's financial
> condition, the borrower generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an authorization to
> apply for a credit report which summarizes the borrower's credit history with
> local merchants and lenders and any record of bankruptcy.  In most cases, an
> employment verification is obtained from an independent source (typically the
> borrower's employer), which verification reports, among other things, the length
> of employment with that organization, the current salary, and whether it is
> expected that the borrower will continue such employment in the future.

*Id.*

59.     The JPMALT 2005-S1 Prospectus Supplement further represented eligibility for

loans made under alternative documentation programs was subject to enhanced credit

requirements and lower loan-to-value ratios:

> A lender may also originate mortgage loans pursuant to alternative sets of
> underwriting criteria under reduced or limited documentation programs. . . .
> Loans underwritten under these programs are generally limited to borrowers who
> have demonstrated an established ability and willingness to repay the mortgage
> loans in a timely fashion.  Permitted maximum loan-to-value ratios under these
> programs are generally more restrictive than those under the lender's standard
> underwriting criteria.

*Id.*

60.     The JPMALT 2005-S1 Prospectus Supplement further represented that any

deviations from specified underwriting criteria would be based on "mitigating factors":

> From time to time, exceptions to a lender's underwriting policies may be made.
> Such exceptions may be made on a loan-by-loan basis at the discretion of the
> lender's underwriter.  Exceptions may be made after careful consideration of
> certain mitigating factors such as borrower liquidity, employment and residential
> stability and local economic conditions.

16

*Id.*

61.     The JPM Offering Materials for all the Certificates contained the same or similar representations as those described above in the JPMALT 2005-S1 Prospectus Supplement, as set forth in detail in Exhibit B.

62.     The JPM Offering Materials also included specific representations about the underwriting standards applied by certain originators that originated a significant percentage of loans.

63.     For example, the JPMALT 2005-S1 Prospectus Supplement stated, as to JPMC Bank, that the mortgage loans were originated and underwritten in accordance with "underwriting policies customarily employed by CHF. . . . [and] CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." *Id.* at S-34.

64.     The JPMALT 2005-S1 Prospectus Supplement represented:

> CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records.  The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants.  In addition, CHF verifies employment, income and assets.  Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party.

*Id.*

65.     The JPMALT 2005-S1 Prospectus Supplement further represented that underwriting standards were consistently applied to confirm the borrower's ability to repay: "a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial

obligations and monthly living expenses." *Id.* at S-34.

66.     The JPMALT 2005-S1 Prospectus Supplement stated that JPMC Bank applied conservative underwriting guidelines to loans originated under CHF's Reduced Documentation Program, Streamlined Refinance Program, "No Doc" program, and Stated Income Stated Asset Program:

> In order to qualify for the [Reduced Documentation Program], the borrower must satisfy a 20% down-payment requirement from the borrower's own assets. These assets are verified through bank statements and may be supplemented by third-party verification. A residential mortgage credit report, or "in file" report, is obtained and reviewed to determine the borrower's repayment history. The maximum loan-to-value ratio of any mortgage loan originated under this program is approximately 80% (65% for "cash out" refinancings). . . . In order to qualify for [the Streamlined Refinance Program], the borrower must have demonstrated overall creditworthiness as defined in the program guides. In addition, a documented servicing record with respect to such borrower of at least 24 months must be available. If there are multiple lenders during such 24 month period, CHF must have been the servicer for at least the most recent 12 months. . . . The underwriting for ["No Doc"] loans is based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral. . . . The underwriting for [the Stated Income Stated Asset Program] is based primarily or entirely on stronger credit profile and lower loan-to-value ratio requirements.

*Id.* at S-34-35.

67.     The JPMALT 2005-S1 Prospectus Supplement further represented that exceptions to the stated underwriting standards were subject to enhanced approval requirements and justified by "mitigating factors":

> From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and underwriting personnel of the Chase Originators who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

*Id.* at S-35.

68.     The JPM Offering Materials contain the same or similar representations regarding specific originator underwriting guidelines as those described above in the JPMALT 2005-S1 Prospectus Supplement, as set forth in detail in Exhibit B.

69.     All those representations were false.  As the JPM Defendants knew, or at the least should have known, the mortgage loans underlying the JPM Certificates did not comply with disclosed underwriting standards because those standards were systematically disregarded. Moreover, the JPM Defendants' "due diligence" of the loans underlying the JPM Certificates did not confirm proper origination practices, but instead alerted the JPM Defendants to widespread abuse.  The JPM Defendants also did not disclose that it was their existing practice not to comply with covenants regarding Transfer of Title for their pre-existing RMBS or that, as was their practice, they did not intend to comply with the Transfer of Title covenants for the loans underlying the Certificates, as represented in the JPM Offering Materials.

**2.      The WaMu Defendants' Misrepresentations**

70.     The WaMu Offering Materials represented that the loans underlying the WaMu Certificates were underwritten in accordance with WaMu Bank's or WMMSC's underwriting standards, regardless of the originator of the loan.  These underwriting standards were purportedly designed to ensure that loans were only provided to qualified borrowers and that mortgaged properties provided sufficient collateral for the loans they secured.

71.     For example, the WMALT 2006-5 Prospectus Supplement stated that these "underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  WMALT 2006-5 Prospectus Supplement dated June 27, 2006 at S-38.

72.     The WMALT 2006-5 Prospectus Supplement further represented:

Prospective borrowers are required to complete a standard loan application in which they may provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history. . . .

[I]n evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")

WMALT 2006-5 Prospectus Supplement at S-38-39.

73.     The WaMu Offering Materials represented that WaMu Defendants applied

conservative underwriting guidelines to loans originated under reduced documentation or no

documentation programs.

74.     For example, the WMALT 2006-5 Prospectus Supplement stated:

Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. Generally, under a reduced documentation program, either (i) a borrower's employment and assets are verified, but no verification of a borrower's income is undertaken, or (ii) a borrower's employment and income are verified, but no verification of a borrower's assets is undertaken . . . .

Generally, a no ratio program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no ratio program relies on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and the borrower's assets. The borrower's income is not required to be obtained or verified. The borrower's stated assets may be verified through receipt of the borrower's recent bank or brokerage statements or directly with the financial institution. In all cases, the borrower's employment is verified with the employer by telephone.

Generally, a no documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no documentation program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. Generally, no verification of the borrower's

employment, income or assets is undertaken.  In some cases, the borrower's
employment may be verified by telephone with the employer if the borrower's
employment has been disclosed.

WMALT 2006-5 Prospectus Supplement at S-39-40.

75.     The WaMu Offering Materials represented that deviations from the designated

underwriting standards would be based on specified compensating factors.  For example, the

WMALT 2006-5 Prospectus Supplement provided:

Exceptions to the underwriting standards described above may be made on a case-
by-case basis if compensating factors are present.  In those cases, the basis for the
exception is documented.  Compensating factors may include, but are not limited
to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the
availability of other liquid assets, stable employment and time in residence at the
prospective borrower's current address.

WMALT 2006-5 Prospectus Supplement at S-40.

76.     Moreover, the WaMu Offering Materials represented that WaMu Defendants

conducted due diligence to ensure that only qualified loans were included in loan pools

underlying the WaMu Certificates.  For example, the WMALT 2006-5 Prospectus Supplement

stated:

The sponsor's credit risk oversight department conducts a credit, appraisal, and
compliance review of adverse samplings (and, in some cases, statistical
samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan
sellers.  Sample size is determined by due diligence results for prior purchased
pools from that seller, performance of mortgage loans previously purchased and
characteristics of the pool presented for purchase.  Automated valuation models
are obtained on all mortgage loans purchased from unaffiliated sellers. For
mortgage loans originated by Washington Mutual Bank, Washington Mutual
Bank's credit risk oversight department conducts a quality control review of
statistical samplings of originated mortgage loans on a regular basis.

WMALT 2006-5 Prospectus Supplement at S-41.

77.     The WaMu Offering Materials contain the same or similar representations as

those described above in the WMALT 2006-5 Prospectus Supplement, as set forth in detail in

Exhibit B.

78.    All those representations were false.  As the WaMu Defendants knew, or at the least should have known, the mortgage loans underlying the WaMu Certificates did not comply with disclosed underwriting standards because those standards were systematically disregarded. Moreover, the WaMu Defendants' "due diligence" of the loans underlying the WaMu Certificates did not confirm proper origination practices, but instead alerted the WaMu Defendants to widespread abuse.  The WaMu Defendants also did not disclose that it was their existing practice not to comply with covenants regarding Transfer of Title for their pre-existing RMBS or that, as was their practice, they did not intend to comply with the Transfer of Title covenants for the loans underlying the Certificates, as represented in the WaMu Offering Materials.

**B.    Defendants Routinely "Waived In" Loans They Knew Did Not Comply With Loan Underwriting Standards**

79.    The 2011 FCIC Report discussed Defendants' practice of routinely "waiving in" mortgage loans that they knew or should have known did not comply with underwriting standards represented in the Offering Materials.

80.    Defendants often relied on outside firms to review mortgage loans underlying a securitization.  The 2011 FCIC Report revealed, however, that the purpose of those reviews was not to confirm that securitized loans complied with underwriting standards as represented in the Offering Materials but to ensure Defendants maximized their own profits by paying as little as possible for the loans.

81.    One of the largest due diligence firms retained by Defendants was Clayton Holdings.  The 2011 FCIC Report concluded that "[b]ecause of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting

standards that originators were actually applying – and that securitizers were willing to accept."

82.     Clayton analyzed a sample of loans from each loan pool it was hired to review, checking for (1) adherence to the underwriting guidelines of the loan originator selling the loans and the risk tolerance of Clayton's client (*i.e.*, the potential purchaser of the loans); (2) compliance with federal, state and local regulatory laws; and (3) the integrity of electronic loan data provided by the seller to the prospective buyer.  This review was commonly referred to as a "credit and compliance review."  Contract underwriters reviewed the loan files, compared loan tape data with hard copy or scanned files to verify loan information, identified discrepancies in the data, and graded loans based on the seller's underwriting guidelines.  Clayton also analyzed whether exceptions to underwriting guidelines were justified by "compensating factors."

83.     Clayton generated reports to Defendants and the loan seller that summarized Clayton's findings.  Clayton determined that only 54% of the nearly one-million loans it reviewed "met guidelines," which Clayton's former president admitted indicated "there [was] a quality control issue in the factory" for RMBS.

84.     Internal Clayton documents show that, contrary to the Defendants' representations in the Offering Materials, a substantial percentage of loans reviewed by Clayton for Defendants were defective, but were nonetheless included in Defendants' securitizations.

85.     Clayton's data showed 26% (or 6,325) of the 23,668 loans Clayton reviewed for the JPM Defendants failed to comply with applicable underwriting standards and were not subject to any compensating factors.  Similarly, 26% (or 9,408) of the 35,008 loans that Clayton reviewed for the WaMu Defendants failed to comply to applicable underwriting standards and were not subject to any compensating factors.

86.     Of the 26% of loans identified by Clayton as non-compliant, the JPM Defendants

"waived in" 51% (or 13% of the total loan pool). WaMu waived in approximately a third of non-compliant loans (or 7% of the total WaMu pool).

87.     The percentage of non-complying loans Defendants knowingly included in their securitizations is highly material because the credit enhancement protecting the most senior tranches in a typical RMBS (namely, that the lower tranches absorb all losses on non-performing loans before the senior tranches bear any loss), is exhausted if roughly 5% of the loans are wiped out. Thus, the 13% defect rate for JPM and 7% defect rate for WaMu are more than enough to negatively impact the returns on the Certificates, and therefore the representations in the Offering Materials were materially false.

88.     In fact, the percentage of defective loans in the mortgage pools underlying the JPM Certificates and WaMu Certificates was much greater than 13% and 7%, respectively, because Defendants only rejected loans in the small samples that Clayton reviewed. The balance of loans in the pools (which Clayton's samples suggested would also be defective at a 26% rate) was never reviewed. Given the high defect rate, the failure to review a larger percentage of the loans assured that thousands of defectively underwritten loans would be included in Defendants' securitizations. For example, as disclosed in the 2011 Subcommittee Report, an independent review of loans originated by WaMu's Long Beach subsidiary by Goldman Sachs in 2007, in connection with Goldman's RMBS business, indicated that approximately 50% of the loans did not comply with WaMu's represented loan underwriting standards.

89.     By letter dated February 21, 2003 to all national banks and operating subsidiaries on the subject of "Avoiding Predatory and Abusive Lending Practices in Brokered and Purchased Loans," the Office of Controller of the Currency ("OCC") recommended, among other things, that "[w]hen brokers or originators are found to have violated bank policies, applicable laws, or the provisions of their agreements, other than on a clearly isolated and inadvertent basis, institutions

should take prompt and appropriate corrective action, including modification of loan terms and termination of the relationship with the third party in question." Defendants failed to follow these recommendations or to take any action with respect to the extraordinary volume of defective loans identified by Clayton.

90.     Because of the practice of Defendants and other major players in the mortgage securitization market routinely to waive in defective loans, Clayton's former President, D. Keith Johnson, admitted before the FCIC in September 2010:

> I don't think that we added any value to the investor, the end investor . . . . I think our only value was done in negotiating the purchase between the seller and securitizer. Perhaps the securitizer was able to negotiate a lower price, and could maximize the line. We added no value to the investor . . . .

FCIC Staff Interview with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), available at http://fcic.law.standord.edu/resource/interviews.

**C.    Publicly Available Information Demonstrates that Defendants Systematically Abandoned Loan Underwriting Standards**

**1.    The JPM Defendants**

91.     Approximately 61% of the loans underlying the JPM Certificates were originated by CHF, the home mortgage division of Defendant JPMC Bank, far more than any other originator.

92.     CHF's departure from underwriting standards has been confirmed by James Dimon, CEO of JPMorgan Chase. In January 2010, JPMorgan Chase CEO James Dimon testified at an FCIC hearing: "[T]he underwriting standards of our mortgage business should have been higher. We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

93.     CHF relied heavily on third parties to originate loans. According to Dimon's

testimony, the bank "closed down most-almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," acknowledging that "there were some unscrupulous mortgage salesmen and mortgage brokers."

94.     On information and belief:

- CHF management often overrode the decisions of underwriters to reject a loan by inflating borrower incomes, removing harmful background documentation, and altering appraisal values.

- CHF management instructed underwriters on how to close a non-qualifying loan, such as by understating loan-to-value ratios or overstating income levels.

- CHF underwriters used lax income verification techniques, were discouraged from verifying income information, and were encouraged to make exceptions for the "reasonableness" of the income stated on applications.

95.     For example, an internal CHF memorandum outlined "cheats and tricks" to gain approval for risky loans from an automated loan underwriting system known as "Zippy."  The memorandum advised bank personnel to "Never Fear!!" because if Zippy rejected a "stated income/stated asset" loan application, "Zippy can be adjusted (just ever so slightly)."  The memorandum also instructed brokers not to break down income by base, overtime, commissions, or bonuses, but to lump all into base income; and further recommended that "[i]f your borrower is getting a gift, add it to the bank account along with the rest of the assets.  Be sure to remove any mention of gift funds[.]"  The memorandum further instructed underwriters how to falsify borrower income and asset information: "try resubmitting with slightly higher income.  Inch it up $500 to see if you can get the findings you want.  Do the same for assets."

96.     JPM recognized by late 2006 that they were originating toxic loans.  As the poor quality of these mortgage loans became apparent and delinquencies increased, JPM's senior management decided to exit its subprime positions.  An article in *Bloomberg* on February 17,

2010 revealed that JPM CEO Jamie Dimon was fully aware that its mortgage assets were of poor and deteriorating credit quality and that he specifically directed the securitized products group to begin selling.  The article reported that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."  By the end of 2006, JPM had unloaded $12 billion in subprime mortgage assets that JPM itself had originated.

### 2.     The WaMu Defendants

97.     The 2011 Subcommittee Report devoted over 100 pages to a case study of the WaMu Defendants' misconduct in the origination of mortgage loans and the issuance of mortgage-backed securities.  The 2011 Subcommittee Report described its case study as "how one bank's strategy for growth and profit led to the origination and securitization of hundreds of billions of dollars in poor quality mortgages that undermined the U.S. financial system."

98.     *Shift to High Margin Loans Leads to Abandonment of Standards*.  James G. Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified before the Senate Subcommittee that by mid-2005, WaMu had shifted its strategy "to becoming more of a higher risk, sub-prime lender."  In April 2006, the President of WaMu's Home Loans Division gave a presentation to the WaMu Board of Directors entitled "Shift to Higher Margin Products," which showed (among other things) that the most profitable loans were Option Adjustable Rate Mortgage ("ARM"), Home Equity, and subprime loans.  According to that presentation, subprime loans were eight times more profitable than traditional fixed-rate loans.

99.     In search of these higher profits, the WaMu Defendants delved into ever-riskier loan products while ignoring their underwriting and due diligence procedures.  In a WaMu internal newsletter dated October 31, 2005 – but made public only recently – risk managers were

Case 1:11-cv-00445-SJD Doc #: 45-21 Filed: 03/23/12 Page: 32 of 141 PAGEID #: 2540

told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan. A former Senior Mortgage Underwriter, who worked at WaMu from 2003 until 2007, explained that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?"

100. Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents." When Ms. Chapman asked how they could possibly close it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it.'"

101. On September 28, 2007, WaMu's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending, which was recently released in connection with the 2011 Subcommittee Report. The report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR." It further concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

102. Mr. Vanasek admitted to the Senate Subcommittee that adherence to underwriting policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

103. _Predatory Lending_. The WaMu Defendants also pushed high risk loans onto borrowers who could not afford them. For example, a substantial percentage of loans underlying

the WaMu Certificates are Option ARM loans, which are very profitable for the lender. An Option ARM loan is typically a 30-year mortgage that gives the borrower the option of paying a specified minimum payment for an initial period. The minimum payment is typically lower than the interest payment and therefore caused the loan to grow (referred to as "negative amortization"), greatly increasing the risk of future default. A 2003 internal WaMu report discussed how reluctant or confused borrowers could be steered towards Option ARM loans by emphasizing the lower initial monthly payment and mentioning "that price appreciation would likely overcome any negative amortization." Sales of these high-risk loans soared. In 2003, WaMu originated $32.3 billion of Option ARM loans. By 2005, that number had doubled to $64.1 billion. Ms. Chapman admitted to the *Seattle Times,* that "[m]ortgage brokers put people into the product [Option ARM] who shouldn't have been."

104. According to recently publicized statements by one former WaMu loan underwriter, WaMu purposely priced traditional 30-year fixed mortgages higher than other lenders in order to steer borrowers toward Option ARM loans because fixed-rate loans were not profitable enough. As reported in December 2011, the WaMu underwriter said he was instructed not to explain to borrowers that loan balances on an Option ARM would increase if they paid only the minimum payment and was also encouraged to help borrowers overstate their incomes in order to qualify for the loans. The underwriter testified via declaration that an in-house WaMu trainer further instructed loan underwriters to target "lower income areas" and "less sophisticated" borrowers for deals that would strip the equity out of their house when they defaulted.

