# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY; WESTERN-SOUTHERN LIFE ASSURANCE COMPANY; COLUMBUS LIFE INSURANCE COMPANY; INTEGRITY LIFE INSURANCE COMPANY; NATIONAL INTEGRITY LIFE INSURANCE COMPANY; and FORT WASHINGTON INVESTMENT ADVISORS, INC. on behalf of FORT WASHINGTON ACTIVE FIXED INCOME LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A.; JPMORGAN MORTGAGE ACQUISITION CORPORATION; J.P. MORGAN SECURITIES LLC; J.P. MORGAN ACCEPTANCE CORPORATION I; WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.; WAMU CAPITAL CORPORATION; and WAMU ASSET ACCEPTANCE CORPORATION, <br><br> Defendants. | Civil Action No. 1:11-CV-00495 <br><br> Chief Judge Susan J. Dlott |
| JPMORGAN CHASE BANK, N.A., <br><br> Third-Party Plaintiff, <br><br> v.z <br><br> THE FEDERAL DEPOSIT INSURANCE CORPORATION, <br><br> Third-Party Defendant. | |

## DEFENDANTS' MOTION TO DISMISS
## THE SECOND AMENDED COMPLAINT

Defendants JPMorgan Chase Bank, N.A., J.P. Morgan Mortgage Acquisition

Corporation, J.P. Morgan Securities LLC, J.P. Morgan Asset Acceptance Corporation I,

Washington Mutual Mortgage Securities Corporation, WaMu Capital Corporation and WaMu

Asset Acceptance Corporation, by their undersigned counsel, respectfully move this Court for the entry of an order dismissing the above-captioned action in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).  The accompanying memorandum of law in support sets forth the grounds for this motion and is incorporated herein by reference.

Respectfully submitted,

/s/ Gregory A. Harrison
Gregory A. Harrison (0029814)
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH  45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
Email:  greg.harrison@dinsmore.com

Trial Attorney for Defendant/Third-Party
Plaintiff JPMorgan Chase Bank, N.A.

OF COUNSEL:

Sharon L. Nelles (*pro hac vice*)
Darrell Cafasso (*pro hac vice*)
Sveker K. Hogberg (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

Counsel for Defendant/Third-Party
 Plaintiff JPMorgan Chase Bank, N.A.

## CERTIFICATE OF SERVICE

This is to certify that on this 23rd day of May, 2012, the foregoing was electronically filed with the Court via CM/ECF. Notice of this filing will be sent to the below-listed counsel by operation of the Court's electronic filing system, and the filing may be accessed through that system.

*/s/ Gregory A. Harrison*
Gregory A. Harrison

Glenn V. Whitaker
Eric W. Richardson
Adam C. Sherman
Erik B. Bond
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202

David H. Wollmuth
Steven S. Fitzgerald
Michael C. Ledley
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110

Trial Attorneys for Plaintiffs


Scott H. Christensen
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006

Trial Attorney for Third-Party Defendant
Federal Deposit Insurance Corporation as
Receiver for Washington Mutual Bank

Daniel H Kurtenbach
Duncan N. Stevens
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room VS-D7026
Arlington, VA 22226

Trial Attorneys for Third-Party Defendant
Federal Deposit Insurance Corporation in its
Corporate Capacity

2127800v1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE WESTERN AND SOUTHERN LIFE
INSURANCE COMPANY, *et al.*,

               Plaintiffs,

      v.

JPMORGAN CHASE BANK, N.A., *et al.*,

               Defendants.

:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:11-CV-00495

Chief Judge Susan J. Dlott

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JPMORGAN CHASE BANK, N.A.,

               Third-Party Plaintiff,

      v.

THE FEDERAL DEPOSIT INSURANCE
CORPORATION,

               Third-Party Defendant.

:
:
:
:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY PURSUANT TO LOCAL RULE 7.2(A)(3)......................1

BACKGROUND .............................................................................................................6

    A.    Alleged Misrepresentations in the Offering Materials..............................7

    B.    Plaintiffs Knew of Their Claims No Later Than March 2009 ................................9

    C.    Plaintiffs' Repackaging of Their Claims To Avoid the Limitations Bar...............11

ARGUMENT ...............................................................................................................12

I.      PLAINTIFFS' CLAIMS ARE TIME-BARRED...............................................................13

    A.    The OSA, Common-Law Fraud and Securities Act Claims Are Barred by the Applicable Statutes of Limitations...........................................................13

    B.    Plaintiffs' OSA, Common-Law Fraud and Securities Act Claims Are Independently Barred by the Applicable Statutes of Repose................................18

    C.    Plaintiffs' Tortious Interference With Contract and Civil Conspiracy Claims Are Barred by the Applicable Statutes of Limitations.................................19

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF FEDERAL AND STATE SECURITIES LAWS AND COMMON-LAW FRAUD. .........................20

    A.    Plaintiffs Fail To Plead Actionable Misstatements or Omissions. ......................20

    B.    Plaintiffs Fail To Plead Scienter and Knowledge. .................................................26

    C.    Plaintiffs Fail To Plead Reasonable Reliance. .......................................................28

    D.    Plaintiffs Fail To Plead Loss Causation................................................................28

III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.........................................................................29

IV.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE OCAA....................30

    A.    Plaintiffs Do Not Adequately Allege Predicate Acts or the Required "Pattern of Corrupt Activity."...........................................................................31

    B.    Plaintiffs Fail To Allege Sufficiently the Existence of an "Enterprise." ..............32

C.     Plaintiffs Do Not Adequately Allege That Any Purported Corrupt Activities Proximately Caused Their Purported Losses. ........................................................33

V.     THE COMPLAINT FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY. ...........34

VI.     PLAINTIFFS' CLAIMS AGAINST JPMC BANK AS THE PURPORTED SUCCESSOR TO WMB ARE BARRED BY FIRREA. ..................................................34

CONCLUSION ...........................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Adkins* v. *Uranium Disposition Servs.*,
  No. 10 Civ. 460, 2011 WL 923351 (S.D. Ohio Feb. 14, 2011) ..........................................5, 30

*Albert Fadem Trust* v. *Am. Elec. Power Co.*,
  334 F. Supp. 2d 985 (S.D. Ohio 2004) ............................................................................21

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) .............................................................................................12, 13

*Ashland* v. *Morgan Stanley & Co., Inc.*,
  652 F.3d 333 (2d Cir. 2011) .................................................................................5, 28

*Baker* v. *Pfeifer*,
  940 F. Supp. 1168, 1181 (S.D. Ohio 1996) ..........................................................31

*Battista* v. *FDIC*,
  195 F.3d 1113 (9th Cir. 1999) ...............................................................................35

*Battista* v. *Lebanon Trotting Assn.*,
  538 F. 2d, 111, 116 (6th Cir. 1978) .......................................................................30

*Begala* v. *PNC Bank*,
  214 F.3d 776 (6th Cir. 2000) .................................................................................33

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ...............................................................................................12

*Benson* v. *JPMorgan Chase Bank, N.A.*,
  673 F.3d 1207 (9th Cir. 2012) ...............................................................................35

*Boilermakers Nat. Annuity Trust Fund* v. *WaMu Mortg. Pass Through Certificates*,
  748 F. Supp. 2d 1246 (W.D. Wash. 2010) ..................................................4, 16, 23

*Boomershine* v. *Lifetime Capital, Inc.*,
  No. 22179, 2008 WL 54803 (Ohio Ct. App. Jan. 4, 2008) ....................................26

*Bovee* v. *Coopers & Lybrand, C.P.A.*,
  272 F.3d 356 (6th Cir. 2001) .................................................................................14

*Brutz* v. *Stillwell*,
  No. 1:09-cv-2564, 2010 WL 1924471 (N.D. Ohio May 10, 2011) .........................32

**Page(s)**

*Cain* v. *Mid-Ohio Sec., Inc.*,
    Nos. 06CA008933, 06CA008932, 2007 WL 2080553 (Ohio Ct. App. July 23, 2007).......3, 14

*City of Ann Arbor Employees' Retirement Sys.* v. *Citigroup Mortg. Loan Trust, Inc.*,
    703 F. Supp. 2d 253 (E.D.N.Y. 2010) ..................................................................21

*Ellington Credit Fund, Ltd.* v. *Select Portfolio Serv., Inc.*,
    No. 08 Civ. 2437 (RJS), 2011 WL 6034310 (S.D.N.Y. Dec. 5, 2011) ............5, 30

*Employees' Ret. Sys. of the Gov't of the V.I.* v. *J.P. Morgan Chase & Co.*,
    804 F. Supp. 2d 141 (S.D.N.Y. 2011)..................................................................23

*Employees' Ret. Sys. of the Gov't of the V.I.* v. *Morgan Stanley & Co.*,
    814 F. Supp. 2d 344 (S.D.N.Y. 2011)..................................................................24

*Footbridge Ltd. Trust* v. *Countrywide Fin. Corp. Inc.*,
    770 F. Supp. 2d 618 (S.D.N.Y. 2011)..................................................................19

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ...................... *passim*

*Freeman* v. *Westland Builders, Inc.*,
    441 N.E. 2d 283 (Ohio Ct. App. 1981)................................................................26

*Galloway* v. *Lorimar Motion Picture Mgmt., Inc.*,
    562 N.E.2d 949 (Ohio Ct. App. 1989)................................................................26

*Glassner* v. *R. J. Reynolds Tobacco Co.*,
    223 F.3d 343 (6th Cir. 2000) .............................................................................29

*Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC, et al.* v. *Countrywide Fin. Corp.*,
    slip op. (N.Y. Sup. Ct. October 7, 2010) ...........................................................30

*Hardin* v. *Reliance Trust Co.*,
    No. 1:04-cv-2079, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006) ..................4, 16

*Herakovic* v. *Catholic Diocese of Cleveland*,
    No. 85467, 2005 WL 3007145 (Ohio Ct. App. Nov. 10, 2005) ....................31, 34

*Herrick* v. *Liberty League Int'l*,
    No. 1:07-cv-936, 2008 WL 2230702 (S.D. Ohio May 28, 2008)....................31, 32

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) .............................................................................24

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)................................................................24

**Page(s)**

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    218 F.R.D. 76 (S.D.N.Y. 2003) ................................................................13

*In re Morgan Stanley Mortg. Pass-Through Certificates,*
    No. 09 Civ 2137 (LTS) (MHD), 2010 WL 3239430 (Aug. 17, 2010) ...................14

*In re Nat'l Century Fin. Enters. Inv. Litig.,*
    504 F. Supp. 2d 287 (S.D. Ohio 2007) ................................................... 34

*In re Nat'l Century Fin. Enters. Inv. Litig.,*
    541 F. Supp. 2d 986 (S.D. Ohio 2007) ...............................................19, 28

*Ind. State Dist. Council of Laborers* v. *Omnicare,*
    583 F. 3d 935 (6th Cir. 2009) ...............................................................13

*J&R Mktg.* v. *Gen. Motors Corp.,*
    549 F.3d 384 (6th Cir. 2008) .................................................................5

