IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Western and Southern Life Insurance Company, *et al.*, | : : : | Case No. 1:11-cv-495 |
| Plaintiffs, | : : | Chief Judge Susan J. Dlott |
| v. | : : | Order Granting in Part and Denying in Part Motion to Dismiss |
| JPMorgan Chase Bank, N.A., *et al.*, | : : | |
| Defendants. | : : | |

This matter is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint (Doc. 57). This suit is one of a myriad of similar suits across the country arising from the sale of residential mortgage-backed securities ("RMBS") and the housing market collapse in the first decade of this century. The claims asserted are complex both legally and factually. Defendants move to dismiss the claims as barred by limitations periods and for failure to state claims upon which relief can be granted. For the reasons that follow, the Court finds that the majority of claims asserted have been sufficiently pleaded to continue to discovery. The Court will **GRANT IN PART AND DENY IN PART** the Motion to Dismiss.

## I.    BACKGROUND

### A.    Factual Allegations

Plaintiffs' Second Amended Complaint ("SAC") is ninety-six pages long with three hundred sixty-seven paragraphs of allegations, exclusive of the appendix. (Doc. 52-1 at PageID 4929–5024.) The allegations are briefly summarized below and discussed in more detail as necessary in the Analysis section.

## 1.    Parties and Security Offerings

Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc. on behalf of Fort Washington Active Fixed Income LLC (collectively, "W&S Plaintiffs") bring this civil action against Defendants JPMorgan Chase Bank, N.A., J.P. Morgan Mortgage Acquisition Corporation, J.P. Morgan Securities LLC, and J.P. Morgan Acceptance Corporation I (collectively, "JPM Defendants"), along with Defendants Washington Mutual Mortgage Securities Corporation, WaMu Asset Acceptance Corporation, and WaMu Capital Corporation (collectively, "WaMu Defendants").

W&S Plaintiffs allege generally that the Defendants "engaged in a pattern of corrupt activity whereby they sought illegally to profit from the origination, securitization, and servicing of mortgage loans, and the sale of [RMBS]." (*Id.* at PageID 4933.) W&S Plaintiffs purchased $202 million of RMBS certificates from JPM Defendants and WaMu Defendants between October 5, 2005 and October 10, 2007 in the following ten securitization transactions:

(i.) J.P. Morgan Alternative Loan Trust, Series 2005-S1 ("JPMALT 2005-S1");

(ii.) J.P. Morgan Mortgage Trust, Series 2005-S3 ("JPMMT 2005-S3");

(iii.) J.P. Morgan Acquisition Trust, Series 2006-WF1 ("JPMAC 2006-WF1");

(iv.) J.P. Morgan Acquisition Trust, Series 2007-CH1 ("JPMAC 2007-CH1");

(v.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-7 Trust ("WMALT 2005-7");

(vi.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-9 Trust ("WMALT 2005-9");

(vii.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-4 Trust ("WMALT 2006-4");

(viii.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-5 Trust ("WMALT 2006-5");

(ix.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-9 Trust ("WMALT 2006-9"); and

(x.) Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA3 Trust ("WMALT 2007-OA3").

(*Id.* at PageID 4933–34.)  The first four securitized transactions—JPMALT 2005-S1, JPMMT 2005-S3, and JPMAC 2006-WF1, and JPMAC 2007-CH1—are referred to as the JPM Offerings or JPM Certificates.  The latter six securitized transactions— WMALT 2005-7, WMALT 2005-9, WMALT 2006-4, WMALT 2006-5, WMALT 2006-9, and WMALT 2007-OA3—are referred to as the WaMu Offerings or WaMu Certificates.  (*Id.*)  The JPM Offerings were issued and sold pursuant to "JPM Offering Materials" which included Shelf Registration Statements dated August 25, 2005, April 24, 2006, and February 26, 2007, a Prospectus and Prospectus Supplement for each Offering, other materials filed with the Securities and Exchange Commission ("SEC"), and certain data compilations and loan tapes.  (*Id.* at PageID 4934.)  The WaMu Offerings were issued and sold pursuant to "WaMu Offering Materials" which included Shelf Registration Statements dated August 23, 2005, January 6, 2006, and March 22, 2007, a Prospectus and Prospectus Supplement for each Offering, other materials filed with the SEC, and certain data compilations and loan tapes.  (*Id.* at PageID 4934–35.)

Defendant J.P. Morgan Acceptance Corp. ("JPMAC") served as the depositor, Defendant J.P. Morgan Securities LLC served as underwriter, Defendant J.P. Morgan Mortgage Acquisition Corp. served as sponsor and seller, and Defendant JPMorgan Chase Bank, N.A. ("JPMC Bank") originated or acquired the mortgage loans and acted as the loan servicer with respect to the JPM Offerings.  (*Id.* at PageID 4939–40, 4986.)

Defendant WaMu Asset Acceptance Corporation ("WMAAC") served as depositor, Defendant WaMu Capital Corporation served as underwriter, and non-defendant Washington Mutual Bank ("WaMu Bank") served as co-sponsor with Defendant WaMu Mortgage Securities Corporation and also originated or acquired mortgage loans and acted as the loan servicer with respect to the WaMu Offerings. (*Id.* at PageID 4941–42, 4986.)

WaMu Bank was a federal savings association that provided financial services to consumer and commercial clients. WaMu Bank served as the co-sponsor for one of the six WaMu Offerings at issue in this action. On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement with the FDIC, under which JPMC Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its ownership of the three WaMu Defendants. JPMC Bank is the successor-in-interest to WaMu Bank with respect to the claims asserted in this action. (*Id.* at 4941.)

## 2. Securitization Process

W&S Plaintiffs set forth in the Second Amended Complaint the process by which RMBS certificates are created and sold, a process known as mortgage securitization. A sponsor or seller pools together a large number of mortgage loans and sells or transfers the pool of loans to a depositor. The depositor is typically an affiliate of the sponsor. The depositor then transfers the pool of loans via a "pooling and servicing agreement" to a trustee. The pooling and servicing agreement establishes various classes or "tranches" of interests in payments made by the borrowers of a loan. Each tranch has a different level of risk and reward. The pooling and servicing agreements also appoint a "servicer" to manage the mortgage loans in exchange for a monthly fee. Senior tranches have higher ratings and are entitled to payment in full ahead of

junior tranches, but junior tranches offer higher potential returns. The trust issues certificates representing each tranch and sells the certificates to an underwriter. The underwriter then re-sells the certificates at a profit to the investors. W&S Plaintiffs allege that Defendants acted as sponsor, depositors, and underwriters of the JPM Offerings and the WaMu Offerings and profited at each stage of the securitization process. (*Id.* at PageID 4944–45.)

### 3. Allegations of Fraud

W&S Plaintiffs allege in the Second Amended Complaint that the JPM Offering Materials and the WaMu Offering Materials contained actionable misrepresentations and omissions regarding the following matters:

- loan underwriting standards and guidelines, (*id.* at PageID 4947–72);

- the appraisal process to value the properties securing the loans underlying the RMBS certificates, (*id.* at PageID 4972–76);

- the percentage of owner-occupied properties securing the loans underlying the RMBS certificates, (*id.* at PageID 4976–78);

- the credit ratings assigned to the certificates because the credit ratings were based on materially misleading or inaccurate information, (*id.* at PageID 4978–79); and

- the transfer of title requirements, foreclosure practices, and Mortgage Electronic Registration System ("MERS"), (*id.* at PageID 4980–96).

## B. Procedural History

W&S Plaintiffs initiated this lawsuit on June 22, 2011 in the Court of Common Pleas, Hamilton County, Ohio as Case No. A1104817. (Doc. 1-1 at PageID 28.) Defendants removed the action to the United States District Court for the Southern District of Ohio on July 22, 1011. (Doc. 1 at PageID 1.) On July 25, 2011, JPMC Bank filed a Third-Party Complaint (Doc. 12) against the Federal Deposit Insurance Corporation ("FDIC") for the potential liabilities arising from the actions or omissions of its predecessor, non-defendant WaMu Bank.

W&S Plaintiffs filed the Second Amended Complaint on March 23, 2012. They asserted

fourteen causes of action:

1. Violation of Ohio Securities Act, Ohio Revised Code ("O.R.C.")
   § 1707.41, (Doc. 52-1 at PageID 5007);

2. Violation of Ohio Securities Act, O.R.C. § 1707.44(B)(4), (*id.* at PageID
   5008);

3. Violation of Ohio Securities Act, O.R.C. § 1707.44(J), (*id.*);

4. Violation of Ohio Securities Act, O.R.C. § 1707.44(G), (*id.*);

5. Repayment pursuant to the Ohio Securities Act, O.R.C. § 1707.43, (*id.* at
   PageID 5009);

6. Tortious interference with contract, (*id.*);

7. Common law fraud, (*id.* at PageID 5010);

8. Common law conspiracy against WaMu Defendants, (*id.* at PageID 5011);

9. Common law conspiracy against JPM Defendants, (*id.* at PageID 5012);

10. Violation of Ohio Corrupt Activities Act, O.R.C. § 2923.31 through
    § 2923.36, against WaMu Defendants and JPMC Bank, (*id.* at PageID
    5013);

11. Violation of Ohio Corrupt Activities Act, O.R.C. § 2923.31 through
    § 2923.36, against the JPM Defendants, (*id.* at PageID 5017);

12. Violation of Section 11 of the 1933 Act, 15 U.S.C. § 77k, against the JPM
    Defendants (*id.* at PageID 5019);

13. Violation of Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2),
    against the JPM Defendants, (*id.* at PageID 5021); and

14. Violation of Section 15 of the 1933 Act, 15 U.S.C. § 77*o*, against JPM
    Mortgage Acquisition and JPMAC, (*id.* at PageID 5022).

Defendants now have moved to dismiss the claims against them. The Court has heard oral

arguments on the dismissal motions and has granted the parties leave to file supplemental

memoranda. The matter is ripe for resolution.