105. *Fraud*. WaMu's appetite for volume also led to rampant fraud in its origination business. For example, a 2005 internal WaMu review found that loans from two California

offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])." The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review." The review went on: "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named." But virtually none of the proposed recommendations were implemented.

106. WaMu Bank's compensation structure, which paid higher commissions for riskier loans, encouraged fraud and other violations of loan underwriting standards. Mr. Vanasek testified that "[b]ecause of the compensation systems rewarding volume vs. quality and the independent structure of the loan originators, I am confident that at times borrowers were coached to fill out applications with overstated incomes or net worth adjusted to meet the minimum underwriting policy requirements."

107. Moreover, an internal September 2008 review concluded that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an investor . . . . There is evidence that this control weakness has existed for some time."

108. When questioned by Senators Carl Levin and Tom Coburn about whether he was aware of WaMu's loan underwriting practices, David Beck, Executive Vice President at Defendant WCC in charge of securitizations, admitted: "I understood there was fraud" and "I knew we had underwriting problems."

109. *WaMu Increases Sales of Toxic Loans*. In late 2006 and early 2007, WaMu Bank

recognized rising delinquency and default rates on its mortgage loans, particularly among Option ARM loans, and decided to take advantage of its superior knowledge of the market to increase the percentage of such loans that it offloaded to investors.

110.    On February 14, 2007, David Beck Mr. Schneider and Cheryl Feltgen, Chief Credit Officer for Home Loans, observed that "[t]he performance of newly minted option arm loans is causing us problems . . . .  We should address selling 1Q as soon as we can before we loose [sic] the oppty."  In response, Ms. Feltgen stated that large Option ARM loans "have been the fastest increasing delinquency rates" in WaMu's single family residential portfolio.  Ms. Feltgen noted, however, that "[t]here is still strong interest around the world in US residential mortgages.  Gain on sale margins for Option ARMs arc attractive.  This seems to me to be a great time to sell as many Option ARMs as we possibly can."

111.    Ms. Feltgen then forwarded these e-mails to additional WaMu executives, noting: "We are contemplating selling a larger portion of our Option ARMs than we have in the recent past.  Gain on sale is attractive and this could be a way to address California concentration, rising delinquencies, falling house prices in California with a favorable arbitrage given that the market seems not yet to be discounting a lot for those factors."

112.    In response to Ms.  Feltgen's e-mail, on February 20, 2007, Robert Shaw, Senior Credit Officer at WaMu, circulated an analysis showing deteriorating delinquency rates for Option ARM loans in WaMu's investment portfolio and recommended shifting those loans from its investment portfolio into a new "Hold for Sale" portfolio.

### 3.    Defendants Acquired Loans From Other Originators That Abandoned Loan Underwriting Standards

113.    Although Defendants originated many of the loans underlying their securitizations, they also acquired loans from third-party originators that systemically abandoned

loan underwriting standards.  For example:

### a.    Countrywide

114.    Countrywide Home Loans, Inc. ("Countrywide") originated approximately 23%

of the loans underlying the Certificates in the JPMMT 2005-S3 offering.

115.    In pursuit of market share, Countrywide internally adopted a "matching" strategy

that would approve any mortgage product feature offered by a competitor.  The "matching"

strategy was implemented through the systematic use of "exceptions" to evade its loan

underwriting standards.

116.    Documents and testimony first made public by the FCIC show that these so-called

"exceptions" constituted roughly a third of all loans and were not based on "compensating

factors" as represented in the Offering Materials:

- Internal reviews conducted by Countrywide in 2006 concluded that one third of
all Countrywide loans violated its underwriting guidelines.  Frank Aguilera, a
Managing Director responsible for risk management, reported the "particularly
alarming" results that 23% of the subprime loans at the time were generated as
exceptions, even taking into account "all guidelines, published and not published,
approved and not yet approved."  Aguilera wrote at the time that "[t]he results
speak towards our inability to adequately impose and monitor controls on
production operations."  Another contemporaneous internal review concluded that
"approximately 40% of the Bank's reduced documentation loans . . . could
potentially have income overstated by more than 10% and a significant percent of
those loans would have income overstated by 50% or more."

- Countrywide's Chief Financial Officer, David Sambol, embraced Countrywide's
abandonment of its underwriting guidelines, stating in a February 13, 2005 email
that "we should be willing to price virtually any loan that we reasonably believe
we can sell/securitize without losing money, even if other lenders can't or won't
do the deal."

- Countrywide's Chief Risk Officer, John McMurray, testified before the FCIC that
he had expressed concerns within Countrywide about Countrywide's practice of
underwriting loans that were prohibited by its underwriting guidelines.  In a May
22, 2005 email, McMurray complained to Sambol that "exceptions are generally
done at terms more aggressive than our guidelines. . . .  Given the expansion in
guidelines and the growing likelihood that the real estate market will cool, this
seems like an appropriate juncture to revisit our approach to exceptions."

- McMurray also testified that his credit risk department "would reject proposals for new products but the people in sales nevertheless used the exceptions procedure to achieve the same result." He was "surprised, angry, and disappointed," when he found out Countrywide (i) was marketing loans with low FICO requirements, (ii) only required a stated (non-documented) income, and (iii) provided 100% financing even though these practices violated underwriting standards.

- Countrywide's flagrant violations of its underwriting guidelines even caught the attention of CEO, Angelo Mozilo, who expressed concerns in an April 13, 2006 email that loans were being originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation" and stating that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]. . . ."

- In a February 11, 2007 email to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market: "I doubt this approach would play well with regulators, investors, rating agencies[,] etc. To some, this approach might seem like we've simply ceded our risk standards . . . to whoever has the most liberal guidelines."

- During a March 12, 2007 meeting of Countrywide's credit risk committee, its Risk Management department reported that 12% of Countrywide loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already-wide underwriting guidelines.

### b.    Wells Fargo

117.    Wells Fargo originated or acquired all of the loans underlying the Certificates in the JPMAC 2006-WF1 offering, or approximately 19% of the loans backing the JPM Certificates that Western & Southern purchased.

118.    Wells Fargo systematically disregarded its underwriting standards and granted exceptions in the absence of compensating factors.

119.    The Court in *In re Wells Fargo Mortgage Backed Certificates Litigation*, 09-cv-01376 (SI) (N.D. Cal.) sustained on a motion to dismiss allegations that Wells Fargo "placed 'intense pressure' on its loan officers to close loans, including by coaching borrowers to provide

qualifying income information, accepting implausible or falsified income information, and
lowering its standards near the end of the calendar year . . . . [and] failed to disclose that variance
from the stated standards was essentially [Wells Fargo's] norm." 712 F. Supp. 2d 958, 971
(N.D. Cal. 2010).

### c.  GreenPoint

120.    GreenPoint Mortgage Funding Inc. ("GreenPoint") originated a substantial
percentage of mortgage loans underlying both JPMorgan Offerings and WaMu Offerings.

121.    GreenPoint systematically disregarded its underwriting standards, granted
exceptions in the absence of compensating factors, and provided reduced or no documentation
loans to borrowers without sound credit histories.

122.    GreenPoint's loans were underwritten by over 18,000 brokers – a large enough
number that GreenPoint could not exercise any degree of reasonable control.  Typically, new
GreenPoint-approved brokers were actively monitored for only the first five to seven loans
submitted, usually during only the first 90 days of being approved.

123.    As a result of GreenPoint's poor underwriting practices, GreenPoint's parent,
Capital One, subsequently took an $860 million charge for its mortgage loan portfolio.

124.    On March 3, 2010, the court in *U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage
Funding, Inc.*, No. 09-600352) (N.Y. Sup. Ct.), sustained on a motion to dismiss U.S. Bank's
claim that GreenPoint breached representations and warranties concerning its loan underwriting
standards and therefore was required to repurchase 30,000 mortgage loans.  An investigation of a
consultant hired by U.S. Bank in that action concluded that 93% of the loans sold by GreenPoint
involved violations of GreenPoint's underwriting standards, misrepresentations of borrower
income and owner occupancy, or inflated appraisals.

### d.     MortgageIT

125.     MortgageIT, Inc. originated approximately 38.8% of the mortgage loans underlying the Certificates in WMALT 2007-A3.

126.     Federal Home Loan Bank of Boston ("FHLB") – unlike Western & Southern – was provided access to complete loan files for certain securitizations involving loans originated by MortgageIT.  In its review of the loan files, FHLB found that MortgageIT originated loans despite evidence that the borrower provided false employment or salary information and loan-to-value ratios exceeded requirements in MortgageIT's underwriting guidelines, and that MortgageIT routinely failed to adhere to industry standard appraisal practices.  *See Federal Home Loan Bank of Boston v. Ally Financial Inc. f/k/a GMAC LLC, et al.*, No. 11-1533 (Super. Ct. Mass.).

127.     Similarly, MortgageIT's insurer Assured Guaranty Corp. ("Assured") was provided access to the results of a third-party loan-level review of a pool of loans 75% of which were originated by MortgageIT.  Assured's review revealed that 1,532 out of a total 1,774 loan files (approximately 86%) contained violations of the applicable underwriting standards.

128.     MortgageIT was recently sued by the United States for originating loans "in blatant disregard of whether borrowers could make mortgage payments."  *United States of America v. Deutsche Bank AG et al.*, 1:11-cv-02976-LAK (S.D.N.Y.).  Of 39,000 government-insured mortgages originated by MortgageIT Inc., 12,500 went into default.

### D.     The Certificates Experienced Widespread Defaults and Downgrades

129.     A high percentage of the mortgage loans backing the Certificates have defaulted, been foreclosed upon, or are delinquent, resulting in massive losses to Western & Southern and other holders of Certificates.  As a result of government reports and media investigations within

two years of the filing of its original complaint in June 2011, Western & Southern came to learn

that the reason for the high delinquency and default rates was Defendants' reckless disregard of

the underwriting standards described in the Offering Materials.

130.     The following table contains the performance data available for the loan pools as

of the commencement of this action:

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| JPMALT 2005-S1 | 12 | 4,151 | 5.10 |
| | 24 | 3,581 | 8.18 |
| | 36 | 3,242 | 14.02 |
| | 48 | 2,931 | 24.97 |
| | 60 | 2,593 | 29.08 |
| JPMAC 2006-WF1 | 12 | 3,642 | 16.10 |
| | 24 | 3,144 | 34.31 |
| | 36 | 2,706 | 49.64 |
| | 48 | 2,281 | 48.70 |
| | 60 | NA | NA |
| JPMAC 2007-CH1 | 12 | 6,720 | 4.74 |
| | 24 | 5,965 | 13.97 |
| | 36 | 5,303 | 24.11 |
| | 48 | 4,830 | 27.44 |
| | 60 | NA | NA |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| JPMMT 2005-S3 | 12 | 1,851 | 1.81 |
| | 24 | 1,707 | 2.58 |
| | 36 | 1,610 | 5.70 |
| | 48 | 1,369 | 13.55 |
| | 60 | 1,136 | 16.64 |
| WMALT 2005-7 | 12 | 2,074 | 1.57 |
| | 24 | 1,830 | 3.83 |
| | 36 | 1,674 | 7.77 |
| | 48 | 1,526 | 15.38 |
| | 60 | 1,377 | 18.97 |
| WMALT 2005-9 | 12 | 1,819 | 1.77 |
| | 24 | 1,617 | 5.55 |
| | 36 | 1,536 | 9.22 |
| | 48 | 1,424 | 19.39 |
| | 60 | 1,278 | 22.58 |
| WMALT 2006-4 | 12 | 1,393 | 12.03 |
| | 24 | 1,221 | 23.94 |
| | 36 | 1,092 | 40.31 |
| | 48 | 923 | 47.98 |
| | 60 | 799 | 44.65 |

| Certificate Offering and Class | Number of Months Since Issuance | Current Number of Loans in Pool | Total % of Current Delinquencies |
|---|---|---|---|
| WMALT 2006-5 1A10 | 12 | 2,692 | 5.47 |
| | 24 | 2,421 | 12.42 |
| | 36 | 2,197 | 28.43 |
| | 48 | 1,919 | 33.08 |
| | 60 | NA | NA |
| WMALT 2006-5 3A6 | 12 | 2,291 | 13.06 |
| | 24 | 2,011 | 29.74 |
| | 36 | 1,737 | 45.32 |
| | 48 | 1,481 | 45.61 |
| | 60 | NA | NA |
| WMALT 2006-9 | 12 | 782 | 12.24 |
| | 24 | 679 | 23.19 |
| | 36 | 574 | 33.04 |
| | 48 | 478 | 39.17 |
| | 60 | NA | NA |
| WMALT 2007-OA3 | 12 | 2,668 | 13.63 |
| | 24 | 2,463 | 40.21 |
| | 36 | 2,137 | 52.86 |
| | 48 | 1,855 | 56.13 |
| | 60 | NA | NA |

131. Not only have the loans backing Western & Southern's Certificates experienced

extraordinary rates of default, but the Certificates' credit ratings have also deteriorated.  Many of the Certificates initially received the highest possible Standard & Poor's rating, AAA.  For RMBS, this rating has historically required an expected loss rate of less than .05% of underlying loan principal.

132.    Because of the high delinquency and default rates, among other things, however, the Certificates have been downgraded as follows:

| Certificate Offering and Class | Original Moody's Rating | Current Moody's Rating | Original Fitch Rating | Current Fitch Rating | Original S&P Rating | Current S&P Rating |
|---|---|---|---|---|---|---|
| JPMALT 2005-S1 1A1 | -- | -- | AAA | C | AAA | CCC |
| JPMAC 2006-WF1 A5 | Aaa | Ca | -- | -- | AAA | CCC |
| JPMAC 2006-WF1 A6 | Aaa | Caa2 | -- | -- | AAA | CCC |
| JPMAC 2007-CH1 AF4 | Aaa | Caa2 | AAA | CC | AAA | BBB* |
| JPMMT 2005-S3 1A3 | -- | -- | AAA | CC | AAA | CCC |
| WMALT 2005-7 2CB1 | Aaa | Caa1 | -- | -- | AAA | CCC |
| WMALT 2005-9 2A4 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-4 3A2A | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-4 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-5 1A10 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2006-5 3A6 | Aaa | Ca | -- | -- | AAA | D |
| WMALT 2006-9 A3 | Aaa | Caa3 | -- | -- | AAA | CCC |
| WMALT 2007-OA3 5A | Aaa | Caa3 | -- | -- | AAA | CC |

133.    The poor performance of the Certificate loan pools and the Certificates' rapidly dropping credit ratings have caused the Certificates to lose, in the aggregate, at least 35% of their

market value as of the commencement of this action.

134.     In light of the information now known about Defendants' misconduct, the economic downturn does not explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools underlying the Certificates.  Properly originated loan pools with the loan-to-value ratios and other characteristics represented in the Offering Materials would have experienced far lower rates of defaults, foreclosures, and delinquencies. As Western & Southern has recently come to learn, the poor performance of the loans underlying the Certificates is due to the fact that origination standards and loan-to-value ratios and other characteristics disclosed in the Offering Materials were false.

## IV.     DEFENDANTS MANIPULATED THE APPRAISAL PROCESS

135.     The Offering Materials represented that Defendants required industry-standard appraisals to value properties securing loans underlying the Certificates.  *See* Exhibit C.

136.     These representations were false and misleading because: (i) the appraisers were not independent from the respective mortgage lenders, which pressured appraisers to value the mortgaged property at a pre-determined, preconceived, inflated, and false appraisal value; (ii) sales managers employed by the respective originators had and utilized the authority to override and inflate an appraiser's final professional valuation of the mortgaged property; and, therefore, (iii) the appraisals failed to conform to industry standards.

137.     In April 2010, Richard Bitner, a former mortgage lender executive with 15 years experience, testified before the FCIC that "the appraisal process [was] highly susceptible to manipulation," and that property valuations were affected by "the subprime industry's acceptance of overvalued appraisals."  Also in April 2010 before the FCIC, Patricia Lindsay, a former wholesale lender, testified that appraisers "fearing [for their] future business and their

livelihoods" would choose properties "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."

138.    In April 2009, Jim Amorin, President of the Appraisal Institute, testified before the House Financial Services Committee that "in many cases, appraisers are ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again."

139.    The 2011 FCIC Report found that Dennis J. Black, an appraiser with 24 years experience, "heard complaints from appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems."  He told the FCIC: "The story I have heard most often is the client saying he could not use the appraisal because the value was [not] what they needed."

140.    The 2011 Subcommittee Report detailed specific misconduct by WaMu with respect to procurement of appraisals.  The Office of Thrift Supervision ("OTS") repeatedly expressed concerns to WaMu about its practice of providing in-house appraisals.  In 2005, the OTS severely criticized WaMu for its practice of relying on "Owner's Estimate of Value" in the appraisal process and WaMu's use of automated appraisal software, finding that the automated appraisals failed to comply with standard appraisal practices and some had "highly questionable value conclusions."  Even after WaMu "outsourced" the appraisal function to third-party appraisaers, WaMu compliance manager (who oversaw WaMu as an FDIC examiner prior to working for the bank) noted serious problems in a 2007 internal appraisal department review, including "undefined" appraisal standards, "unreasonable and imprudent sales force influence over the appraisal function" and a "broken" third-party appraisal risk control process that "may be contributing to the increasing incidence of mortgage fraud."

141.    Each prospectus supplement also contains representations concerning the loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios of the mortgage loans underlying each securitization, which typically incorporated the appraised value of the property.  An LTV ratio is the ratio of a loan's principal balance to the appraised value of mortgaged property securing the loan.  A CLTV ratio is the ratio of the amount of all liens on the mortgaged property to the appraised value of the property.

142.    These ratios were material to Western & Southern and other investors because higher ratios meant a higher risk of default.  A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  Loss on foreclosure is also more likely where the amount of a loan is a high percentage of the value of the mortgaged property.  LTV and CLTV are common metrics for analysts and investors to evaluate the price and risk of RMBS.

143.    The Offering Materials provide a statistical overview of the mortgage loans underlying each Offering, including a chart regarding the LTV and, for certain Offerings, the CLTV characteristics of the loans in the aggregate collateral pool.  These statistics were false and misleading because many of the LTV and CLTV ratios for the individual loans were materially understated.

144.    For example, pages S-33-35 of the JPMAC 2007-CH1 Prospectus Supplement presents the following untrue and misleading statements regarding LTV ratios for the mortgage loans in the aggregate collateral pool: (i) the weighted average initial LTV ratio is 75.40%; (ii) no loans have an LTV ratio greater than 100%; and (iii) only approximately 34.19% of the mortgage loans have an LTV ratio greater than 80%.