*Koyo Corp.* v. *Comerica Bank,*
    No. 1:10 CV 2557, 2011 WL 4540957 (N.D. Ohio Sept. 29, 2011) ....................34

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.,*
    2012 WL 1352590 (2d Cir. Apr. 19, 2012) ............................................27, 28

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.,*
    821 F. Supp. 2d 616 (S.D.N.Y. 2011)...................................................5, 27

*Lasmer Indus.* v. *AM Gen., LLC,*
    741 F. Supp. 2d 829 (S.D. Ohio 2010) ...............................................19, 20, 34

*Lentell* v. *Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005)...............................................................5, 29

*Lesick* v. *Mannick,*
    No. 91-C-70, 1992 WL 380284 (Ohio Ct. App. Dec. 17, 1992) .........................34

*Local 295/Local 851 IBT Emplr. Grp. Pension Trust & Welfare Fund* v. *Fifth Third Bancorp,*
    731 F. Supp. 2d 689 (S.D. Ohio 2010) ....................................................28

*Lopardo* v. *Lehman Bros., Inc.,*
    548 F. Supp. 2d 450 (N.D. Ohio 2008).................................................13, 31

*Luminent Mortg. Capital, Inc.* v. *Merrill Lynch & Co.,*
    652 F. Supp. 2d 576 (E.D. Pa. 2009) ......................................................29

**Page(s)**

*Mass. Mut. Life Ins. Co.* v. *Residential Funding Co.*,
No. 11-30035-MAP, 2012 WL 479106 (D. Mass. Feb. 14, 2012) .........................................25

*Metz* v. *Unizan Bank*,
649 F.3d 492 (6th Cir. 2011) .................................................................................3, 4, 14

*Morrow* v. *Reminger & Reminger Co. LPA*,
915 N.E.2d 696 (Ohio Ct. App. 2009) .....................................................................20, 33

*N.J. Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*,
720 F. Supp. 2d 254 (S.D.N.Y. 2010) .............................................................................25

*N.J. Carpenters' Health Fund* v. *NovaStar Mortg., Inc.*,
2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ...............................................................21, 22

*New England Health Care Employees Pension Fund* v. *Ernst & Young, LLP*,
336 F.3d 495 (6th Cir. 2003) ..........................................................................................14

*Ohio Police & Fire Pension Fund* v. *Std. & Poor's Fin. Serv.*,
813 F. Supp. 2d 871 (S.D. Ohio 2011) ...........................................................12, 13, 20, 24

*Pappas* v. *Ippolito*,
895 N.E.2d 610 (Ohio Ct. App. 2008) ..............................................................................34

*Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) ..........................................................................27, 19

*Republic Bank & Trust Co.* v. *Bear, Stearns, & Co., Inc.*,
707 F. Supp. 2d 702 (W.D. Ky. 2010) ..............................................................................21

*RSM Prod. Corp.* v. *Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009) .......................................................................13, 23, 25

*Schlenker Enters., LP* v. *Reese*,
Nos. 2-10-16, 2-10-19, 2010 WL 4323662 (Ohio Ct. App. Nov. 1, 2010) ...........................31

*Schubert* v. *Neyer*,
165 N.E.2d 226 (Ohio Ct. App. 1959) ..............................................................................26

*Sell* v. *Zions First Nation Bank*,
2006 WL 322469 .........................................................................................................32

*State* v. *Lanning*,
832 N.E.2d 143 (Ohio Ct. App. 2005) ..............................................................................33

*State* v. *Warner*,
55 Ohio St. 3d 31 (1990)................................................................................................27

**Page(s)**

*Stichting Pensioenfonds ABP* v. *Countrywide Fin. Corp.*,
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) ..................................................4, 18

*Stuckey* v. *Online Resources Corp.*,
    819 F. Supp. 2d 673 (S.D. Ohio 2011) ..................................................12

*The Western and Southern Life Ins. Co.* v. *Countrywide*,
    Nos. 2:11-ML-2265-MRP (MANx), 2:11-cv-7166-MRP (MANx), 2:11-cv-9889-
    MRP (MANx), 2012 WL 1097244 (C.D. Cal. Mar. 9, 2012) ........................11, 17

*Union Square Realty, Inc.* v. *Golfers & Hackers, Inc.*,
    No. 2010 CA 00005, 2011 WL 1466308 (Ohio Ct. App. Apr. 18, 2011) ................30

*VanDenBroeck* v. *Commonpoint Mortgage Co.*, *abrogated on other grounds*
    210 F.3d 696 (6th Cir. 2000) .............................................................5, 33

*Village of Oakwood* v. *State Bank & Trust Co.*,
    539 F.3d 373 (6th Cir. 2008) .............................................................6, 35

*Vitek* v. *AIG Life Brokerage*,
    No. 06-cv-615, 2008 WL 4372670 (S.D. Ohio Sept. 22, 2008) ......................20

*Wuliger* v. *Owens*,
    365 F. Supp. 2d 838 (N.D. Ohio. 2005) ..................................................4, 19

*Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*,
    413 F.3d 553 (6th Cir. 2005) .............................................................19

## Statutes and Other Authorities

**Page(s)**

Fed. R. Civ. P. 9(b) ...........................................................................13, 20, 22, 26

Fed. R. Civ. P. 12(b)(6) .......................................................................1, 12

12 U.S.C. § 1821(d) ...........................................................................35

15 U.S.C. §§ 77k, 77l(a)(2) ..................................................................21

15 U.S.C. § 77m ...............................................................................18, 19

O.R.C. § 1707.41 ..............................................................................21, 28, 29

O.R.C. § 1707.43(B) ..........................................................................13

O.R.C. § 1707.44 ..............................................................................21, 26

**Page(s)**

O.R.C. § 2305.09(D)............................................................................................20

O.R.C. § 2923 ............................................................................................31, 32, 34

17 C.F.R. § 229.1121 ............................................................................................10

Defendants JPMorgan Chase Bank, N.A., J.P. Morgan Mortgage Acquisition Corporation, J.P. Morgan Securities LLC, J.P. Morgan Asset Acceptance Corporation I, Washington Mutual Mortgage Securities Corporation, WaMu Capital Corporation and WaMu Asset Acceptance Corporation (collectively, "defendants") respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' Second Amended Complaint ("SAC" or "complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## INTRODUCTION AND SUMMARY PURSUANT TO LOCAL RULE 7.2(a)(3)

Plaintiffs are sophisticated insurance companies and investment advisors operating as part of the Western & Southern Financial Group that purchased billions of dollars of residential mortgage-backed securities ("RMBS") before the unprecedented implosion of the housing market. Plaintiffs now want this Court to undo those investments. In this action, one of seven lawsuits filed by plaintiffs against dozens of financial institutions that participated in the issuance of RMBS,[2] plaintiffs contend that untold numbers of loan originators and brokers, appraisers, due diligence firms, loan servicers and mortgage insurers were knowing participants in a massive scheme to originate and securitize defective mortgage loans. At the same time, plaintiffs claim that, despite sitting squarely in the middle of this supposed colossal conspiracy,

---

[1]   Plaintiffs are The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company and Fort Washington Investment Advisors, Inc. (collectively, "plaintiffs").

[2]   *The Western and Southern Life Ins. Co.* v. *Countrywide Fin. Corp.*, No. 1:11-CV-267 (S.D. Ohio Apr. 11, 2011), *transferred to* 2:11-cv-07166 (C.D. Cal.); *The Western and Southern Life Ins. Co.* v. *Residential Funding Co., LLC*, No. A1105042 (Hamilton C.P. June 29, 2011); *The Western and Southern Life Ins. Co.* v. *DLJ Mortg. Capital, Inc.*, A1105352 (Hamilton C.P. July 11, 2011); *The Western and Southern Life Ins. Co.* v. *Morgan Stanley Mortg. Capital*, No. A1105563 (Hamilton C.P. July 18, 2011); *The Western and Southern Life Ins. Co.* v. *GS Morg. Sec.*, No. A1106193 (Hamilton C.P. Aug. 5, 2011); *The Western and Southern Life Ins. Co.* v. *Bank of America*, No. A1106524 (Hamilton C.P. Aug. 18, 2011).

they did not know, and could not have known, of the purported industry-wide mortgage fraud that is the factual predicate of their claims.

In their 367-paragraph complaint, plaintiffs contend that they purchased approximately $202 million of securities in ten separate RMBS offerings sponsored and underwritten by defendants between 2005 and 2007 (the "Offerings") pursuant to offering materials that supposedly contained materially false and misleading statements. Plaintiffs assert fourteen causes of actions for violations of the Ohio Securities Act ("OSA"), the Ohio Corrupt Activities Act ("OCAA"), the Securities Act of 1933 ("Securities Act") and common-law fraud, conspiracy and tortious inteference with contract, seeking to hold defendants liable for their investment losses. The length of plaintiffs' complaint should not be mistaken for merit. It relies almost exclusively on allegations from other lawsuits and investigations having no relation to the securities or mortgage loans that are the subject of this lawsuit. Of the handful of allegations that purport to bear any connection to the mortgage loans at issue, plaintiffs simply copy those allegations from complaints in other cases, which is not enough to support their far-reaching claims of fraud and conspiracy. Rather, plaintiffs ask the Court to assume that defendants defrauded them because their RMBS declined in value. Of course, their investments lost value in the wake of the worst economic crisis since the Great Depression, and their unsupported inference of fraud must be rejected as fraud-by-hindsight pleading.

Plaintiffs' failure to plead particularized facts as to their RMBS and the Offerings in which they purchased them is fatal for one of two reasons. Either (1) plaintiffs had enough information to plead their claims more than two years before they filed suit, leading to the conclusion that their claims are time-barred under the applicable statutes of limitations; or (2) the allegations in the complaint—which are not tied to the Offerings or mortgage loans backing their

RMBS—are too general to state viable claims with respect to these Offerings.  In other words, if plaintiffs are correct that their generalized allegations are sufficient to state claims, even though they are not specific to the Offerings, then the claims are untimely and must be dismissed for that threshold reason.  It must be one or the other.

  **Untimeliness.**  Plaintiffs commenced this action on June 22, 2011.  Their OSA and common-law fraud claims are governed by a two-year statute of limitations.  Although plaintiffs claim that they did not know, and could not have known, of their claims prior to June 22, 2009, their own allegations and public statements prove otherwise.  In March 2009, for example, plaintiffs testified to Congress that their RMBS losses were in part attributable to "rampant fraud" and "poor underwriting standards"—the very matters upon which they now base their claims.  Further, plaintiffs point to "[w]idespread [d]efaults and [d]owngrades" on their RMBS as supposed evidence of an abandonment of underwriting standards.  (SAC ¶¶ 129-134.)  The mortgage loans at issue began experiencing unexpectedly high defaults and downgrades long before June 2009.  Plaintiffs thus knew more than two years before filing suit that (i) their RMBS losses were due to supposed "rampant fraud" in the industry and (ii) the mortgage loans at issue were experiencing widespread defaults and delinquencies.  Nothing more was required to trigger the limitations period. *See Metz* v. *Unizan Bank*, 649 F.3d 492, 498 (6th Cir. 2011); *Cain* v. *Mid-Ohio Sec., Inc.*, 2007 WL 2080553, at *3 (Ohio Ct. App. July 23, 2007).