## II.    STANDARDS GOVERNING MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A district court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997). However, this tenet is inapplicable to legal conclusions, or legal conclusions couched as factual allegations, which are not entitled to an assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To withstand a dismissal motion, a complaint "does not need detailed factual allegations," but it must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]he complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Harvard v. Wayne Cty.*, 436 F. App'x 451, 457 (6th Cir. 2011) (internal quotation and citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court does not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Court may consider SEC filings, other public records, and other materials appropriate for the taking of judicial notice without converting a Rule 12(b)(6) motion to a Rule 56 motion. *See New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001). "Courts take judicial notice of matters of common knowledge." *Pearce v. Faurecia*

*Exhaust Syss., Inc.*, 529 F. App'x 454, 459 (6th Cir. 2013). Courts may take notice of adjudicative facts which are "not subject to reasonable dispute" because they are "generally known within the trial court's jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Sources typically used to take judicial notice include "a dictionary, public record, or even a newspaper article." *Pearce*, 529 F. App'x at 459; *see also Logan v. Denny's Inc.*, 259 F.3d 558, 578 (6th Cir. 2001) (taking judicial notice of newspaper article). However, the Court will not take notice of information in a newspaper article that is subject to reasonable dispute as to its accuracy. *Berk v. Mohr*, No. 2:10-cv-1082, 2012 WL 3780313, at *12 (S.D. Ohio July 23, 2012).

## III.     ANALYSIS

### A.     Ohio Securities Act and Common Law Fraud Claims

W&S Plaintiffs allege violations of the Ohio Securities Act ("OSA"), Ohio Revised Code §§ 1707.41, 1707.43, 1707.44(B)(4), 1707.44(G), and 1707.44(J) in the First through Fifth Causes of Action, as well as common law fraud in the Seventh Cause of Action. (Doc. 52-1 at PageID 5007–09, 5010–11.) Section 1707.41 of the Ohio Revised Code provides in relevant part: "any person that, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts." Section 1707.44(B)(4) provides: "No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes: . . . Selling any securities in this state."

Section 1707.44(G) states: "No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited." Section 1707.44(G) "prohibits not only affirmative misrepresentation, but also fraudulent nondisclosure where there is a duty to disclose." *Ohio v. Warner*, 55 Ohio St. 3d 31, 54, 564 N.E.2d 18 (1990). Finally, Section 1707.44(J) provides: "No person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when the person knows that the statement or advertisement is false in any material respect." Sales or contracts for sales made in violation of Chapter 1707 are voidable at the election of the purchaser. O.R.C. § 1707.43(A).

The elements of common law fraud in Ohio are as follows:

(1) a representation or, when there is a duty to disclose, a concealment of fact;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred;

(4) with the intent of misleading another into relying upon it;

(5) justifiable reliance on the representation or concealment; and

(6) an injury proximately caused by that reliance.

*Stuckey v. Online Resources Corp.*, 909 F. Supp. 2d 912, 940–41 (S.D. Ohio Nov. 9, 2012).

A party alleging fraud or a violation of the Ohio Securities Act has to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Ohio Police and Fire Pen. Fund v. Standard & Poor's Fin. Servs., LLC*, 813 F. Supp. 2d 871, 878–9 (S.D. Ohio 2011) (applying Rule 9(b) standard to OSA claims). "[A] plaintiff must

specify 1) what the fraudulent statements were, 2) who made them, 3) when and where the statements were made, and 4) why the statements were fraudulent." *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562 (6th Cir. 2013). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The OSA contains a two-year statute of limitations and a five-year statute of repose. O.R.C. § 1707.43(B). The OSA provides in relevant part as follows:

> No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

*Id.* The fraud claim alleged has the same two-year statute of limitations and five-year statute of repose because it arises from or is predicated upon the sale of securities. *See Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 561 (6th Cir. 2005); *Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 467 (N.D. Ohio 2008). "Ohio law weighs heavily toward a finding that common law claims which are predicated on or inextricably interwoven with the sale of securities or the contracts related to securities sales are governed by the statute of limitations in O.R.C. § 1707.43(B)." *Lopardo*, 548 F. Supp. 2d at 467; *cf. Rogers v. Isler*, No., 2:03-cv-1192, 2005 WL 3776350, at *3 (S.D. Ohio June 20, 2005) (stating that whether § 1707.43 is applied is contingent on the nature or subject matter of the claim, rather than the form of the action).

### 1. Statute of Limitations

Defendants allege that the fraud and OSA claim are untimely pursuant to the two-year limitations period in § 1707.43(B). Ohio courts have not defined what constitutes constructive

notice under § 1707.43(B).  *See Wyser-Pratte*, 413 F.3d at 562; *In re Nat'l Century Fin. Enters.,*

*Inc. Investment Lit.*, 755 F. Supp. 2d 857, 868 (S.D. Ohio 2010).  In the absence of direct

guidance, courts in the Sixth Circuit have applied the standard used in federal securities law.  *See*

*Wyser-Pratte*, 413 F.3d at 562; *Nat'l Century Fin. Enters.*, 755 F. Supp. 2d at 868.  Notice of the

possibility of fraud is not sufficient to commence the limitations period.  *See Wyser-Pratte*, 413

F.3d at 562; *Cain v. Mid-Ohio Secs., Inc.*, Nos. 06CA008933, 06CA008932, 2007 WL 2080553,

at *2 (Ohio App. July 23, 2007).  "[K]nowledge of 'suspicious facts' or 'storm warnings'

triggers a plaintiffs duty to investigate, and the limitations period 'begins to run only when a

reasonably diligent investigation would have discovered the fraud.'"  *In re Nat'l Century Fin.*

*Enters.*, 755 F. Supp. 2d at 868 (quoting *Wyser-Pratte,* 413 F.3d at 562–63).

      The inquiry notice standard is objective.  *Hardin v. Reliance Trust Co.*, No. 1:04-cv-

02079, 2006 WL 2850455, at *6 (N.D. Ohio Sept. 29, 2006), *aff'd Cline v. Reliance Trust Co.*,

245 F. App'x 503 (6th Cir. 2007).  "[T]he limitations period begins to run when a plaintiff

should have discovered, by exercising reasonable diligence, the facts underlying the alleged

fraud."  *Wyser-Pratte*, 413 F.3d at 562–63 (internal quotation and citation omitted).  The

reasonable plaintiff must become aware of facts alerting the plaintiffs of general claims to

pursue, not of the particular causes of action or legal theories to pursue.  *Loyd v. Huntington*

*Nat'l Bank*, No. 1:08-cv-2301, 2009 WL 1767585, at *9 (N.D. Ohio June 18, 2009).  The inquiry

notice standard for a fraud or securities violation includes the facts which suggest scienter or

knowledge.  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648–49 (2010).  Finally, issues of

constructive notice are issues of fact and are appropriate for a jury.  *Charash v. Oberlin College*,

14 F.3d 291, 300 (6th Cir. 1994).

The initial Complaint in this action was filed on June 22, 2011. Plaintiffs assert that their claims are not untimely because they did not have sufficient information to file their claims on or before June 22, 2009. Plaintiffs state that they relied on the materials from the January 2011 Congressional Financial Crisis Inquiry Commission report ("2011 FCIC Report") and the April 2011 Senate Permanent Subcommittee on Investigations ("2011 Senate Subcommittee Report"), including the Clayton Holdings information, in order to properly plead the scienter element of their claims. Clayton Holdings was a due diligence firm hired by Defendants. (Doc. 52-1 at PageID 4936, 4954–57.) Clayton Holdings analyzed samples of loans from Defendants and reported the results to Defendants. (*Id.* at PageID 4954–57.) Plaintiffs allege that the Clayton Holdings' reports demonstrated that JPM Defendants knew that the loan pool in its securitizations included greater than 13% of defective loans and that WaMu Defendants knew that the loan pool in its securitizations included greater than 7% of defective loans. (*Id.*) Plaintiffs also cite the testimony of the former president of Clayton Holdings to the effect that the internal due diligence that Clayton Holdings provided to the Defendants did not "add[ ] any value" to investors. (*Id.* at PageID 4957.) Plaintiffs allege that instead Defendants used due diligence reports to maximize their profits by paying as little as possible for loans.[1] (*Id.* at PageID 4954.)

The 2011 FCIC Report also contained statements from appraisers who felt pressured by mortgage lenders to overestimate the value of the appraised properties. (*Id.* at PageID 4972–73.)

---

[1] Defendants cite *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616 (S.D.N.Y. 2011) for the proposition that the Clayton reports should not be considered. In *Landesbank*, the court held that a defendant could not use the Clayton report to support the knowledge of falsity prong of its fraud claim against the defendant. *Id.* at 622. However, the court found that the plaintiff could not prove that the defendant had knowledge of falsity in 2006 using that particular Clayton report because the report was dated in 2007. Defendants here have not identified a similar timing issue. The Court does not read *Landesbank* to stand for a general proposition that the Clayton report cannot ever be used to support securities fraud allegations. Also, a later opinion by the Southern District of New York stated that Clayton due diligence reports could be considered with other evidence to support fraud allegations. *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 643 (S.D.N.Y. 2012).

The 2011 Senate Subcommittee Report included a case study of how WaMu Defendants'

"strategy for growth and profit led to the origination and securitization of hundreds of billions of

dollars in poor quality mortgages that undermined the U.S. financial system." (*Id.* at PageID

4959–60.) The 2011 Senate Subcommittee Report included specific allegations of improper

conduct in the practice of appraisals, including using in-house appraisals, automated software

that did not comply with industry standards, and undefined standards. (*Id.* at PageID 4973.) It

also included allegations that Defendants manipulated credit ratings by such practices as

blacklisting analysts who refused to provide favorable ratings. (*Id.* at PageID 4979.)

On the other hand, Defendants argue that three types of evidence gave W&S Plaintiffs

constructive notice sufficient to trigger the statute of limitations prior to June 22, 2009. *See*

*Woori Bank v. Citigroup Global Markets, Inc.*, No. 12-cv-3868 (KBF), 2014 WL 3844778, at

*7–9 (S.D.N.Y. Aug. 5, 2014) (stating that the FCIC report and an SEC complaint "may have

strengthened" a securities claim, but that facts sufficient to trigger the statute of limitations had

been known earlier). First, Defendants contend that the testimony of Bradley Hunkler, the Vice

President of Controller of Western & Southern Financial Group, before the House Committee on

Financial Services on March 25, 2009 triggered the limitations period. (Doc. 58-35.) Hunkler

testified generally that there was "rampant fraud in the mortgage origination and underwriting

process; poor underwriting standards that overemphasized rising housing prices and did not

adequately consider borrower creditworthiness; . . . over-inflated ratings; and a lack of

transparency relating to the underlying collateral and deal structure." (*Id.* at PageID 2939.) He

further stated that "bank and Wall Street underwriting due diligence failed to pick up" that

"mortgage brokers have committed significant amounts of fraud." (*Id.* at PageID 2940.) His

testimony did not address the conduct of JPM Defendants or WaMu Defendants specifically, nor

did it address the JPM Offerings or the WaMu Offerings specifically. Moreover, a reasonable factfinder could conclude that his testimony was not sufficient to put W&S Plaintiffs on notice of wholesale abandonment of underwriting guidelines. The Hunkler testimony standing alone is not sufficient to have triggered the two-year limitations period as a matter of law.