145.    Allstate Insurance Company and certain of its affiliates ("Allstate") purchased

Certificates in the 2007-CH1 Offering secured by the same loan pool as the Certificates purchased by Western & Southern.

146.    Allstate performed a loan-level analysis of a random sample of 1,600 mortgages in the aggregate loan pool and determined that the LTV ratios were on average much higher than the Offering Materials represent.  *See generally Allstate Bank, et al. v. JPMorgan Chase Bank, N.A.*, Index No. 650398/11 (N.Y. Sup. Ct,) at Exhibit J.  In particular, (i) the weighted average initial LTV ratio is 83.58% (more than 8% higher than represented in the Prospectus Supplement); (ii) 160 loans (15.89% of the loans tested) have an LTV ratio greater than 100%; (iii) 333 loans (33.07% of the loans tested) have an LTV ratio greater than 90%; and (iv) 516 loans (51.24% of the loans tested) have an LTV ratio greater than 80%.  *Id.*

147.    Allstate's loan-level analysis further determined that 30.98% of the loans have an actual LTV ratio that is between 10-25% greater than the LTV ratios represented in the Prospectus Supplement, and 6.55% of the loans have an actual LTV ratio that is more than 25% greater than the LTV ratios represented in the Prospectus Supplement.  *Id.*

148.    Similar allegations regarding material understatement of LTV ratios have been asserted against JPM and WaMu by John Hancock Life Insurance Company and its affiliates ("John Hancock") and the Federal Housing Finance Agency, acting as conservator for Fannie Mae and Freddie Mac (the "FHFA"), with respect to the following Offerings at issue in this action: WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, and JPMMT 2005-S3.  *See generally John Hancock Life Insurance Company (USA), et al. v. JPMorgan Chase & Co., et al.*, Index No.: 650195/2012 (N.Y. Sup. Ct.); *Federal Housing Finance Association, as Conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation v. JPMorgan Chase & Co., et al.*, 11-cv-6188 (S.D.N.Y.).

43

149.    Western & Southern has engaged in discussions with counsel for Allstate, John Hancock and the FHFA and obtained non-confidential information concerning their investigation and findings.

150.    The material understatement of LTV ratios of the loans underlying the WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, JPMMT 2005-S3, and JPMAC 2007-CH1 Offerings was due principally to Defendants' systematic acceptance of inflated and fraudulent property appraisals and, on information and belief, the LTV and CLTV ratios for all the Certificates were similarly misrepresented.

151.    With respect to all mortgage fraud (including fraudulent appraisals), the Federal Bureau of Investigation ("FBI") has concluded that 80% of all borrower fraud involved lender collusion (for example, by supplying or procuring fraudulent appraisals for borrowers or coaching borrowers how to submit false information in order to qualify for a loan).  Accordingly, Defendants knew, or should have known, that the representations regarding appraisals were false, and the statistics regarding LTV and CLTV ratios were unreliable, at the time the Offering Materials were filed.

## V.    DEFENDANTS MISREPRESENTED OWNER OCCUPANCY RATES

152.    There are three categories of residential real estate occupancy: primary residences, second homes, and investment properties.  Primary-residence loans are less risky because borrowers are less likely to default on loans secured by their homes, as opposed to vacation homes and investment properties.  The percentage of loans in a securitization that are not secured by primary residences is a key risk indicator.

153.    For these reasons, the occupancy status of the collateral backing the mortgages in loan pools was highly material to Western & Southern's decision to invest in the Certificates.

154. The Offering Materials contain representations as to the percentage of owner-occupied properties securing the loans underlying the Certificates. These representations were false and misleading.

155. For example, the 2007-CH1 Prospectus Supplement contains the following representations concerning the occupancy status of properties securing mortgage loans in the aggregate collateral pool underlying the Certificates Western & Southern purchased:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool |
|---|---|---|
| Primary Home | 11,338 | 93.05% |
| Second Home | 113 | 0.78% |
| Investment | 853 | 6.17% |
| Total Mortgaged Properties | 12,304 | 100% |

JPMAC 2007-CH1 Prospectus Supplement at S-39. These representations drastically overstate the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

156. Allstate conducted a loan-level analysis of 1,454 loans allegedly secured by owner-occupied properties and determined that 184 or 12.7% of allegedly owner-occupied properties in the test sample were not the borrower's primary residence. John Hancock and the FHFA have alleged that owner occupancy rates were similarly misstated in the Offering Materials for the following Offerings at issue in this action: WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, and JPMMT 2005-S3.

157. The representations regarding occupancy status in the WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, JPMMT 2005-S3, and JPMAC 2007-CH1 Prospectus Supplements were due principally to Defendants' knowing acceptance of fraudulent occupancy status assertions by borrowers and, on information and belief, the owner occupancy rates represented in Offering Materials for all of the Certificates were materially false and

misleading.

158.     According to published Fannie Mae guidelines, false occupancy assertions made by borrowers can often be detected by banks from "red flags" arising within the four corners of the loan file, including (i) a representation that applicant intends to lease current residence, (ii) unrealistic commute distance, or (iii) a sales contract that is subject to an existing lease.  Indeed, according to the FBI, 80% of all borrower fraud involves lender collusion.

159.     Accordingly, Defendants knew, or should have known, that the owner occupancy statistics represented in the Offering Materials were false and misleading at the time the Offering Materials were filed.

## VI.     DEFENDANTS MANIPULATED THE RATINGS PROCESS

160.     Each of the Certificates received a credit rating from a nationally recognized rating agency.  The Certificates' initial ratings were AAA, the highest rating.  The ratings were material to investors such as Western & Southern because the ratings provided additional assurances that investors would receive their expected interest and principal payments.  The Certificates would have been unmarketable to investors such as Western & Southern and would not have been issued without these ratings.

161.     The Offering Materials represented that rating agencies analyzed the likelihood of delinquencies and defaults in the mortgage pools underlying the Certificates.  For example, the Offering Materials for JPMAC 2006-WF1 represent:

> The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued.  Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates.

46

JPMAC 2006-WF1 Prospectus Supplement at S-66.  The same or similar representations appeared in the Offering Materials for each of the Certificates, as set forth in detail in Exhibit D.

162.    These representations were materially misleading as, among other things, the ratings did not fairly "address the likelihood of the receipt of all payments on the mortgage loans."  The Certificate credit ratings were based on data concerning underlying loans that Defendants supplied to the agencies.  Key components of that data were false, because the underlying loans were originated without regard to stated origination procedures, property appraisals were manipulated, LTV ratios were understated, owner occupancy rates were misstated, and Transfer of Title requirements had not been met.  As a result, representations concerning credit ratings in the Offering Materials were materially misleading because Defendants failed to disclose that those ratings were based on materially misleading and inaccurate information.

163.    In addition, the Senate 2011 Subcommittee Report recently released documents from the internal files of the Defendants detailing how the Defendants manipulated the credit rating agencies to achieve their desired rating results.  The 2011 Subcommittee Report reported that investment banks, including JPMC Bank and WaMu Bank, "were pressuring [the ratings agencies] to ease rating standards" on mortgage-backed securities.  This included the Defendants' practice of blacklisting ratings analysts who refused to provide favorable credit ratings to the defective mortgage portfolios they were offloading to investors such as Western & Southern.

164.    The failure of Defendants to disclose their efforts to undermine rating-agency independence and coerce favorable RMBS credit ratings further caused the representations concerning credit ratings in the Offering Materials to be materially misleading.

## VII. DEFENDANTS' MISREPRESENTATIONS REGARDING TRANSFER OF TITLE, THEIR FORECLOSURE PRACTICES, AND THE MERS SYSTEM

165.     The Transfer of Title is a fundamental step in the mortgage securitization process. If the requirements for Transfer of Title are not met, a securitization trust will not be legally entitled to enforce the mortgage loans in the trust in the event of default.

166.     Two documents relating to each mortgage loan must be validly transferred: a promissory note and a mortgage instrument.

167.     The rules for these transfers are a function of the real property law of the state in which the underlying properties are located, the law governing the issuing trust with respect to matters of trust law, and the terms of the applicable pooling and servicing agreement.

168.     Generally, state laws and the pooling and servicing agreements require the promissory note to be transferred by endorsement and delivery, and the mortgage assigned.  In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable against the borrower in the event of default.

169.     In order to preserve the bankruptcy-remote status of issuing trusts, notes and mortgage instruments are generally not transferred and assigned directly to the trust.  Instead, the notes and mortgages are initially transferred from the originator to the sponsor, and then from the sponsor to the depositor.  The depositor then transfers the notes and mortgages to the issuing trust.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

170.     State trust law generally requires strict compliance with trust documents such as pooling and servicing agreements, so that failure to comply with timeliness, endorsement,

physical delivery, and other requirements concerning the transfer of notes and mortgages may result in void transfers.

### A. Misrepresentations Regarding Transfer of Title

171. The Offering Materials represented that the mortgage for each loan underlying the Certificates comprised a valid lien such that the Trusts could effectively foreclose in the event of borrower default. For example, the JPMALT 2005-S1 Prospectus Supplement represented that "[t]he mortgage loans consist primarily of fixed rate, fully amortizing, first lien residential mortgage loans." JPMALT 2005-S1 Prospectus Supplement at S-10. The same or similar representation appeared in the Offering Materials for each of the Certificates, as set forth in detail in Exhibit E.

172. Defendants represented in the Certificate Offering Materials that (i) the mortgage loans would be properly assigned to the trusts; (ii) the original notes would be endorsed in blank and delivered to the trust (either via the trustee or a custodian); (iii) mortgage assignments would be executed in the name of the trust (with all intervening assignments properly evidenced) or registered with MERS, so as to allow efficient foreclosure on mortgaged properties in the event of borrower default; and (iv) other documents from the loan file or necessary for foreclosure (such as a "substitution of trustee") would be executed and delivered as appropriate. For example, the JPMALT 2005-S1 Prospectus Supplement stated:

> [p]ursuant to a pooling and servicing agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). . . . In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian the Mortgage File. Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records.

JPMALT 2005-S1 Prospectus Supplement at S-32. The same or similar representations

appeared in the Offering Materials for each of the Certificates, as set forth in detail in Exhibit E.

173.    The Prospectus for WMALT 2005-7 represented:

> The Company, a Servicing Entity or a Servicer, as the case may be, will, as to
> each Mortgage Loan, deliver or cause to be delivered to the Trustee the Mortgage
> Note, an assignment (except as to any Mortgage Loan registered on the MERS
> System (as defined below) and unless otherwise indicated in the applicable
> Prospectus Supplement) to the Trustee or in blank of the Mortgage in a form for
> recording. . . .

Prospectus for WMALT 2005-7 at 20. The same or similar representation appeared in the

Offering Materials for each of the Certificates, as set forth in detail in Exhibit E.

174.    "MERS" refers to the Mortgage Electronic Registration System, which is an

alternative mortgage registration system created and owned by the major participants in the

financial industry, including Defendants, that is intended to track the ownership of the high

volume of mortgages needed for securitization and avoid state and local mortgage recording fees.

175.    All of the representations as to the Transfer of Title led investors such as Western

& Southern to believe that Defendants had taken all steps necessary to ensure that the Trusts

could negotiate loan modifications with proper authority and, when necessary, foreclose upon

defaulted mortgage collateral in an efficient manner. These material representations were false.

Indeed, Defendants lost much of the paperwork relating to loans underlying their RMBS, or

made no attempt to assign mortgages, properly substitute the trustees as beneficial owners of the

mortgages, and deliver original promissory notes to issuing trusts.

176.    Even where Defendants attempted to transfer mortgages through MERS, they

virtually never endorsed and delivered the promissory notes, as required under state law. Many

purported mortgage assignments through MERS were also missing evidence of intervening

assignments essential to establishing a proper chain of title. As a result, registration in the

MERS system has unduly delayed and often prevented foreclosures on properties securing loans underlying the Certificates.

177.     Moreover, because Defendants' failure to perform the actions necessary for Transfer of Title was systemic and pervasive, Defendants knew that the statements in the Offering Materials regarding Transfer of Title were false at the time they were made.

178.     As discussed below, Defendants and other servicers for loans underlying the Certificates have engaged in widespread misconduct in foreclosure proceedings resulting from the inability of securitization trusts appropriately to foreclose on mortgaged properties.  The widespread foreclosure misconduct further evidences the material falsity of Defendants' representations regarding Transfer of Title.

**B.     Misrepresentations Regarding MERS**

179.     The representations in the Offering Materials regarding MERS were materially omissive, and therefore false and misleading.  For example, the Prospectus for WMALT 2005-7 stated:

> With respect to any Mortgage Loan registered on the mortgage electronic registration system (the 'MERS System') maintained by MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or any successor thereto ('MERS'), an assignment of Mortgage will not be delivered to the Trustee as described above, but instead the change in beneficial ownership to the Trust will be registered electronically through the MERS System in accordance with the rules of membership of MERS.  MERS will serve as mortgagee of record with respect to these Mortgage Loans solely as a nominee of the Trust, in an administrative capacity, and will not have any interest in these Mortgage Loans.

Prospectus for WMALT 2005-7 at 21-22.  The same or similar representation appeared in the Offering Materials for each of the Certificates, as set forth in detail in Exhibit E.

180.     A number of courts have held that the MERS system cannot be used to circumvent state recording laws and that assignments of mortgages to MERS are invalid without

endorsement and delivery of the accompanying note. The Offering Materials provided no warnings as to the unproven nature of MERS or the failure of the MERS system to comply with certain state laws, which have lead to delays and additional costs in commencing, prosecuting and completing foreclosure proceedings, and greater losses for Certificateholders.

181.    Moreover, the Offering Materials did not disclose that use of the MERS system threatens the bankruptcy remoteness of the securitization trusts with respect to MERS loans, permitting creditors of MERS or a bankruptcy trustee to claim an interest in the mortgage loans in the event MERS files for bankruptcy. Because MERS is a thinly capitalized "shell" company, and it is both (i) a defendant in numerous litigations, including class actions, alleging MERS' complicity in its members' foreclosure misconduct and (ii) exposed to potential claims by government regulators, there is a significant risk that it could be forced into bankruptcy, which would subject loans underlying the Certificates to potential claims by the MERS' bankruptcy estate.

182.    On February 3, 2012, the New York State Attorney General filed a complaint against MERS and various loan servicers, including Defendant JPMC Bank and CHF, alleging fraud in connection with New York mortgage foreclosure proceedings. *People vs. JPMorgan Chase Bank, N.A., et al.* (N.Y. Sup. Ct., Kings County) (the "NY Attorney General Complaint").

183.    As the NY Attorney General Complaint observes:

The mortgage industry created MERS to allow financial institutions to evade county recording fees, avoid the need to publicly record mortgage transfers and facilitate the rapid sale and securitization of mortgages en masse.
. . .

[F]or years, MERS affirmatively encouraged its members to file foreclosures in MERS' name . . . .  However, MERS often lacked standing to foreclose, and representations in court submissions that MERS owned and/or held the promissory note in such proceedings were often false and deceptive.

184.     The NY Attorney General Complaint also catalogues a long list of MERS deficiencies including that MERS was updated only by its members (such as Defendants) without any safeguards, that the system was riddled with inaccuracy, that MERS "signing officers" labored under an undisclosed conflict of interest, in that each such officer was employed by a MERS member, and that flaws in MERS had since at least 2003 resulted in a wide range of deceptive and illegal practices in foreclosure proceedings, such as the submission of false and deceptive assignments, affidavits, and other documentation.  None of these deficiencies were disclosed in the Offering Materials.

## VIII.   DEFENDANTS CONSPIRED WITH LOAN SERVICERS AND ORIGINATORS TO COVER UP THE MISSTATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS

185.     Defendants and other servicers and originators of loans underlying the Certificates have conspired to engage in perjury and forgery to systematically cover up Defendants' failure to comply with requirements regarding Transfer of Title and their violations of state and federal securities laws, including the violations of the Ohio Securities Act alleged herein.

### A.     Forgery and Perjury in Foreclosure Proceedings

186.     A centerpiece of the cover up has been the servicers' employment of so-called "robo-signers" who execute thousands of perjurious foreclosure affidavits a month, in the great majority of which the robo-signer falsely swears to personal knowledge, and with which the "robo-signer" often submits retroactive mortgage assignments and other falsified documentation.

187.     Unbeknownst to Western & Southern, these abuses began as early as 2003, and they continued through at least 2010.  The longstanding cover-up of prior RMBS abuses made possible and facilitated the sale of the Certificates to investors such as Western & Southern. Further, the cover-up fraudulently concealed claims brought by Western & Southern in this

action.

188.     The failure of the Offering Materials to disclose the practice of perjury, forgery, and fraud in foreclosure proceedings was a material omission that rendered the Offering Materials materially misleading.

189.     In addition, the Offering Materials contained numerous partial disclosures that misleadingly failed to disclose the pre-existing practice of perjury, forgery and fraud in foreclosure proceedings.  For example, the Prospectuses for WMALT 2005-7 and WMALT 2005-9 state that "[f]oreclosure may be accomplished by judicial action" and "[d]elays in completion of the foreclosure may occasionally result from difficulties in locating necessary parties defendant."  The Prospectuses for JPALT 2005-S1, JPMAC 2006-WF1, JPMAC 2007-CH1, and JPMMT 2005-S3 contain the same misleading partial disclosures.  The Prospectuses for WMALT 2006-4, WMALT 2006-5, WMALT 2006-9, and WMALT 2007-OA3 also state that "[a] foreclosure action or sale in accordance with a power of sale is subject to most of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring up to several years to complete" and "[b]ecause of the difficulty potential third party purchasers at the sale have in determining the exact status of title and because the physical condition of the property may have deteriorated during the foreclosure proceedings, it is uncommon for a third party to purchase the property at the foreclosure sale."

190.     Mortgage loans are often serviced by the same companies that originated the loans (or their affiliates).  Defendant JPMC Bank is the servicer for the majority of the loans underlying the JPM Certificates, with certain other originators (particularly Countrywide and Wells Fargo) servicing loans that they (or their affiliates) originated.  WaMu Bank was originally the servicer for the WaMu Certificates (with Countrywide as co-servicer with respect to

WMALT 2007-OA3).  When JPMC Bank acquired substantially all of the assets of WaMu Bank in September 2008, it acquired WaMu Bank's servicing business and assumed servicing responsibilities in connection with the WaMu Certificates.  All of these servicers have engaged in widespread foreclosure misconduct in an attempt to cover up Defendants' misstatements and omissions concerning origination standards for the underlying mortgage loans and the Transfer of Title.