  Plaintiffs cannot avoid the limitations bar by arguing that, although they may be charged with knowledge of alleged mortgage abuses affecting the industry generally, they were not on notice of claims against defendants with respect to the Offerings.  That argument is foreclosed by their failure to plead particularized facts specific to the Offerings.  Long before June 2009, there were myriad news reports and other RMBS-related lawsuits making identical

generalized allegations *against defendants*.  Plaintiffs' OSA and common-law fraud claims are

therefore barred by the two-year statute of limitations.  *A fortiori*, their Securities Act claims,

which are governed by a shorter one-year statute of limitations, are likewise time-barred.  *See*

*Boilermakers Nat. Annuity Trust Fund* v. *WaMu Mortg. Pass Through Certificates*, 748 F. Supp.

2d 1246, 1258-59 (W.D. Wash. 2010); *Stichting Pensioenfonds ABP* v. *Countrywide Fin. Corp.*,

802 F. Supp. 2d 1125, 1137 (C.D. Cal. 2011); *Hardin* v. *Reliance Trust Co.*, 2006 WL 2850455,

at *9-10 (N.D. Ohio Sept. 29, 2006).

        Some of these claims are also barred by the applicable statutes of repose.

Plaintiffs' Securities Act claims are categorically barred by the three-year statute of repose

because plaintiffs purchased the relevant RMBS more than three years before filing suit.  *See*

*Wuliger* v. *Owens*, 365 F. Supp. 2d 838, 844-46 (N.D. Ohio. 2005).  Plaintiffs' OSA and

common-law fraud claims are governed by a five-year statute of repose and are barred with

respect to three offerings that occurred before June 2006, more than five years before plaintiffs

brought suit.  *See Metz*, 649 F.3d at 498-99.

        Finally, plaintiffs' tortious interference with contract claim likewise is untimely

under the applicable four-year statute of limitations because the alleged contract interference

occurred more than four years before the start of this action.  Plaintiffs' conspiracy claims are

barred for the same reasons that the underlying claims from which they are derived are barred.

        **Failure To State Viable Claims.**  Even if the complaint were timely (it is not), it

suffers from incurable legal defects compelling its dismissal as a matter of law.  The OSA,

Securities Act and common law fraud claims fail for at least four reasons:

- *No Actionable Material Misrepresentations.*  Plaintiffs fail to plead adequately any
actionable material misstatements or omissions in the applicable offering materials.  In
fact, (i) the complaint is devoid of allegations that specifically relate to any of the
Offerings; (ii) the offering materials accurately disclosed the information that plaintiffs

allege was misrepresented; and (iii) the alleged misrepresentations were either non-actionable statements of opinion (appraisals, LTVs and credit ratings) or statements of future intent (transfer of title).  *See J&R Mktg.* v. *Gen. Motors Corp.*, 549 F.3d 384, 392-93 (6th Cir. 2008); *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *12 (S.D.N.Y. Sept. 28, 2010).

- *No Scienter or Knowledge.*  Plaintiffs fail to plead adequately that defendants had the requisite mental state—intent to defraud or knowledge of the alleged misstatements.  Instead, plaintiffs recite alleged facts from other proceedings with no nexus to the Offerings, and then leap to the conclusion that defendants engaged in fraud with respect to the Offerings.  This is a fraud case—plaintiffs are required to plead particularized facts to sustain their claims.  They have not come close to doing so.  *See Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011).

- *No Reasonable Reliance.*  Plaintiffs are sophisticated investors with extensive experience and expertise in the RMBS markets.  If, as plaintiffs allege, there was an industry-wide fraud, then it is implausible that plaintiffs did not know about it.  *Cf. Ashland* v. *Morgan Stanley & Co., Inc.*, 652 F.3d 333, 335 (2d Cir. 2011).

- *No Loss Causation.*  Plaintiffs have made no attempt to plead that their alleged losses—which occurred only *after* the crash of the housing market and concomitant financial crisis—resulted from alleged misrepresentations rather than the cratering of the economy.  *See Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005).

None of the other legal theories in the complaint fare any better.  Plaintiffs' OCAA claims—which are nothing more than a creative recasting of their core securities claims to avoid the limitations bar on those claims—fail because the laundry list of supposed "predicate acts" does not establish the requisite "pattern of corrupt activity," nor does the vast array of unspecified mortgage market participants constitute an "enterprise."  *VanDenBroeck* v. *Commonpoint Mortgage Co.*, 210 F.3d 696, 699-700 (6th Cir. 2000).  Plaintiffs' tortious interference claim cannot survive because (i) plaintiffs do not allege compliance with the contractually mandated procedures for bringing such claims and (ii) defendants cannot be found to have tortiously interfered with their own contract.  *See Ellington Credit Fund, Ltd.* v. *Select Portfolio Serv., Inc.*, 2011 WL 6034310, at *9-12 (S.D.N.Y. Dec. 5, 2011); *Adkins* v. *Uranium Disposition Servs.*, 2011 WL 923351, at *2 (S.D. Ohio Feb. 14, 2011).  Plaintiffs' conspiracy claims are derivative of their other claims and thus fail for the same reasons.

**FIRREA Preclusion.** Plaintiffs' claims against JPMorgan Chase Bank, N.A.

("JPMC Bank") as the purported successor-in-interest to Washington Mutual Bank ("WMB") are

also barred by the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA").

*See Village of Oakwood* v. *State Bank & Trust Co.*, 539 F.3d 373, 386 (6th Cir. 2008).

## BACKGROUND

In this variant of their many RMBS-related lawsuits, plaintiffs seek to rescind

RMBS issued by two separate groups of corporate affiliates—heritage JPMorgan Chase & Co.

affiliates (the "JPM defendants") and heritage Washington Mutual Bank ("WMB") affiliates (the

"WaMu defendants"). (SAC ¶¶ 21-35.) At the time of the Offerings, there was no corporate

affiliation between the JPM defendants and WaMu defendants. In September 2008, JPMC Bank

purchased certain assets of WMB from the Federal Deposit Insurance Corporation ("FDIC").[3]

The WaMu defendants are now subsidiaries of JPMC Bank.

In their complaint, plaintiffs allege as follows: Between October 5, 2005 and

October 11, 2007, plaintiffs purchased sixty-three RMBS certificates (the "Certificates") in ten

Offerings, representing a face value of approximately $202 million. (SAC ¶¶ 2, 254.) Those

Certificates, like RMBS certificates generally, were created in a multi-step process that, in broad

terms, included (i) the origination of loans by mortgage originators pursuant to their respective

underwriting guidelines; (ii) the acquisition and aggregation of loans by a so-called securitization

"sponsor"; (iii) the transfer of the pooled mortgages to a "depositor," which then transfers the

---

[3]     On September 25, 2008, the Office of Thrift Supervision closed WMB and appointed the
FDIC as its receiver. The FDIC thereafter sold certain assets and liabilities of WMB to JPMC
Bank. Plaintiffs allege that JPMC Bank is liable for the pre-closing conduct of WMB (not a
defendant) as its purported successor-in-interest. (SAC ¶ 29.) As discussed *infra*, those claims
fail under FIRREA. In addition to moving to dismiss these successor claims, JPMC Bank has
filed a third-party complaint against the FDIC for indemnification of any losses or costs incurred
relating to the pre-closing activities of WMB. (*See* Dkt. No. 51.)

loans to a trust for the benefit of investors in exchange for certificates representing specified

interests in the principal and interest streams generated by the pool of loans held by the trust; and

(iv) the sale of certificates by the depositor to an underwriter for eventual resale to investors in

public or private offerings.  (SAC ¶¶ 44-45.)  Plaintiffs allege that defendants served as

originators, sponsors, depositors and/or underwriters for the Offerings at issue.  (SAC ¶¶ 21-32.)

### A.    Alleged Misrepresentations in the Offering Materials

Plaintiffs contend that the offering materials for their RMBS contain several

categories of material misstatements and omissions in violation of the OSA, the Securities Act

and common-law fraud.  (SAC ¶¶ 55-184.)  The complaint, however, is fatally flawed because it

fails to allege facts that adequately link plaintiffs' generalized allegations to the specific

mortgage loans backing the Certificates (the "Mortgage Loans").

*First*, with respect to underwriting guidelines, plaintiffs contend that the Mortgage

Loans "did not comply with disclosed underwriting standards because those standards were

systematically disregarded."  (SAC ¶¶ 69, 78.)  In particular, plaintiffs contend that originators

did not assess the creditworthiness of borrowers (SAC ¶¶ 57, 71) and that defendants' loan-level

due diligence alerted defendants to "defective loans" that failed to comply with the represented

guidelines (SAC ¶ 88).  Other than referencing publicly available loan performance and ratings

data for the Certificates (a matter of public record years before plaintiffs filed this suit in June

2011), the complaint includes no facts to support the supposed abandonment of underwriting

standards that are specific to the Mortgage Loans.  In support of their allegations, plaintiffs rely

on (i) a January 2011 report by the Financial Crisis Inquiry Commission ("FCIC") (the "FCIC

Report") (SAC ¶¶ 79-90), (ii) testimony provided by the Chief Executive Officer of JPMorgan

Chase & Co. (together with its affiliates, "JPM") before the FCIC (SAC ¶¶ 92-93), (iii) news

reports regarding JPM (SAC ¶¶ 95-96), (iv) an April 2011 report of the Senate Permanent

Subcommittee on Investigations (the "2011 Senate Subcommittee Report") regarding Washington Mutual Bank and its affiliates ("WaMu") (SAC ¶¶ 97-112), and (v) public reports and lawsuits concerning mortgage lenders that originated some of the Mortgage Loans at issue (SAC ¶¶ 113-128). None of these allegations is specific to the Mortgage Loans.

*Second*, with respect to appraisals, plaintiffs contend that defendants misrepresented the independence and integrity of the appraisal process, because "the appraisers were not independent from the respective mortgage lenders" and "the appraisals failed to conform to industry standards." (SAC ¶ 136.) Plaintiffs also assert that the statistics regarding loan-to-value ratios for the Mortgage Loans were based on "inflated and fraudulent property appraisals" and thus were misrepresented in the offering materials. (SAC ¶¶ 135-151.) In support, plaintiffs rely primarily on the FCIC Report and 2011 Senate Subcommittee Report (SAC ¶¶ 137-140), neither of which relates to the appraisals performed for the Mortgage Loans.