Second, Defendants assert that W&S Plaintiffs pleaded facts concerning their knowledge about delinquencies and downgrades which happened prior to June 2009. For instance, some of the JPM Offerings and the WaMu Offerings, which were purchased between October 5, 2005 and October 10, 2007, had delinquencies in the 10% to 50% range within forty-eight months. (Doc. 52-1 at PageID 4968–70.) W&S Plaintiffs also pleaded that the ratings for the Offerings had been downgraded at an unspecified date, but Defendants' public records indicate that the downgrades had begun by March 2009. (*Id.* at PageID 4971; Doc. 58-1.) W&S Plaintiffs respond that this information standing alone was not sufficient to give them complete notice of the facts underlying their claim. Further, they point out that Moody's Investor Services issued a release in February 2009 in which it attributed higher loss expectations, in part, on the "continued deterioration in home prices." (Doc. 61-3 at PageID 4124–25.) Other courts have found that reports of delinquencies or downgrades were not necessarily sufficient to put plaintiffs on notice of their claims for fraudulent abandonment of underwriting standards. *See FDIC v. Chase Mortg. Fin. Corp.*, No. 12 Civ. 6166(LLS), 2013 WL 5434633, at *5 (S.D.N.Y. Sept. 27, 2013); *Capital Ventures Int'l v. J.P Morgan Mortg. Acquisition Corp.*, No. 12-10085-RWZ, 2013 WL 535320, at *7 (D. Mass. Feb. 13, 2013).

Third, Defendants point to media reports and other lawsuits as evidence triggering the limitations period. The Court has examined the media reports provided by Defendants. (Docs. 58-15 through 58-25.) Some provide only generalized allegations of improprieties, but do not

address WaMu Defendants or JPM Defendants specifically.  (Docs. 58-23 through 58-25.)

Several articles depict a reckless culture at WaMu[2] that encouraged making risky loans,

including problems with appraisal values and with the failure to follow underwriting guidelines.

(Docs. 58-15 through 58-19.)  The specific WaMu Offerings are not discussed.  (*Id.*)  In other

articles, WaMu Defendants and JPM Defendants denied allegations of wrongdoing or assigned

blame for problems on factors beyond their control.  (Docs. 58-17, 58-19, and 58-20.)

Defendants also point to lawsuits filed against WaMu Defendants and against JPM

Defendants in 2008 and 2009, prior to June 2009, alleging false statements in connection with

RMBS offerings.  Some courts have taken judicial notice of court filings and litigation notices

and considered them as "storm warning" evidence triggering at least the duty to investigate.  *See*

*e.g.*, *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (stating that it

is proper to take judicial notice of the fact of prior lawsuits to decide whether inquiry notice was

triggered); *Loyd*, 2009 WL 1767585, at *10 & n.24 (considering prior lawsuit of which

plaintiff's counsel had knowledge as part of public information triggering the statute of

limitations); *Hardin*, 2006 WL 2850455, at *7–8 (stating that lawsuits and public records can be

sufficient to put investors on inquiry notice under an objective standard); *but see Fed. Home*

*Loan Bank of Pittsburgh v. JP Morgan Secs., LLC*, No. GD-09-016892, slip op. at 6–7 (C.P.

Allegheny Cty. Penn. Nov. 12, 2006) (finding no evidence that plaintiffs knew or should have

known about a lawsuit filed in a different state).[3]  The Court agrees that it can take notice of the

prior lawsuits, the dates such suits were filed, and the existence of the allegations made in the

filings in such suits.  However, the Court does not consider the complaint allegations from

earlier-filed lawsuits to be adjudicative facts because they are subject to reasonable dispute.  *See*

---

[2]  The media articles generally do not specify which Washington Mutual entity is being discussed.
[3]  A copy of the *Federal Home Loan Bank* decision is filed at Doc. 70-3 at PageID 4910–23.

Fed. R. Evid. 201.  While such allegations may constitute "storm warnings" triggering a duty to investigate, the statute of limitations does not begin to run until the plaintiff knows of the facts underlying the fraud.  *Wyser-Pratte*, 413 F.3d at 562–63.

The Court finds persuasive decisions from other courts that have found that press reports and earlier filed lawsuits do not constitute a sufficient bases at the Rule 12(b)(6) stage to conclude as a matter of law that the limitations period was triggered on or before a date certain. *See W&S Life Ins. Co. v. Residential Funding Co., LLC*, No. A115042, slip op. at 7–10 (Ohio C.P. Hamilton Cty. June 6, 2012) (finding that question of fact remained on the statute of limitations despite existence of public records such as earlier lawsuits and press reports);[4] *see also FDIC v. Chase Mortg. Fin. Corp.*, 2013 WL 5434633, at *3–7 (finding publicly-accessible reports and other complaints insufficient to establish untimeliness of complaint against multiple defendants, including JPM Chase); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) (stating that statute of limitations was not triggered by newspaper articles and other publications that "provided only generalized reports on the industry, did not discuss Defendants' practices specifically, and did not alert Plaintiff to potential fraud in any specific securitization it had purchased"); *In re Wells Fargo Mortgage-Backed Certificates Lit.*, 712 F. Supp. 2d 958, 967 (N.D. Cal. 2010); *Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC*, No. 650547/2011, 42 Misc. 3d 1220(A), at *3–6 (N.Y. Sup. Jan. 24, 2014); *but see Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1138–39 (C.D. Cal. 2011) (holding that press reports and earlier-filed lawsuits were sufficient to put the plaintiffs on notice regarding the scienter element of its claim).

In summary, the Court concludes that the issue of when the statute of limitations began to run is not appropriate for resolution upon a dismissal motion.

---

[4]  A copy of the slip opinion was filed in this case at Doc. 75-1 beginning at PageID 5093–5115.

## 2.     Statute of Repose

As stated earlier, the Ohio Securities Act contains a five-year statute of repose which applies to the OSA and fraud claims.  O.R.C. § 1707.43(B).  Defendants assert that W&S Plaintiffs' claims are barred by the statute of repose, in part, because W&S Plaintiffs purchased WMALT 2005-7, WMALT 2005-9, and WMALT 2006-4 Certificates more than five years before July 22, 2011, the date this suit was filed.  (Doc. 52-1 at PageID 5025–33.)[5]  Plaintiffs respond that the claims based on the WMALT 2005-7, WMALT 2005-9, and WMALT 2006-4 Certificates are not barred because the statute of repose is unconstitutional as applied to them.

The constitutionality of the statute of repose in § 1707.43(B) has been disputed.  A court in the Northern District of Ohio found that the statute of repose in § 1707.43(B) was unconstitutional where the facts indicated that the cause of action accrued within the five-year repose period, but the plaintiff had an unreasonably short period of time after discovery of the claim to bring an action vindicating its rights under the Ohio Securities Act or common law.  *See e.g.*, *Metz v. Unizan Bank*, No. 05-CV-1510, 2008 WL 2017574, at *5 (N.D. Ohio May 7, 2008) (stating that the Ohio Supreme Court would find § 1707.43(B) violates the right-to-remedy clause of the Ohio Constitution as applied because the injury arising from the sale of securities was not discovered until after statute of repose expired); *Lopardo,* 548 F. Supp. 2d at 466–67 (same).  Likewise, a court in California refused to apply the Ohio statute of repose to bar Western and Southern claims in another RMBS case because "if Western and Southern was on notice of its title transfer claims by June 2010, applying the statute of repose to those claims would have given Western and Southern an unreasonably short period of time to file its claim." *In re Countrywide Fin. Corp. Mort.-Backed Secs. Lit.*, Nos. 2:11–ML–02265–MRP (MANx),

---

[5]  As to WMALT 2005-9, there is an exception for two Fort Washington purchases totaling $ 1,906,217.34, which Plaintiffs allege occurred on or near September 26, 2007.  (Doc. 52-1 at PageID 5030.)  Defendants do not assert that the Fort Washington purchases are barred by the statute of repose.

2:11–cv–07166–MRP (MANx), 2:11–cv–09889–MRP (MANx), 2012 WL 1097244, at *12

(C.D. Cal. Mar. 9, 2012).

However, the Sixth Circuit Court of Appeals more recently has held that that the statute

of repose in § 1707.43(B) is not facially unconstitutional.  *Fencorp, Co. v. Ohio Ky. Oil Corp.*,

675 F.3d 933, 945 (6th Cir. Apr. 4, 2012.)  The Sixth Circuit analyzed the issue as follows:

> Fencorp's second contention on cross-appeal is that the district court erred in
> applying the Ohio securities statute of repose because that statute is contrary to
> the Ohio state constitution's right to remedy provision.
>
> Article I, section 16 of the Ohio constitution provides:  "All courts shall be open,
> and every person, for an injury done him in his land, goods, person, or reputation,
> shall have remedy by due course of law, and shall have justice administered
> without denial or delay."  Ohio Const. art. I, § 16.  Fencorp asserts that this "right
> to remedy" provision has been used to strike down various statutes of repose that
> take away the remedy the law would have otherwise permitted.  Ohio courts, for
> example, struck down the medical malpractice statute of repose.  *Hardy v.
> VerMeulen*, 32 Ohio St. 3d 45, 512 N.E.2d 626, 629 (1987).  *But see Groch v.
> Gen. Motors Corp.*, 117 Ohio St. 3d 192, 883 N.E.2d 377, 398 (2008) (upholding
> the products liability statute of repose).  Fencorp now asks us to employ the right
> to remedy provision and hold that the Ohio securities statute of repose is contrary
> to the Ohio constitution.
>
> We begin our analysis by noting that Ohio law requires a high degree of certainty
> before a law is declared to be contrary to the state constitution.  "All [Ohio]
> statutes have a strong presumption of constitutionality."  *Arbino v. Johnson &
> Johnson*, 116 Ohio St. 3d 468, 880 N.E.2d 420, 429 (2007); *see also Hartford
> Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy*, 740 F.2d
> 1362, 1366 (6th Cir.1984) ("[A]cts of the General Assembly are presumed valid
> under Ohio law, and in cases of doubt should be held constitutional.").  For an
> Ohio court to declare the legislature's action unconstitutional, "it must appear
> beyond a reasonable doubt that the legislative and constitutional provisions are
> clearly incompatible."  *Id.* (quoting *State ex rel. Dickman v. Defenbacher*, 164
> Ohio St. 142, 128 N.E.2d 59, 60 (1955)).  Furthermore, "the constitutionality of
> any statute of repose should turn on the particular features of the statute at issue,
> and ... such a statute should be evaluated narrowly within its specific context."
> *Groch*, 883 N.E.2d at 401.  A party bringing a facial challenge "must demonstrate
> that there is no set of circumstances in which the statute would be valid."  *Id.*
>
> Recently, the Ohio Supreme Court in *Groch* considered *Brennaman v. R.M.I. Co.*,
> 70 Ohio St. 3d 460, 639 N.E.2d 425 (1994), a case Fencorp cites and upon which
> other cases Fencorp cites rely.  The Ohio Supreme Court criticized the logic of the