191.    Courts have concluded that the Defendants have committed outright fraud to cover up the fact that they did not properly assign mortgages or maintain mortgage documentation.  For example, in *JP Morgan Chase Bank, N.A. v. Pocopanni*, Case No. 16-2008-CA-3989 (Cir. Ct. Fla. Aug. 9, 2010), the Court stated as follows:

> The Court finds by clear and convincing evidence that WAMU, Chase and [counsel for JPMC Bank] committed fraud on this Court. . . .  The Court finds that WAMU and Chase made representations to this Court during the course of the instant action that are known to be false. . . .  Throughout the litigation, WAMU and Chase and [their counsel] have represented to this Court that plaintiff owns and holds the note and mortgage.  Moreover, WAMU and [counsel] created a false Assignment of Mortgage dated April 11, 2008 as evidence of these assertions. . . .  The Court finds by clear and convincing evidence that these acts committed by WAMU, Chase and [counsel] amount to a "knowing deception intended to prevent the defendants from discovery essential to defending the claim" and are therefore fraud.

192.    In September 2010 (after JPMC had acquired WaMu Bank's assets and assumed the administration of WaMu-securitized loans in addition to its own), JPMC Bank suspended foreclosures in 23 states and publicly acknowledged that it systemically submitted forged or otherwise improper documentation in foreclosure proceedings.

193.    On April 13, 2011, JPMC Bank, BAC Home Loan Servicing (as successor to Countrywide) and Wells Fargo, among others, stipulated to a Consent Order by the Comptroller of the Currency.  The Consent Order found that each servicer had attempted to foreclose on

mortgage loans by engaging in improper and fraudulent practices, and required sweeping

reviews of foreclosure practices.

194.    On December 1, 2011, the Massachusetts Attorney General commenced an action

against JPMC Bank, Wells Fargo, and BAC Home Loan Servicing (as successor to

Countrywide) alleging "rampant violations" of state law in foreclosure proceedings.

*Commonwealth of Massachusetts v. Bank of America, N.A. et. al*, 11-CV-4363 (Super. Ct.

Mass., Suffolk County).

195.    The February 3, 2012 NY Attorney General Complaint charges various loan

servicers, including JPMC Bank, Wells Fargo, and BAC Home Loan Servicing (as successor to

Countrywide) with persistent fraud and deceptive acts in connection with mortgage foreclosure

proceedings.  As the complaint points out: "[The defendant loan servicers] have repeatedly

submitted court documents containing false and misleading information that made it appear that

the foreclosing party had the authority to bring a case when in fact it may not have."

196.    The Attorneys General of all 50 states conducted investigations of Defendants'

extensive misconduct in mortgage foreclosure proceedings, including participation in acts of

perjury and falsification of documents.  In early February 2012, federal and state governments

entered into a reported $26 billion settlement with prominent mortgage loan servicers, including

JPMC Bank, Wells Fargo and BAC Home Loan Servicing, arising out of the servicers' rampant

forgery, perjury and fraud in foreclosure proceedings across the country.  Reportedly, servicers

will be permitted to earn "credits" against their payment obligations under the settlement by

granting homeowners principal reductions on loans that sit in RMBS securitization pools.  Such

principal reductions may reduce the available proceeds payable to investors in RMBS, further

exacerbating losses for RMBS investors.  Moreover, on information and belief, in granting loan

modifications, Defendants have frequently acted with conflicts of interest, granting greater modifications of first lien mortgages than are justified by market conditions in order to protect the value of second lien mortgages owned by Defendants.  Ohio Senator Sherrod Brown has expressed concern that a servicer settlement that gave banks credit for modifications of loans owned by RMBS trusts would harm Ohio public employee pension funds that (like Western & Southern) have significant investments in RMBS.

197.    One of the Defendants' "robo-signers" was a woman named Martha Kunkle.  Ms. Kunkle died in 1995, but the Defendants continued to use her name on "robo-signed" documents until 2010 foreclosing upon many homes where WaMu Bank (now replaced by JPMC Bank) served as the servicer.

198.    Beth Ann Cottrell, an agent of JPMC Bank and "robo-signer," testified that she signed *18,000* foreclosure related documents a month and admitted that she had no personal knowledge regarding assertions made in the documents she was signing.

199.    Another JPMC Bank "robo-signer," Angela Nolan, detailed in testimony Defendants' practice of deceiving courts by fabricating an "allonge" after the fact as evidence that the original mortgage note was properly endorsed when it had not been.  State laws require that endorsements be executed on the back of the original note when it is assigned or on an attached document called an "allonge."  Ms. Nolan testified that JPMC Bank has a regular practice of executing an allonge years after the closing of the securitization despite the fact that there was room on the original notes for additional endorsements.  She further confirmed that the Defendants routinely misrepresented to courts that the allonges evidenced proper assignments.

200.    Another JPMC Bank "robo-signer" is Barbara Hindman, an employee of JPMC Bank in Jacksonville, FL.  She wears many hats.  In some foreclosure documents filed in state

57

courts she represents that she is "Vice President of Mortgage Electronic Registration Systems, Inc." Sometimes she is "Vice President, Bank of America, N.A." Other times she is "Vice President, JP Morgan Chase Bank, N.A., as successor-in-interest to Washington Mutual Bank." Ms. Hindman works with Margaret Dalton another JPMorgan "robo-signer" based in Jacksonville, Florida.

201.    Defendants have also retained third party vendors to "robo-sign" documents for them including Lender Processing Services Inc. ("LPS"). LPS is the subject of a federal criminal investigation related to its foreclosure document preparation and its subsidiary or employees have been criminally indicted in the states of Missouri and Nevada. Additionally, the Attorneys General of Michigan, California, and Florida issued subpoenas to LPS seeking various foreclosure documents prepared by LPS "robo-signers." LPS employees have testified that LPS prepared thousands of fabricated foreclosure documents on a daily basis for their clients including the Defendants. For example, in *In re: Wilson* (U.S. Bk. Ct., No. 07-11862) (E.D. Louisiana), LPS employees confirmed that employees of LPS routinely swear under oath that certain facts are true, without confirming that they are, and that no attempt is made to confirm that assertions made in foreclosure documentation are accurate. Reflecting the widespread, systemic misconduct perpetrated by the Defendants and others, the Court in the *Wilson* action involving LPS remarked, "[t]he fraud perpetrated on the Court, Debtors, and trustee would be shocking if this Court had less experience concerning the conduct of mortgage servicers."

B.    **Defendants' Acts of Perjury in Ohio**

202.    Western & Southern has conducted a review of numerous files from foreclosure proceedings in Ohio. The review found that Defendants committed acts of perjury in Ohio in violation of Section § 2921.11 of the Ohio Revised Code ("ORC").

203. In the Ohio proceeding *Washington Mutual Bank v. Bret A. Jagger, et al.,* 9th Dist. No. 08-CV-7842 (Summit County, November 10, 2008), JPMC Bank (as successor to WaMu Bank) submitted an assignment dated September 15, 2008 purporting to transfer a mortgage to WaMu Bank. LPS employee Bethany Hood falsely signed the assignment as a vice president of MERS.

204. Hood is located in Mendota Heights, Minnesota, and signs thousands of mortgage documents monthly using at least 20 different job titles. On September 30, 2010, the United States Bankruptcy Court for the Northern District of Indiana referred to another assignment by Hood as a "false document" and held that "the Creditors have been forced to admit that a non-employee [Hood] signed the Assignment of Mortgage, representing herself to be a Vice President of MERS and other banks or mortgage companies held the Mortgage or Note at issue." *See Koontz v. EverHome Mortgage and Mortgage Electronic Registration System, Inc.*, Case No. 09-30024 (Bankr. N.D. Ind.).

205. In the Ohio proceeding *Washington Mutual Bank v. Monica L. Dawson, et al.,* 9th Dist. No. 06-CV-5111 (Summit County, August 15, 2006), WaMu Bank submitted an assignment purporting to transfer a mortgage to WaMu Bank. LPS employee Liquenda Allotey falsely signed the assignment as a vice president of MERS. The *Dawson* assignment was executed approximately 6 years after the note was purportedly transferred and 3 months before the foreclosure complaint was filed.

206. The *Dawson* assignment was also purportedly notarized by Bethany Hood. However, Hood's signature on the *Dawson* assignment is noticeably different from the signature on the *Jagger* assignment mentioned above and other assignments she purportedly signed, suggesting that one or more of the signatures were forged.

207. Allotey is an LPS employee located in Dakota County, Minnesota, and has also "robo-signed" on at least two occasions as "Attorney-in-Fact" for JPMC Bank, as successor in interest to WaMu Bank, and as a purported officer of MERS on behalf of at least ten other mortgage companies. On November 8, 2010, the United States Bankruptcy Court for the Eastern District of Virginia found that Allotey "fraudulently executed" a Deed of Appointment while falsely claiming to be an employee of American Home Mortgage Servicing, Inc. *See In Re Shelia Sue Long*, No. 10-14924 (Bankr. E.D.V.A November 8, 2010).

208. In the Ohio proceeding *GSMPS MORTGAGE LOAN TRUST 2004-4 v. Michael Sartoski, et al.,* 9th Dist. No. 2006-CV-4226 (Summit County, February 25, 2006), LPS employee Greg Allen falsely signed an assignment purporting to transfer a mortgage from WaMu Bank to the securitization trust, although Allen was not employed by WaMu Bank or its affiliates.

209. Allen has robo-signed, purportedly as an officer of MERS, for at least 11 different mortgage companies.

210. In each case discussed above, Defendants conspired with the Ohio law firm of Lerner Sampson & Rothfuss, which prepared the assignment documentation. On January 5, 2011, former Ohio Attorney General Marc Dann filed a class action against the Lerner Sampson firm, alleging that it "has engaged in the pattern of filing and prosecuting foreclosure actions notwithstanding the fact that their clients lack standing to bring such actions." *See Turner v. Lerner, Sampson & Rothfuss*, 11-CV-00056 (Cuyahoga Cty. January 5, 2011).

211. Upon information and belief, Stacy E. Spohn and Beth Ann Cottrell are employees at LPS who, on at least 12 occasions in 2010 alone, purported to execute assignments on behalf of JPMC Bank or Chase Bank USA in connection with foreclosure proceedings in

Franklin County, Ohio.

212.     As discussed above, Defendant JPMC Bank, WaMu Bank, and others have committed overt acts in furtherance of a conspiracy to cover up the false representations in the WaMu Offering Materials regarding Transfer of Title.

### C.     Fraud and Tortious Interference With Trustee Obligations

213.     As an additional means of furthering the cover-up, Defendants and other servicers for the loans underlying the Certificates have for years conspired to provide false monthly reports (often referred to as remittance reports), to ignore contractual obligations to disclose breaches of representations and warranties to each Trustee and others, and to file false reports and certifications with the SEC.

214.     Pooling and servicing agreements, such as those for the Certificate securitizations, require servicers to deliver to trustees and RMBS holders monthly remittance reports describing the performance of underlying loans.  Under item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset representations or warranties or transaction covenants."  *See* 17 C.F.R. § 229.1121(a)(12).  Such disclosure is also required among parties to the pooling and servicing agreements, which require disclosure to all parties thereto, including the trustee.

215.     Pooling and servicing agreements also require that the Transfer of Title requirements be met for each underlying loan.  If any such requirement is not met, then the trust must demand that the seller or originator repurchase the defective loan or provide a qualifying substitute loan.

216.     For the first year of its existence, each trust was a reporting entity for purposes of the Securities Exchange Act of 1934.  At the end of that year, the depositors filed with the SEC

with respect to each Trust a report on Form 10-K certifying, among other things, that collateral securing the loans held by the Trust had been maintained as required by the relevant transaction agreements, and that pool assets and related documents were safeguarded. *See* SEC Regulation AB, 17 C.F.R § 229.1122(d)(4)(i) and (ii). Defendants JPMAC and WMAAC filed such forms with respect to each of the JPM Offerings and WaMu Offerings, respectively. These filings were false and misleading in that they failed to disclose Defendants' many breaches of representations and warranties regarding the underwriting of the mortgage loans and their obligations as to Transfer of Title.

217. Pooling and servicing agreements further provide that all parties to the agreement – depositor, servicer, and trustee – must disclose to the others any breach of any representation and warranty or violation of covenants regarding Transfer of Title that materially adversely affects the interests of holders of certificates.

218. Defendant JPMC Bank (and, prior to September 25, 2008, WaMu Bank) and other servicers of loans underlying the Certificates have never disclosed to any trustee or depositor, in a remittance report or otherwise, the massive number of loans for which Defendants provided false representations and warranties regarding the underlying mortgage loans and breached their obligations as to Transfer of Title. Further, in the years since the closing of the Certificate securitizations, despite dealing with thousands of defaulted and modified loans, none of the servicers have ever disclosed that a large volume of the underlying loans violated requirements regarding Transfer of Title.

219. In violation of the disclosure provisions of the pooling and servicing agreements for the Certificate securitizations and the representations in the Offering Materials, Defendants have never reported to the Trustees (or anyone else) Defendants' breach of representations and

warranties regarding the underwriting of the mortgage loans and their failure to meet their obligations for Transfer of Title.

220.    The effect and objective of these multiple violations of disclosure obligations concerning breaches of representations and warranties and requirements as to Transfer of Title has been to defraud the trustees, or to permit the trustees to engage in conscious eye-shutting, thereby precluding the proper functioning of the trustees on behalf of certificateholders and tortiously interfering with the rights of holders of Certificates as third-party beneficiaries of the pooling and servicing agreements.

221.    By concealing their breaches of representations and warranties concerning the underlying loans and violations of covenants concerning Transfer of Title for years, Defendants and other loan servicers caused the Trustees to fail (or facilitated their failure) to perform their duties under the pooling and servicing agreements (i) to disclose breaches of representations and warranties and transaction covenants and (ii) to assure that demands for repurchase or substitution of the loans are made to appropriate Defendants (or to the originators).

222.    In the face of trustee inaction, on December 16, 2011 institutional holders of more than 25% of the voting rights in various securitization trusts issued by Defendants, including the trusts for the JPMMT 2005-S3, JPMAC 2006-S1, WMALT 2005-7, WMALT 2005-9, and WMALT 2007-OA3 Offerings at issue in this action, sent a letter pursuant to the applicable pooling and servicing agreements instructing the trustees for the various trusts to open an investigation into the large volume of defective loans securing the RMBS and misconduct by servicers of those loans, and to take other appropriate action on behalf of certificateholders.

223.    The conspiracy of silence among Defendants (and, prior to September 25, 2008, WaMu Bank) and other loan servicers interfered with the rights of Certificateholders as third-

party beneficiaries of the pooling and servicing agreements.  It was also an essential piece of Defendants' scheme to offload defective mortgage loans on investors such as Western & Southern.  A core responsibility of the trustee under a pooling and servicing agreement is to ensure that, once it has received notice, mortgage loans in material breach of the agreement's representations and warranties and Transfer of Title covenants are "put back" to the appropriate party.  Depending on the deal that is either the depositor (in this case, Defendants JPMAC and WMAAC, respectively for the JPM Certificates and WaMu Certificates) or seller (Defendants JPM Mortgage Acquisition and WaMu Bank or WMMSC, respectively) or the originator (which is generally an affiliate of the loan servicer).  The depositor and seller, in turn, can "put back" the defective loans to the mortgage originator.  For these reasons, all or substantially all of the profit from offloading defective mortgage loans on RMBS investors like Western & Southern would be disgorged if properly functioning trustees ensured that defective loans were ultimately "put back" to the mortgage originators.

224.    Western & Southern and other holders of Certificates have been damaged by their longstanding tortious interference and cover-up, in that such misconduct has severely damaged the value of the Certificates by, among other things, greatly increasing losses on loans that rather than being put back to the depositors, JPMAC and WMAAC, have defaulted and then languished in extended foreclosure proceedings.

## IX.    DEFENDANTS RECEIVED MORTGAGE INSURANCE KICKBACKS

225.    JPM engaged insurers such as PMI Mortgage Insurance Company, Mortgage Guaranty Insurance Corporation, Genworth Mortgage Insurance Corporation, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance (collectively, the "PMI Insurers") in connection with mortgage

loans it originated and serviced, including loans underlying the JPM Certificates.

226.    WaMu also engaged insurers such as the PMI Insurers in connection with mortgage loans it originated and serviced, including loans underlying the WaMu Certificates.

227.    JPM utilized its captive reinsurer, Cross Country Insurance Company ("Cross Country"), to extract kickbacks from the PMI Insurers.

228.    WaMu utilized its captive reinsurer, WM Mortgage Reinsurance Company ("WM Reinsurance"), to extract kickbacks from the PMI Insurers.

229.    These kickbacks were illegal under the Real Estate Settlement Procedures Act of 1974 ("RESPA").

230.    WaMu and JPM used their leverage as two of the nation's largest mortgage lenders to force PMI insurers to pay for the opportunity to provide mortgage insurance on loans that they originated.  Because these payments amounted to illegal kickbacks under RESPA, WaMu and JPM disguised them by entering into reinsurance contracts with their respective captive reinsurers, WM Reinsurance and Cross Country (the "Captive Reinsurers"), pursuant to which the PMI insurers paid the Captive Reinsurers a share of the premiums they received under their mortgage insurance policies.

231.    At all relevant times, each of the PMI Insurers was authorized to do business in Ohio.

232.    Certain loans underlying the JPM Certificates are secured by properties in Ohio and covered by the PMI Insurers' policies and, on information and belief, reinsured by Cross Country.

233.    Certain loans underlying the WaMu Certificates are secured by properties in Ohio and covered by the PMI Insurers' policies and, on information and belief, reinsured by WM

Reinsurance.

234.     The "reinsurance contracts" between the PMI Insurers and the Captive Reinsurers were sham reinsurance contracts because neither Cross Country nor WM Reinsurance assumed meaningful risk.

235.     From 2004 to 2008, Cross Country collected at least $428 million in reinsurance premiums from private mortgage insurers and paid only approximately $7 million in losses.

236.     From 1999 to 2008, WM Reinsurance collected $295 million in reinsurance premiums from private mortgage insurers and paid $0 dollars in losses.

237.     In September 2011, the *American Banker* issued a series of reports on an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD") that had uncovered illegal reinsurance arrangements by several major mortgage loan originators and their captive reinsurers, and resulted in a referral by HUD to the Department of Justice for criminal prosecution.

238.     On information and belief, the sham "reinsurance arrangement" between the PMI Insurers and the Captive Reinsurers was consistent with the wrongful conduct found by HUD.

239.     The failure of the Offering Materials to disclose the illegal kickback scheme was a material omission that rendered the Offering Materials materially misleading.

240.     In addition, the Offering Materials contain misleading partial disclosures regarding WaMu Defendants' procurement of mortgage insurance.  For example, The Prospectus Supplement for WMALT 2007-OA3 states:

> For each WMB Loan with an original loan-to-value ratio greater than 80%, the pooling agreement generally will require WMB to keep in full force and effect a primary mortgage insurance policy.