Plaintiffs also try to rely on allegations from other lawsuits involving some of the same Offerings at issue in this action. (SAC ¶¶ 146-148.) For example, plaintiffs allege that Allstate Insurance Company ("Allstate") purchased certificates in one of the same offerings as they did and that Allstate performed an unidentified "loan-level analysis" to "determine[] that the LTV ratios were on average much higher than the Offering Materials represented." (SAC ¶ 146.) Plaintiffs nowhere allege, however, that they independently analyzed or reviewed the appraisals or Mortgage Loans at issue. (SAC ¶ 149.)

*Third*, with respect to owner occupancy rates, plaintiffs assert that defendants misrepresented the percentage of owner-occupied properties securing the Mortgage Loans. (SAC ¶¶ 152-159.) Plaintiffs offer no factual support for this assertion other than references to

Allstate's allegations in another lawsuit. (SAC ¶ 156.) Again, plaintiffs have not alleged that they performed any analysis of their own that applies specifically to the Mortgage Loans.

*Fourth*, with respect to credit ratings, plaintiffs contend that defendants "manipulated the ratings process" by providing false data to the rating agencies and misrepresenting the integrity and independence of the credit ratings. (SAC ¶¶ 160-164.) As the sole factual support for this broad assertion, plaintiffs rely on the 2011 Senate Subcommittee Report, which reported that investment banks "were pressuring [the ratings agencies] to ease rating standards." (SAC ¶ 163.) These allegations are not connected to the Offerings.

*Finally*, with respect to transfer of title, plaintiffs assert that defendants misrepresented that title would be effectively transferred and the loans assigned to the issuing trusts after the securitizations closed. (SAC ¶¶ 165-184.) Plaintiffs further contend that defendants failed to disclose that Defendants and other servicers for loans engaged in "deceptive and illegal practices in foreclosure proceedings." (SAC ¶ 184.) In other words, according to plaintiffs, defendants not only knowingly originated and securitized defective mortgage loans, but also continued their scheme post-securitization by "engaging in widespread misconduct in foreclosure proceedings." (SAC ¶ 178.) For support, plaintiffs refer only to other lawsuits and investigations that are not related to the Mortgage Loans.

**B.** **Plaintiffs Knew of Their Claims No Later Than March 2009**

Relying on the foregoing categories of purported misrepresentations, plaintiffs claim that their Certificates have "incurred substantial losses" and that the Certificates would have "held their value had the [underlying] loans been as represented in the Offering Materials." (SAC ¶ 259.) As plaintiffs do not tie their factual allegations to the Offerings or Mortgage Loans, they had knowledge of their claims no later than March 2009.

On March 25, 2009, Bradley Hunkler, the Vice President and Controller of the Western & Southern Financial Group (who also oversees accounting and reporting for plaintiffs) testified before the U.S. House of Representatives Committee on Financial Services that:

- Plaintiffs' RMBS losses were caused in part by "rampant fraud in the . . . origination and underwriting process; poor underwriting standards that . . .did not adequately consider borrower creditworthiness; . . . [and] over-inflated ratings." (Ex. F. at 1-3.)[4]

- "[M]ortgage brokers have committed significant amounts of fraud, and bank and Wall Street underwriting due diligence failed to pick this up." (*Id.* at 4.)

Thus, by no later than March 2009, plaintiffs believed that there was "rampant fraud" in the industry, that originators "did not adequately consider borrower creditworthiness," that credit ratings were inflated, and that the due diligence performed by Wall Street banks failed to identify this purported mortgage fraud. Of course, these are the very same subjects that plaintiffs claim were misrepresented in the offering materials.

At around the same time that Mr. Hunkler was testifying to Congress about "rampant fraud" in the mortgage industry, plaintiffs knew that the loans backing their Certificates were experiencing "[w]idespread [d]efaults and [d]owngrades." (SAC ¶ 129.) In fact, plaintiffs allege that most of the Certificates were experiencing unexpectedly high default and delinquency rates as early as 2008. (SAC ¶ 130.) As plaintiffs admit, they had contemporaenous knowledge of this information because trustees provided plaintiffs with public monthly remittance reports reflecting performance data for the underlying loans, as required by 17 C.F.R. § 229.1121. (SAC ¶ 273.) Further, the ratings downgrades on plaintiffs' Certificates were widely reported and also began to occur by March 2009. (Ex. A.) Thus, by March 2009,

---

[4]     References to "Ex." refer to the Exhibits to the Declaration of Gregory A. Harrison, dated May 23, 2012 ("Harrison Decl."), submitted in support of this motion.

plaintiffs not only believed that their losses were caused by "rampant fraud," but knew that the RMBS Certificates at issue were experiencing unexpectedly high defaults and downgrades.

## C. Plaintiffs' Repackaging of Their Claims To Avoid the Limitations Bar

Plaintiffs did not file this lawsuit, or any of their many other RMBS-related lawsuits, until 2011. Because plaintiffs admitted to having knowledge of their claims by no later than March 2009, defendants in other RMBS lawsuits have moved to dismiss those actions based, in part, on the untimeliness of the claims. Several of those motions are *sub judice*, and one federal court has found that all of plaintiffs' claims (except for those based on transfer of title allegations) are time-barred by the applicable statute of limitations. *See The Western and Southern Life Ins. Co.* v. *Countrywide Fin. Corp.*, 2012 WL 1097244 (C.D. Cal. Mar. 9, 2012).

In light of challenges to the timeliness of their claims in other similar RMBS lawsuits, on March 23, 2012, plaintiffs filed their Second Amended Complaint in this action, which amends their prior allegations in two respects in an attempt to avoid the limitations bar. First, plaintiffs have removed certain allegations that confirmed the untimeliness of their claims. In their First Amended Complaint, for example, plaintiffs alleged that the defaults and downgrades constituted "*strong evidence* that [the Mortgage Loans] were improperly underwritten." (FAC ¶¶ 130 (Dkt. No. 17).) Because this public information was sufficient to serve as a basis for their claims, as they alleged, then it is also sufficient to put plaintiffs on notice of those claims, and did so more than two years before this action was filed. Plaintiffs now contend that they have only "recently come to learn" that the defaults and downgrades cannot be explained by the economic downturn and must be the result of poor underwriting. (SAC ¶ 134.) Plaintiffs' artful deletions cannot nullify the effect of their prior allegations; the fact remains that plaintiffs had knowledge more than two years before filing suit of (i) supposed

"rampant fraud" as the cause of their RMBS losses and (ii) "widespread defaults and downgrades" in the Mortgage Loans.

Second, plaintiffs have repackaged their OSA, Securities Act and common law fraud claims into the following new theories of liability:

- A claim for tortious interference with contract, alleging that defendants tortiously intererefed with plaintiffs' supposed third-party beneficiary rights under the Pooling and Servicing Agreements ("PSAs") governing the relevant securitization trusts by failing to disclose information to trustees regarding the Mortgage Loans. (SAC ¶¶ 300-308.)

- Claims for treble damages under the OCAA, alleging that defendants, their unidentified corporate affiliates and unspecified lenders, brokers, appraisers, servicers, mortgage insurers and other actors in the mortgage markets formed an amorphous "enterprise" that engaged in various disparate predicate offenses amounting to a "pattern of corrupt activity." (SAC ¶¶ 327-347.)

- Civil conspiracy claims, alleging that defendants conspired with themselves and unspecified originators and servicers to defraud plaintiffs. (SAC ¶¶ 315-326.)

The new tortious intererefence with contract and civil conspiracy claims are still untimely, however. Although the OCAA claims are not untimely, they are fatally flawed for other reasons.

## ARGUMENT

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 1949 (2009). Although a court must construe the complaint in the plaintiff's favor and accept the "well-pleaded material allegations in the complaint as true," a court "will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations." *Stuckey* v. *Online Resources Corp.*, 819 F. Supp. 2d 673, 680 (S.D. Ohio 2011); *Ohio Police & Fire Pension Fund* v. *Std. & Poor's Fin. Serv.*, 813 F. Supp. 2d 871, 876 (S.D. Ohio 2011) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." (quoting *Iqbal*, 556 U.S. 662 at 679)). Further, unproven allegations from other lawsuits or investigations are immaterial as a matter of law. *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("[P]aragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (same).

Because this is a fraud case, plaintiffs must plead the circumstances constituting the fraud with particularity. Fed. R. Civ. P. 9(b). These heightened pleading standards apply to claims in which fraud is an element, as well as claims grounded or sounding in fraud. *See Ind. State Dist. Council of Laborers* v. *Omnicare*, 583 F. 3d 935, 948 (6th Cir. 2009); *see also Ohio Police & Fire*, 813 F. Supp. 2d at 878-79 (applying 9(b) to OSA claims). Plaintiffs, "at a minimum, must allege the time, place, and content of the alleged misrepresentation on which [they] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Ohio Police & Fire*, 813 F. Supp. 2d at 878-79 (quoting *Walburn* v. *Lockheed Martin Corp.*, 431 F.3d 966, 972 (6th Cir. 2005) (internal quotation marks omitted)).

Here, the Court does not need to consider whether plaintiffs' claims are adequately pleaded because, with the exception of the OCAA claim, they are time-barred. Even if the claims were timely, however, none comes close to meeting plaintiffs' heightened pleading burden. The Complaint should be dismissed in its entirety with prejudice.

## I. PLAINTIFFS' CLAIMS ARE TIME-BARRED.

### A. The OSA, Common-Law Fraud and Securities Act Claims Are Barred by the Applicable Statutes of Limitations.

Plaintiffs' OSA and common-law fraud claims are subject to a two-year statute of limitations. O.R.C. § 1707.43(B); *see Lopardo* v. *Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 467

(N.D. Ohio 2008).  This limitations period "begins running once plaintiffs are deemed to be on notice to investigate the facts and circumstances relevant to their claim." *Metz*, 649 F.3d at 498 (quoting *Flowers* v. *Walker*, 63 Ohio St. 3d 546, 549 (1992)).  Once the duty to investigate is triggered, "[n]o more than a reasonable opportunity to discover the [fraud] is required to start the period of limitations." *Cain*, 2007 WL 2080553, at \*3.  Here, plaintiffs' own allegations and judicially noticeable facts demonstrate that plaintiffs had enough information to plead the same claims more than two years before bringing them.[5]

　　　To begin, as evidenced by Mr. Hunkler's congressional testimony, plaintiffs had actual knowledge of the allegations underlying their claims more than two years before bringing them.  Plaintiffs also were aware of "[w]idespread [d]efaults and [d]owngrades" affecting the Certificates more than two years before they sued.  (SAC ¶¶ 129-134.)  Indeed, by June 2009, some of the Certificates were experiencing defaults and delinquencies as high as thirty-five or forty percent and the ratings on all of the Certificates had been downgraded at least once, and all but one had been downgraded to "junk-bond" status.  (Ex. A.)  *See In re Morgan Stanley Mortg. Pass-Through Certificates*, 2010 WL 3239430, at \*7-8 (Aug. 17, 2010) (securities claims untimely where monthly remittance reports showed high delinquencies).  Plaintiffs had enough information to connect the alleged "rampant fraud" to the RMBS at issue here by March 2009.