*Brennaman* decision and stated: "To the extent that *Brennaman* stands for the proposition that all statutes of repose are repugnant to Section 16, Article I [of the Ohio constitution], we expressly reject that conclusion." *Groch,* 883 N.E.2d at 403. The court "confine[d] *Brennaman* to its particular holding" regarding the statute of repose for improvements to real property. *Id.* Instead, the court quoted with approval language from an earlier Ohio Supreme Court case: "the right to remedy provision . . . applies only to existing, vested rights, and it is state law which determines what injuries are recognized and what remedies are available." *Id.* (quoting *Sedar v. Knowlton Const. Co.*, 49 Ohio St. 3d 193, 551 N.E.2d 938, 947 (1990)).

Reviewing the statute "narrowly within its specific context," we emphasize that the securities claims were created by statute and gave plaintiffs substantial protections and privileges not available under common law. Where the legislature creates a new, statutory right, it is reasonable that the legislature also has the ability to shape the contours and limits of that right. To hold otherwise would mean that any statutorily-created right in Ohio, once created, could not be limited by a statute of repose. This policy concern cautions us from declaring the statute unconstitutional.

Fencorp's argument is similar to the arguments used by the Ohio Supreme Court to find medical malpractice statutes of repose unconstitutional. *See Groch,* 883 N.E.2d at 404 (noting instances in which the Ohio Supreme Court struck down medical malpractice statutes of repose because those statutes "took away an existing, actionable negligence claim before the injured person discovered the injury (when the injury had already occurred) or gave the injured person too little time to file suit.") However, it does not appear to us "beyond a reasonable doubt" that the securities statute, which had created new rights, is analogous to the common-law rights limited by the medical malpractice statutes of repose. Moreover, although the common law fraud claims are similar to medical malpractice claims, Fencorp attempts a facial challenge to the whole statute and not an as-applied challenge to just the common-law elements governed by the statute, so it must demonstrate that there is "no set of circumstances in which the statute would be valid." This Fencorp has failed to do. Finally, no Ohio court has declared this statute of repose unconstitutional, and Ohio appeals courts have not been dissuaded by the medical malpractice cases from applying the securities statute of repose to common-law claims subsumed within the larger securities claims. *See Helman v. EPL Prolong, Inc.*, 139 Ohio App. 3d 231, 743 N.E.2d 484, 493 (2000). All of these elements combine and lead us to uphold the constitutionality of the securities statute of repose. We therefore affirm the district court.

*Id.* at 945–46.

One judge in the Court of Common Pleas for Hamilton County, Ohio has adopted the reasoning of *Fencorp* and held that the statute of repose in § 1707.43(B) was constitutional as applied to claims asserted by Western and Southern Plaintiffs in an RMBS case. *See W&S Life Ins. Co. v. Residential Funding*, slip op. at 11–12 (dismissing all claims brought after the five-year statute of repose). Another judge in the same court reached the opposite conclusion in *DLJ Mortgage Capital Inc.*, but he provided no analysis so his opinion letter is not helpful. (Doc. 59-4 at PageID 3310–11; *Id.* at PageID 3295–3309.) This Court will follow the recent opinions of *Fencorp* and *Residential Funding* and hold that the statute of repose is not unconstitutional as applied here. The legislature created by statute the cause of action for securities fraud. It is reasonable that the legislature "could shape the contours and limits" of the cause of action with a statute of repose. *Fencorp*, 675 F.3d at 945. The Ohio Securities Act and fraud claims based on the WMALT 2005-7, WMALT 2005-9, and WMALT 2006-4 Certificates are dismissed as barred by the statute of repose.

### 3. Sufficiency of Allegations

W&S Plaintiffs allege violations of the OSA, Ohio Revised Code §§ 1707.41, 1707.43, 1707.44(B)(4), 1707.44(G), and 1707.44(J), as well as common law fraud. (Doc. 52-1 at PageID 5007–09, 5010–11.) Defendants challenge the sufficiency of the allegations as a matter of law.

#### a. Abandonment of Underwriting Guidelines

W&S Plaintiffs allege that Defendants represented that the loans underlying the Certificates were underwritten pursuant to particular underwriting standards. They further allege that Defendants stated that they sometimes applied alternative underwriting standards, but that

such alternative standards were generally limited to situations where enhanced credit requirements and lower loan-to-value ratios were applied. Plaintiffs allege that Defendants represented that exceptions were made only when mitigating factors existed. Plaintiffs allege that these representations were false because Defendants knowingly and systematically disregarded their purported underwriting standards and allowed non-compliant loans. (*Id.* at PageID 4947–72.)

<strong>b.      Appraisal Allegations</strong>

In the next set of OSA allegations, W&S Plaintiffs allege that Defendants misrepresented that they used industry-standard appraisals to value the properties securing the loans underlying the Certificates in several ways. Plaintiffs allege that the appraisers in the mortgage industry were not independent from the originators and were pressured by the originators to overvalue the properties. They also allege that appraisers' appraisal values were overridden or inflated. W&S Plaintiffs allege that WaMu used in-house appraisals or an "owner's estimate of value" in the appraisal process. (*Id.* at PageID 4972–76.) A false representation that appraisals will follow certain specific standards is actionable in fraud. *Mass. Mut. Life Ins. Co.*, 843 F. Supp. 2d at 203.

W&S Plaintiffs also allege that the overstated appraisal values skewed the loan-to-value ("LTV") ratios stated on the Offering Materials. LTV ratios are the ratio of a loan's principal balance to the appraised value of the property. A higher LTV ratio indicates a higher risk of default. (Doc. 52-1 at PageID 4974.) Plaintiffs cite a study by Allstate Insurance Company in regards to JPMAC 2007-CH1that showed the actual LTV ratios in the Certificates were greater than had been stated in the prospectus supplement. (Doc. 52-1 at PageID 4972–76.) Plaintiffs also allege that they obtained non-confidential investigative findings about the WMALT 2005-9,

WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, and JPMMT 2005-S3 Certificates after consulting with counsel for John Hancock in *John Hancock Life Ins. Co. (USA) v. JPMorgan Chase & Co.*, Index No.: 650195/2012 (N.Y. Sup. Ct.) and with counsel for the Federal Housing Finance Agency in *Federal Housing Finance Association v. JPMorgan Chase & Co.*, No. 11-cv-6188 (S.D.N.Y.) (*Id.* at PageID 4975–76.)[6] Based on that consultation, Plaintiffs allege that there was a material understatement of LTV ratios in those Offering Materials for those four WaMu Certificates and one JPMorgan Certificate due to Defendants' systemic acceptance of inflated and fraudulent property values. (*Id.*) Finally, Plaintiffs allege upon information and belief that the LTV ratios were similarly misstated on all of the Offering Materials. (*Id.*)

### c. Owner Occupancy Allegations

W&S Plaintiffs' owner occupancy allegations are structurally similar to the appraisal allegations. Plaintiffs allege that Defendants misrepresented the owner occupancy status of the collateral backing the mortgages in the loan pools. Primary residence loans are considered less risky because the borrowers are less likely to default. Plaintiffs allege specifically that the JPMAC 2007-CH1 Offering Materials represented that 93% of the mortgages in the 2007-CH1 mortgage pool were secured by primary residences and that only approximately 7% were secured by secondary residences or investment properties. However, Plaintiffs further allege that a loan-level analysis conducted by Allstate determined that greater than 12% of the mortgages in the 2007-CH1 mortgage pool were not secured by primary residences. Finally, Plaintiffs state that counsel in other lawsuits have alleged that occupancy rates were similarly misstated in the

---

[6] Defendants cite *RSM Prods. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), for the proposition that a complaint cannot rely solely on allegations in other complaints that have dismissed, settled, or not otherwise resolved. *Id.* at 403. However, the court finds *Johns v. Bayer Corp.*, No. 09CV1935 DMS (JMA), 2010 WL 2573493 (S.D. Cal. June 24, 2010), to be more persuasive. The *Johns* court allowed the plaintiff to state complaint allegations derived from the complaint in an earlier-filed lawsuit where the plaintiff's attorney reviewed the publicly available information and consulted with the attorney from the earlier-filed lawsuit. *Id.* at *2.

WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, and JPMMT 2005-S3 Offerings. Based on these samples, Plaintiffs allege upon information and belief that the owner occupancy rates were misstated for all of the Offerings. (*Id.* at PageID 4976–78.)

The OSA expressly imposes a duty of due diligence upon the seller of securities in the context of criminal liability. O.R.C. § 1707.29; *Warner*, 55 Ohio St. 3d at 56–57 (interpreting § 1707.29). Ohio courts have imported the due diligence requirement of § 1707.29 into the civil context as well. *See Emick v. Hawkins & Assoc.*, No. 03 MA 175, 2004 WL 2913255, at * 3 (Ohio App. Dec. 8, 2004) (applying it to O.R.C. § 1707.44(C)); *Chiles v. M.C. Cap. Corp.*, 95 Ohio App. 3d 485, 497, 642 N.E.2d 1115 (1994) (same). Plaintiffs identify three Fannie May guidelines which serve as "red flag" indicators in a loan file to alert a lender to false occupancy assertions. (Doc. 52-1 at PageID 4978.) Plaintiffs suggest that if Defendants had performed due diligence here, then they would have discovered the "red flag" indicators.