WMALT 2007-OA3 Prospectus Settlement at S-79.  The same or similar representations

66

appeared in the Offering Materials for each of the Certificates, as set forth in detail in Exhibit F.

241.    Those statements were materially misleading because they failed to disclose that Defendants procured mortgage insurance through the illegal kickback scheme described above.

242.    Moreover, Defendants also run an insurance scam involving "force placed" property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happens the loan servicer, usually JPMC Bank (and, with respect to the WaMu Certificates prior to September 25, 2008, WaMu Bank), replaces the policies with new insurance policies often issued by affiliated insurance companies and then "charges" the trust (by deducting amounts otherwise payable to certificateholders) exorbitant amounts that are several multiples of the premium under the original policy.  In January 2012, the New York State Department of Financial Services issued subpoenas to loan servicers that imposed "force-placed" insurance on borrowers, including JPMC Bank.

## X.    DEFENDANTS ENGAGED IN BANK FRAUD

243.    Fannie Mae, Freddie Mac and the Government National Mortgage Association ("Ginne Mae") (collectively, the "GSEs") are financial institutions under 18 U.S.C. § 1344 (Bank Fraud).

244.    Defendants defrauded the GSEs in connection with the sale of billions of dollars of unsecuritized whole loans and the sale of billions of dollars of RMBS.

245.    In 2005 through 2008, JPM sold approximately $380 billion of unsecuritized whole loans to the GSEs.

246.    In 2005 through 2008, WaMu sold approximately $165 billion of unsecuritized whole loans to GSEs.

247.    The agreements whereby the GSEs purchased whole loans from Defendants include loan-level representations and warranties by Defendants as to, among other things, loan origination guidelines, borrower ability to repay, loan-to-value ratios, owner occupancy, and completeness of loan documentation.  The agreements further provide that if any such representation and warranty is found to be inaccurate as to any loan, then the buyer may require Defendants to repurchase the defective loan.

248.    To date, the GSEs have demanded that JPM and WaMu repurchase more than $10 billion of loans that breached sales agreement representations and warranties.  As of December 31, 2010, JPM recognized $5 billion in outstanding repurchase liabilities to GSEs and estimated that liabilities for future repurchase demands could be $2 billion.

249.    Just as Defendants knowingly misrepresented material facts and knowingly omitted material facts as to loans underlying the Certificates with an intent to mislead Western & Southern, so Defendants knowingly misrepresented material facts and knowingly omitted material facts as to whole loans with an intent to mislead the GSEs.

250.    The GSEs justifiably relied on such misrepresentations and omissions, and as a direct and proximate result of such reliance, the GSEs have each suffered damages in connection with the decline in the value of the loans, and reduced payment of principal and interest.

251.    Defendants also defrauded Fannie Mae and Freddie Mac in the sale of RMBS.

252.    On September 4, 2011, the FHFA, acting as conservator on behalf of Fannie Mae and Freddie Mac, brought an action for securities fraud against Defendants.  The lawsuit alleges that in connection with sales of over $33 billion of RMBS to Fannie Mae and Freddie Mac, Defendants falsely represented, among other things, that underlying loans met standard underwriting guidelines, that borrowers had the ability to repay underlying loans, and that homes

securing underlying loans were legitimately appraised, all as further described in the FHFA

complaint.  *See Federal Housing Finance Association, as Conservator for the Federal National*

*Mortgage Association and the Federal Home Loan Mortgage Corporation v. JPMorgan Chase*

*& Co., et al.*, 11-cv-6188 (S.D.N.Y.).

253.    The FHFA lawsuit seeks billions of dollars in damages, including punitive

damages against Defendants for "intentional and wanton" misconduct.

## XI.    WESTERN & SOUTHERN'S PURCHASES OF DEFENDANTS' CERTIFICATES

254.    Western & Southern purchased over $202 million of Certificates from October 5,

2005 through October 11, 2007.  These purchases are each listed individually in Exhibit A,

attached hereto.

## XII.    WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES

255.    In purchasing the Certificates, Western & Southern relied on the representations

in the Offering Materials described herein, including representations regarding loan origination

practices, property appraisals, and Transfer of Title.  These representations materially altered the

total mix of information upon which Western & Southern made its purchasing decisions.

256.    But for the misrepresentations and omissions in the Offering Materials, Western

& Southern would not have purchased the Certificates, and those representations and omissions

were material to Western & Southern's decision to invest in the Certificates.

257.    The false and misleading statements of material facts and omissions of material

facts in the Offering Materials directly caused Western & Southern's damages because the

Certificates were in fact far riskier than described.  The loans underlying the Certificates

experienced default and delinquency at extraordinarily high rates due to the lack of proper

diligence and abandonment of the underwriting standards represented in the Offering Materials.

And when the inevitable defaults followed, many of the underlying loans could not be foreclosed or modified on a timely and efficient basis because Defendants systematically failed to meet requirements for Transfer of Title (as past practices show they intended at the time the Offering Materials were filed). Western & Southern's losses on the Certificates to date and projected future losses have been much greater than they would have been if the loans were as Defendants represented them to be. Western & Southern's losses were further exacerbated by each of the acts of cover-up, fraudulent concealment and tortious interference described above.

258. There are several ways of valuing a mortgage-backed security. One way is secondary-market pricing. Though the market "seized up" during the financial crisis, it has since partially recovered, and there is a functioning secondary market for mortgage-backed securities such as the Certificates.

259. Western & Southern has incurred substantial losses in the secondary market value of the Certificates. Further, the income and principal payments that Western & Southern received have been, or will be, less than Western & Southern expected under the "waterfall" provisions of the securitizations. The Certificates would have held their value had the loans underlying the Certificates been as represented in the Offering Materials.

## XIII. LIABILITY OF THE SPONSORS, DEPOSITORS, AND UNDERWRITERS AS SELLERS OR SALE PARTICIPANTS

260. The Defendants that qualify as sellers of securities or that otherwise participated in the sale of securities are the sponsors (JPM Mortgage Acquisition, WMMSC and WaMu Bank (now JPMC Bank)), the depositors (JPMAC and WMAAC), and underwriters (J.P. Morgan Securities and WCC). Each of these is liable for misrepresentations in the Offering Materials under ORC §§ 1707.41, 1707.43 and 1707.44.

261. The JPM Defendants are also liable as primary violators of Section 11 of the 1933

Act in connection with the JPMAC 2006-WF1 and JPMMT 2007-CH1 offerings.

262.    Defendant JPM Mortgage Acquisition was the sponsor for the JPM Offerings.  It originated or acquired the mortgage loans underlying the JPM Certificates, and then sold the loans to JPMAC, the depositor for the JPM Offerings.

263.    Defendant JPMAC purportedly transferred or otherwise conveyed the loans to the Trusts for the JPM Offerings pursuant to pooling and servicing agreements that established the JPM Offerings' various certificate tranches.

264.    The JPM Certificates were sold to Defendant J.P. Morgan Securities, the underwriter for the JPM Offerings.  J.P. Morgan Securities re-sold the JPM Certificates to Western & Southern and other investors.

265.    Each of the JPM Morgan Defendants participated in the creation of the JPM Offering Materials, and each profited from the sales of the JPM Certificates.

266.    Defendants WMMSC and WaMu Bank (now JPMC Bank) were the sponsors for the WaMu Offerings.  They originated or acquired the mortgage loans underlying the WaMu Certificates, and then sold the loans to WMAAC, the depositor for the WaMu Offerings.

267.    Defendant WMAAC purportedly transferred or otherwise conveyed the loans to the Trusts for the WaMu Offerings pursuant to pooling and servicing agreements that established the WaMu Offerings' various certificate tranches.

268.    The WaMu Certificates were sold to Defendant WCC, the underwriter for the WaMu Offerings.  WCC re-sold the WaMu Certificates to Western & Southern and other investors.

269.    Each of the WaMu Defendants participated in the creation of the WaMu Offering Materials, and each profited from the sales of the WaMu Certificates.

270. The Trusts issued the securitization certificates, including the Certificates. The Trusts had no assets of their own, and were mere agents of the particular depositor for each offering, created for the sole purposes of holding the loans underlying the Certificates.

## IX. WESTERN & SOUTHERN DID NOT KNOW AND COULD NOT HAVE KNOWN OF ITS CLAIMS PRIOR TO JUNE 2009

271. Western & Southern purchased its Certificates to hold them to maturity for long term interest income. Five of the six Western & Southern plaintiffs are insurance companies that are required to maintain certain levels of loss reserves. Statutory accounting rules impact the types of investments these insurers can hold in order to meet certain reserve requirements. As a result, Western & Southern generally purchased only triple-A rated (or the equivalent) mortgage-backed securities.

272. All of the Certificates were originally triple-A rated or the equivalent.

273. From at least 2007-2009, Defendants also provided, directly or indirectly, monthly reports containing loan level data for use by Western & Southern in its proprietary model to analyze the probability of default and associated loss severity for loans underlying the Certificates.

274. After Western & Southern acquired the Certificates, it received monthly data from servicers of the loans underlying the Certificates. The monthly data, on which Western & Southern relied, was materially false (as discussed above) and fraudulently concealed from Western & Southern the misconduct described herein.

275. When Lehman Brothers filed for bankruptcy in 2008, the market for securitized assets of many types – mortgage loans, credit card debt, auto loans, student loans (to name a few) – essentially stopped trading. Based in part on the flawed information it had received from Defendants, Western & Southern believed the cessation of trading was due to fears of a

cataclysmic collapse of the financial markets, and did not fairly reflect the intrinsic value of the underlying Certificates. Additionally, third-party pricing sources were not equipped to accurately determine idiosyncratic deal risk. Accordingly, in fall 2008, Western & Southern developed its proprietary "fair value pricing" model, which it used to determine the value of the Certificates.

276. Western & Southern used both its loan-level model and its fair value pricing model through June 2009 in an ongoing effort to determine the likelihood and magnitude of any losses it could expect to sustain with respect to the Certificates. In turn, Western & Southern used that analysis to determine whether or not to impair certain securities in its internal accounting as required under applicable insurance regulations.

277. In fact, within a few months after the Lehman Brothers bankruptcy (by early 2009), changes in accounting rules required Western & Southern to analyze for impairment purposes the Certificates based on the expected cash flows to be received under those Certificates discounted to present value using the same discount rate as the applicable yield on such certificates at the time of their acquisition. By early 2009, Western & Southern was aware of the impending accounting change (which was adopted on September 14, 2009) and therefore analyzed the Certificates for impairment purposes using (i) expected cash flows on the Certificates determined by reference to the actual performance of the collateral underlying the Certificates it owned, which were then (ii) discounted to present value using the yield on the Certificates at the time of purchase. To corroborate the loss rates produced by its proprietary model, Western & Southern compared its loss rates to those disclosed by, among others, other RMBS dealers, ratings agencies, and other third parties. Using such analysis, and relying in part upon the information provided by Defendants, as of June 2009, Western & Southern had not

impaired any of the Certificates it owned (meaning as a "buy and hold" investor Western &
Southern did not have notice that it would take material losses on any Certificates it had not yet
impaired).

278.    On November 17, 2009, the National Association of Insurance Commissioners
("NAIC") announced that it had retained the giant fixed-income asset manager PIMCO to
develop a cash-flow projection valuation model for determining appropriate risk based capital
requirements for residential mortgage-backed securities.  The NAIC announcement stated:

> "Creating this new assessment process is an important step toward providing
> more transparency about these complex securities," said Roger Sevigny, NAIC
> President and New Hampshire Insurance Commissioner.  "This unique treatment
> of residential mortgage-backed securities distinguishes the NAIC as the only
> regulator to analyze these securities and require capital based upon the expected
> loss amount for a particular company."
>
> PIMCO will work with regulators to develop a set of price ranges for designations
> one through six to be used by insurers in their statutory financial statements and to
> calculate the risk-based capital charges for each specific security they own.  These
> designations will apply only to year-end 2009 reporting.

279.    Prior to PIMCO's work, there was no market standard approach sufficient to
value the Certificates.

280.    Prior to June 2009, Western & Southern had no reason to expect that its highly-
rated senior Certificates would not weather what was then known about Defendants' faulty loan
underwriting practices.

281.    Based on subordination, over-collateralization and/or excess spread data reported
in the Offering Materials, Western & Southern could not suffer a net loss on the Certificates until
an aggregate loss of an unprecedented amount of loan principal, depending on the deal.  In fact,
Western & Southern did not suffer any diminution in interest or principal payments prior to May
2010 and only seven of Western & Southern's thirteen tranches have suffered principal or

interest shortfalls to date (though it is now highly likely that shortfalls will expand dramatically in the near future).

282.     Western & Southern did not know, and could not have known, that Defendants' statements regarding Transfer of Title were materially false and misleading, that Defendants were already engaged in a practice of perjury and forgery in foreclosure proceedings prior to Western & Southern's purchase of the Certificates, that certain Defendants were engaged in two different fraudulent insurance schemes, or that Defendants had misrepresented the utility of the MERS system before learning the facts described in Sections VI and VII.  And, as set forth in Section VII, Defendants' conspiracy to cover-up their failure to comply with requirements concerning Transfer of Title only began to surface in the second half of 2010.

## FIRST CAUSE OF ACTION
### (Violation of Ohio Securities Act, ORC § 1707.41)

283.     Western & Southern realleges each allegation above as if fully set forth herein.

284.     This claim is brought under the Ohio Securities Act, ORC § 1707.41 against all Defendants.  Defendants (a) offered securities for sale by a written or printed circular, prospectus, or advertisement, and received profits accruing from the sale of the certificates; (b) Western & Southern purchased these securities relying on such written or printed circular, prospectus, or advertisement; and (c) such written or printed circular, prospectus, or advertisement contained untrue statements of material fact and omitted material facts.

285.     Defendants violated ORC § 1707.41.  By reason of this violation, Western & Southern has suffered damages in connection with the decline in the value of the Certificates and reduced payments of principal and interest.

## SECOND CAUSE OF ACTION
### (Violation of Ohio Securities Act, ORC § 1707.44(B)(4))

286. Western & Southern realleges each allegation above as if fully set forth herein.

287. This claim is brought under the Ohio Securities Act, ORC § 1707.44(B)(4), against all Defendants. Defendants made or caused to be made false representations concerning material and relevant facts in the Offering Materials for the purpose of selling securities in Ohio.

288. Defendants knowingly made such false representations in that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

289. Defendants violated ORC § 1707.44(B)(4). As a direct and proximate result of that violation, Western & Southern has suffered damages in connection with the decline in the value of the Certificates and reduced payments of principal and interest.

## THIRD CAUSE OF ACTION
### (Violation of Ohio Securities Act, ORC § 1707.44(J))

290. Western & Southern realleges each allegation above as if fully set forth herein.

291. This claim is brought under the Ohio Securities Act, ORC § 1707.44(J), against all Defendants. Defendants, with a purpose to deceive, knowingly made or caused to be made materially false statements in the Offering Materials concerning the value of the Certificates.

292. Defendants knowingly made such false statements in that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

293. Defendants have violated ORC § 1707.44(J). As a direct and proximate result of that violation, Western & Southern has suffered damages in connection with the decline in the value of the Certificates, and reduced payments of principal and interest.

## FOURTH CAUSE OF ACTION
### (Violation of Ohio Securities Act, ORC § 1707.44(G))

294. Western & Southern realleges each allegation above as if fully set forth herein.

295.     This claim is brought under the Ohio Securities Act, ORC § 1707.44(G), against all Defendants.  Defendants knowingly engaged in acts prohibited in the Ohio Securities Act in selling the Certificates to Western & Southern.

296.     By virtue of the foregoing, Defendants violated ORC § 1707.44(G).  As a direct and proximate result of that violation, Western & Southern has suffered damages in connection with the decline in the value of the Certificates and reduced payments of principal and interest.

## FIFTH CAUSE OF ACTION
### (Repayment Pursuant to Ohio Securities Act, ORC § 1707.43)

297.     Western & Southern realleges each allegation above as if fully set forth herein.

298.     This claim is brought under the Ohio Securities Act, ORC § 1707.43, against all Defendants.  As set forth in the First, Second, Third, and Fourth Causes of Action, Defendants made sales in violation of the Ohio Securities Act or participated in or aided the sellers in making such sales.

299.     Western & Southern is entitled to void the sale of Certificates and to recover from Defendants the full amount paid for the Certificates and all taxable court costs.

## SIXTH CAUSE OF ACTION
### (Tortious Interference With Contract)

300.     Western & Southern realleges each allegation above as if fully set forth herein.

301.     This claim is brought against Defendants JPMC Bank, JPM Mortgage Acquisition, JPMAC, WMMSC, and WMAAC, each of which acted as sponsor, depositor or servicer for one or more of the JPM Offerings or WaMu Offerings.

302.     As a Certificateholder, Western & Southern is an intended third-party beneficiary of the pooling and servicing agreements for the respective Trusts.

303.     Defendants were at all relevant times aware of the pooling and servicing

agreements for the respective Trusts and Certificateholders' third-party beneficiary rights thereto.

304.    Upon the receipt of notice from the depositor or the servicer of (i) a breach of representations and warranties or (ii) failure to meet covenants regarding Transfer of Title in the pooling and servicing agreements for the Trusts, the Trustee for each Trust is required to take certain actions for the benefit of Western & Southern and other Certificateholders, including disclosing such violations to Certificateholders and demanding that Defendants (or, in some cases, the initial originator) repurchase the defective loans.

305.    Defendants have knowingly concealed from the Trustees Defendants' breach of representations and warranties in the pooling and servicing agreements for the Trusts regarding the underlying loans and failure to meet requirements for Transfer of Title.

306.    By concealing breaches of representations and warranties concerning loans underlying the Certificates, Defendants and other servicers knowingly caused or facilitated the failure of Trustees to perform their duties under the pooling and servicing agreements to disclose breaches of representations and warranties and demand loan repurchases.

307.    Defendants' actions were without privilege or justification.

308.    As a direct and proximate result of Defendants' tortious interference with Western & Southern's rights as a third-party beneficiary of the pooling and servicing agreements for the Trusts, Western & Southern has suffered damages in connection with the decline in the value of the Certificates and reduced payments of principal and interest.

### SEVENTH CAUSE OF ACTION
### (Common Law Fraud)

309.    Western & Southern realleges each allegation above as if fully set forth herein.

310.    This claim is brought against all Defendants.

311.    Defendants knowingly misrepresented material facts and knowingly omitted material facts with an intent to mislead Western & Southern in connection with sale of the Certificates.

312.    As a separate and independent fraud, Defendant JPMC Bank and other servicers acted together to make false and misleading statements to securitization trustees (including the Trustees) in order to fraudulently conceal breaches of representations and warranties, and to prevent such trustees from discharging their duties by making disclosures to Certificateholders and requiring repurchase of defective mortgage loans.