　　　Plaintiffs allege that they learned of their claims "[a]s a result of government reports and media investigations within two years of the filing of [their] original complaint in June 2011." (SAC ¶ 129.)  But, as described below, these "government reports and media

---

[5]　　　The Court may take judicial notice of public news articles, reports, Congressional testimony, pleadings filed in other judicial actions, and documents filed with the Securities and Exchange Commission. *See New England Health Care Employees Pension Fund* v. *Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *Bovee* v. *Coopers & Lybrand, C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001).

investigations" did not reveal any information specific to the Offerings or Mortgage Loans. Rather, they are just the same types of non-specific assertions that had long been the subject of the earlier widespread press releases, lawsuits and investigations.

      **WaMu.** Plaintiffs point principally to the 2011 Senate Subcommittee Report and other similar news articles to support their assertion that they learned of the purportedly fraudulent origination and securitization practices at WaMu within two years of filing suit. (SAC ¶¶ 97-98.) But news articles concerning purported mortgage abuses at WaMu saturated the market long before June 2009, especially after WMB was seized by regulators in September 2008. For example, in December 2008, in an article entitled *Saying Yes to Anyone, WaMu Built Empire on Shaky Loans*, the New York Times reported on alleged "relaxed standards," inflated appraisals and "relentless pressure to churn out loans" at WaMu. (Ex. D.1.) Other articles likewise reported allegations that WaMu underwriters were "pressured . . . to approve loans, no matter what" and ignore fraud (Ex. D.2). Other examples abound. (*See, e.g.*, Exs. D.2-D.4.)

      Several lawsuits and investigations, commenced before June 2009, made similar allegations against WaMu. For example:

- In 2007, the New York Attorney General ("NYAG") filed a lawsuit accusing WaMu of pressuring appraiser eAppraiseIT to artificially inflate appraisals. (Ex. B.1.)

- In December 2008 and January 2009, two class action lawsuits were filed and eventually consolidated in Washington federal court ("*Boilermakers*"), alleging that WaMu improperly pressured appraisers and "disregarded [its] underwriting guidelines" and made misrepresentations in the offering documents. (Ex. B.2 ¶ 67; Ex. B.3 ¶¶ 4, 75.)

- In August 2008, a consolidated class action complaint was filed by WaMu stockholders against WaMu and its officers, asserting violations of the Securities Act and section 10(b) of the Exchange Act. The complaint, which alleged, *inter alia*, WaMu "abandoned . . . asserted underwriting standards," was supported by "detailed statements" from nearly ninety confidential witnesses describing WaMu's alleged abuses. (Ex. B.4 ¶ 2.)

      These lawsuits put plaintiffs on notice of their claims against the WaMu defendants before June 2009. Indeed, in the *Boilermakers* action, when plaintiffs tried to bring

additional underwriting and appraisal claims relating to offerings not part of the initial complaints, the court found that those claims were time-barred because, "[i]f the [generalized] allegations [in earlier complaints] are sufficient to state a claim as to the earlier Certificates, they must also be sufficient to put other holders of WaMu certificates on notice of underwriting and appraisal issues." *Boilermakers*, 748 F. Supp. 2d at 1258-59.  The same is true here.  *See Hardin*, 2006 WL 2850455, at *8-9 (OSA claims time-barred where earlier lawsuits put plaintiffs on notice of their claims).

> **JPM.**  To support their claims against the JPM defendants, plaintiffs reference an internal Chase Home Finance memorandum that supposedly outlined "cheats and tricks" to gain approval for risky loans.  (SAC ¶ 95.)  This information was publicly reported in March 2008.  (Ex. D.6.)  Plaintiffs also point to a February 17, 2010 *Bloomberg* article that "revealed" a 2006 directive at JPM to sell subprime mortgage positions.  (SAC ¶ 96.)  This same "revelation" was first published in Fortune Magazine in September 2008.  (Ex. D.7.)  Plaintiffs cannot rely on this information to state their claims and ignore the actual publication dates for the same information.

> Plaintiffs are also charged with constructive knowledge of two putative class actions filed in March 2008 and March 2009 making nearly identical allegations to those plaintiffs make here:

- In March 2008, a putative class action was filed in New York, *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust* v. *J.P. Morgan Acceptance Corp. I*, No. 5675/08 (N.Y. Sup. Ct.) ("*Plumbers' & Pipefitters*"), alleging false statements in offering documents regarding underwriting, due diligence practices, appraisals and credit ratings.  (Ex. B.5 ¶¶ 7, 8, 29, 32-34, 56-57.)  Not only were the allegations similar to those here, the original complaint asserted claims as to two of the very same offerings—JPMAC 2006-WF1 and JPMAC 2007-CH1.  (*See id.* ¶¶ 15, 64.).

- In March 2009, another putative class action, *Fort Worth Employees' Retirement Fund* v. *J.P. Morgan Chase & Co.*, No. 600767/2009 (N.Y. Sup. Ct.), was filed in New York, alleging misrepresentations regarding underwriting standards, appraisals, LTVs and

credit ratings. (Ex. B.6 ¶¶ 63-65.) Further, the loans underlying the offerings were originated by many of the same originators at issue here. (*See id.* ¶ 54.)

These two actions put plaintiffs on notice of their claims against the JPM defendants more than two years before they sued.

**Relevant Originators.** To further support their claim that defendants misrepresented underwriting standards, plaintiffs allege that defendants "acquired loans from third-party originators that systematically abandoned their loan underwriting standards," including Countrywide, GreenPoint, Wells Fargo and MortgageIT. (SAC ¶ 113; *see* ¶¶ 114-128.) These same allegations were in the public domain long before June 2009. (*See* Ex. C.) *First*, as already found by at least one court, with regard to Countrywide, plaintiffs were on notice of claims against Countrywide by April 2009, "at a bare minimum," due to "various press reports and legal proceedings." *Western & Southern Life. Ins. Co.* v. *Countrywide Fin. Corp.*, 2012 WL 1097244, at *11. *Second*, with regard to GreenPoint and Wells Fargo, plaintiffs rely exclusively on allegations made in two other lawsuits to support their claim that these originators "systematically disregarded [their] underwriting standards." (SAC ¶¶ 119, 124.) Yet, those lawsuits—*U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortgage Funding, Inc.*, No 09-600352 (N.Y. Sup. Ct.), and *In re Wells Fargo Mortgage Backed Certificates Litig.*, No. 09-cv-1376 (N.D. Cal.)—were filed in February and March 2009, respectively. (Ex C.) *Third*, with regard to MortgageIT, plaintiffs not only again rely exclusively on allegations from other lawsuits, but also ignore other earlier lawsuits and reports that MortgageIT originated loans that failed to comply with their underwriting guidelines (*see id.*). Plaintiffs' allegations regarding these mortgage originators only confirms the untimeliness of their claims. *See Stichting*, 802 F. Supp. 2d at 1137 (plaintiff is "clearly on notice" of its claims from earlier "complaints and public press reports" regarding the same conduct).

-17-

In sum, plaintiffs cannot justify their delay in bringing suit by referring to other "government reports and media investigations." These later reports and investigations merely parroted the generalized allegations in numerous prior reports, lawsuits and investigations concerning defendants and the originators at issue here. Had the later reports or investigations on which plaintiffs rely referenced specific factual allegations as to the Offerings or Mortgage Loans, then perhaps plaintiffs could credibly argue that the statute of limitations as to these Offerings was not triggered until the later reports and investigations came to light. But that is not the case—no information revealed in these later "government reports and media investigations" relates to the Offerings or Mortgage Loans. Consequently, if plaintiffs are correct that the information in these later reports and investigations is sufficient to state a claim for fraud and other securities violations with respect to the Offerings, then plaintiffs had enough information to state these same claims before June 22, 2009. Plaintiffs' OSA and common-law fraud claims are therefore barred by the two-year statute of limitations.

The same reaasoning applies, *a fortiori*, to plaintiffs' Securities Act claims. These claims are governed by an even shorter limitations period—one year from discovery of the alleged misstatements. *See* 15 U.S.C. § 77m. For the reasons just discussed, plaintiffs had notice of their claims long before June 22, 2010 (one year before bringing them). In fact, in support of their claims, plaintiffs refer to publications from January and February 2010. (*See* SAC ¶¶ 92, 96.) Again, plaintiffs' own allegations demonstrate the untimeliness of their claims.

### B.    Plaintiffs' OSA, Common-Law Fraud and Securities Act Claims Are Independently Barred by the Applicable Statutes of Repose.

Plaintiffs' OSA and common-law fraud claims are governed by a five-year statute of repose, triggered from the date of sale, that constitutes an absolute bar to suit regardless of when a plaintiff discovered the relevant facts. *In re Nat'l Century Fin. Enters. Inv. Litig.*, 541 F.

Supp. 2d 986, 1008-09 (S.D. Ohio 2007).  Because plaintiffs purchased their Certificates in the

WMALT 2005-7, WMALT 2005-9,[6] and WMALT 2006-4 securitizations more than five-years

before filing suit (*see* SAC Ex. A), their OSA and common-law fraud claims as to these three

offerings are barred by the statute of repose.

      With regard to plaintiffs' Securities Act claims, the Securities Act absolutely bars

all claims filed more than three years after the security first was offered to the public (for Section

11 claims) or sold to the plaintiff (for Section 12(a)(2) claims).  *See* 15 U.S.C. § 77m; *see also*

*Wuliger*, 365 F. Supp. 2d at 844.  Because the Certificates were offered, and plaintiffs purchased

them, more than three years before suing (*see* SAC Ex. A), their Securities Act claims are

categorically barred by the three-year statute of repose.[7]

### C.    Plaintiffs' Tortious Interference With Contract and Civil Conspiracy Claims Are Barred by the Applicable Statutes of Limitations.

      Plaintiffs' claim for tortious interference with contract is subject to a four-year

statute of limitations.  *See* O.R.C. § 2305.09(D); *Lasmer Indus.* v. *AM Gen., LLC*, 741 F. Supp.

2d 829, 836 (S.D. Ohio 2010).  The four-year period begins to run on the date of the first alleged

breach giving rise to the tortious interference claim—regardless of when the breaches are

discovered or whether they continue.  *Lasmer*, 741 F. Supp. 2d at 836-37; *Vitek* v. *AIG Life*

*Brokerage*, 2008 WL 4372670, at *5 & n.5 (S.D. Ohio Sept. 22, 2008).  Thus, if any of the

---

[6]    With the exception of two Fort Washington purchases totalling $1,906,217.34, which Plaintiffs allege occurred on or near September 26, 2007.  (*See* SAC Ex. A.)

[7]    Plaintiffs assert their Securities Act claims were tolled by the filing of the class action complaint in *Plumbers' & Pipefitters.*  (SAC ¶¶ 353, 360.)  Plaintiffs are wrong.  First, the statute of repose is not subject to tolling.  *See, e.g., Footbridge Ltd. Trust* v. *Countrywide Fin. Corp. Inc.*, 770 F. Supp. 2d 618, 624-627 (S.D.N.Y. 2011).  Second,  there has been no class certification decision in *Plumbers*, and, in the Sixth Circuit, plaintiffs may not rely on tolling until class certification is denied in the action of which they claim to be putative class members.  *See Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*, 413 F.3d 553, 568-69 (6th Cir. 2005).

alleged breaches occurred before June 22, 2007 (four years before plaintiffs brought their claim), then the tortious interference with contract claim is untimely.