### d.     Credit Rating Representations

W&S Plaintiffs allege that the credit ratings assigned to the Certificates from nationally recognized rating agencies were material. The Offering Materials for the Certificates stated that the ratings addressed the likelihood of repayments of the mortgage loans underlying the Certificates. (*Id.* at PageID 4978–79.) Plaintiffs allege that these statements were misleading, and that the credit ratings were inaccurate, because Defendants misrepresented to the credit agencies the underwriting standards followed, the appraisal procedures followed, and the owner-occupancy rates. (*Id.* at PageID 4979.) In addition, Plaintiffs allege, based on the 2011 Senate Subcommittee Report, that Defendants pressured the rating agencies to obtain favorable credit ratings by blacklisting analysts who provided unfavorable ratings. (*Id.*) Finally, Plaintiffs allege that the credit ratings for the Certificates have fallen. For example, the original S&P rating for

each Certificate began at AAA, but fell to BBB for JPMAC 2007-CH1, to CCC or CC for nine

Certificates, and to D for three Certificates.  (*Id.* at PageID 4971.)

### e.    Transfer of Title and MERS System Allegations

W&S Plaintiffs allege that Defendants represented in the Offering Materials that the

Trusts could successfully foreclose upon the mortgages for each loan underlying the Certificates

in the events of borrower defaults.  Defendants stated that loan paperwork, including mortgage

notes and assignments, would be properly transferred and recorded, including that some

mortgages would be registered on the Mortgage Electronic Registration System ("MERS").

(Doc. 52-1 at PageID 4980–85.)  W&S Plaintiffs further alleged, however, that in fact,

Defendants "lost much of the paperwork relating to loans underlying their RMBS, or made no

attempt to assign mortgages, properly substitute the trustees as beneficial owners of the

mortgages, and deliver original promissory notes to issuing trusts."  (*Id.* at 4982.)

For mortgages transferred within MERS, W&S Plaintiffs allege that Defendants failed to

endorse and deliver promissory notes and failed to maintain assignment paperwork.  (*Id.*)

Plaintiffs additionally alleged that Defendants failed to disclose risks associated with the use of

MERS including that MERS did not comply with all state laws and that MERS threatened the

bankruptcy remoteness of the securitizations. (*Id.* at 4984.)  Finally, Plaintiffs allege that

Defendants sought to coverup the RMBS abuses, particularly the abuses in the transfer of title,

by utilizing "robo-signers" to submit falsified mortgage assignments and other documentation.

(*Id.* at PageID 4985–92.)

### f.    Analysis of the Sufficiency of the OSA and Fraud Allegations

Defendants contend that each set of allegations fails to state a claim upon which relief

can be granted because W&S Plaintiffs failed to plead facts connecting the loans and Certificates

at issue to their generalized allegations of mortgage-related abuses. The Court does not agree. The case of *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239 (6th Cir. 2012), is instructive, particularly as to the failure to follow underwriting guidelines allegations.

The Sixth Circuit in *Republic Bank* dismissed two sets of allegations—that defendants failed to disclose that prudent underwriting standards were not followed and the similar claim that defendants did not follow their own underwriting standards—because the plaintiff did not "connect the underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case." 683 F.3d at 255–57. However, the Sixth Circuit recognized that an allegation that RMBS certificates offered a "modicum of safety and rested on loans made according to some underwriting standards" is actionable if in fact the loans "were issued according to no underwriting standards at all." *Id.* at 249. Therefore, the Court stated that the dismissed claims could have survived if the plaintiff had pleaded facts to show that the defendants "in reality, . . . used no [underwriting] standards at all." *Id.* at 257. The court also instructed that a plaintiff need not "pick apart mortgage-backed securities loan-by-loan" so long as the allegations create "some connection . . . between general social conditions and the specific practices or defendants that allegedly caused harm to this plaintiff." *Id.* at 257 n.8.

Plaintiffs have pleaded sufficient facts suggesting a systemic abandonment of underwriting guidelines to survive a dismissal motion. (Doc. 52-1 at PageID 4947–72.) Courts in many jurisdictions have joined the Sixth Circuit in allowing claims based on the wholesale abandonment of underwriting guidelines. *Republic Bank*, 683 F.3d at 249, 255–57; *see also*, *e.g.*, *Plumbers' Union Loc. No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011) ("Plaintiffs' allegation of wholesale abandonment . . . is enough to defeat dismissal."); *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 238

(S.D.N.Y. 2013) ("[T]he Amended Complaint's allegations, as well as the documents incorporated therein, present a picture of defendants' unsound mortgage origination and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case."); *Allstate Ins. Co.*, 42 Misc. 3d 1220(A), at *9 (stating that the weight of authority indicates that allegations of systemic underwriting failure do not need be accompanied by references to the specific loans at issue); *W&S Life Ins. Co. v. Residential Funding Co., LLC*, slip op. at 14 (citing favorably the *Plumbers' Union Local No. 12* holding that an allegation of wholesale abandonment is sufficient); *but see Space Coast Credit Union v. Lynch*, No. 12-60430-CIV, 2014 WL 1230719, at *7 (S.D. Fla. Mar. 25, 2014) (dismissing complaint based on collateralized debt obligations as a whole and not on the specific obligations owned by the plaintiff's predecessor).

Additionally, W&S Plaintiffs have pleaded facts connecting, at least indirectly, the RMBS abuses described above to the relevant Certificates. Plaintiffs allege that the relevant Certificates suffered a high rate of delinquencies and collapsed credit ratings. (Doc. 52-1 at PageID 4968–72.) They allege that Clayton Holdings' due diligence reports revealed that more than one-quarter of JPM Defendants' and WaMu Defendants' loans did not meet underwriting guidelines. (*Id.* at PageID 4955–56.) They rely on a loan level analysis of the 2007-CH1 Certificates conducted by Allstate which indicated that actual LTV ratios and the percentage of mortgages secured by primary residences in the 2007-CH1 Certificates were greater than had been stated in the Offering Materials. (*Id.* at PageID 4972–76.) W&S Plaintiffs also allege, based on consultations with counsel in other lawsuits, that similar misrepresentations were made about appraisal values and owner-occupancy statuses for the WMALT 2005-9, WMALT 2006-5, WMALT 2006-9, WMALT 2007-OA3, and JPMMT 2005-S3 Certificates. (*Id.* at PageID 4975–

76.)  It was not unreasonable for W&S Plaintiffs to assert, based upon information and belief, including upon the allegations reiterated here, that the industry-wide RMBS abuses set forth inflicted all of the Certificates here.  The Court does not know if the evidence gathered during discovery will support W&S Plaintiffs' allegations in whole or even in part.  However, the Court finds that these allegations are sufficient to withstand the dismissal motion.

The Court also concludes that W&S Plaintiffs have adequately pleaded scienter to survive the dismissal motion.  Common law fraud and Ohio Revised Code § 1707.44(J) require that a defendant act with an intent to mislead or deceive.  Ohio Revised Code § 1707.44(B)(4) & (G) require a defendant act knowingly.  A defendant acts knowingly for purposes of the OSA if the person "represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts."  *Warner*, 55 Ohio St. 3d at 57.  Intent and knowledge can be alleged generally.  Fed. R. Civ. P. 9(b).  "Scienter may be alleged generally, but there must be factual allegations to make scienter plausible."  *Rheinfrank v. Abbot Labs.*, No. 1:13-cv-144, 2013 WL 4067826, at *4 (S.D. Ohio Aug. 12, 2013).

This Court agrees with the New York court which stated that in RMBS cases, "the allegations of the mortgage loans material and pervasive non-compliance with the Seller's underwriting guidelines and the mortgage loan representations are sufficient non-compliance from which Defendant's scienter can be inferred."  *MBIA Ins. Corp. v. Morgan Stanley*, 42 Misc. 3d 1213(A), 984 N.Y.S.2d 633 (Sup. Ct. 2011).  W&S Plaintiffs here alleged, for example, that Clayton Holdings' due diligence reports revealed JPM Defendants waived in approximately half of the loans identified as non-compliant and that WaMu waived in approximately one-third of their loans identified as non-compliant.  (Doc. 52-1 at PageID 4955–56.)  They alleged that Defendants used "robo-signers" to cover up transfer of title problems.  (*Id.* at PageID 4985–93.)

They further alleged that Defendants pressured credit agencies for favorable ratings and blacklisted analysts who refused to provide favorable ratings, and that JPM Defendants began selling their own subprime mortgage assets by late 2006. (*Id.* at PageID 4958–59, 4973–74, 4979.) The Court finds that scienter can be sufficiently inferred from the Second Amended Complaint allegations to withstand the dismissal motion.

### 4. Conclusion on Fraud and Ohio Securities Act Claims

The Court dismisses the fraud and OSA claims to the extent that they are based upon the WMALT 2005-7, WMALT 2005-9, WMALT 2006-4 Certificates as barred by the statute of repose.[7] The fraud and OSA claims otherwise may proceed to discovery.

## B. Federal Securities Act Claim

W&S Plaintiffs assert in the Twelfth and Thirteenth Causes of Action claims against JPM Defendants for violation of Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k; Section 12(a)(2) of the Act, 15 U.S.C. § 77*l*(a)(2); and Section 15 of the Act, 15 U.S.C. § 77*o*, with respect to two JPM Offerings, JPMAC 2006-WF1 and JPMAC 2007-CH1. (Doc. 52-1 at PageID 5019–23.)

The 1933 Securities Act provides its own statute of limitations and statute of repose:

> No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, . . . , unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public . . . .

15 U.S.C. § 77m. Accordingly, the federal Securities Act provides a three-year statute of repose.

W&S Plaintiffs purchased JPMAC 2006-WF1 on August 31, 2006 and JPMAC 2007-CH1 on March 13, 2007. (Doc. 52-1 at PageID 5025–30.) The Complaint in this action was

---

[7] Regarding WMALT 2005-9, the Fort Washington purchases made on or near September 26, 2007 are not barred.

filed on July 22, 2011, more than three years after the Certificates were purchased. However, Plaintiffs assert that the statute of repose was tolled so that the claims are not untimely.

The Supreme Court held in 1974 that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983). Putative class members may then file their own suits or move to intervene in the pending suit. *Id.* "Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights" and the "[t]olling the statute of limitations thus creates no potential for unfair surprise." *Id.* at 352–53.

Plaintiffs assert that they were purported members of the class sought to be certified in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I*, 2:08-cv-01713 (E.D.N.Y). The class action complaint filed in *Plumbers' and Pipefitters'* on March 26, 2008 involved the JPMAC 2006-WF1 and JPMAC 2007-CH1 Certificates. (Doc. 58-7 at PageID 2789, 2792.) Plaintiffs assert that the statute of repose was tolled by the *Plumbers' and Pipefitters'* case pursuant to *American Pipe*.