313.    Western & Southern justifiably relied on such misrepresentations and omissions.

314.    As a direct and proximate result of such reliance, Western & Southern has suffered damages in connection with the decline in the value of the Certificates, and reduced payments of principal and interest.

### EIGHTH CAUSE OF ACTION
### (Common Law Conspiracy – WaMu Defendants)

315.    Western & Southern realleges each allegation above as if fully set forth herein.

316.    This claim is brought against the WaMu Defendants and JPMC Bank.

317.    The WaMu Defendants formed a malicious combination among themselves; other current or former affiliates; other originators and servicers of mortgage loans underlying the WaMu Certificates to violate the Ohio Securities Act, to violate the Ohio Corrupt Activities Act, and to engage in common law fraud by selling the WaMu Certificates to Western & Southern through material misstatements and omissions.  The conspiracy continued following the sale of the WaMu Certificates with overt acts (each of which further injured plaintiffs) by the WaMu Defendants and JPMC Bank (which joined the conspiracy after its acquisition of WaMu), designed to unlawfully conceal and cover-up Defendants' material misstatements and omissions

and to unlawfully garner additional financial gain for the participants in the conspiracy. As described herein, such acts involved insurance and foreclosure fraud with respect to the mortgage loans underlying the WaMu Certificates and violated the Ohio Corrupt Activities Act, Ohio common law, Ohio insurance law, and Ohio's laws against perjury and forgery (which were routinely violated by JPMC Bank and its agents in Ohio foreclosure proceedings), and tortious interference with Western & Southern's rights as a third-party beneficiary under the pooling and servicing agreements for the Trusts (the acts referred to in this paragraph and above are referred to as the "WaMu Conspiracy").

318.    Given the co-conspirators' distinct roles in the conspiracy, the WaMu Conspiracy could not have been executed by any of the co-conspirators acting alone.

319.    The overt acts of the WaMu Conspiracy included misrepresentations in the sale of securities in violation of the Ohio Securities Act, insurance fraud, and ongoing efforts to fraudulently conceal and cover-up the WaMu Defendants' misconduct and to obtain additional financial gain for the participants in the conspiracy.

320.    The WaMu Conspiracy has caused Western & Southern extensive injury arising out of its purchase and the subsequent decline in value of the WaMu Certificates and reduced payments of principal and interest.

## NINTH CAUSE OF ACTION
### (Common Law Conspiracy – JPM Defendants)

321.    Western & Southern realleges each allegation above as if fully set forth herein.

322.    This claim is brought against the JPM Defendants.

323.    The JPM Defendants formed a malicious combination among themselves; CHF; and other originators and servicers of mortgage loans underlying the JPM Certificates to violate the Ohio Securities Act, the Ohio Corrupt Activities Act, and to engage in common law fraud by

selling the JPM Certificates to Western & Southern through material misstatements and omissions. The conspiracy continued following the sale of the JPM Certificates with overt acts (each of which further injured plaintiffs) by the JPM Defendants to unlawfully conceal and cover-up Defendants' material misstatements and omissions and to unlawfully garner additional financial gain for the participants in the conspiracy. As described herein, such acts involved insurance and foreclosure fraud with respect to the mortgage loans underlying the JPM Certificates and violated the Ohio Corrupt Activities Act, Ohio common law, Ohio insurance law, and Ohio's laws against perjury and forgery (which were routinely violated by JPMC Bank and its agents in Ohio foreclosure proceedings), and tortious interference with Western & Southern's rights as a third-party beneficiary under the pooling and servicing agreements for the Trusts (the acts referred to in this paragraph and above are referred to as the "JPM Conspiracy")

324. Given the co-conspirators' distinct roles in the conspiracy, the JPM Conspiracy could not have been executed by any of the co-conspirators acting alone.

325. The overt acts of the JPM Conspiracy included misrepresentations in the sale of securities in violation of the Ohio Securities Act, insurance fraud, and ongoing efforts to fraudulently conceal and cover-up the JPM Defendants' misconduct and to obtain additional financial gain for the participants in the conspiracy.

326. The JPM Conspiracy has caused Western & Southern extensive injury arising out its purchase and the subsequent decline in value of the JPM Certificates and reduced payments of principal and interest.

## TENTH CAUSE OF ACTION
### (Violation of Ohio Corrupt Activities Act, ORC § 2923.31 - 2923.36 – WaMu Enterprise)

327. Western & Southern realleges each allegation above as if fully set forth herein.

328. This claim is brought against the WaMu Defendants and Defendant JPMC Bank,

each of which injured Western & Southern through the overt acts described herein undertaken in furtherance of the enterprise described below.

329.    The WaMu Defendants, WaMu Bank, and, following JPM's acquisition of WaMu Bank's business as a going concern, Defendant JPMC Bank were members of an enterprise that included themselves and certain correspondent lenders and brokers supplying mortgage loans to the WaMu Defendants; appraisers of real property securing WaMu mortgage loans; servicers of loans underlying the WaMu Certificates (including, in particular, JPMC Bank) that engaged in forgery and perjury in foreclosure proceedings to cover up WaMu's failure to meet Transfer of Title requirements and extracted further profits for the enterprise through fraudulent over-charges in violation of applicable law and the "force placed" insurance scheme described above; foreclosure law firms that promoted forgery and perjury to cover up WaMu's faulty mortgage assignments and loan-file transfers; and PMI insurers that paid unlawful kickbacks to WaMu (the "WaMu Enterprise").

330.    The WaMu Enterprise was an association-in-fact in which members played distinct roles for the common purpose of profiting from the financing, origination, sale, securitization, and servicing of improperly or fraudulently underwritten mortgage loans.

331.    The participants in the WaMu Enterprise engaged in a continuing pattern of corrupt activity spanning several years by, among other things originating mortgage loans without regard for underwriting standards (including borrower ability to repay and legitimate property appraisals) and through a course of misconduct directed against borrowers, including predatory lending and private mortgage insurance fraud; defrauding banks that funded such loans and other financial institutions that purchased the loans after they were funded (including Fannie Mae and Freddie Mac); packaging those loans into RMBS; selling those securities through

materially misleading Offering Materials; and servicing mortgage loans by means of, among
other improper acts, false and fraudulent filings in foreclosure proceedings, "force placed"
insurance and other fraudulent charges to defaulting borrowers; and making false and misleading
statements to securitization trustees in order to fraudulently conceal breaches of representations
and warranties, and to prevent such trustees from requiring repurchase of defective mortgage
loans.

332.    The activities described above were continuous and directly related to the WaMu
Enterprise's scheme to profit from the origination, sale, securitization, and servicing of defective
mortgage loans.

333.    As examples of the members' distinct roles in furtherance of the WaMu
Enterprise:

(i)     **WaMu Bank** raised capital, originated and funded mortgage loans, acted as
        sponsor for certain RMBS offerings, participated in the preparation of offering
        materials, until September 25, 2008 serviced mortgage loans held by, among
        others, securitization trusts for RMBS offerings, and, as servicer, engaged in
        widespread misconduct in foreclosure proceedings, including perjury, to cover up
        WaMu Defendants' failure to comply with pooling and servicing agreement
        requirements for Transfer of Title, fraudulently concealed breaches of
        representations and warranties in order to prevent securitization trustees from
        requiring repurchase of defective mortgage loans, and extracted further profits for
        the enterprise through fraudulent over-charges to borrowers and the "force placed"
        insurance scheme described above;

(ii)    **WMMSC** acquired mortgage loans for securitization, acted as the sponsor for
        RMBS offerings, and directed the activities of WMAAC;

(iii)   **WMAAC** purchased mortgage loans from WMSSC and WaMu Bank, acted as the
        depositor for RMBS offerings, filed materially misleading offering materials and
        reports with the SEC, and fraudulently concealed breaches of pooling and servicing

agreement representations and warranties in order to prevent securitization trustees from requiring repurchase of defective mortgage loans;

(iv) **WCC** underwrote and sold RMBS through the use of false and misleading offering materials; and

(v) **JPMC Bank**, after September 25, 2008 serviced mortgage loans held by securitization trusts for RMBS offerings, and, as servicer, engaged in widespread misconduct in foreclosure proceedings, including perjury, to cover up WaMu Defendants' failure to comply with pooling and servicing agreement requirements for Transfer of Title, fraudulently concealed breaches of representations and warranties in order to prevent securitization trustees from requiring repurchase of defective mortgage loans, and extracted further profits for the enterprise through fraudulent over-charges to borrowers and the "force placed" insurance scheme described above.

334. The participation of separately incorporated WaMu affiliates in the WaMu Enterprise facilitated, and was necessary to, the purpose and unlawful activity of the WaMu Enterprise because, among other reasons, the securitization process requires multiple legal entities to act as sponsor, depositor, underwriter, issuer and servicer, and providing such functions through affiliate entities enhanced (i) the efficiency of the WaMu Enterprise by allowing the enterprise to avoid the due diligence and checks and balances that would have been imposed by third-parties and (ii) the ability of the WaMu Enterprise to operate without disclosure of its unlawful activities to investors, regulators and others.

335. The WaMu Defendants and JPMC Bank conducted or participated in, directly or indirectly, the affairs of the WaMu Enterprise through a pattern of corrupt activity that included (1) multiple violations of the Ohio Securities Act, (2) multiple acts of forgery or falsification in violation of ORC § 2913.31, (3) multiple acts of perjury in violation of ORC § 2921.11, (4) multiple violations of ORC § 2913.47 (Insurance Fraud), (5) multiple violations of 18 U.S.C. § 1344 (Bank Fraud), and (6) multiple acts of mail and wire fraud in violation of 18 U.S.C. §§

84

1341, 1343, all as elsewhere alleged with particularity herein.

336.     The acts of the WaMu Enterprise injured or threatened to injure Western &
Southern.

337.     As a result of the foregoing, Western & Southern has suffered damages according
to proof and is entitled to recover treble damages and attorneys' fees and expenses.

## ELEVENTH CAUSE OF ACTION
### (Violation of Ohio Corrupt Activities Act, ORC § 2923.31 - 2923.36 – JPM Enterprise)

338.     Western & Southern realleges each allegation above as if fully set forth herein.

339.     This claim is brought against the JPM Defendants.

340.     The JPM Defendants were members of an enterprise that included themselves,
CHF, JPMorgan Chase & Co., and other originators of loans underlying JPM mortgage-backed
securities and their servicer affiliates; appraisers of real property securing Defendants' mortgage
loans; foreclosure law firms that promoted forgery and perjury in attempting to cover up
Defendants' failure to comply with requirements for Transfer of Title; and PMI insurers that paid
unlawful kickbacks to JPM (the "JPM Enterprise").

341.     The JPM Enterprise was an association-in-fact in which members played distinct
roles for the common purpose of profiting from the financing, origination, securitization, and
servicing of improperly or fraudulently underwritten mortgage loans.

342.     The participants in the JPM Enterprise engaged in a continuing pattern of corrupt
activity spanning several years by, among other things originating mortgage loans without regard
for underwriting standards (including borrower ability to repay and legitimate property
appraisals) and through a course of misconduct directed against borrowers, including private
mortgage insurance fraud; defrauding banks that funded such loans and other financial
institutions that purchased the loans after they were funded (including Fannie Mae and Freddie

Mac); packaging those loans into RMBS; selling those securities through materially misleading Offering Materials; and servicing mortgage loans by means of, among other improper acts, false and fraudulent filings in foreclosure proceedings, "force placed" insurance and other fraudulent charges to defaulting borrowers; and making false and misleading statements to securitization trustees in order to fraudulently conceal breaches of representations and warranties, and to prevent such trustees from requiring repurchase of defective mortgage loans.

343.     The activities described above were continuous and directly related to the JPM Enterprise's scheme to profit from the origination, sale, securitization, and servicing of defective mortgage loans.

344.     As examples of the members' distinct roles in furtherance of the JPM Enterprise:

(i)     **JPMC Bank** (or its subsidiary CHF) raised capital, originated and funded mortgage loans, participated in the preparation of offering materials, serviced mortgage loans held by, among others, securitization trusts for RMBS offerings, and, as servicer, engaged in widespread misconduct in foreclosure proceedings, including perjury, to cover up the JPM Defendants' failure to comply with pooling and servicing agreement requirements for Transfer of Title, fraudulently concealed breaches of representations and warranties in order to prevent securitization trustees from requiring repurchase of defective mortgage loans, and extracted further profits for the enterprise through fraudulent over-charges to borrowers and the "force placed" insurance scheme described above;

(ii)     **JPM Mortgage Acquisition** acquired mortgage loans for securitization, acted as the sponsor for RMBS offerings, participated in the preparation of offering materials, and directed the activities of JPMAC;

(iii)     **JPMAC** purchased mortgage loans from JPM Mortgage Acquisition, acted as the depositor for RMBS offerings, filed materially misleading offering materials and reports with the SEC, and fraudulently concealed breaches of pooling and services agreement representations and warranties in order to prevent securitization trustees from requiring repurchase of defective mortgage loans;

(iv) **J.P. Morgan Securities** underwrote and sold RMBS through the use of false and misleading offering materials; and

(v) **JPMorgan Chase & Co.**, as ultimate parent of the JPM entities, directed and orchestrated the activities of the JPM Defendants and knowingly provided material assistance to other participants in the enterprise.

345.     The participation of separately incorporated JPM affiliates in the JPM Enterprise facilitated, and was necessary to, the purpose and unlawful activity of the enterprise because, among other reasons, the securitization process requires multiple legal entities as sponsor, depositor, underwriter, issuer and servicer, and providing such functions through affiliate entities enhanced (i) the efficiency of the JPM Enterprise by allowing the enterprise to avoid the due diligence and checks and balances that would have been imposed by third-parties and (ii) the ability of the JPM Enterprise to operate without disclosure of its unlawful activities to investors, regulators and others..

346.     The JPM Defendants conducted or participated in, directly or indirectly, the affairs of the JPM Enterprise through a pattern of corrupt activity that included (1) multiple violations of the Ohio Securities Act, (2) multiple acts of forgery or falsification in violation of ORC § 2913.31, (3) multiple acts of perjury in violation of ORC § 2921.11, (4) multiple violations of ORC § 2913.47 (Insurance Fraud), (5) multiple violations of 18 U.S.C. § 1344 (Bank Fraud), and (6) multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, all as elsewhere alleged with particularity herein.

347.     The acts of the JPM Enterprise injured or threatened to injure Western & Southern.

### TWELFTH CAUSE OF ACTION
### (Violation of Section 11 of the 1933 Act)

348.     Western & Southern realleges each allegation above as if fully set forth herein,

except that Western & Southern expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

349. This claim is brought under Section 11 of the 1933 Act, 15 U.S.C. § 77k, against the JPM Defendants.

350. This count is predicated upon the JPM Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials for the JPMAC 2006-WF1 and JPMAC 2007-CH1 Certificates.

351. Each of Western & Southern's purchases of the JPMAC 2006-WF1 and JPMAC 2007-CH1 Certificates was made pursuant to false and misleading Offering Materials, including the registration statements, prospectus and prospectus supplements filed with the SEC.

352. The JPM Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Western & Southern of the Offering Materials.

353. This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the complaint in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust, et al. v. J.P. Morgan Acceptance Corporation I, et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of Western & Southern's claims afforded by that filing.

354. Western & Southern has sustained damages measured by the difference between the price Western & Southern paid for the certificates and (1) the value of the Certificates at the time this suit was brought, or (2) the price at which Western & Southern sold the Certificates in

the market prior to the time suit was brought.

355.    By reason of the conduct herein alleged, the JPM Defendants violated Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing.  By virtue of the foregoing, Western & Southern is entitled to damages from each of the JPM Defendants.

### THIRTEENTH CAUSE OF ACTION
#### (Violation of Section 12(a)(2) of the 1933 Act)

356.    Western & Southern realleges each allegation above as if fully set forth herein, except that Western & Southern expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

357.    This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), against the JPM Defendants.

358.    The JPM Defendants offered and sold the Certificates to Western & Southern by means of defective Offering Materials, including the prospectuses and prospectus supplements, which contained materially untrue statements of facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Western & Southern purchased the Certificates directly from the JPM Defendants, who both transferred title to Western & Southern and who solicited Western & Southern for financial gain.

359.    The JPM Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

360.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the complaint in

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust, et al. v. J.P. Morgan Acceptance Corporation I, et al.*, 2:08-cv-01713-ERK-WDW (E.D.N.Y) and by the tolling of Western & Southern's claims afforded by that filing.

361.   Western & Southern sustained material damages in connection with its investments in the securitizations and accordingly has the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.  Western & Southern hereby tenders its Certificates and demands rescission.

## FOURTEENTH CAUSE OF ACTION
### (Violation of Section 15 of the 1933 Act)

362.   Western & Southern realleges each allegation above as if fully set forth herein.

363.   This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. § 770, against JPM Mortgage Acquisition and JPMAC (the "Section 15 Defendants") for control person liability with regard to the causes of action for violations of Section 11 and Section 12(a)(2) of the 1933 Act set forth above.

364.   The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of depositor and/or issuing trusts associated with the JPMAC 2006-WF1 and JPMAC 2007-CH1 offerings.

365.   The Section 15 Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Materials.  The Section 15 Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

366.   The Section 15 Defendants had power and influence over the JPM Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By

90

virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Materials.