Plaintiffs allege that certain of the defendants caused the trustees of the issuing trusts to breach their obligations to the certificateholders by failing to disclose to the trustees alleged breaches of representations and warranties concerning the loans.  (SAC ¶¶ 214-221, 302-306.)  Because plaintiffs allege that the loan characteristics and transfer of title provisions were misrepresented as of the closing of the securitizations (*see* SAC ¶¶ 187, 190, 304-306), such interference is alleged to have occurred shortly after each respective transaction closed—and long before June 22, 2007.  These claims accordingly are time-barred.

Plaintiffs' conspiracy claim is a derivative claim that cannot be maintained in the absence of an underlying tort that is actionable without the conspiracy.  *See Morrow* v. *Reminger & Reminger Co. LPA*, 915 N.E.2d 696, 711-12 (Ohio Ct. App. 2009).  Thus, the statutes of limitations for the underlying securities and common-law claims apply to the civil conspiracy claim, *Lasmer*, 741 F. Supp. 2d at 843-844, and plaintiffs' civil conspiracy claims are time-barred for the same reasons as their other claims.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF FEDERAL AND STATE SECURITIES LAWS AND COMMON-LAW FRAUD.

Plaintiffs' securities claims sound in fraud and are governed by Rule 9(b).  *See Ohio Police & Fire*, 813 F. Supp. 2d at 878-79 (applying 9(b) to OSA claims).  Plaintiffs have not pleaded these claims with the requisite particularity for several reasons, as discussed below:

### A.    Plaintiffs Fail To Plead Actionable Misstatements or Omissions.

Plaintiffs are required to plead the existence of a material misstatement or omission in the offering materials.  *See* 15 U.S.C. §§ 77k, 77l(a)(2); O.R.C. §§ 1707.41, 1707.44(B)(4), 1707.44(J).  "The test for whether a statement is materially misleading . . . is

'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Albert Fadem Trust* v. *Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1019 (S.D. Ohio 2004) (quoting *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).

**<u>Underwriting Guidelines.</u>** Plaintiffs have failed to plead actionable misstatements and omissions regarding underwriting standards for several reasons. *First*, none of the underwriting allegations in the complaint relates to any of the Offerings or Mortgage Loans (other than the default and downgrade allegations, which are not sufficient standing alone to state misrepresentation claims). Plaintiffs cannot satisfy their heightened pleading obligations by simply pointing to other lawsuits or investigations that have nothing to do with the Offerings or Mortgage Loans. *Republic Bank & Trust Co.* v. *Bear, Stearns, & Co., Inc.*, 707 F. Supp. 2d 702, 712 (W.D. Ky. 2010) (dismissing securities fraud claims based on misrepresentations of underwriting standards where allegations were not "specific to the loans and securities involved in [the] case"); *City of Ann Arbor Employees' Ret. Sys.* v. *Citigroup Mortg. Loan Trust, Inc.*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring plaintiffs to plead how the misrepresentations "are tied to the loans in which they invested"); *N.J. Carpenters' Health Fund* v. *NovaStar Mortg., Inc.*, 2012 WL 1076143, at *4 (S.D.N.Y. Mar. 29, 2012) ("Plaintiff does not cite any example of a loan that failed to meet the underwriting guidelines and ended up in the []loan pool, let alone the specific loans which secured Plaintiff's investment.").

*Second*, the offering materials did not make the type of categorical and unqualified representations about underwriting standards that plaintiffs pretend they did. Plaintiffs allege that defendants represented that the Mortgage Loans were underwritten pursuant to underwriting standards" intended "to ensure that loans were made only to qualified borrowers and that mortgaged properties provided sufficient collateral." (SAC ¶¶ 56, 70.) In fact, the

offering materials represented only that the mortgage loans would *generally* comply with described underwriting standards, and that originators had discretion to deviate from the guidelines. (*See* Ex. E at 1-2.)  Accordingly, the actual disclosures themselves refute plaintiffs' claim that they were not informed that originaters could, and did, deviate from their underwriting guidelines. *See Footbridge*, 2010 WL 3790810, at *12 (rejecting similar underwriting allegations as "insufficient to set forth a plausible claim of fraud [under] Rule 9(b)").

Further, far from making definitive statements about the characteristics of tens of thousands of mortgage loans underlying the Offerings, the offering materials contemplated that certain loans would inevitably fail to conform to the representations and warranties made about the loans in general.  The offering materials established a contractual procedure to address breaches of representations and warranties, whereby the seller is required to repurchase, substitute or cure defective loans.  (*See* Ex. E at 2.)  This fact also refutes the claim that the offering materials guaranteed that all loans would absolutely conform to the described characteristics. *See Footbridge*, 2010 WL 3790810, at *16 (holding that "repurchase or substitute" provision in offering documents "change[s] the nature of [the] representation" so as to make the statements regarding loan characteristics non-actionable).

*Third*, the alleged misrepresentations regarding underwriting guidelines were not material, especially to these sophisticated plaintiffs, in light of the extensive risk disclosures in the offering materials and widespread contemporaneous public information about alleged underwriting abuses.  Not only did the offering materials *not* guarantee that borrowers would always be able to repay their loans and that the properties would always provide sufficient collateral, the offering materials expressly warned about the potential adverse impact of external events, such as declines in real estate values, on borrowers' ability to repay the loans and the

value of the underlying collateral.  For example, the prospectus supplement for the JPMAC 2007-CH1 Offering discussed recent developments in the mortgage markets, warning that delinquencies and losses with respect to mortgage loans "have increased in recent months, and may continue to increase," and advising investors to "consider that the general market conditions [] may adversely affect the performance and market value of your securities."  (Ex. E at 2-3.)

**Appraisals.**  Plaintiffs allege that the offering materials misrepresented that "[d]efendants required industry-standard appraisals to value properties securing loans underlying the Certificates."  (SAC ¶ 135.)  But "[a] bare assertion that appraisals" were not conducted in accordance with appraisal industry practice is "a legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations." *Employees' Ret. Sys. of the Gov't of the V.I.* v. *J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 153 (S.D.N.Y. 2011).  Again, plaintiffs cite only to industry-wide reports about appraisal abuses that have no connection to the Offerings or Mortgage Loans (*see* SAC ¶¶ 137-140).  This is not enough. *See Footbridge*, 2010 WL 3790810, at *13; *see also Boilermakers*, 748 F. Supp. 2d at 1256 (dismissing appraisal claims where plaintiffs' allegations "offer[] no nexus to the Certificates at issue").

Plaintiffs also allege that the LTV and CLTV ratios in the offerings materials for some of the Offerings were false and misleading, relying on unidentified "loan-level" valuation analyses allegedly performed by Allstate and other plaintiffs in other actions.  (*See* SAC ¶¶ 145-150.)  This is a fraud case, however, and plaintiffs cannot simply rely on allegations from complaints in other pending cases. *See, e.g., RSM Prod. Corp.*, 643 F. Supp. 2d at 403.

Finally, even if plaintiffs had adequately alleged that the appraisal disclosures in the offering materials were inaccurate, plaintiffs' appraisal-related claims fail because appraisals—and thus LTV and CLTV ratios—are non-actionable statements of opinion. *See*,

*e.g.*, *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010) (concluding that appraisals and LTV ratios are statements of opinion). Statements of opinion are actionable only if defendants did not believe them to be true when made, *see In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 571-72 (6th Cir. 2004), which plaintiffs do not allege here, except in wholly conclusory fashion (*see* SAC ¶ 151), which is not enough.

   **Credit Ratings.** It is well settled that investment ratings are subjective opinions. *See In re IndyMac*, 718 F. Supp. 2d at 511-12; *Ohio Police & Fire*, 813 F. Supp. 2d at 882-83. Plaintiffs nevertheless allege that, because of the subsequent downgrades in their Certificates, defendants must have "manipulated" the ratings process. (SAC ¶ 163.) This is again hindsight pleading. Plaintiffs fail to identify any inaccurate or false information defendants provided to the rating agencies regarding the Certificates or to plead any facts specific to defendants and the Offerings that support the contention that defendants "pressure[d]" the rating agencies to inflate the ratings on the Certificates. (*See, e.g.*, SAC ¶ 163.) Plaintiffs' generalized allegations do not satisfy their pleading burden. *See Employees' Ret. Sys. of the Gov't of the V.I.* v. *Morgan Stanley & Co.*, 814 F. Supp. 2d 344, 352 (S.D.N.Y. 2011) (dismissing claims regarding credit ratings where "[p]laintiff offer[ed] nothing regarding this alleged collaboration" between defendant and rating agencies beyond "conclusory allegation[s]" and "general statements").

   Further, plaintiffs' credit rating allegations are inadequate because the offering documents expressly warned investors that (i) the performance of the loans backing the Certificates was unpredictable and could be worse than indicated by historical analyses; and (ii) a rating "is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies." (Ex. E at 5-6.) *See N.J. Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC,* 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010)

(dismissing ratings-based claim because the "Offering Documents disclosed the risks of relying on credit ratings").

**Owner-Occupancy Rates.**  Plaintiffs' allegations regarding owner-occupancy rates fail for two reasons.  *First*, plaintiffs yet again rely exclusively on allegations from other complaints with no independent investigation of the alleged facts (*see* SAC ¶ 156).  This is not allowed.  *See*, *e.g.*, *RSM Prod. Corp.*, 643 F. Supp. 2d at 403.  *Second*, the offering materials stated clearly that occupancy status was based on representations by the borrower.  (*See* Ex. E at 6.)  "[B]ecause the offering documents explicitly stated that all occupancy rates were based only on borrowers' representations and because Plaintiff[s] does not allege that Defendants falsely reported the borrowers' representations, the [offering materials] contain no misstatements or omissions concerning owner-occupancy rates as a matter of law."  *Mass. Mut. Life Ins. Co.* v. *Residential Funding Co.*, 2012 WL 479106, at *8 (D. Mass. Feb. 14, 2012).

**Transfer of Title.**  Plaintiffs allege that the offering documents misrepresented that defendants would transfer and assign loan documentation and mortgage notes securing the loans to the trustees for the issuing trusts (to enable foreclosure, if necessary) because, in many instances, documentation available in public recording offices does not reflect assignments. (SAC ¶¶ 172-176.)  These allegations fail on two fronts.  *First*, plaintiffs have not pled any facts to suggest that the alleged practices affected any of the loans in the Offerings, let alone any loans backing the Certificates.  Rather, plaintiffs allege "widespread" foreclosure misconduct by loan servicers having nothing to do with the Certificates or Mortgage Loans.  (*See* SAC ¶ 178.)  Nor do plaintiffs contend that any of the trusts were unable to foreclose on any of the properties as a result of the supposedly deficient transfer-of-title.  Again, plaintiffs' failure to allege any nexus between the alleged misconduct and the Certificates dooms their claims.