JPM Defendants make two arguments against the application of *American Pipe* tolling to the Securities Act statute of repose. First, JPM argues that Court should adopt the holding of the Second Circuit Court of Appeals that the Securities Act statute of repose is not subject to equitable or legal tolling. *See Police and Fire Retirement Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013), *cert. granted*, 134 S. Ct. 1515 (2014), *cert. dismissed*

*as improvidently granted*, 2014 WL 4799891 (U.S. Sept. 29, 2014). Second, JPM Defendants

argue that even if *American Pipe* tolling can be applied to the Securities Act, Plaintiffs

"forfeited" *American Pipe* tolling by filing the instant law suit prior to the determination of the

class certification issue in *Plumbers' and Piperfitters'*. "A plaintiff who chooses to file an

independent action without waiting for a determination on the class certification issue may not

rely on the *American Pipe* tolling doctrine." *Wyser-Pratte*, 413 F.3d at 569. The Court will

address only this latter argument.

W&S Plaintiffs assert that the *Wyser-Pratte* exception to *American Pipe* tolling is not

applicable to a case in the procedural posture of *Plumbers' and Pipefitters'*. The class

certification issue was not adjudicated in the *Plumbers' and Pipefitters'* case so W&S Plaintiffs

argue that they cannot be penalized for filing this action while the *Plumbers'* and *Pipefitters'*

case was pending. The *Plumbers' and Pipefitters'* court on Feb. 23, 2012 dismissed for lack of

standing the claims based on the JPMAC 2006-WF1 and JPMAC 2007-CH1 Certificates before

addressing the class certification issue. 2012 WL 601448 at *2 n.4, *6. The *American Pipe*

tolling analysis can be extended to cases where the class action claims are dismissed for lack of

standing. *See e.g.*, *In re Wachovia Equity Secs. Lit.*, 753 F. Supp. 2d 326, 371–72 (S.D.N.Y.

2011) (giving plaintiffs benefit of *American Pipe* tolling where earlier filed class action claims

were dismissed for lack of standing).

The problem for W&S Plaintiffs is that they filed the instant case in July 2011 while two

motions to dismiss were pending in the *Plumbers' and Pipefitters'* case. *Wyser-Pratte* should be

extended in this circumstance to mean that W&S Plaintiffs may not rely on the *American Pipe*

tolling doctrine because they filed an independent action without waiting for a determination of

dismissal motions. For example, in *In re Vertrue Inc. Marketing and Sales Practices Lit.*, 719

F.3d 474, 480 (6th Cir. 2013), the Sixth Circuit explained that the plaintiffs had satisfied *Wyser-Pratte* by waiting to file a new action until after the district court had determined in the first-filed action that the class certification issue would not be reached. *Id.* at 480. "The district court's dismissal of the [first-filed] action, although not a determination of the certification issue, foreclosed the possibility that any decision on the certification issue would be forthcoming." *Id.* W&S Plaintiffs filed this action while the dismissal motions in *Plumbers' and Pipefitters'* were pending and before it was determined whether the class certification issue would be decided. W&S Plaintiffs, therefore, forfeited their right to *American Pipe* tolling of the statute of repose.

Accordingly, the Court will dismiss the claims for violations of the federal Securities Act as barred by the three-year statute of repose.

## C.     Tortious Interference with Contract Claim

W&S Plaintiffs assert this claim as the Sixth Cause of Action against Defendants JPMC Bank, JPM Mortgage Acquisition, JPMAC, WaMu Mortgage Securities Corp., and WaMu Asset Acceptance Corp. (Doc. 52-1 at PageID 5009.) Tortious interference with contract generally occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14, 651 N.E.2d 1283 (1995); *see also Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419, 650 N.E.2d 863 (1995) (defining elements as "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages").

W&S Plaintiffs allege that they were the intended third-party beneficiaries of the pooling and servicing agreements for the relevant trusts. The pooling and servicing agreements required that the transfer of title requirements be met for the underlying loans. They further required the servicers to deliver monthly remittance reports to the trustees and RMBS holders describing the performance of the loans and disclosing any material breaches of warranties. (Doc. 52-1 at PageID 4993.) W&S Plaintiffs allege that they were injured when the named Defendants knowingly concealed from the trustees of the trusts their breaches of warranties and representations and transfer of title failures. (*Id.* at PageID 4993–95, 5010.)

Defendants argue that W&S Plaintiffs have failed to state a claim upon which relief can be granted for two reasons: (1) the claims are barred by "no action" clauses in the pooling and servicing agreements and (2) Defendants cannot be liable for tortiously interfering with contracts to which they are parties. The Court will address only the latter argument.

"An individual or entity cannot be held liable for inducing a breach of contract when that individual or entity is a party to the contract." *Adkins v. Urannium Disposition Servs., LLC*, No. 1:10-cv-460, 2011 WL 923351 at *2 (S.D. Ohio Feb. 14, 2011), *report and recommendation adopted by*, 2011 WL 901797 (S.D. Ohio Mar. 15, 2011). The *Adkins* court dismissed a tortious interference claim because the defendant was a party to the contract with which he was accused of interfering. *Adkins*, 2011 WL 923351, at *3; *see also Gunthorpe v. DaimlerChrysler Corp.*, 90 F. App'x 877, 881 (6th Cir. 2004) (stating in dicta that only a third party to a contract can be held liable for inducing a breach of that contract). State courts in Ohio have ruled similarly. *See e.g.*, *Kenty*, 72 Ohio St. 3d at 418–19 (adopting the Restatement of Law 2d, Torts (1979) which held that interference with a contract must be by a person who is a third party to the contract); *Bindra v. Fuenning*, No 26489, 2013 WL 6844094, at *8 (Ohio App. Dec. 26, 2013) (Carr J.,

concurring) (stating that the wrongdoer's third party status is an element of a tortious interference claim).

The Court will not deviate from these authorities. Defendants cannot be liable for tortiously interfering with contracts to which they were parties. Plaintiffs have alleged that Defendants were parties to the applicable pooling and servicing agreements. (Doc. 52-1 at PageID 4994, 5009; Doc. 59 at PageID 3014–15.) As a matter of law, W&S Plaintiffs cannot state a claim that Defendants tortiously interfered with the pooling and servicing agreements.

For the foregoing reasons, the Court will dismiss the tortious interference claim.

**D.     Conspiracy Claim**

W&S Plaintiffs allege in their Eighth and Ninth Causes of Action that WaMu Defendants and JPM Defendants, respectively, are liable for a civil conspiracy. (Doc. 52-1 at PageID 5011–13.) "The tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co*., 83 Ohio St. 3d 464, 475, 700 N.E.2d 859 (1998) (internal quotation and citation omitted). A civil conspiracy claim is dependent upon the finding of an unlawful underlying act. *Id.*; *Morrow v. Reminger & Reminger Co., LPA*, 183 Ohio App. 3d 40, 60, 915 N.E.2d 696 (Ohio App. 2009).

Defendants move to dismiss this claim primarily on the grounds that the underlying claims also should be dismissed. However, the Court is dismissing the underlying claims only in part. Accordingly, the conspiracy claim is dismissed only to the extent that the claim cannot be based on fraud or OSA violations related to WMALT 2005-7, WMALT 2005-9, and WMALT

2006-4 or on Securities Act violations.[8]  The Court finds that the W&S Plaintiffs have adequately pleaded the other elements of a civil conspiracy.

### E.    Ohio Corrupt Activities Claims

W&S Plaintiffs allege in the Tenth Cause of Action that the WaMu Defendants, WaMu Bank, and JPMC Bank together with others comprised an enterprise ("WaMu Enterprise") which engaged in a pattern of corrupt activity in violation of the Ohio Corrupt Activities Act ("OCAA"), Ohio Revised Code §§ 2923.31 to 2923.36.  (Doc. 52-1 at PageID 5013–17.) Plaintiffs allege in the Eleventh Cause of Action that the JPM Defendants, Chase Home Finance LLC, and JPMorgan Chase & Co. together with others comprised an enterprise ("JPM Enterprise") that engaged in a pattern of corrupt activity in violation of the OCAA, Ohio Revised Code §§ 2923.31 to 2923.36.  (Doc. 52-1 at PageID 5017–19.)  Defendants concede that the OCAA claims are timely.  (Doc. 57 at PageID 2700.)

The OCAA is the state RICO analogue.  The OCAA prohibits any "person employed by, or associated with, any enterprise" from conducting or participating in "the affairs of the enterprise through a pattern of corrupt activity."  O.R.C. § 2923.32(A)(1).  It provides a cause of action for persons injured or threatened with injury by the violation of § 2923.32.  *See* O.R.C. § 2923.34(A).  The elements of an OCAA claim include "(1) conduct of the defendant which involves the commission of two or more specifically prohibited state or federal criminal offenses; (2) the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity; and (3) the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise."  *Lopardo*, 548 F. Supp. 2d at 469.  OCAA claims must be pleaded with particularity.  *Schlenker Enters., LP v. Reese*, Nos. 2-10-16, 2-10-

---

[8] Regarding WMALT 2005-9, claims based on the Fort Washington purchases made on or near September 26, 2007 are not dismissed.

19, 2010 WL 4323662, at *9–11 (Ohio App. Nov. 1, 2010); *see also BAC Home Loans, Serv. LP v. Fall Oaks Farm LLC*, No. 2:11-cv-274, 2012 WL 1203488, at *4 (S.D. Ohio Apr. 10, 2012). Courts generally may rely upon federal RICO case law when analyzing the OCAA. *Ohio v. Sparks*, 10 N.E.3d 775, 760 (Ohio App. 2014); *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App. 3d 284, 291, 629 N.E.2d 28 (1993).

Defendants assert that the OCAA claims should be dismissed on three alternative bases. Defendants first assert that Plaintiffs failed to plead sufficient predicate acts. Defendants next assert that Plaintiffs failed to plead sufficient facts to support the finding that an enterprise existed. Defendants finally argue that Plaintiffs failed to plead proximate causation.

### 1.     Predicate Acts

Defendants allege that Plaintiffs have failed to plead sufficient predicate acts. A "pattern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." O.R.C. § 2923.31(E). The OCAA enumerates the offenses that constitute a corrupt activity for purposes of an OCAA claim. O.R.C. § 2923.31(I)(1)–(5). A plaintiff "seeking to recover under the Ohio Corrupt Activities Act must allege a pattern of corrupt activity that includes at least one predicate act that is not a form of securities fraud, mail or wire fraud, or the interstate transportation of stolen property or securities." *Baker v. Pfeifer*, 940 F. Supp. 1168, 1181 (S.D. Ohio 1996); *see also* O.R.C. § 2923.34(A). The plaintiff also must show that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989) (emphasis

in the original); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 795 (6th Cir. 2012) (same).