367.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with – and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

## PRAYER FOR RELIEF

WHEREFORE Western & Southern prays for relief as follows:

An award of damages in favor of Western & Southern against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.    Rescission and recovery of the consideration paid for the Certificates, with interest thereon;

b.    Western & Southern's monetary losses, including loss of market value and loss of principal and interest payments, on all claims other than Western & Southern's 12(a)(2) claim or other claims for rescission;

c.    Attorneys' fees and costs;

d.    Treble damages;

e.    Punitive damages;

f.    Prejudgment interest at the maximum legal rate; and

g.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated: March 8, 2012

<div align="right">

Respectfully Submitted,

_____/s/ Glenn V. Whitaker_____
Glenn V. Whitaker  (0018169)
Eric W. Richardson  (0066530)
Adam C. Sherman  (0076850)
Vorys, Sater, Seymour and Pease LLP
Suite 2000, Atrium Two
221 East Fourth Street
P.O. Box 0236
Cincinnati, Ohio  45201-0236
Telephone:    (513) 723-4000
Facsimile:    (513) 723-4056

*Attorneys for Plaintiffs The Western and
Southern Life Insurance Company, Western-
Southern Life Assurance Company, Columbus
Life Insurance Company, Integrity Life
Insurance Company, National Integrity Life
Insurance Company, Western & Southern
Financial Group, Inc., and Fort Washington
Investment Advisors, Inc.*

</div>

*OF COUNSEL:*

David H. Wollmuth
Michael C. Ledley
Steven S. Fitzgerald
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

**Exhibit A**

**Overview of Western & Southern's Purchases**

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMALT 2005-S1 1A1 | Columbus Life Insurance Company | 12/26/2006 | 2,200,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMALT 2005-S1 1A1 | Western-Southern Life Assurance Company | 12/26/2006 | 2,200,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 4,300,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|-------|-----------|-------------|------------|-------------------|
| JPMAC 2006-WF1 A5 | Western-Southern Life Assurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | National Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A5 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Integrity Life Insurance Company | 8/31/2006 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 6,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western-Southern Life Assurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | National Integrity Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western and Southern Life Insurance Company | 8/31/2006 | 2,025,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2006-WF1 A6 | Western and Southern Life Insurance Company | 8/31/2006 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Integrity Life Insurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| | | | | J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Western-Southern Life Assurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | Western-Southern Life Assurance Company | 3/13/2007 | 1,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMAC 2007-CH1 AF4 | National Integrity Life Insurance Company | 3/13/2007 | 3,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMMT 2005-S3 1A3 | Columbus Life Insurance Company | 10/10/2006 | 2,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |
| JPMMT 2005-S3 1A3 | Western and Southern Life Insurance Company | 10/10/2006 | 13,000,000.00 | JPM Mortgage Acquisition (Seller/Sponsor)<br><br>JPMAC (Depositor)<br><br>J.P. Morgan Securities (Underwriter) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2005-7 2CB1 | Integrity Life Insurance Company | 10/05/2005 | 1,424,200.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western-Southern Life Assurance Company | 10/05/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | National Integrity Life Insurance Company | 10/05/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | National Integrity Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 2,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-7 2CB1 | Western and Southern Life Insurance Company | 10/05/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 09/26/2007 | 847,207.71 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Fort Washington Investment Advisors, Inc. | 09/26/2007 | 1,059,009.63 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western and Southern Life Insurance Company | 10/31/2005 | 1,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Integrity Life Insurance Company | 10/31/2005 | 1,250,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Integrity Life Insurance Company | 10/31/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western-Southern Life Assurance Company | 10/31/2005 | 6,150,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |

6

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2005-9 2A4 | Western-Southern Life Assurance Company | 10/31/2005 | 7,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | National Integrity Life Insurance Company | 10/31/2005 | 7,500,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | National Integrity Life Insurance Company | 10/31/2005 | 5,000,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2005-9 2A4 | Western and Southern Life Insurance Company | 10/31/2005 | 1,650,000.00 | WMMSC (Depositor)<br><br>WCC (Underwriter) |
| WMALT 2006-4 3A2A | Integrity Life Insurance Company | 04/28/2006 | 7,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A2A | Western-Southern Life Assurance Company | 04/28/2006 | 1,100,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A2A | National Integrity Life Insurance Company | 04/28/2006 | 7,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A6 | Columbus Life Insurance Company | 04/28/2006 | 2,200,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-4 3A6 | Western-Southern Life Assurance Company | 04/28/2006 | 7,800,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Integrity Life Insurance Company | 06/30/2006 | 2,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

7

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|-------|-----------|-------------|------------|-------------------|
| WMALT 2006-5 1A10 | Integrity Life Insurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Western-Southern Life Assurance Company | 06/30/2006 | 6,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | Western-Southern Life Assurance Company | 06/30/2006 | 2,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 1A10 | National Integrity Life Insurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 3A6 | Integrity Life Insurance Company | 06/30/2006 | 3,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 3A6 | Western-Southern Life Assurance Company | 06/30/2006 | 5,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-5 3A6 | Western-Southern Life Assurance Company | 06/30/2006 | 1,500,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-9 A3 | Columbus Life Insurance Company | 10/31/2006 | 3,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2006-9 A3 | Western-Southern Life Assurance Company | 10/31/2006 | 22,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

| Asset | Purchaser | Settle Date | Face Value | Seller Defendants |
|---|---|---|---|---|
| WMALT 2006-9 A3 | National Integrity Life Insurance Company | 10/31/2006 | 5,000,000.00 | WMMSC (Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2007-OA3 5A | Western and Southern Life Insurance Company | 10/11/2007 | 7,235,244.30 | WMMSC (co-Sponsor)<br><br>WaMu Bank (co-Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |
| WMALT 2007-OA3 5A | Western-Southern Life Assurance Company | 10/11/2007 | 904,405.54 | WMMSC (co-Sponsor)<br><br>WaMu Bank (co-Sponsor)<br><br>WCC (Underwriter)<br><br>WMAAC (Depositor) |

**EXHIBIT B**

**Misrepresentations Regarding Underwriting Standards**

**JPMALT 2005-S3**

1.      Date of Prospectus Supplement:  December 27, 2005

2.      False and misleading representations regarding underwriting standards in the

Offering Materials include:

- "Underwriting standards are applied by or on behalf of a lender to evaluate a

  borrower's credit standing and repayment ability, and the value and adequacy of the

  related Mortgaged Property as collateral."  JPMALT 2005-S3 Prospectus Supplement

  at S-30.

- "In general, a prospective borrower applying for a loan is required to fill out a

  detailed application designed to provide to the underwriting officer pertinent credit

  information.  As part of the description of the borrower's financial condition, the

  borrower generally is required to provide a current list of assets and liabilities and a

  statement of income and expenses, as well as an authorization to apply for a credit

  report which summarizes the borrower's credit history with local merchants and

  lenders and any record of bankruptcy. In most cases, an employment verification is

  obtained from an independent source (typically the borrower's employer), which

  verification reports, among other things, the length of employment with that

  organization, the current salary, and whether it is expected that the borrower will

  continue such employment in the future."  *Id*. at S-30-S-31.

- "A lender may also originate mortgage loans pursuant to alternative sets of

  underwriting criteria under reduced or limited documentation programs.  These

programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded.  Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion.  Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria." *Id*. at S-31.

- "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions." *Id*.

- "CHF's underwriting standards are designed to evaluate a borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." *Id*. at S-32.

- "CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records.  The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants.  In addition, CHF verifies employment, income and assets.  Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party." *Id*.

- "[A] prospective borrower is required to fill out an application designed to provide pertinent information about the borrower's assets, liabilities, income and credit, the property to be financed and the type of loan desired.  CHF obtains a three-file merged credit report for each borrower, which summarizes each repository's credit score, credit history and depth, and any derogatory public records.  The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants. In addition, CHF verifies employment, income and assets.  Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses independently verified by a third party." *Id*.

- "In order to qualify for the [Reduced Documentation] program, the borrower must satisfy a 20% down-payment requirement from the borrower's own assets.  These assets are verified through bank statements and may be supplemented by third-party verification.  A residential mortgage credit report, or "in file" report, is obtained and reviewed to determine the borrower's repayment history.  The maximum loan-to-value ratio of any mortgage loan originated under this program is approximately 80% (65% for "cash out" refinancings). . . In order to qualify for [the Streamlined Refinance] program, the borrower must have demonstrated overall creditworthiness as defined in the program guides.  In addition, a documented servicing record with respect to such borrower of at least 24 months must be available.  If there are multiple lenders during such 24 month period, CHF must have been the servicer for at least the most recent 12 months. . . The underwriting for [the "No Doc" program] is based

primarily or entirely on a stronger credit profile (evidenced by a higher minimum

FICO credit risk score), a lower maximum product limit and additional due diligence

performed on the collateral. . . The underwriting for [the Stated Income Stated Asset

Program] is based primarily or entirely on stronger credit profile and lower loan-to-

value ratio requirements." *Id*. at S-31-S-32.

- "From time to time, exceptions to a lender's underwriting policies may be made.

  Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's

  underwriter.  Exceptions may be made after careful consideration of certain

  mitigating factors such as borrower liquidity, employment and residential stability

  and local economic conditions." *Id*. at S-31.

### JPMAC 2006-WF1

1.      Date of Prospectus Supplement:  August 29, 2006

2.      False and misleading representations regarding underwriting standards in the

Offering Materials include:

- "Underwriting standards are applied by or on behalf of a lender to evaluate a

  borrower's credit standing and repayment ability, and the value and adequacy of the

  related mortgaged property as collateral."  JPMAC 2006-WF1 Prospectus

  Supplement at 22.

- "In general, a prospective borrower applying for a loan is required to fill out a

  detailed application designed to provide to the underwriting officer pertinent credit

  information.  As part of the description of the borrower's financial condition, the

  borrower generally is required to provide a current list of assets and liabilities and a

  statement of income and expenses, as well as an authorization to apply for a credit

4

report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future." *Id.*

- "A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs.  These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded.  Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria." *Id.* at 23.

- "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter.  Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions." *Id.*

- As to Wells Fargo Bank, that the Prospectus Supplement represented that the mortgage loans were originated and underwritten in accordance with underwriting standards that are "applied by or on behalf of Wells Fargo Bank to evaluate the

5

applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." *Id*. at S-22.

- "The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history." *Id*.

- "A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. A self-employed applicant may be required to submit his or her most recent signed federal income tax returns. With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders. Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant." *Id*.

- "Wells Fargo Bank's underwriting of every mortgage loan submitted (as to which underwriting authority has not been delegated) consists of not only a credit review, but also a separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by RELS, or (iii) RELS itself. Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property

appraisals.  All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the amount of the mortgage loan or the identity of the appraiser.  Certain loans require a third party review in the form of either a desk review or field review."  *Id*. at S-30.

- "During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies.  This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines."  *Id*.

### JPMAC 2007-CH1

1.      Date of Prospectus Supplement:  March 7, 2007

2.      False and misleading representations regarding underwriting standards in the Offering Materials include:

- "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral."  JPMAC 2007-CH1 Prospectus at 22.

- "In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the

borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future." *Id.*

- Prior to the funding or acquiring of any non-prime quality mortgage loan, JPMorgan underwrites the related mortgage loan in accordance with the then current underwriting standards established by the Home Mortgage division of JPMorgan Chase Bank, N.A. ("Chase Home Mortgage"). The Mortgage Loans were originated and underwritten in accordance with either the Chase Home Mortgage Call Center Underwriting Guidelines described below (the "CHM Call Center Underwriting Guidelines") or the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines described below (the "CHM Wholesale/Retail Underwriting Guidelines")." JPMALT 2007-CH1 Pro. Supp. at 89.

- "The CHM HLD Underwriting Guidelines consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the credit standing and repayment ability of the prospective borrower. On a case by case basis, CHM HLD underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting

exception.  Compensating factors may include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence."  *Id.*

- "There are three major steps in the underwriting process: (1) identify the eligibility and appropriate credit grade of the mortgagor, (2) evaluate the eligibility and lendable equity of the mortgaged property, and (3) ensure that the mortgage loan terms meet those acceptable for the applicable credit grade."  *Id.*

- "The value of each property proposed as security for a mortgage loan is determined by either a full appraisal, an automated valuation model ("AVM"), a limited appraisal conducted on a drive-by basis, or a statistical valuation.  Two full appraisals are generally required if the mortgage loan exceeds $500,000 and beginning with loans originated on or after April 23, 2006, $650,000.  Origination means for purposes of the following description of the underwriting guidelines, the date of submission of a mortgage application."  *Id.*

- "A credit report by an independent, nationally recognized credit reporting agency is required reflecting the applicant's complete credit history. The credit report should reflect delinquencies of 30 days or more, repossessions, judgments, foreclosures, garnishments, bankruptcies and similar instances of adverse credit that can be discovered by a search of public records. All taxes and assessments not included in the payment are required to be verified as current."  *Id.* at 90.

- "In general, for mortgage loans underwritten by CHM HLD under the CHM Full Documentation Program, the underwriters verify income and assets through alternate documentation or written third party verifications, except that no asset verification is

required for loans whose credit score is at least 640, or a loan-to-value ratio is less than or equal to 80%. The CHM 24-Month Bank Statement Program is similar to the CHM Full Documentation Program, except that the last 24 months of bank statements are utilized to support income. In general, the CHM 24-Month Bank Statement Program is available to borrowers in all credit grades. The CHM 24-Month Bank Statement program was replaced by the CHM 12-Month Bank Statement program on or about June 2005. The CHM 12-Month Bank Statement program is similar to the CHM Full Documentation Program, except that the last 12 months of bank statements are utilized to support income. In general, the CHM 12-Month Bank Statement Program is available to borrowers in all credit grades. In general, the CHM Reduced Documentation Program is available for credit grades A1/A+ through C1. The CHM Stated Income Program is a no income verification program available for credit grades A1/A+ through B2. The CHM HLD Underwriting Guidelines utilize various credit grade categories to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These credit grade categories establish the maximum permitted loan-to-value ratio, debt-to-income ratio and loan amount, given the borrower's credit history considered in a manner generally consistent with non-prime mortgage industry practice, the occupancy status of the mortgaged property, the type of mortgaged property and documentation type." *Id*.

- "From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating

factors such as borrower liquidity, employment and residential stability and local

economic conditions."  Prospectus at 22.

### WMALT 2005-7

1.      Date of Prospectus Supplement:  August 24, 2005

2.      False and misleading representations regarding underwriting standards in the

Offering Materials include:

- "The Company's underwriting standards are intended to evaluate the prospective

    Mortgagor's credit standing and repayment ability, and the value and adequacy of the

    proposed Mortgaged Property as collateral."  WMALT 2005-7 Prospectus at 17.

- "In the loan application process, prospective Mortgagors will be required to provide

    information regarding such factors as their assets, liabilities, income, credit history,

    employment history and other related items.  Each prospective mortgagor will also

    provide an authorization to apply for a credit report which summarizes the

    Mortgagor's credit history.  With respect to establishing the prospective Mortgagor's

    ability to make timely payments, the Company will require evidence regarding the

    Mortgagor's employment and income, and of the amount of deposits made to

    financial institutions where the Mortgagor maintains demand or savings accounts."

    *Id.*

- "For a mortgage loan originated under a Limited Documentation Origination Program

    to qualify for purchase by the Company, the prospective mortgagor must have a good

    credit history and be financially capable of making a larger cash down payment, in a

    purchase, or be willing to finance less of the appraised value, in a refinancing, than

    would otherwise be required by the Company. Currently, the Company's underwriting

standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase." *Id*.

- "In addition, the Company may purchase Mortgage Loans which do not conform to the underwriting standards set forth in the Guide. Such Mortgage Loans may be purchased in negotiated transactions from Sellers who will represent that the Mortgage Loans have been originated in accordance with credit, appraisal and underwriting standards agreed to by the Company. The Company will generally review only a limited portion of the Mortgage Loans in any delivery of such Mortgage Loans for conformity with the applicable credit, appraisal and underwriting standards. Certain other Mortgage Loans will be purchased from Sellers who will represent that the Mortgage Loans were originated pursuant to credit, appraisal and underwriting standards determined by a mortgage insurance company acceptable to the Company. The Company will accept a certification from such insurance company as to a Mortgage Loan's insurability in a mortgage pool as of the date of certification as evidence that such Mortgage Loan conforms to applicable underwriting standards." *Id*.

- "All of the credit, appraisal and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the adequacy of the Mortgaged Property as collateral. Due to the variety of underwriting standards and review procedures that may be applicable to the Mortgage Loans included in any Mortgage Pool, the related Prospectus Supplement will not distinguish among the various credit, appraisal and underwriting standards applicable to the Mortgage Loans nor describe any review for compliance with applicable credit,

appraisal and underwriting standards performed by the Company. Moreover, there can be no assurance that every Mortgage Loan was originated in conformity with the applicable credit, appraisal and underwriting standards in all material respects, or that the quality or performance of Mortgage Loans underwritten pursuant to varying standards as described above will be equivalent under all circumstances." *Id.* at 17-18.

## WMALT 2005-9

1.    Date of Prospectus Supplement:  October 25, 2005

2.    False and misleading representations regarding underwriting standards in the Offering Materials include:

- "The Company's underwriting standards are intended to evaluate the prospective Mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed Mortgaged Property as collateral."  WMALT 2005-9 Prospectus at 17.

- "In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history. With respect to establishing the prospective Mortgagor's ability to make timely payments, the Company will require evidence regarding the Mortgagor's employment and income, and of the amount of deposits made to financial institutions where the Mortgagor maintains demand or savings accounts." *Id.*

- "For a mortgage loan originated under a Limited Documentation Origination Program to qualify for purchase by the Company, the prospective mortgagor must have a good credit history and be financially capable of making a larger cash down payment, in a purchase, or be willing to finance less of the appraised value, in a refinancing, than would otherwise be required by the Company.  Currently, the Company's underwriting standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase."  *Id*.

- "In addition, the Company may purchase Mortgage Loans which do not conform to the underwriting standards set forth in the Guide. Such Mortgage Loans may be purchased in negotiated transactions from Sellers who will represent that the Mortgage Loans have been originated in accordance with credit, appraisal and underwriting standards agreed to by the Company. The Company will generally review only a limited portion of the Mortgage Loans in any delivery of such Mortgage Loans for conformity with the applicable credit, appraisal and underwriting standards. Certain other Mortgage Loans will be purchased from Sellers who will represent that the Mortgage Loans were originated pursuant to credit, appraisal and underwriting standards determined by a mortgage insurance company acceptable to the Company. The Company will accept a certification from such insurance company as to a Mortgage Loan's insurability in a mortgage pool as of the date of certification as evidence that such Mortgage Loan conforms to applicable underwriting standards." *Id*.

- "All of the credit, appraisal and underwriting standards will provide an underwriter with sufficient information to evaluate the borrower's repayment ability and the

adequacy of the Mortgaged Property as collateral. Due to the variety of underwriting standards and review procedures that may be applicable to the Mortgage Loans included in any Mortgage Pool, the related Prospectus Supplement will not distinguish among the various credit, appraisal and underwriting standards applicable to the Mortgage Loans nor describe any review for compliance with applicable credit, appraisal and underwriting standards performed by the Company. Moreover, there can be no assurance that every Mortgage Loan was originated in conformity with the applicable credit, appraisal and underwriting standards in all material respects, or that the quality or performance of Mortgage Loans underwritten pursuant to varying standards as described above will be equivalent under all circumstances." *Id*. at 17-18.

### WMALT 2006-4

1.      Date of Prospectus Supplement:  April 26, 2006

2.      False and misleading representations regarding underwriting standards in the Offering Materials include:

- "The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  WMALT 2006-4 Prospectus Supplement at S-30.

- "Prospective borrowers are required to complete a standard loan application in which they may provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that

summarizes the borrower's credit history. . . [I]n evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id*. at S-30-S-31.

• "Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. Generally, under a reduced documentation program, either (i) a borrower's employment and assets are verified, but no verification of a borrower's income is undertaken, or (ii) a borrower's employment and income are verified, but no verification of a borrower's assets is undertaken. . . Generally, a no ratio program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no ratio program relies on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and the borrower's assets. The borrower's income is not required to be obtained or verified. The borrower's stated assets may be verified through receipt of the borrower's recent bank or brokerage statements or directly with the financial institution. In all cases, the borrower's employment is verified with the employer by telephone. Generally, a no documentation program is available to borrowers with certain loan-to-value ratios,

loan amounts, and credit scores. A no documentation program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. Generally, no verification of the borrower's employment, income or assets is undertaken. In some cases, the borrower's employment may be verified by telephone with the employer if the borrower's employment has been disclosed." *Id*. at S-32.