*Second*, these statements are non-actionable promises and representations concerning future conduct. *See Freeman* v. *Westland Builders, Inc.*, 441 N.E.2d 283, 289 (Ohio Ct. App. 1981). The purported transfer-of-title representations—including those alleged in the complaint—provided that such assignments and transfers would occur in the future. Because plaintiffs do not adequately allege that defendants had no intention of carrying out the promised act, plaintiffs' transfer of title claims fail. (SAC ¶¶ 165-184); *see* Fed. R. Civ. P. 9(b).

### B.    Plaintiffs Fail To Plead Scienter and Knowledge.

To state claims for common law fraud and O.R.C. § 1707.44(J), plaintiffs must plead that defendants acted with scienter—an intent to deceive. *See Schubert* v. *Neyer*, 165 N.E.2d 226, 229 (Ohio Ct. App. 1959); *Boomershine* v. *Lifetime Capital, Inc.*, 2008 WL 54803, at *3 (Ohio Ct. App. Jan. 4, 2008). Likewise, three of plaintiffs' OSA claims (O.R.C. §§ 1707.44(B)(4), (J), and (G)) require proof that defendants "knowingly" made misrepresentations.[8] To satisfy their pleading burden, plaintiffs must allege "more than merely conclusory allegations" of intent or knowledge. *Galloway* v. *Lorimar Motion Picture Mgmt., Inc.*, 562 N.E.2d 949, 953 (Ohio Ct. App. 1989).

Plaintiffs' scienter and knowledge allegations are deficient on their face. The complaint repeatedly alleges, in conclusory fashion, only that defendants knew *or should have known* that various statements in the offering materials for the Certificates were purportedly false (*see, e.g.*, SAC ¶¶ 69, 78), suggesting only negligence, not intent to deceive. Further, to the extent that the complaint can even be construed to plead requisite scienter, it relies on (i) the poor performance of the Certificates and (ii) selective quotations from politcally charged government

---

[8]    A person acts knowingly under 1707.44(B), (G), and (J) if he represents "facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain [them]." *State* v. *Warner*, 55 Ohio St. 3d 31, 57 (1990).

reports.  But the poor performance of the Certificates, which is explainable by market forces, is not a substitute for particularized scienter allegations.  *See Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer*, 673 F. Supp. 2d 718, 742 n.24 (S.D. Ind. 2009) ("[P]roof of fraud by hindsight based on post hoc market reactions is not sufficient.").

Moreover, plaintiffs make no effort to tie any of their generalized allegations to any of the Offerings or Certificates.  For example, plaintiffs rely on a late-2007 report by Clayton Holdings to allege that defendants waived in loans they knew did not conform to underwriting guidelines.  (SAC ¶¶ 79-88.).  Yet, plaintiffs fail to allege any connection between the reports and the Mortgage Loans.  *See Landesbank*, 821 F. Supp. 2d at 622 (dismissing fraud claims based on the same Clayton reports referenced in instant action), *aff'd*, 2012 WL 1352590, at *2 (2d Cir. Apr. 19, 2012).  Likewise, plaintiffs' vague references to the defendants' "due diligence" of the loans (SAC ¶¶ 69, 78) are wholly insufficient.  "[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements 'must specifically identify the reports or statements containing this information.'"  *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 2012 WL 1352590, at *2 (2d Cir. Apr. 19, 2012); *cf. Local 295/Local 851 IBT Emplr. Grp. Pension Trust & Welfare Fund* v. *Fifth Third Bancorp*, 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010).  Aside from the Clayton report, plaintiffs wholly fail to identify, let alone plead with particularity, any specific "due diligence" defendants received alerting them to noncompliance with underwriting guidelines.  *See Landesbank*, 2012 WL 1352590, at *2 ("[G]eneralized references" to "other due diligence reports" cannot sustain "pleading burden as to intent").

Plaintiffs' scienter allegations also fail in light of the extensive warnings in the offering materials about the risks associated with the Offerings (*see* Ex. E. at 3-5), because

providing such warnings is inconsistent with an intent to deceive. *See Footbridge*, 2010 WL 3790810, at *20 ("Defendants' disclosures about the risk inherent in the investment . . . and the flexibility of the underwriting guidelines . . . are inconsistent with a state of mind going toward deliberate illegal behavior . . . ."). Plaintiffs have not met their burden to plead scienter.

    **C.**    **Plaintiffs Fail To Plead Reasonable Reliance.**

        Plaintiffs are required to plead reasonable reliance on the purported misstatements for their claims under section 1707.41 of the OSA and common-law fraud. *See In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 541 F. Supp. 2d at 996. Plaintiffs allege that they relied on and were damaged by supposed misrepresentations because "[t]hese representations materially altered the total mix of information upon which Western & Southern made its purchasing decisions." (SAC ¶¶ 255-256.) These boilerplate allegations are plainly insufficient. *First*, the offering materials contained robust disclosures warning of the risks inherent in the transactions. "[S]ophisticated investors" cannot plead reliance in the face of robust risk disclosures. *See Ashland*, 652 F.3d at 335. *Second*, plaintiffs' claim of reliance is implausible in light of the sheer scope of the fraudulent scheme and conspiracy alleged in their seven RMBS cases. If such a vast industry-wide scheme and conspiracy truly existed, plaintiffs would have known about it.

    **D.**    **Plaintiffs Fail To Plead Loss Causation.**

        Plaintiffs' OSA and common-law fraud claims must be dismissed for one last reason—plaintiffs fail to plead that the alleged misrepresentations, as opposed to the cratering of the economy, proximately caused their losses (a required element of their fraud and OSA claims). *See* O.R.C. § 1707.41; *Glassner* v. *R. J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000). Plaintiffs make no effort in their complaint to untangle the impact of the market collapse from the impact of the alleged misstatements on the value of their Certificates. Rather, plaintiffs allege, in conclusory fashion, that the "economic downturn does not explain" the

defaults and delinquencies in the Mortgage Loans.  This is not enough to plead loss causation, especially in a fraud case.  *See Lentell*, 396 F.3d at 174 (plaintiff's securities claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events"); *Footbridge*, 2010 WL 3790810, at *22 (rejecting conclusory assertion that plaintiffs' losses were not due to the housing market decline); *Luminent Mortg. Capital, Inc.* v. *Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 594 (E.D. Pa. 2009) (plaintiff failed to plead causation where it "ma[de] no allegations that would allow the Court to apportion any losses between [the] misrepresentations and the significant declines in market value for mortgage-backed securities").

## III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

Plaintiffs' claim for tortious interference fails for two separate reasons. *First*, it is barred by the terms of the PSAs, which each contain a "no-action clause" providing that no certificateholder has any right "to institute any suit, action or proceeding . . . upon or under or with respect to" the PSAs unless the (i) certificateholder notifies the trustee of the alleged breach, (ii) holders of at least twenty-five percent of each affected class request in writing that the trustee institute suit and offer indemnification and (iii) the trustee fails to do so after sixty days of receiving the request.  (Ex. G.) The "no-action clauses" apply to any action "with respect to" the PSAs, and thus cover plaintiffs' claim for breach of supposed third-party rights under the PSAs.

Plaintiffs make no attempt to plead that they have complied with the "no-action clause" preconditions.  Rather, they state merely that unidentified institutional holders of at least 25% of the voting rights in just four of the Offerings sent a letter to the applicable trustees requesting that they "open an investigation" and take "other appropriate action."  (SAC ¶ 222.) Plaintiffs nowhere allege that *they* have complied with their notice obligation or that they alone

represent 25% of the voting rights of their class. Their tortious interference claim accordingly must be dismissed for failure to comply with the "no action clause" procedures. *See Ellington Credit Fund*, 2011 WL 6034310, at *9-*12 (barring plaintiffs' tort and contract claims for failure to comply with procedures of similar "no-action" clause); *Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC, et al.* v. *Countrywide Fin. Corp. et al.*, slip op. at 3-4, 6-7 (N.Y. Sup. Ct. October 7, 2010) (same) (attached as Ex. H to the Harrison Decl.).

 *Second*, tortious interference with contract is a potential cause of action only "when one party to a contract is induced to breach the contract by the malicious acts of a third person *who is not a party to the contract*." *Union Square Realty, Inc.* v. *Golfers & Hackers, Inc.*, 2011 WL 1466308, at *7 (Ohio Ct. App. Apr. 18, 2011) (quoting *Battista* v. *Lebanon Trotting Assn.*, 538 F. 2d, 111, 116 (6th Cir. 1978)). Here, however, plaintiffs are claiming that parties to the applicable PSAs—defendants JPMAC, WMMSC and WAAC—caused their contractual counterparties, the trustees, to breach the PSA. This cannot amount to tortious interference with contract as a matter of law. *See Adkins*, 2011 WL 923351, at *2.

## IV. THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE OCAA.

 To establish a claim for violation of the OCAA, a plaintiff must properly allege: (1) the commission of two or more specifically prohibited state or federal criminal offenses, (2) a pattern of corrupt activity, and (3) defendants have participated in the affairs of an enterprise or acquired and maintained an interest in or control of an enterprise. *Lopardo*, 548 F. Supp. 2d at 469. The elements of a civil claim under the OCAA must be pled with specificity. *Schlenker Enters., LP* v. *Reese*, 2010 WL 4323662, at *8 (Ohio Ct. App. Nov. 1, 2010). Plaintiffs "must not only specifically plead cause-in-fact injury but must allege that [defendants] proximately caused their injury." *Herakovic* v. *Catholic Diocese of Cleveland*, 2005 WL 3007145, at *6 (Ohio Ct. App. Nov. 10, 2005). Plaintiffs' allegations do not meet these requirements.

### A.  Plaintiffs Do Not Adequately Allege Predicate Acts or the Required "Pattern of Corrupt Activity."

The OCAA enumerates the offenses that constitute "corrupt activity" for an OCAA claim.  *See* O.R.C. § 2923.31(l)(1)-(5).  Plaintiffs must allege particularized facts constituting "two or more instances of" the enumerated violations "that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." O.R.C. § 2923.31(C).  A private plaintiff must also allege a pattern of activity "that includes at least one predicate act that is not a form of securities fraud, mail or wire fraud." *Baker* v. *Pfeifer*, 940 F. Supp. 1168, 1181 (S.D. Ohio 1996); *see* O.R.C. § 2923.34(A).

Here, plaintiffs allege a "pattern of corrupt activity" based on (i) violations of the OSA; (ii) forgery or falsification and perjury in foreclosure proceedings in violation of O.R.C. §§ 2913.31 and 2921.11; (iii) insurance fraud, purportedly from an alleged kick-back scheme, in violation of O.R.C. § 2913.47; (iv) bank fraud in violation of 18 U.S.C. § 1344, and (v) mail and wire fraud.  (SAC ¶¶ 335, 346.)  None of these alleged predicate acts withstands scrutiny:

- *OSA Violations.*  Plaintiffs' alleged OSA violations cannot serve as a predicate offense for their OCAA claim because, as discussed *supra*, their complaint fails to state a valid OSA claim for multiple reasons.