W&S Plaintiffs allege that the WaMu Enterprise and the JPM Enterprise engaged in patterns of corrupt activity which included (1) violations of the Ohio Securities Act; (2) forgery and falsification in violation of Ohio Revised Code § 2913.31; (3) perjury in violation of Ohio Revised Code § 2921.11; (4) insurance fraud pursuant to Ohio Revised Code § 2913.47; (5) bank fraud in violation of 18 U.S.C. § 1344; and (6) mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343. (Doc. 52-1 at PageID 5016, 5019.) Defendants appear to concede that the predicate acts alleged could qualify as "corrupt activity" for purposes of Ohio Revised Code § 2923.31(I). They argue, however, that W&S Plaintiffs have not properly alleged facts sufficient to support a claim for each of the purported predicate acts.

First, Defendants argue that the alleged Ohio Securities Act violations are not sufficient to constitute predicate acts because alleged violations are not timely and fail to state a claim for relief pursuant to Rule 12(b)(6). This is a repeat of the arguments made above. The Court finds that the OSA claims are sufficient to serve as predicate acts except as to claims related to WMALT 2005-7, WMALT 2005-9, and WMALT 2006-4. [9]

Second, Defendants argue that the alleged acts of forgery and perjury also are insufficient. The Ohio forgery statute prohibits the acts of forging "any writing of another without the other person's authority" or forging "any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act . . . ." O.R.C. § 2913.31(A)(1)&(2). The perjury statute prohibits the act of knowingly "in any official proceeding, . . . mak[ing] a false statement under oath or affirmation" or "swear[ing] or

---

[9] Regarding WMALT 2005-9, claims based on the Fort Washington purchases made on or near September 26, 2007 are not dismissed.

affirm[ing] the truth of a false statement previously made, when either statement is material."
O.R.C. § 2921.11.

The alleged forgery and perjury involved the use of "robo-signed" foreclosure affidavits attached to mortgage assignments in which the "robo-signer" falsely swore to personal knowledge of the mortgage documents. (Doc. 52-1 at PageID 4985–93.) Regarding acts which occurred in Ohio, Plaintiffs allege that employees of Lender Processing, Services, Inc., a servicer retained by Defendants, "robo-signed" documents wherein they falsely signed as officers of MERS. (*Id.* at PageID 4990–93.) These allegations are sufficient at the dismissal stage to assert an act of forgery. However, the allegations are not sufficient to present a claim for perjury because W&S Plaintiffs have not pleaded facts to establish that Defendants or their agents made false statements under oath. They have not alleged facts demonstrating that "robo-signers" signed assignments or other mortgage documentation under oath. Plaintiffs allege that LPS employees confirmed in a Louisiana case that they routinely make false statements under oath, but no facts suggest that LPS attorneys made false statements under oath in Ohio. (*Compare* SAC ¶ 201, Doc. 52-1 at PageID 4990 *with* SAC ¶¶ 202–12, Doc. 52-1 at PageID 4990–92.)

Third, Defendants argue that the alleged acts of insurance fraud are insufficient. The insurance fraud claim involved a scheme whereby Defendants allegedly procured mortgage insurance through an illegal kickback scheme in violation of Ohio Revised Code § 2913.47. (*Id.* at PageID 4996–99.) The kickback scheme alleged does not appear to fall within the purview of § 2913.47. The statute provides as follows:

No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following:

(1) Present to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of, an application for insurance, a claim for payment

pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive;

(2) Assist, aid, abet, solicit, procure, or conspire with another to prepare or make any written or oral statement that is intended to be presented to an insurer as part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive.

O.R.C. § 2913.47(B). The statute targets fraud by an insured against the insurer in regards to an application for insurance or a claim for policy payment or other benefit. It does not address kickbacks. For these reasons, the insurance fraud alleged cannot serve as the predicate for an OCAA claim.

Fourth, Defendants argue that the alleged acts of bank fraud are insufficient. In the bank fraud allegations, Plaintiffs allege that Defendants defrauded Fannie Mae, Freddie Mac, and the Government National Mortgage Association (collectively, the "GSEs") through the sale of loans that breached the sales agreement representations and warranties in violation of 18 U.S.C. § 1344 (Doc. 52-1 at PageID 4999–5001.) Defendants assert that Plaintiffs do not have standing to assert the alleged fraud against the GSEs, and therefore that bank fraud cannot serve as a predicate act for OCAA liability. This Court previously has held that only defrauded financial institutions have standing to assert bank fraud as a predicate act for a federal RICO claim. *Herrick v. Liberty League Int'l*, No. 1:07-cv-936, 2008 WL 2230702, at *4 (S.D. Ohio May 28, 2008). Other district courts in the Sixth Circuit have concurred as to federal RICO claims, explaining that the bank fraud must be the proximate cause of the plaintiff's injuries to serve as a predicate act. *E.g.*, *Tunne v. Hendrick*, No. 5:10cv-00181-JMH, 2012 WL 3644825, at *13 (W.D. Ky. Aug. 24, 2012); *Infocision Mgmt. Corp. v. Foundation for Moral Law, Inc.*, No. 5:08 cv 1342, 5:08-cv-1412, 2009 WL 650282, at *9 (N.D. Ohio Jan. 14, 2009).

W&S Plaintiffs respond, however, that the OCAA is broader than the federal RICO statute in this regard. The OCAA creates a civil cause of action for any person "directly or indirectly injured by conduct in violation of section 2923.32." O.R.C. § 2923.34(E). Thus, "the Ohio General Assembly has determined that persons indirectly injured should have standing to bring an action under the Ohio Pattern of Corrupt Activity Act." *Iron Workers Loc. Union No. 17 Ins. Fund. v. Phillip Morris Inc.*, 23 F Supp. 2d 771, 788 (N.D. Ohio 1998). Plaintiffs posit that they were indirectly injured by the bank fraud insofar as it was a part of the pattern of corrupt activity that led to them being defrauded. "[L]iability ultimately hinges on the existence of a "pattern of corrupt activity" committed by the enterprise." *In re Nat'l Century Fin. Enters., Inc. v. Investment Lit.*, 604 F. Supp. 2d 1128, 1140–41 (S.D. Ohio 2009). Defendants did not directly respond to the argument that the OCAA standing provision is broader than in the federal RICO statute. The Court will not dismiss the OCAA claim at this time on the grounds that the bank fraud allegations are insufficient to serve as predicate acts.

Fifth, Defendants argue that the alleged acts of mail and wire fraud are insufficient to serve as predicate acts. Plaintiffs do not respond to the argument. Accordingly, the Court considers Plaintiffs to have withdrawn the allegation that the alleged acts of mail and wire fraud constitute predicate acts for purposes of the OCAA.

## 2. Enterprise

An enterprise under the OCAA includes "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." O.R.C. § 2923.31(C). The enterprise element is to be broadly construed to effectuate the remedial purpose of the statute. *Boyle v. U.S.*, 556 U.S. 938, 944 (2009) (discussing federal

RICO); *Baird v. Daniels*, No. 1:12-cv-945, 2014 WL 1407945, at *3 (S.D. Ohio Apr. 11, 2014) (same). A plaintiff must prove the existence of "(1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *Ouwinga*, 694 F.3d at 793 (discussing federal RICO). To prove an association-in-fact enterprise, the plaintiff must prove structure with three features: "a [common] purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 945–46 (discussing federal RICO); *Sparks*, 10 N.E.2d at 760 (applying *Boyle* to the OCAA).

Conceptually, an association involves both "interpersonal relationships and a common interest." *Boyle*, 556 U.S. at 946. Sharing a common purpose is not the equivalent of having the same purpose. *Sparks*, 10 N.E.2d at 761. "[A]llegations of mirror-image, ill-motivated activity of normal business conduct" can be sufficient to establish an enterprise. *Ouwinga*, 694 F.3d at 794. This is because the term "enterprise" in the OCAA includes both licit and illicit enterprises. O.R.C. 2923.31(C). The enterprise must be distinct from the corrupt activities. *Herakovic v. Catholic Diocese of Cleveland*, No. 85467, 2005 WL 3007145, at *5 (Ohio App. Nov. 10, 2005) (finding that the plaintiff must "allege in their complaint that the association in fact had a shared purpose, continuity, unity, an identifiable structure, and some goals separate from the predicate acts themselves"). However, although the "enterprise" and "pattern of corrupt activity" are separate elements, "they may be proved by the same evidence." *Ouwinga*, 694 F.3d at 794. The defendants in an enterprise must have "conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." *Id.* at 792.

The "person" charged with violating the OCAA must be a separate entity from the "enterprise." Ordinarily, this mean that neither the WaMu Defendants alone and nor the JPM Defendants alone could constitute an enterprise. *See Shields v. UnumProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011) ("[A] corporation may not be liable under § 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members."); *Herakovic*, 2005 WL 3007145, at *2, 4 (finding that Catholic Church, individual bishops, and individual parishes do not comprise an association in fact enterprise because they are not distinct entities). However, the Sixth Circuit recognized an exception more recently. "Typically, a parent corporation and its subsidiaries do not satisfy the distinctness requirement because they cannot form an enterprise distinct from the parent[, but] the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme." *In re ClassicStar Mare Lease Lit.*, 727 F.3d 473, 493 (6th Cir. 2013).

An enterprise must engage in "ongoing, coordinated behavior among the defendants." *Baird*, 2014 WL 1407945, at *4 (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000)); *Arnold v. Alphatec Spine, Inc.*, No. 1:13-cv-714, 2014 WL 2896838, at *10 (S.D. Ohio June 26, 2014) (same). The complaint must allege "specific factual allegations regarding how the [d]efendants coordinated and interacted with one another or functioned as a continuing unit." *Baird*, 2014 WL 1407945, at *4. An enterprise, on the other hand, "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948.