- "Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address." *Id*.

- "The sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers. Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase. Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers.  For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis." *Id*. at S-33.

## WMALT 2006-9

1.      Date of Prospectus Supplement:  October 26, 2006

2.      False and misleading representations regarding underwriting standards in the

Offering Materials include:

- "The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the  mortgaged property as collateral."  WMALT 2006-9 Prospectus Supplement at S-26.

- "Prospective borrowers are required to complete a standard loan application in which they may provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history. . . [I]n evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio")." *Id*. at S-26-S-27.

- "Generally, a reduced documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A reduced documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the

borrower's assets. Generally, under a reduced documentation program, either (i) a borrower's employment and assets are verified, but no verification of a borrower's income is undertaken, (ii) a borrower's employment and income are verified, but no verification of a borrower's assets is undertaken . . . Generally, a no ratio program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no ratio program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. The borrower's income is not required to be obtained or verified. Generally, under a no ratio program, the borrower's stated assets are also verified through receipt of the borrower's recent bank or brokerage statements or directly with the financial institution. In all cases, the borrower's employment is verified with the employer by telephone or by other independent means. Generally, a no documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no documentation program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. Generally, the borrower's employment, income and assets are neither obtained nor verified. In some cases, the borrower's employment may be verified by telephone with the employer or by other independent means if the borrower's employment has been disclosed." *Id*. at S-28.

- "Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the

availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address." *Id.*

- "The sponsor's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers. Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase. Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers. For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis." *Id.* at S-29.

## WMALT 2007-OA3

1.    Date of Prospectus Supplement:  March 26, 2007

2.    False and misleading representations regarding underwriting standards in the Offering Materials include:

- "Washington Mutual Mortgage Securities Corp.'s underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  WMALT 2007-OA3 Prospectus Supplement at S-63.

- "Prospective borrowers are required to complete a standard loan application in which they may provide financial information regarding such factors as their assets,

liabilities and related monthly payments, income, employment history and credit
history. Each borrower also provides an authorization to access a credit report that
summarizes the borrower's credit history. . . [I]n evaluating a prospective borrower's
ability to repay a mortgage loan, the loan underwriter considers the ratio of the
borrower's mortgage payments, real property taxes and other monthly housing
expenses to the borrower's gross income (referred to as the "housingto- income ratio"
or "front end ratio"), and the ratio of the borrower's total monthly debt (including
certain non-housing expenses) to the borrower's gross income (referred to as the
"debt-to-income ratio" or "back end ratio")." *Id.* at S-64.

- "Generally, a reduced documentation program is available to borrowers with certain
loan-to-value ratios, loan amounts, and credit scores. A reduced documentation
program places increased reliance on the value and adequacy of the mortgaged
property as collateral, the borrower's credit standing and (in some cases) the
borrower's assets. Generally, under a reduced documentation program, either (i) a
borrower's employment and assets are verified, but no verification of a borrower's
income is undertaken . . . Generally, a no ratio program is available to borrowers with
certain loan-to-value ratios, loan amounts, and credit scores. A no ratio program relies
on the value and adequacy of the mortgaged property as collateral and the borrower's
credit standing. The borrower's income is not required to be obtained or verified.
Generally, under a no ratio program, the borrower's stated assets are also verified
through receipt of the borrower's recent bank or brokerage statements or directly with
the financial institution. In all cases, the borrower's employment is verified with the
employer by telephone or by other independent means.  Generally, a no

documentation program is available to borrowers with certain loan-to-value ratios, loan amounts, and credit scores. A no documentation program relies on the value and adequacy of the mortgaged property as collateral and the borrower's credit standing. Generally, the borrower's employment, income and assets are neither obtained nor verified. In some cases, the borrower's employment may be verified by telephone with the employer or by other independent means if the borrower's employment has been disclosed." *Id.* at S-65-S-66.

- "Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address." *Id.* at S-66.

- "Washington Mutual Mortgage Securities Corp.'s credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers. Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase. Automated valuation models are obtained on all mortgage loans purchased from unaffiliated sellers. For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis." *Id.* at S-67.

22

**Exhibit C**

**Misrepresentations Regarding Appraisals**

| | |
|---|---|
| **JPMALT 2005-S1** | All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.   Prospectus Supplement at S-33. |
| **JPMALT 2005-S3** | All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  Prospectus Supplement at S-31. |
| **JPMAC 2006-WF1** | Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals. All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the amount of the mortgage loan or the identity of the appraiser. Certain loans require a third party review in the form of either a desk review or field review. Prospectus Supplement at S-30. |
| **JPMAC 2007-CH1** | The value of each property proposed as security for a mortgage loan is determined by either a full appraisal, an automated valuation model ("AVM"), a limited appraisal conducted on a drive-by basis, or a statistical valuation. Two full appraisals are generally required if the mortgage loan exceeds $500,000 and beginning with loans originated on or after April 23, 2006, $650,000.  Prospectus Supplement at S-88. |
| **WMALT 2005-7** | In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property.  Prospectus Supplement at 18. |

| WMALT 2005-9 | In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property. Prospectus Supplement at 18. |
|---|---|
| WMALT 2006-4 | In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. Prospectus Supplement at 44. |
| WMALT 2006-5 | In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. Prospectus Supplement at 44. |
| WMALT 2006-9 | In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. Prospectus Supplement at 44. |
| WMALT 2007-OA3 | In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. Prospectus Supplement at 43. |

# EXHIBIT D

## Misrepresentations Regarding Ratings

| JPMALT 2005-S1 | The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates. Prospectus Supplement at S-80. |
|---|---|
| JPMALT 2005-S3 | The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates. Prospectus Supplement at S-73. |
| JPMAC 2006-WF1 | The ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates. Prospectus Supplement at S-66. |
| JPMAC 2007-CH1 | The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage group, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage group is adequate to make the payments required by such certificates. Prospectus at 121. |

| WMALT 2005-7 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-79. |
|---|---|
| WMALT 2005-9 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-88. |
| WMALT 2006-4 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-107. |
| WMALT 2006-5 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-134. |
| WMALT 2006-9 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-84. |
| WMALT 2007-OA3 | The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities. Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation. The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Prospectus Supplement at S-204. |

**Exhibit E**

**Misrepresentations Regarding Transfer of Title**

| | | | |
|---|---|---|---|
| **JPMALT 2005-S1** | The mortgage loans consist primarily of fixed rate, fully amortizing, first lien residential mortgage loans.  Prospectus Supplement at S-10. | Pursuant to a pooling and servicing agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). . . .  In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian the Mortgage File.  Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records. Prospectus Supplement at S-32. | [W]ith respect to any mortgage which has been recorded in the name of the Mortgage Electronic Registration Systems, Inc., or MERS®, or its designee, no mortgage assignment in favor of the trustee will be required to be prepared or delivered. Instead, the master servicer will be required to take all actions as are necessary to cause the applicable trust fund to be shown as the owner of the related mortgage loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.  Prospectus at 61. |

| JPMALT 2005-S3 | The mortgage loans consist primarily of fixed rate, fully amortizing, first lien residential mortgage loans. Prospectus Supplement at S-8. | Pursuant to a pooling and servicing agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase obligations). . . . In connection with such transfer and assignment of the Mortgage Loans, the Depositor will deliver or cause to be delivered to the Trustee or its custodian the Mortgage File. Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records. Prospectus Supplement at S-30. | [W]ith respect to any mortgage which has been recorded in the name of the MortgageElectronic Registration Systems, Inc., or MERSU, or its designee, no mortgage assignment in favor of the trustee will be required to be prepared or delivered. Instead, the master servicer will be required to take all actions as are necessary to cause the applicable trust fund to be shown as the owner of the related mortgage loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS. Prospectus at 61. |
| JPMAC 2006-WF1 | The mortgage loans consist primarily of fixed-rate, fully-amortizing, first lien residential mortgage loans, substantially all of which have an original term to stated maturity of 30 years. Prospectus Supplement at S-7-S-8. | Pursuant to the Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreement (including the right to enforce the Originator's purchase obligations). The obligations of the Originator and the Seller with respect to the Certificates are limited to their respective obligations to purchase or substitute for Defective Mortgage Loans. Prospectus Supplement at S-18. | [W]ith respect to any mortgage which has been recorded in the name of the Mortgage Electronic Registration Systems, Inc., or MERS(R), or its designee, no mortgage assignment in favor of the trustee will be required to be prepared or delivered. Instead, the master servicer will be required to take all actions as are necessary to cause the applicable trust fund to be shown as the owner of the related mortgage loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS. Prospectus at 63. |

| JPMAC 2007-CH1 | The mortgage loans consist primarily of adjustable and fixed rate, fully amortizing and balloon, conventional, first and second lien residential mortgage loans, approximately 74.26% of which have an original term to stated maturity of 30 years. Supp. at 15. | Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce CHF's repurchase obligations). The obligations of CHF and the Seller with respect to the Certificates are limited to their respective obligations to purchase or substitute for Defective Mortgage Loans. Supp. at 134-35. | [W]ith respect to any mortgage which has been recorded in the name of the Mortgage Electronic Registration Systems, Inc., or MERS®, or its designee, no mortgage assignment in favor of the trustee will be required to be prepared or delivered. Instead, the master servicer will be required to take all actions as are necessary to cause the applicable trust fund to be shown as the owner of the related mortgage loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS. Prospectus at 62. |
|---|---|---|---|
| WMALT 2005-7 | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties or shares of stock relating to cooperative apartments. Prospectus Supplement at 25. | When each Series of Certificates is issued, the Company will cause the Mortgage Loans in the Mortgage Pool for that Series to be assigned to the Trust. An independent bank or trust company will act as trustee (the 'Trustee') for the benefit of the holders of Certificates of that Series . . . . Prospectus at 11.

The Company, a Servicing Entity or a Servicer, as the case may be, will, as to each Mortgage Loan, deliver or cause to be delivered to the Trustee the Mortgage Note, an assignment (except as to any Mortgage Loan registered on the MERS System (as defined below) and unless otherwise indicated in the applicable Prospectus Supplement) to the Trustee or in blank of | With respect to any Mortgage Loan registered on the mortgage electronic registration system (the 'MERS System') maintained by MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or any successor thereto ('MERS'), an assignment of Mortgage will not be delivered to the Trustee as described above, but instead the change in beneficial ownership to the Trust will be registered electronically through the MERS System in accordance with the rules of membership of MERS. MERS will serve as mortgagee of record with respect to these Mortgage Loans solely as a nominee of the Trust, in an administrative capacity, and will not have any interest in these Mortgage Loans. |

3

| | | the Mortgage in a form for recording . . . . Prospectus at 20. | Prospectus at 21. |
|---|---|---|---|
| **WMALT 2005-9** | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties or shares of stock relating to cooperative apartments. Prospectus Supplement at S-27. | When each Series of Certificates is issued, the Company will cause the Mortgage Loans in the Mortgage Pool for that Series to be assigned to the Trust. An independent bank or trust company will act as trustee (the 'Trustee') for the benefit of the holders of Certificates of that Series . . . . Prospectus at 11.<br><br>The Company, a Servicing Entity or a Servicer, as the case may be, will, as to each Mortgage Loan, deliver or cause to be delivered to the Trustee the Mortgage Note, an assignment (except as to any Mortgage Loan registered on the MERS'r' System (as defined below) and unless otherwise indicated in the applicable Prospectus Supplement) to the Trustee or in blank of the Mortgage in a form for recording. . . . Prospectus at 20. | With respect to any Mortgage Loan registered on the mortgage electronic registration system (the 'MERS'r' System') maintained by MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or any successor thereto ('MERS'), an assignment of Mortgage will not be delivered to the Trustee as described above, but instead the change in beneficial ownership to the Trust will be registered electronically through the MERS'r' System in accordance with the rules of membership of MERS. MERS will serve as mortgagee of record with respect to these Mortgage Loans solely as a nominee of the Trust, in an administrative capacity, and will not have any interest in these Mortgage Loans. Prospectus at 21. |
| **WMALT 2006-4** | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties | Under the mortgage loan sale agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the Trust pursuant to the pooling agreement . . . Pursuant to the pooling agreement, the depositor will represent and warrant to the Trust that, as of the Closing Date, the Trust will be the legal | If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the |

| | or shares of stock relating to cooperative apartments. Prospectus Supplement at S-49. | owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the sponsor and (ii) any lien under the pooling agreement). Prospectus Supplement at S-53.<br><br>The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located. . . . Prospectus at 51. | MERS® System, MERS® shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trust and will not have any interest in any of those mortgage loans. Prospectus at 51. |
| --- | --- | --- | --- |
| **WMALT 2006-5** | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties or shares of stock | Under the mortgage loan sale agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the Trust pursuant to the pooling agreement. . . Pursuant to the pooling agreement, the depositor will represent and warrant to the Trust that, as of the Closing Date, the Trust will be the legal owner of each mortgage loan, free and clear | If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the MERS® System, MERS® shall serve as |

|  | relating to cooperative apartments. Prospectus Supplement at S-57. | of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the sponsor and (ii) any lien under the pooling agreement).  Prospectus Supplement at S-60-S-61.<br><br>The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located. . . . Prospectus at 51. | mortgagee of record solely as a nominee in an administrative capacity on behalf of the trust and will not have any interest in any of those mortgage loans.  Prospectus at 51. |
|---|---|---|---|
| **WMALT 2006-9** | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties or shares of stock relating to cooperative | Under the mortgage loan sale agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the Trust pursuant to the pooling agreement. . . Pursuant to the pooling agreement, the depositor will represent and warrant to the Trust that, as of the Closing Date, the Trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) | If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the MERS® System, MERS® shall serve as mortgagee of record solely as a nominee |

|  | apartments. Prospectus Supplement at S-43. | any lien arising before the depositor's purchase of the mortgage loan from the sponsor and (ii) any lien under the pooling agreement).  Prospectus Supplement at S-46.<br><br>The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located. . . . Prospectus at 51. | in an administrative capacity on behalf of the trust and will not have any interest in any of those mortgage loans.  Prospectus at 51. |
| --- | --- | --- | --- |
| **WMALT 2007-OA3** | The mortgage loans are secured by first mortgages or first deeds of trust or other similar security instruments creating first liens on fee simple or leasehold interests in one- to four-family residential properties or shares of stock relating to cooperative apartments. | Under the related mortgage loan sale agreement pursuant to which Washington Mutual Mortgage Securities Corp. or Washington Mutual Bank, as applicable, will sell the mortgage loans to the depositor, Washington Mutual Mortgage Securities Corp. or Washington Mutual Bank, as applicable, will make representations and warranties in respect of the related mortgage loans, which representations and warranties the depositor will assign to the Trust pursuant to the pooling agreement. . . Pursuant to the pooling agreement, the depositor will represent and | If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the MERS® System, MERS® shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of |

| | | | |
|---|---|---|---|
| | Prospectus Supplement at S-85. | warrant to the Trust that, as of the Closing Date, the Trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from Washington Mutual Mortgage Securities Corp. or Washington Mutual Bank, as applicable, and (ii) any lien under the pooling agreement).  Prospectus Supplement at S-101-102.<br><br>The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located. . . .  Prospectus at 50. | the trust and will not have any interest in any of those mortgage loans.  Prospectus at 50. |

## EXHIBIT F

### Misrepresentations Regarding Primary Mortgage Insurance

| | |
|---|---|
| **JPMALT 2005-S1** | All Mortgage Loans with Loan-to-Value Ratios greater than 80% at origination that were not supported by a third-party guarantee were covered by a primary mortgage insurance policy. Prospectus Supplement at S-25. |
| **JPMALT 2005-S3** | All Mortgage Loans with Loan-to-Value Ratios greater than 80% at origination that were not supported by a third-party guarantee were covered by a primary mortgage insurance policy. Prospectus Supplement at S-23. |
| **JPMAC 2006-WF1** | All Mortgage Loans with Loan-to-Value Ratios greater than 80% at origination that are not covered under the PMI Policy are covered by a primary mortgage insurance policy. Prospectus Supplement at S-16. |
| **JPMAC 2007-CH1** | If specified in the related prospectus supplement, certain of the loans included in a trust fund may have loan-to-value ratios greater than 80%. Loans with higher loan-to-value ratios may present a greater risk of loss than loans with loan-to-value ratios of 80% or below. Even if the related loans have primary mortgage insurance, we cannot assure you that the primary mortgage insurance coverage will be adequate to cover any losses that might be experienced by those loans. Prospectus at 14. |
| **WMALT 2005-7** | Unless otherwise specified in the applicable Prospectus Supplement, each Mortgage Loan with a loan-to-value ratio at origination and at the Cut-Off Date greater than 80% will be covered by a primary mortgage insurance policy (a 'Primary Insurance Policy') providing insurance coverage against default on such Mortgage Loan, in general, of up to 25% of the principal balance of such Mortgage Loan with maintenance requirements in certain cases for the remaining term of such Mortgage Loan, but at least until the loan-to-value ratio drops to 80%. Prospectus at 41. |
| **WMALT 2005-9** | Unless otherwise specified in the applicable Prospectus Supplement, each Mortgage Loan with a loan-to-value ratio at origination and at the Cut-Off Date greater than 80% will be covered by a primary mortgage insurance policy (a 'Primary Insurance Policy') providing insurance coverage against default on such Mortgage Loan, in general, of up to 25% of the principal balance of such Mortgage Loan with maintenance requirements in certain cases for the remaining term of such Mortgage Loan, but at least until the loan-to-value ratio drops to 80%. Prospectus at 41. |

| WMALT 2006-4 | For each mortgage loan with an original loan-to-value ratio greater than 80%, the pooling agreement generally will require the servicer to keep in full force and effect a primary mortgage insurance policy.  Prospectus Supplement at S-44. |
|---|---|
| WMALT 2006-5 | For each mortgage loan with an original loan-to-value ratio greater than 80%, the pooling agreement generally will require the servicer to keep in full force and effect a primary mortgage insurance policy.  Prospectus Supplement at S-53. |
| WMALT 2006-9 | For each mortgage loan with an original loan-to-value ratio greater than 80%, the pooling agreement generally will require the servicer to keep in full force and effect a primary mortgage insurance policy.  Prospectus Supplement at S-39. |
| WMALT 2007-OA3 | For each WMB Loan with an original loan-to-value ratio greater than 80%, the pooling agreement generally will require WMB to keep in full force and effect a primary mortgage insurance policy. Prospectus Supplement at S-79. |