- *Bank Fraud.*  Plaintiffs allege that defendants violated the federal bank fraud statute, 18 U.S.C. § 1344, in connection with sales of whole loans to Fannie Mae, Freddie Mac and Ginnie Mae, and sales of RMBS certificates to Fannie Mae and Freddie Mac.  (SAC ¶¶ 243-253.)  Plaintiffs lack standing to assert bank fraud here.  "Only defrauded financial institutions have standing to assert bank fraud as a RICO predicate."  *Herrick* v. *Liberty League Int'l*, 2008 WL 2230702, at *4 (S.D. Ohio May 28, 2008) (Dlott, C.J.).

- *Insurance Fraud.*  Plaintiffs' "insurance fraud" allegations, which purport to describe a scheme by defendants to coerce kickback payments from primary mortgage insurers (SAC ¶¶ 225-242), are based only on a subpoena from the N.Y. Department of Financial Services and an American Banker article that nowhere mentions any of the defendants here (SAC ¶¶ 237-238, 242).  This does not come close to satisfying plaintiffs' pleading requirements under the OCAA.  Further, because plaintiffs allege that the failure to disclose the kickback scheme rendered the offering materials misleading (SAC ¶¶ 239-

241), the alleged scheme cannot be used to satisfy the OCAA requirement that at least one predicate act not involve securities fraud. *Cf. Sell* v. *Zions First Nation Bank*, 2006 WL 322469, at *10 (D. Ariz. Feb. 9, 2006) ("[T]he question is not whether a plaintiff can state a claim under a non-securities-related predicate act, but whether the allegations that form the basis of that predicate act occur 'in connection with' securities fraud.").

- ***Perjury and Forgery.*** Plaintiffs' allegations that defendants committed acts of perjury and forgery in Ohio are insufficient. (SAC ¶ 202.) *First*, plaintiffs allege defendants committed forgery in violation of Ohio law, but none of plaintiffs' purported examples bear any connection to Ohio. (*See* SAC ¶¶ 191-201.) *Second*, the perjury allegations rely entirely on three foreclosure proceedings supposedly found during plaintiffs' "review of numerous files from foreclosure proceedings in Ohio" (SAC ¶ 202). Plaintiffs claim that employees of third-party vendor Lender Processing Services, Inc. supposedly falsely represented themselves as employees of MERS. (*See* SAC ¶¶ 203, 208.) Plaintiffs fail to allege, however, that defendants knowingly made a false statement *under oath*, an essential element of a perjury offense. *See* O.R.C. § 2921.11; *State* v. *Lanning*, 832 N.E.2d 143, 148 (Ohio Ct. App. 2005). *Third*, because plaintiffs contend that such acts were committed to conceal false statements in the offering materials (SAC ¶ 212), those acts cannot serve as predicate acts not involving securities fraud.

- ***Mail and Wire Fraud***. Although plaintiffs contend that defendants engaged in "multiple acts" of mail and wire fraud (SAC ¶¶ 335, 346), they fail to plead properly the requisite elements—a scheme to defraud and use of the mail or interstate electronic communications in furtherance of the scheme—let alone with the requisite particularity. *See Brutz* v. *Stillwell*, 2010 WL 1924471, at *15-16 (N.D. Ohio May 10, 2011).

Having failed to allege the commision of any predicate act, plaintiffs cannot establish "two or more instances of" such conduct, let alone a "pattern of corrupt activity." O.R.C. § 2923.31(C).

### B. Plaintiffs Fail To Allege Sufficiently the Existence of an "Enterprise."

Plaintiffs allege the existence of WaMu and JPM enterprises consisting of defendants and affiliates, along with untold numbers of originators, brokers, servicers, appraisers, mortgage insurers and foreclosure law firms. (SAC ¶¶ 329, 344.) But this disparate group fails to constitute an "enterprise" under the OCAA. *See Morrow*, 915 N.E.2d at 711 (plaintiffs must plead with an association in fact that "had a shared purpose, continuity, unity, an identifiable structure, and some goals separate from the predicate acts themselves").

The Sixth Circuit's decision in *VanDenBroeck* v. *Commonpoint Mortgage Co.* is instructive. There, plaintiffs alleged that the defendant mortgage loan company had conspired

with secondary lenders to defraud borrowers in violation of the federal RICO statute (an analogue to the OCAA), without identifying (or even limiting) the lenders with whom the defendant supposedly conspired or any structure under which the enterprise operated.  210 F.3d at 699-700.  The district court dismissed the claim for failure to allege an enterprise because the allegations "do not show any type of mechanism by which this 'group' ([defendants] and the entire secondary lending market) conducted its affairs or made decisions." *Id.*  The Sixth Circuit affirmed the dismissal, noting that "[m]ost cases . . . require evidence of some sort of 'chain of command' or other evidence of hierarchy" and the allegations appeared to indicate that defendant had only a business relationship with the secondary lenders. *Id.*   Here, too, the complaint does not "contain facts suggesting the behavior of the listed entities is 'coordinated' in such a way that they function as a continuing unit." *Begala* v. *PNC Bank*, 214 F.3d 776, 781-82 (6th Cir. 2000).  It merely lists a "string of entities" followed by a "string of supposed racketeering activities in which the enterprise purportedly engaged," which is wholly insufficient under the OCAA. *Id.*

> **C.**    **Plaintiffs Do Not Adequately Allege That Any Purported Corrupt Activities Proximately Caused Their Purported Losses.**

Plaintiffs' conclusory allegation that "the acts of the [WaMu or JPM] Enterprise[s] injured or threatened to injure" plaintiffs (SAC ¶¶ 336-337, 347) is not enough to plead cause-in-fact injury and proximate causation with specificity, as required by the OCAA. *See Herakovic*, 2005 WL 3007145, at *5; *cf. Lesick* v. *Mannick*, 1992 WL 380284, at *3 (Ohio Ct. App. Dec. 17, 1992) (O.R.C. § 2923.34(F) does not relieve plaintiff "of the burden of demonstrating that the illegal conduct proximately caused their injury").

## V. THE COMPLAINT FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY.

To establish civil conspiracy, plaintiffs must show "(1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) existence of an unlawful act independent from the conspiracy itself." *Pappas* v. *Ippolito*, 895 N.E.2d 610, 623 (Ohio Ct. App. 2008). "To survive a motion to dismiss, a conspiracy claim must be pled with some degree of specificity and vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Koyo Corp*. v. *Comerica Bank*, 2011 WL 4540957, at *9 (N.D. Ohio Sept. 29, 2011) (internal quotation marks and citation omitted).

Plaintiffs' civil conspiracy claims fail because the underlying torts from which they are derived are not actionable. *Lasmer*, 741 F. Supp. at 843. Plaintiffs' conspiracy claims also fail because the complaint does not adequately plead a malicious combination, which requires that plaintiffs allege "a common understanding or design, even if tacit, to commit an unlawful act." *In re Nat'l Century Fin. Enters. Inv. Litig.*, 504 F. Supp. 2d 287, 326 (S.D. Ohio 2007). Plaintiffs' conclusory allegations that defendants and a disparate groups of unidentified participants in the RMBS industry formed a malicious combination are insufficient. *See Koyo*, 2011 WL 4540957, at *9 (dismissing conspiracy claim where conspiracy allegations "rest[ed] on mere labels and conclusions").

## VI. PLAINTIFFS' CLAIMS AGAINST JPMC BANK AS THE PURPORTED SUCCESSOR TO WMB ARE BARRED BY FIRREA.

Separate and apart from the foregoing defects pervading all claims, plaintiffs' claims against JPMC Bank as the purported successor to WMB (*see* SAC ¶ 29) are barred by FIRREA, which establishes the exclusive claims procedures for claims relating to failed banks (such as WMB). Specifically, FIRREA requires that any "claim relating to any act or omission of [a failed bank] or the [FDIC] as receiver" must be submitted through FIRREA's

administrative claims process.  12 U.S.C. § 1821(d)(13)(D)(i)-(ii).[9]  If a claimant fails to follow FIRREA's procedures, "the claim shall be deemed to be disallowed . . . , such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim." *Id.* § 1821(d)(6)(B)(ii).  This exhaustion requirement is jurisdictional and applies even to claims brought against a purchasing bank, such as JPMC Bank.  *Village of Oakwood*, 539 F.3d at 386.

Plaintiffs do not (and cannot) allege that they have exhausted FIRREA's claims procedures with respect to their claims against JPMC Bank as purported successor-in-interest to WMB.  Such claims are thus barred and must be dismissed for this reason alone.  *See id.* at 386 (failure to comply with FIRREA administrative claims process "results in their having no further rights or remedies with respect to such claims"); *Benson* v. *JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1208-09 (9th Cir. 2012) (affirming dismissal of claims against JPMC Bank as "successor-in-interest" to WMB because plaintiff failed to exhaust FIRREA's administrative claims process).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss plaintffs' Second Amended Complaint in its entirety with prejudice.

---

[9]     Under FIRREA, any claim relating to any act or omission of a failed bank (such as WMB) must be filed with the FDIC.  If the FDIC approves the claim, it will issue a receivership certificate, which entitles the claimant to a share of the receivership's assets.  Even if the certificate fails to make the claimant whole, it is deemed to satisfy the claim in full and supplants any cause of action the claimant might have had under state law.  *See Battista* v. *FDIC*, 195 F.3d 1113, 1116 (9th Cir. 1999).

Dated:  May 23, 2012                                    Respectfully submitted,


                                                        /s/ Gregory A. Harrison

*Of Counsel*:                                           Gregory A. Harrison (0029814)
                                                        DINSMORE & SHOHL LLP
Sharon L. Nelles (*pro hac vice*)                       255 East Fifth Street, Suite 1900
Darrell Cafasso (*pro hac vice*)                        Cincinnati, OH  45202
Sveker K. Hogberg (*pro hac vice*)                      Telephone:  (513) 977-8200
SULLIVAN & CROMWELL LLP                                 Facsimile:  (513) 977-8141
125 Broad Street                                        Email:  greg.harrison@dinsmore.com
New York, New York  10004-2498
Telephone:  (212) 558-4000                              *Trial Attorney for Defendant and Third-*
Facsimile:  (212) 558-3588                              *Party Plaintiff*

*Counsel for Defendant and Third-Party*
*Plaintiff*


## CERTIFICATE OF SERVICE

        This is to certify that on this 23rd day of May, 2012, the foregoing was electronically filed with the Court via CM/ECF.  Notice of this filing will be sent to the below-listed counsel by operation of the Court's electronic filing system, and the filing may be accessed through that system.

                                        */s/ Gregory A. Harrison*
                                        Gregory A. Harrison