W&S Plaintiffs plead that the JPM Enterprise and the WaMu Enterprise had the common purpose of "profiting from the financing, origination, sale, securitization, and servicing of

improperly or fraudulently underwritten mortgage loans." (Doc. 52-1 at PageID 5014, 5017.). W&S Plaintiffs describe the relationships between the various entities comprising the JPM Enterprise and the WaMu Enterprise as webs or hubs-and-spokes. (*Id.* at PageID 5015–16, 5018–19.) They allege with facts the roles each entity played in the respective enterprises. (*Id.*) Plaintiffs allege that the JPM Enterprise included outside originators, appraisers and foreclosure law firms. (*Id.* at PageID 5017.) Similarly, Plaintiffs allege that the WaMu Enterprise included lenders and brokers who supplied mortgage loans to the WaMu Defendants, appraisers, services, and foreclosure law firms. (*Id.* at PageID 5014.) Plaintiffs identify Countrywide Home Loans, Inc., Wells Fargo, GreenPoint Mortgage Funding, and MortgageIT as originators. (*Id.* at PageID 4964–67.)

They explain that the participation of multiple entities was necessary because "the securitization process requires multiple legal entities to act as sponsor, depositor, underwriter, issuer and servicer, and providing such functions through affiliate entities enhanced (i) the efficiency of the [WaMu/JPM] Enterprise by allowing the enterprise to avoid the due diligence and checks and balances that would have been imposed by third-parties and (ii) the ability of the [WaMu/JPM] Enterprise to operate without disclosure of its unlawful activities to investors, regulators and others." (Doc. 52-1 at 5016, 5019.) Whether W&S Plaintiffs can prove that the enterprises existed involves questions of fact for the factfinder. *See Ouwinga*, 694 F.3d at 793; *Matthews v. Baumhaft*, No. 06-11618, 2007 WL 926050, at *3 (E.D. Mich. Mar. 28, 2007) (citing *U.S. v. Sanders*, 928 F.2d 940, 943 (10th Cir. 1991)). The Court finds here only that Plaintiffs have asserted sufficient facts to withstand the Rule 12(b)(6) challenge.

### 3.  Proximate Cause

Defendants' final argument for dismissing the OCAA claim is that W&S Plaintiffs have failed to adequately plead proximate causation.  An OCAA plaintiff "must not only specifically plead cause in fact injury but must allege that the [defendants] proximately caused their injury." *Herakovic*, 2005 WL 3007145, at *5–6 (adopting federal RICO proximate causation element as defined in *Holmes v. Secs. Investor Prof. Corp.*, 503 U.S. 258, 268–69 (1992)).  The language in § 2923.34(E) that any person directly or indirectly injured can state a private cause of action informs the analysis of whether, but does not relieve the burden to prove that, the illegal conduct proximately caused the plaintiff's injury.  *See CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, No. 2010CA00303, 2012 WL 750972, at *9–10 (Ohio App. Mar. 5, 2012); *Lesick v. Manning*, No. 91-C-70, 1992 WL 380284, at *3 (Ohio App. Dec. 17, 1992).  Plaintiffs allege in the Second Amended Complaint that the poor performance of the loans underlying the Certificates was caused by the false disclosures made in the Offering Materials as well as by the concealment of the fraud.  (Doc. 52-1 at PageID 4972, 5002.)  They offer sufficient facts concerning the to survive the Rule 12(b)(6) challenge on the basis of proximate causation.

### 4.  Conclusion on OCAA Claims

The Court will not dismiss the OCAA claims.

## F.  FIRREA

Plaintiffs allege that JPMC Bank entered into an agreement with the FDIC on September 25, 2008 to assume substantially all of WaMu Bank's liabilities and to purchase substantially all of WaMu Bank's assets.  (*Id.* at PageID 4941.)  Plaintiffs further allege that JPMC Bank is the successor-in-interest to WaMu Bank with respect to the claims in this action.  (*Id.*)

Defendants assert that Plaintiffs' claims against JPMC Bank, as the successor-in-interest to WaMu Bank, are barred by the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(d). Plaintiffs conceded in their Reply brief that pursuant to *Village of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 386 (6th Cir. 2008), "the administrative exhaustion provisions of [FIRREA] bar *successor liability* claims against a firm (like JPMC Bank) that acquires a failed financial institution under FDIC receivership, if the claim relates to the conduct of the failed institution." (Doc. 59 at PageID 3018 (emphasis in the original)). However, Plaintiffs rescinded that concession at the dismissal motion hearing, asserting that new case law persuasively distinguished the *Village of Oakwood* holding from the facts of this case. (Doc. 76 at 5268–69.)

The Sixth Circuit in *Village of Oakwood* explained the FIRREA statute as follows:

Section 1821(d) clearly establishes a process for the administrative review of "any claim against a depository institution for which the Corporation is receiver." 12 U.S.C. § 1821(d)(6)(A)(i). Pursuant to § 1821(d)(6)(B)(ii), if a party fails to comply with the statutory time limitations, any claim that a party has "shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver) as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim."

Section 1821(d) also contains an explicit subsection titled "Limitation of judicial review." The pertinent subsection reads as follows:

(D) Limitation of judicial review

Except as otherwise provided in [§ 1821(d)], no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D). . . .

Other courts have recognized a tension between § 1821(d)(6)(A)'s process for reviewing claims that are "against a depository institution" and the broad prohibition against judicial review of "any claim relating to any act or omission of ... the Corporation as receiver" found in § 1821(d)(13)(D)(ii). As the D.C. Circuit explained in *Auction Co. II*,

> for claims that are not "against a depository institution" but that do fall within (d)(13)(D), the effect of the two sections, on a plain language approach, would be not to impose an administrative exhaustion requirement but to foreclose judicial jurisdiction altogether, a result troubling from a constitutional perspective and certainly not the goal of FIRREA.

*Auction Co. II*, 141 F.3d at 1200.

In order to resolve this ambiguity, every court that has addressed the issue has interpreted § 1821(d)(13)(D) "as imposing a statutory exhaustion requirement rather than an absolute bar to jurisdiction." *Home Capital Collateral, Inc. v. FDIC*, 96 F.3d 760, 763 (5th Cir.1996). . . . We now join our sister circuits in adopting this approach, which means that the Uninsured Depositors' failure to file an administrative claim within the period provided by § 1821(d)(6) results in their having "no further rights or remedies with respect to such claim[s]" pursuant to § 1821(d)(6)(B)(ii).

539 F.3d at 385–86.

The plaintiffs in *Village of Oakwood* conceded that they had not complied with the administrative claim procedures outlined in FIRREA. *Id.* at 386. They argued, however, that FIRREA did not apply because they were not suing the FDIC directly, but rather State Bank, the entity that had assumed the failed depository institution's assets from the FDIC. *Id.* The Sixth Circuit rejected the plaintiffs' arguments holding that "[t]he problem with this novel argument is that all of their claims against State Bank are directly related to acts or omissions of the FDIC as the receiver of [failed depository institution]." *Id.*

Post-*Village of Oakwood*, two district courts have held that FIRREA should not apply to prohibit securities claims which could not have been asserted in the FIRREA administrative

procedures.  In 2012, a district court stated that FIRREA did not apply to block lawsuit claims

against JPMorgan after it assumed the liabilities of WaMu Bank from the FDIC.  *Fed. Housing*

*Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 501–02 (S.D.N.Y. 2012) (hereafter

"FHFA").  The court stated that the plaintiff had not explained how the claims against

JPMorgan, as WaMu's successor, could have been brought through the FIRREA administrative

procedures.  *Id.* at 502.  The court held that because the assets and liabilities of WaMu had

passed from the FDIC to JPMorgan, the claims that the plaintiff asserted could not be brought

under the administrative procedures of § 1821(d), making FIRREA's exhaustion requirement

inapplicable.  *Id.*; *see also Nat'l Credit Union Admin. Bd. v. JPMorgan Chase Bank, N.A.*, No.

13-2012-JWL, 2013 WL 4736374, at *3 (D. Kan. Sep. 3, 2013) (adopting the reasoning and

holding of *FHFA* in another case against JPMorgan as the successor to WaMu).

     The Ninth Circuit has reached a different result.  In *Rundgren v. Wash. Mut. Bank, FA*,

760 F.3d 1056 (9th Cir. 2014), the Ninth Circuit held that "a claimant cannot circumvent the

exhaustion requirement by suing the purchasing bank based on the conduct of the failed

institution."  *Id.* at 1064  The Ninth Circuit had held prior to *Rundgren* that a plaintiffs' claims

against JPMorgan based on its assumption of the liabilities of WaMu from the FDIC fell within

the FIRREA administrative exhaustion bar.  *Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d

1207, 1215 (9th Cir. 2012).  "FIRREA's jurisdictional bar applies to claims asserted against a

purchasing bank when the claim is based on the conduct of the failed institution."  *Id.* at 1214.

Similarly, the Seventh Circuit and the District of Columbia Circuit have held that the application

of the FIRREA administrative exhaustion requirement is based on the entity responsible for the

wrongdoing, not the entity named as the defendant.  *Westberg v. FDIC*, 741 F.3d 1301, 1306

(D.C. Cir. 2014); *Farnick v. FDIC*, 707 F.3d 717, 723 (7th Cir. 2013).  Pursuant to this latter line

of cases, FIRREA would bar the W&S Plaintiffs' claims against JPMC Bank to the extent that claims against it are based on the wrongdoing of WaMu Bank.

The Court believes the latter line of Circuit decisions is more in line with the *Village of Oakwood*. To the extent that W&S Plaintiffs are seeking to hold JPM Bank, as the successor to WaMu, liable for WaMu's wrongdoing, the claims qualify as "relating to any act or omission of such institution or the Corporation as receiver." 12 U.S.C. § 1821(d)(13)(D)(ii). As such, they are administratively barred by FIRREA. *See Village of Oakwood*, 529 F.3d at 385–86.

The Court recognizes that the law in this area appears unsettled in different jurisdictions. W&S Plaintiffs can move the Court to amend the Second Amended Complaint to re-instate the claims against JPMC Bank as successor to WaMu if the law in this Circuit changes.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint (Doc. 57) is **GRANTED IN PART AND DENIED IN PART**. The Ohio Securities Act and fraud are dismissed to the extent that they are based upon the WMALT 2005-7, WMALT 2005-9, WMALT 200-4 Certificates as barred by the statute of repose.[10] The conspiracy claim is barred to the same extent. The claims based on the federal Securities Act also are dismissed as barred by the statute of repose stated in 15 U.S.C. § 77m. Finally, the claims against JPM Bank as the successor to WaMu are barred by FIRREA. The remaining claims are not dismissed.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

---

[10] Regarding WMALT 2005-9, claims based on the Fort Washington purchases made on or near September 26, 2007 are not barred.